JAMES C. YOON, State Bar No. 177155
    Email:  jyoon@wsgr.com
STEFANI E. SHANBERG, State Bar No. 206717
    Email:  sshanberg@wsgr.com
BRIAN DIETZEL, *Pro Hac Vice*
    Email: bdietzel@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Plaintiff and Counterclaim Defendant
DISPLAYLINK CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| DISPLAYLINK CORPORATION, a Washington Corporation, <br><br> Plaintiff, <br><br> v. <br><br> MAGIC CONTROL TECHNOLOGY CORPORATION, a Taiwanese Corporation; <br><br> Defendant. <br><br>_____ <br><br> AND RELATED COUNTERCLAIMS <br> _____ | CASE NO.:  5:07-CV-01998-RMW <br><br> **PLAINTIFF AND COUNTERCLAIM DEFENDANT DISPLAYLINK'S RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT LOCAL RULE 4-5** <br><br> Date: March 3, 2008 <br> Time: 1:30 pm <br> Courtroom: Courtroom 6 – 4th Floor <br> Before: Hon. Ronald M. Whyte |

1

# TABLE OF CONTENTS

2

**Page**

3    I.     INTRODUCTION ................................................................................................... 1

4    II.    BACKGROUND ..................................................................................................... 2

5           A.    The Personal Computer .................................................................................. 2

6           B.    A Port/Interface for Every Peripheral ............................................................ 2

7           C.    The Video Graphics Array (VGA) PC Monitor Standard ............................... 2

8           D.    The Move to a Universal Peripheral Interface ................................................ 3

9           E.    The Universal Serial Bus (USB) Specification Standard ................................ 4

10          F.    Legacy Peripheral Devices and Converters ................................................... 4

11   III.   STANDARD FOR CLAIM CONSTRUCTION .................................................... 5

12   IV.    PROPER CONSTRUCTION OF THE '788 PATENT ......................................... 7

13          A.    MCT's Construction of "USB" is Contrary to the Intrinsic Evidence and the
                  Understanding of Persons of Ordinary Skill in the Field of the '788 Patent ......... 7
14

15          B.    MCT's Construction of "VGA" is Contrary to the Intrinsic Evidence and
                  the Understanding of Persons of Ordinary Skill in the Field of the '788
16                Patent .............................................................................................................. 9

17          C.    MCT's Construction of "Display Device" is Vague and Contrary to the
                  Intrinsic Evidence of the '788 Patent ........................................................... 11

18          D.    MCT's Construction of "USB Controller" Ignores the Claims and
                  Specification of the '788 Patent .................................................................... 13
19
            E.    MCT's Construction of "VGA Controller" Is Contradicted by the Claims
20                and Specification of the '788 Patent ............................................................. 15

21          F.    MCT's Construction of "USB Based Display Signals" Is At Odds with the
                  Language of the Claims, the Specification of the '788 Patent and the
22                Understanding of Persons of Ordinary Skill in the Field of the '788 Patent ........ 16

23          G.    MCT's Construction of "USB Based Display Signals From the Computer"
                  Is Contrary to the Express Language of the Claims and the Specification of
24                the '788 Patent .............................................................................................. 18

25          H.    MCT's Construction of "For Receiving Exclusively Therethrough USB
                  Based Display Signals" Ignores the Claim Language and the Specification
26                of the '788 Patent .......................................................................................... 19

27          I.    MCT's Construction of "Bridge" Is At Odds with the Intrinsic Evidence of
                  the '788 Patent .............................................................................................. 22
28

J.   MCT's Construction of "Connecting the USB Controller and the VGA Controller One to the Other for the Passage of Data Therebetween" Is At Odds with the Claim Language and Specification of the '788 Patent ...................24

K.   MCT's Construction of "The Bridge Circuit Converting the USB Based Display Signals into Corresponding VGA Signals" Ignores the Intrinsic Evidence ...............................................................................................................25

1

**TABLE OF AUTHORITIES**

2

<u>**Page(s)**</u>

3

**CASES**

4

*Anderson v. Int'l Eng'g & Mfg., Inc.*, 160 F.3d 1345 (Fed. Cir. 1998) ...........................................6

5

*Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295 (Fed. Cir. 2004)...........................6

6

*Nazomi Comm., Inc. v. Arm Holdings, PLC*, 403 F.3d 1364 (Fed. Cir. 2005) ..........................6, 8

7

*Phillips v. AWH*, 415 F.3d 1303 (Fed. Cir. July 2005) ...........................................................*passim*

8

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) .........................5

9

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .................................5, 6, 7
14

10

*W.E. Hall, Inc. v. Atlanta Corrugating, LLC*, 370 F.3d 1343 (Fed. Cir. 2004) .............................6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2         Magic Control Technology Corporation's ("MCT") claim construction brief relating to

3    U.S. Patent No. 7,203,788 ("'788 Patent") is a classic example of "buyer's remorse."

4         MCT drafted and selected each term (and phrase) recited in the claims of the '788 Patent.

5    MCT – not some third party – included terms with well-understood meanings such as "USB" and

6    "VGA" in the claims.  MCT drafted the specification of the patent with full knowledge that it

7    would be used as an important guide for interpreting the meaning and scope of the claims.  MCT

8    – and MCT alone – made the strategic decisions regarding what it would seek to claim when it

9    prosecuted the '788 Patent before the United States Patent and Trademark Office ("PTO").  As a

10   matter of law, the PTO had a right to rely on MCT's representations regarding the nature and

11   scope of the claims when it issued the '788 Patent on April 10, 2007.  MCT must live by the

12   terms of the deal it made with the PTO to obtain the '788 Patent.

13        As discussed below, MCT misapprehends the nature of the claim construction disputes

14   between the parties and violates the most basic doctrines of claim construction when it interprets

15   the disputed terms and phrases of the '788 Patent.  Repeatedly, throughout its brief, MCT seeks

16   to grossly expand the scope and reach of its patent beyond the meaning set forth in the claims

17   and specification of the patent and the well-understood meaning the claim terms would have to

18   persons of ordinary skill in the field of the '788 Patent.  The Court should reject MCT's efforts to

19   use this claim construction hearing as a vehicle to redraft the issued claims of the '788 Patent.

20        In sharp contrast to MCT and contrary to MCT's assertions, DisplayLink applied the

21   proper principles of claim construction to interpret the disputed terms and phrases in a manner

22   consistent with the Federal Circuit's guidance in *Phillips v. AWH* and its progeny.  In *Phillips,*

23   the Federal Circuit ruled that the claim "construction that stays true to the claim language and

24   ***most naturally aligns with the patent's description*** of the invention will be, in the end, the

25   correct construction."  DisplayLink's claim constructions most naturally align with the claims

26   and description in the '788 Patent.  Accordingly, DisplayLink has applied proper principles of

27   claim construction to arrive at proper constructions that should be adopted by this Court.

28

## II.    BACKGROUND

### A.    The Personal Computer

The "personal computer" (or PC) has existed for over thirty years.  In 1975, Micro Instrumentation and Telemetry Systems introduced the Altair 8800.  Jones Decl. ¶ 5.[1]  Despite the introduction of the personal computer in 1975, the birth of the modern PC is often attributed to the introduction of the International Business Machine Corporation's ("IBM") IBM 5150 in 1981.  *Id*. ¶ 6.  The introduction of the IBM PC (as well as a PC from Apple Computer) was considered so revolutionary that Time Magazine named the "Personal Computer" its "Person of the Year" for 1982 – marking the first time a non-human had been given this distinction.  *Id*. ¶ 7.

### B.    A Port/Interface for Every Peripheral

IBM PCs, like the IBM 5150, were based on an open, card based architecture.  Jones Decl. ¶ 5.  This open architecture enabled third parties to develop peripherals such as monitors, printers, portable disk drives, external disk drives, imaging equipment and other devices for use with the PC.  *Id*. ¶ 5.  As a result, PC users were provided with a wide selection of peripherals from which to choose.  *Id*. ¶ 8.  In the process of choosing between the various peripheral options, PC users were often required to select between different (and incompatible) manners to connect a selected peripheral to their PC.  *Id*. ¶ 8.

### C.    The Video Graphics Array (VGA) PC Monitor Standard

The PC monitor is the most used peripheral in computing.  When the IBM PC was introduced, there were two primary graphics adapters available to interface PC monitors to a PC: MDA and CGA.  Jones Decl. ¶ 9.  These adapters suffered from significant performance limitations due to their ability to support only a very limited range of colors.  *Id.*

In 1987, IBM introduced the Video Graphics Array chip architecture and interface ("VGA").  *Id*. ¶ 10.  Then, as it is now, the technical details of VGA were defined in IBM Corporation, Personal System/2 Hardware Interface Technical Reference (1988 and as updated

---

[1]    As used herein, references to the "Jones Decl. ¶ __" refer to the Declaration of Alan H. Jones, Ph.D. in support of DisplayLink Corporation's Responsive Claim Construction Brief filed concurrently herewith.

1    in 1991) and IBM Personal System/2 and Personal Computer BIOS Interface Technical

2    Reference (1991) (the "IBM VGA Technical Reference Manuals").  *Id*.  Without question,

3    persons of skill in the computer industry understand that VGA refers to the technology set forth

4    in the IBM VGA Technical Reference Manuals.  *Id*.  VGA became the industry standard display

5    to PC interface and, even today, virtually all PCs support VGA and VGA monitors.  *Id*.

6         In many ways, VGA was vastly different from its predecessor interface technologies.

7    Jones Decl. ¶ 10-11.  First, VGA rendered its predecessor technologies obsolete by replacing

8    their digital interfaces with an analog interface.  *Id*. ¶ 11.  Second, VGA improved the state of the

9    art by allowing the simultaneous display of 256 colors out of a palette of 262,144 – a significant

10   improvement over the then state of the art support for 16 colors from a palette of 64.  *Id*.

11        Subsequent to the creation of VGA, new video standards such as the SVGA ("Super

12   Video Graphics Array"), XGA ("eXtended Graphics Array"), SXGA ("Super eXtended Graphics

13   Array"), UXGA ("Ultra eXtended Graphics Array") or QXGA ("Quad eXtended Graphics

14   Array") have been developed that provide higher levels of video performance.  These newer

15   video standards (while at times providing backward compatibility to VGA) are different interface

16   standards from VGA.  A person of ordinary skill in the field of the '788 Patent would not

17   confuse "Video Graphics Array" with "Super Video Graphics Array."  *Id.*. ¶ 12-13.

18        Despite its age, VGA remains today the only register-level standard on which nearly all

19   graphics adapters made since 1990 agree.  *Id.* ¶ 10.  As such, VGA is the common denominator

20   among display technologies used in personal computing today.  *Id*.  Further, while conventional

21   display interface technology supports a number of video standards such as VGA and SVGA, a

22   VGA display interface does not.  It supports only the VGA signals that are provided pursuant to

23   the IBM VGA specification.  *Id*. ¶ 13-14.

24        **D.    The Move to a Universal Peripheral Interface**

25        The early IBM PC had many different types of ports that could be used to connect

26   peripherals to the PC.  Jones Decl. ¶ 15.  As noted above, since 1987, the PC has connected to

27   monitors through a VGA (15-pin) port.  *Id*. ¶ 10.  For a period of time, keyboards were

28   connected to the PC through an AT port (which was later replaced by the PS/2 port for both the

1  keyboard and a mouse). In addition to the VGA and AT interfaces, many PCs included (1) serial

2  or COM ports using the RS-232 standard and (2) a parallel, LPT, or printer port. *Id.* ¶ 15.

3      By the mid 1990s, there were a wide range of ports on every PC manufactured, each port

4  serving essentially the same task (connecting a peripheral to a computer) over and over. *Id.* ¶¶

5  15-17. Such a large number of ports created a myriad of inefficiencies and problems from

6  incompatible devices and interface ports to wiring nightmares. *Id.*

7          **E.    The Universal Serial Bus (USB) Specification Standard**

8      In early 1996, the PC industry took a significant step towards resolving the inefficiencies

9  and problems resulting from the disparate peripheral interface technologies. The solution:

10  Universal Serial Bus or USB. Jones Decl. ¶ 17. USB, like nearly all other bus, socket and/or

11  cable interface, on every PC produced today (and probably for the last 20+ years), is based on a

12  studied, peer-commented, and industry acknowledged, approved and adopted standard. *Id.* ¶¶

13  17-18. Consequently, it is well understood in the personal computer industry that USB refers

14  only to the technology defined in and by the specifications promulgated and adopted by the USB

15  Implementers Forum.[2] *Id.* As of today, the only specifications that have been adopted by the

16  USB Implementers Forum are Universal Serial Bus Specification Revision 2.0 and its

17  predecessor revisions. *Id.*

18      With USB, users are now able to connect virtually all of their peripherals to the PC using

19  a single standard interface – often via a single chain connected to a single port. *Id.* ¶¶ 18-20.

20  With this design characteristic, USB eliminated the problems and inefficiencies resulting from

21  too many competing plug/interface designs. *Id.*

22          **F.    Legacy Peripheral Devices and Converters**

23      When USB was introduced, there were a large number of peripheral devices on the

24  market that required the old interfaces such as PC parallel ports. These older "legacy" peripheral

25  devices could not directly connect to the new USB interface but instead required a direct

26  _____

27      [2]   While many other serial interfaces exist, some of which may have characteristics similar
   to that of USB, if they are not implemented in accordance with one of the USB specifications,

28  such interfaces are interfaces by another name. Jones Decl. ¶ 17.

1   connection to their old interface. Jones Decl. ¶ 21. The need to support these older peripherals

2   was understood and anticipated by USB's designers. Consequently, virtually simultaneously

3   with the release of USB 1.0 there were available interface converters for connecting legacy

4   devices to the USB port. *Id*. For example, there were converters for connecting devices that

5   traditionally connected to the PC's parallel, serial, and PS/2 ports to the new USB port. *Id*.

6       In 2000, USB 2.0 was introduced. *Id.* ¶ 17. USB 2.0 possessed a much higher bandwidth

7   than either USB 1.0 or USB 1.1. *Id*. ¶ 17, 22. USB 2.0's robust bandwidth of 480 Mbits/second

8   and USB's many advantages over other technologies made the USB interface an ideal choice for

9   high speed peripherals such as the PC monitor. *Id.* ¶ 22. As a result, the personal computing

10  industry promptly repeated the practice seen with the launch of USB 1.0 quickly developing

11  USB-to-VGA converters to allow USB 2.0 enabled PCs to work with the VGA interface on

12  existing monitors. *Id*. As a result of USB 2.0, the industry wide movement from the many old

13  peripheral interfaces to a new single universal port is now nearly complete.

14  **III.    STANDARD FOR CLAIM CONSTRUCTION**

15      The proper construction of a claim term "can only be determined and confirmed with a

16  full understanding of what the inventors ***actually invented*** and ***intended to envelop*** with the

17  claim." *Phillips v. AWH*, 415 F.3d 1303, 1316 (Fed. Cir. July 2005) (quoting *Renishaw PLC v.*

18  *Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).[3] Thus, "[t]he construction

19  that stays true to the claim language and ***most naturally aligns with the patent's description*** of

20  the invention will be, in the end, the correct construction." *Id*.

21      "[T]he claims themselves provide substantial guidance as to the meaning of particular

22  claim terms." *Phillips*, 415 F.3d at 1314 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

23  1576, 1582 (Fed. Cir. 1996)). It is essential to consider the claim as whole when construing each

24  term, because the context in which a term is used in a claim "can be highly instructive." *Phillips*,

25  415 F.3d at 1314, 1316. "Other claims of the patent . . . can also be valuable sources of

26  enlightenment as to the meaning of a claim term." *Id.* at 1314. Claim terms "are generally given

27  

28      [3]   Emphasis is added throughout this brief unless otherwise noted.

their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582.  However, it is critical to understand that this "ordinary meaning" is the "meaning to the ordinary artisan ***after reading the entire patent***." *Phillips*, 415 F.3d at 1321.

The Federal Circuit has made clear the primacy of the specification over extrinsic evidence, and cautioned against relying on dictionary definitions, in determining the ordinary meaning of claim terms. *Id.* at 1314-1323; *see also Anderson v. Int'l Eng'g & Mfg., Inc.*, 160 F.3d 1345, 1348-49 (Fed. Cir. 1998)  Thus, the specification is critical to determining the ordinary meaning of a claim term.  The specification provides "context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art of the time of the invention." *Nazomi Comm., Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005).  It is "the best source for discerning this proper context," because it is in the specification that "the patent applicant describes the invention." *Id*.

In addition to providing guidance as to the ordinary meaning of a claim term, the specification "acts as a dictionary" both "when it expressly defines terms used in the claims" and "when it defines terms by implication." *Vitronics*, 90 F.3d at 1582.  For example, the specification "may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1320-21 (quoting *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)).  In addition, the specification will clarify the meaning of a claim term where "the term chosen makes the scope of the claim unclear," or where the inventor "highlighted a particular feature as important to the invention." *W.E. Hall, Inc. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1353 (Fed. Cir. 2004).

The prosecution history, including "the prior art cited," is "part of the 'intrinsic evidence.'" *Phillips*, 415 F.3d at 1317.  The prosecution history "provides evidence of how the PTO and the inventor understood the patent." *Id*. ("the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention"). Further, "the prior art is often a reliable source of the understanding of one of ordinary skill in the art." *Nazomi*, 403 F.3d at 1369.

1

IV.    **PROPER CONSTRUCTION OF THE '788 PATENT**

2

    A.    **MCT's Construction of "USB" is Contrary to the Intrinsic Evidence and the Understanding of Persons of Ordinary Skill in the Field of the '788 Patent**

3

4

    As it often does, MCT seeks to grossly expand the scope of the term "USB" beyond its

5

meaning in the specification of the '788 Patent and its well-understood meaning to persons of

6

ordinary skill in the field of the '788 Patent.[4]  Jones Decl. ¶ 24-27.  In doing so, MCT violates

7

basic doctrines of claim construction by arguing that the term "USB" in the '788 Patent refers to

8

"*any serial bus specifications* which support USB based display signals from the host computer

9

and which are compatible with *any USB port/plug*."  MCT Br. at 23-24.[5]  What MCT attempts

10

to do with its construction of USB is similar to its goal regarding the term VGA – it seeks to

11

cover the port or plug *associated with* the named standard, rather than the standard itself.

12

    Unfortunately for MCT, the '788 Patent specification makes clear that the term "USB"

13

does not "generically" refer to "*any serial bus specification"* that is "compatible with "*any*"

14

USB port/plug.  Rather, column 1, lines 6-10 of the patent expressly state that USB refers to the

15

"Universal Serial Bus" standard.  *Vitronics*, 90 F.3d at 1583 (specification can act as a

16

dictionary).  This reference to "Universal Serial Bus" makes it clear that there is a specific

17

meaning to the term "USB" in the '788 Patent (*i.e.*, it is an abbreviation for Universal Serial

18

Bus).  Jones Decl. ¶ 24-27.

19

    Indeed, it is undisputed that persons of ordinary skill in art of the '788 Patent would

20

understand that the terms "USB" or "Universal Serial Bus" refer to the technology described in

21

the industry standard Universal Serial Bus Specifications.  *See* MCT Br. at 23-24 ("The USB

22

port and USB cable are built based upon an industry accepted USB standard.  USB is generically

23

understood in the field to refer to USB without any reference to particular versions of the

24

------

25

    [4]    Additionally, MCT's definition of "USB" is fatally flawed.  The definition is circular, redundant, and ambiguous.  In its brief, MCT argues, in effect, that the term *USB* covers anything compatible with a *USB* plug. MCT Br. at 24-25.

26

27

    [5]    As used herein, references to "MCT Br. at __" refer to Defendant and Counterclaim Plaintiff Magic Control Technology's Opening Claim Construction Brief Pursuant to Local Rule 4-5 (Docket Entry No. 33).

28

    - 7 -

1    standard."); Jones Decl. ¶ 24-26, Exh. 11 and 14 (prior art patents confirming that USB versions

2    1.0, 1.1, and 2.0 were well-known to persons of ordinary skill); *Nazomi*, 403 F.3d at 1369 ("the

3    prior art is often a reliable source of the understanding of one of ordinary skill in the art.").

4         As of the filing date of the '788 Patent, multiple revisions of the USB Specification had

5    been published, and USB Specification 2.0 was the then "current" version of the specification.[6]

6    Jones Decl. ¶ 17, 26, Exhs. 6-8. There is nothing in the claims or specification of '788 Patent to

7    suggest the meaning of the term "USB" should be expanded to include ***any serial bus***

8    ***specification*** compatible with ***any*** USB port/plug.[7]  *Id.* ¶ 27. There is no mention of the words

9    "compatible" or "compatibility" in the entire text of the '788 Patent. It is clear from the

10   specification and claims of the '788 Patent that the applicant intended "USB" to mean "Universal

11   Serial Bus." Moreover, the term "USB" cannot encompass "future" versions of the standard, as

12   suggested by MCT. This argument is invalid as a matter of law. The understanding of claim

13   terms is set at the time of filing and is not based on speculation about the future. *Phillips v.*

14   *AWH,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("We have made clear, moreover, that the ordinary

15   and customary meaning of a claim term is the meaning that the term would have to a person of

16   ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date

17   of the patent application.") (citation omitted). There is no way to know whether or not "future"

18   versions of the USB standard will substantially similar to or substantially different from the

19   versions that existed at the time the '788 Patent application was filed.

20        Contrary to MCT's allegations, DisplayLink applied the proper legal principles in its

21

22        [6]   In its brief, MCT wrongly suggests that DisplayLink has improperly limited the term
23   "USB" to a specific version of the USB specification. MCT Br. at 24. DisplayLink's
     construction of "USB" encompasses all known versions of the USB specification as of the
24   application date for the '788 Patent – indeed, as of the date of this briefing. Jones Decl. ¶ 24.

25        [7]   There is nothing in the specification or prosecution history of the '788 Patent that
     indicates that the patent used the term "USB" manner contrary to its well-understood ordinary
26   meaning. Jones Decl. ¶ 27. There is nothing in the specification that supports MCT's contention
     that USB "generically refers to any serial bus specifications . . . which are compatible with any
27   USB port/plug." MCT Br. at 23-24. The term "USB" refers to a specific specification, the
     "Universal Serial Bus" specification. It does not "generically" refer to any serial bus
28   specifications that are "compatible" with any USB port/plug. Jones Decl. ¶ 27.

1    construction of "USB."  DisplayLink reviewed the claims, specification and prosecution history

2    of the '788 Patent.  From this review, DisplayLink observed that the specification used the terms

3    "USB" and "Universal Serial Bus" interchangeably.  DisplayLink then investigated the ordinary

4    meaning of "Universal Serial Bus" to persons of ordinary skill in the art of the '788 Patent.  This

5    investigation revealed that, *at the time of filing of the '788 Patent*, a person of ordinary skill

6    would understand the term "Universal Serial Bus" or "USB" to refer only to the technology

7    described in the Universal Serial Bus Specification, Revision 2.0 or earlier.  Jones Decl. ¶ 24-25;

8    MCT Br. at 24 (acknowledging that DisplayLink's construction of "USB" encompasses all

9    versions of "USB" in existence at the time of filing).  Accordingly, DisplayLink properly

10   construed the term "USB" to refer to "Universal Serial Bus, the technology described in the

11   Universal Serial Bus Specification Revision 2.0 and its predecessor revisions."  Jones Decl. ¶ 24;

12   Exhs. 6-8 ("This document defines an industry standard Universal Serial Bus.  The specification

13   describes the bus attributes, the protocol definitions, types of transaction, bus management and

14   programming interface required to design and the protocol systems and peripherals that are

15   compliant with this standard.").  The validity of DisplayLink's construction of USB was

16   confirmed by the testimony of MCT's own expert, Dr. Min:

17       Q.    . . . – I mean USB is defined by the various specifications covering USB; correct?
         A.    Yeah, that is correct.
18       Q.    [I]f someone wanted to design a system that implemented USB, they would turn
               to one or more of the USB specifications; correct?
19       A.    That's correct, yes.

20       *See Id.*, Exh. 3 at 142:9-16.

21           For the above reasons, the Court should adopt DisplayLink's proposed construction of

22   the term "USB" and define the term to mean "Universal Serial Bus, the technology described in

23   the Universal Serial Bus Specification Revision 2.0 and its predecessor revisions."

24       **B.    MCT's Construction of "VGA" is Contrary to the Intrinsic Evidence and the
                 Understanding of Persons of Ordinary Skill in the Field of the '788 Patent**

25           In another attempt to grossly expand the scope of its patent, MCT erroneously asserts the

26

27   term "VGA" refers to "*all video display standards compatible with any 15-pin VGA port/plug.*"

28   MCT Br. at 19-20.  This assertion wrongly seeks to expand the meaning of the term "VGA"

1    beyond its meaning in the specification of the '788 Patent and its well-understood definition to

2    persons of ordinary skill in art.  Again, the '788 Patent is not concerned with the ***plug associated***

3    ***with the named standard***, but, rather, the named standard itself.

4         Unfortunately for MCT, the '788 Patent specification makes clear that the term "VGA"

5    does not refer to "***all video display standards***" that are "***compatible***" with "***any***" VGA port/plug.

6    The specification expressly states that VGA refers to "Video Graphics Array."  '788 Patent at

7    1:6-10.[8]  There is no reference in the specification to SVGA ("Super Video Graphics Array"),

8    XGA ("eXtended Graphics Array"), SXGA ("Super eXtended Graphics Array"), UXGA ("Ultra

9    eXtended Graphics Array") or QXGA ("Quad eXtended Graphics Array").[9]  There is nothing in

10   the specification that states or suggests that the term VGA encompasses these unique video

11   standards.  Jones Decl. ¶ 30.  As indicated in the '788 Patent specification, a person of ordinary

12   skill in the field of the '788 Patent understands that the term "VGA" is an abbreviation for

13   "Video Graphics Array."  *Id*. at 28-29, 30.  Such a person would understand that VGA referred

14   to the 640-by-480 video technology in the IBM Specification for VGA.[10]  *Id*. at 31; Exhs. 4-5.

15        There is nothing in the claims or specification of '788 Patent that indicates or suggests

16   that the term "VGA" can be expanded to include ***all video display standards*** compatible with

17   ***any*** VGA port/plug.  Jones Decl. ¶ 29.  There is no mention of the words "compatible" or

18   "compatibility" in the entire text of the '788 Patent.  There is nothing in the specification that

19   indicates that the term VGA was meant to cover other standards that were backward compatible

20   _____

21   [8] The '788 Patent is included as Exhibit A to Defendant and Counterclaim Plaintiff Magic
     Control Technology's Opening Claims Construction Brief Pursuant to Local Rule 4-5 (Docket
22   Entry No. 33).

23   [9] Moreover, unlike in the context of the USB Specifications Versions 1.0 and 2.0, the issue is
     not one of different versions of the same standard, but rather of entirely different standards.

24   [10]   There is nothing in the specification or prosecution history of the '788 Patent that
25   indicates that the patent used the term "VGA" in a manner contrary to its well-understood and
     ordinary meaning.  Jones Decl. ¶ 29-30.  There is nothing in the specification of the '788 Patent
26   that supports MCT's contention that VGA refers to "***all video display standards*** compatible with
     any 15-pin VGA port/plug."  MCT Br. at 19-20.  *Id*.  MCT's argument that the inclusion of the
27   word "generally" in the specification allows it to read the '788 Patent on entirely different video
     standards is without merit.  There is no argument that anything but VGA itself is contemplated
28   by or disclosed by the '788 Patent.

DISPLAYLINK'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF                              - 10 -
CASE NO.:  5:07-CV-01998-RMW

1  to VGA.  *Id.* at 30.   At the time the application for the '788 Patent was filed, there were several

2  such standards, such as SVGA, already in existence.  There is no mention of SVGA, or any other

3  standard, in the '788 Patent.  Thus, there is nothing in the '788 Patent to suggest the patent

4  applicant intended to apply a special, non-standard, meaning to the term "VGA."[11]

5          In sharp contrast to MCT, DisplayLink applied the proper legal principles in its

6  construction of "VGA."  DisplayLink reviewed the intrinsic evidence of the claims, specification

7  and prosecution history of the '788 Patent.  From the intrinsic evidence, DisplayLink observed

8  that the specification expressly defined VGA as "Video Graphics Array."  '788 Patent at 1:7.  At

9  the time of filing of the '788 Patent, a person ordinary skill understood that "Video Graphics

10  Array" or VGA referred to the 640-by-480 technology described in the IBM Specifications for

11  Video Graphics Array.[12]  Jones Decl. ¶ 28-31.

12          For at least the reasons stated above, the Court should adopt DisplayLink's proposed

13  construction of the term "VGA" and construe the phrase to refer to "Video Graphics Array, the

14  technology described in IBM Corporation, Personal System/2 Hardwar Interface Technical

15  Reference (1988 and as updated in 1991) and in IBM Personal System/2 and Personal Computer

16  BIOS Interface Technical Reference (1991)."

17          **C.      MCT's Construction of "Display Device" is Vague and Contrary to the
                      Intrinsic Evidence of the '788 Patent**

18          Here, MCT misapprehends the dispute between the parties regarding the term "display

19  device."  The dispute is not whether a generic display device can convert electrical signals to

20  images.  DisplayLink agrees with MCT and its own expert Dr. Jones – it certainly can.[13]  Rather,

21  _____

22          [11]   MCT argues that DisplayLink's construction would limit the '788 Patent to "sunset
       technology."  As a threshold matter, this argument is irrelevant, as the '788 Patent covers what it

23      discloses and claims – not what MCT wishes it disclosed or claimed.  In addition, "VGA" is by
       no means a "sunset technology."  As set forth in the Jones Declaration, VGA remains today the

24      only register-level standard on which nearly all graphics adapters made since 1990 agree.  Jones
       Decl. ¶ 10.  As such, VGA is the common denominator among display technologies used in

25      personal computing today.  *Id.*

26          [12]   At his deposition, MCT expert Dr. Min admitted that if someone wanted to implement a
       640-by-480 VGA system, they would – as DisplayLink contends – turn to the 1991 IBM

27      specification for video graphics array.  Jones Decl., Exh. 3 at 143:20-144:16.

28          [13]   Contrary to MCT's assertion, Dr. Jones never states that MCT's proposed construction for
       the term "display device" is the proper construction of that terms in the context of the '788 Patent.
                                                                                      (continued...)

1

2

3

the dispute involves whether *the display device claimed in the '788 Patent*, can generically convert all electrical signals to images, or whether it must be limited to "representing VGA signals." MCT's definition is not wrong – it is just generic, incomplete and unhelpful.

4

5

6

7

8

MCT's construction of the "display device" of the '788 Patent as a "device that converts electrical signals into images" violates multiple rules of claim construction. MCT Br. at 13-14. In particular, the construction violates the rule that claims must be viewed "as a whole" and "in light of the specification" when interpreting the meaning of a claim term because the context in which a term is used in a claim is "highly instructive." *Phillips*, 415 F.3d at 1314.

9

10

11

12

13

14

15

16

Taken as whole, each claim of the '788 Patent expressly requires that the claimed "display device" receive VGA signals for display. '788 Patent at 4:65-68, 5:1-10, 6:42-44, 6:45-56. The claims specifically state that the VGA controller "applies the VGA signals to the display device." '788 Patent at 5:9-11 and 6:54-56. Thus, the claims make clear that the *claimed* "display device" does not convert *any* type of electrical signal into images but is instead limited to converting *VGA signals* into images. *Id*. ¶ 33. MCT's attempt to enlarge the definition of "display device" to encompass a device that converts *any* type of electrical signal into an image should be rejected.

17

18

19

20

21

22

23

24

Like the claim language, the '788 Patent specification only teaches that the claimed display device converts VGA signals, as opposed any type of electrical signal, for display. *Id*. ¶¶ 33-34. The '788 Patent specification expressly states that "an object of the present invention is to provide a USB-to-VGA converter which converts USB based display signals issued from a host computer *into VGA signals that can be received and recognized by a display device* where [the] image to be displayed can be transmitted from the host computer in USB form." '788 Patent at 1:31-36, 1:45-60; Jones Decl. ¶ 33.

25

26

27

(...continued from previous page)
MCT Br. at 14. Indeed, immediately after confirming that DisplayLink's proposed construction for display device is the proper construction, Dr. Jones states merely that MCT's proposed construction, while a generic description of a display device, does not accurately characterize the display device of the '788 Patent. MCT Br. Exh. B at 62:6-21.

28

1

2

The correct nature of DisplayLink's construction was confirmed by the testimony of

MCT expert, Dr. Min:

3

4

5

6

7

Q.    You stated early that the '788 Patent discloses only VGA signals; correct? It doesn't disclose an alternative form of display signal.
A.    That is correct.
Q.    Regarding the display device, does the '788 Patent disclose anything other than a VGA?
A.    No.

8

*See* Jones Decl., Exh. 3 at 51:10-16.

9

Accordingly, the Court should adopt DisplayLink's construction of "display device" And

10

define the term to mean "an electronic device for visually representing VGA signals."  *Id*. ¶ 32.

11

**D.    MCT's Construction of "USB Controller" Ignores the Claims and Specification of the '788 Patent**

12

Again, MCT's construction is incomplete and conveniently ignores the requirements of

13

the claims and the specification of the '788 Patent.  Again, MCT's arguments misapprehend the

14

dispute between the parties.  There is no dispute that the USB controller of the '788 Patent refers

15

to a device positioned between the USB port of the host computer and the bridge.  MCT Br. at 3.

16

There is also no dispute that the USB controller receives display signals from the host computer

17

in USB form and passes them on to the bridge in a first-in-first-out manner.  *Id.*  Indeed, the

18

claims themselves say as much. [14]  MCT's construction adds nothing but redundancy to the

19

claims – it does not provide clarification, and, most importantly, it does not actually provide a

20

21

22

23

24

25

26

27

28

[14]    MCT misconstrues the deposition testimony of Dr. Jones with respect to his opinion regarding the accuracy of MCT's proposed construction for the disputed term "USB controller." MCT Br. at 4.  While it is accurate that Dr. Jones stated that MCT's proposed construction was "compatible with the USB controller in the patent," Dr. Jones stated then, as he does now, that the term USB controller in the context of the '788 Patent refers to component(s) that control the receipt, storage, and routing of USB encoded data.  MCT Br. Exh. B at 16:18-17:1; Jones Decl. at 35-40.  Indeed, Dr. Jones spends the next five pages of testimony explaining why DisplayLink's proposed construction is proper and MCT's proposed construction is not.  MCT Br. Exh. B at 17:2-23:17.  Notably, Dr. Jones, responding to whether he agreed with MCT's proposed claim construction, states "as a construction of what a USB controller is, I would disagree."  *Id.* at 23:6-12.  MCT makes a similar mistake with respect to Dr. Jones' testimony regarding the proper construction of the term "VGA controller."  MCT Br. at 13.  Here again, Dr. Jones' testimony is clear that while he states that MCT's proposed construction is consistent with the '788 Patent, DisplayLink's proposed construction is the only proper construction of the term within the context of the patent.  MCT Br. Exh. B at 45:3-19, 60:1-8.

1  definition for USB controller.  In contrast, DisplayLink's construction defines the term "USB

2  controller" in the context of the claims of the '788 Patent.

3      MCT's construction of "USB Controller" as merely a "device that communicates with the

4  computer according to the USB standard and communicates with the bridge in signal form

5  understood by the bridge" is also contrary to the intrinsic evidence.  MCT Br. at 3-4.  The '788

6  Patent teaches that the claimed USB controller is not merely a passive device that

7  "communicates" with a computer and a bridge.  Instead, the patent mandates that the "USB

8  controller" be an active device that ***controls*** receipt, storage and routing of USB encoded data.

9  Jones Decl. ¶ 36.  MCT's definition essentially gives no meaning to the term "controller."

10     The claims of the '788 Patent provide substantial guidance regarding the proper meaning

11  of "USB controller." *Phillips*, 415 F.3d at 1314 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90

12  F.3d 1576, 1582 (Fed. Cir. 1996)).  The claims expressly require that the USB controller ***receive***

13  USB based display signals from a computer.  '788 Patent at 4:60-64, 6:36-40.  The claims further

14  require that the USB Controller ***issue a bus control command*** to the bridge of the claimed USB-

15  to-VGA converter.  *Id.*  This command controls the ***routing*** of USB data from the computer to

16  the bridge and controls the ***receipt*** of USB data by the bridge.  *Id.*; Jones Decl. ¶ 38-39.

17  Subsequent to the issuance of the claimed bus control command, the claims recite that the

18  transfer of data from USB controller to the bridge occurs in a "first-in-first-out" manner.  '788

19  Patent at 5:1-11, 6:45-55.  This reference to "first-in-first-out" (also known as FIFO) in the body

20  of the claim indicates how data is ***stored*** and ***retrieved*** from a memory.  Jones Decl. ¶ 37.

21     Like the claim language, the '788 Patent specification confirms that a USB controller is

22  an active device that controls the receipt, storage and routing of USB data.  The specification

23  explains that the USB controller receives data from the host computer.  *Id.* ¶ 36-37.  The

24  specification shows how the USB controller works with a FIFO controller to control the storage

25  of USB data from the host computer.  *Id.* ¶¶ 37-39.  Finally, the specification illustrates how the

26  controller routes data received from the host computer to the bridge.  *Id.*

27     The understanding of persons of ordinary skill in the art of the '788 Patent confirms that

28  DisplayLink properly construed the term "USB Controller."  *Id.* ¶ 35.  The USB Specification

1  defines all USB devices as having three layers:  a bottom layer which transmits and *receives*

2  packets; a middle layer that handles *routing* data to various endpoints on the device; and a top

3  layer providing the functionality of the serial bus device.  *Id*. ¶ 40.  Thus, a device implemented

4  in accordance with the USB specifications would include a "USB controller" that controls

5  receipt, storage and routing of USB encoded data.  *Id*.

6        Accordingly, the Court should adopt DisplayLink's construction of "USB Controller."

7  The Court should interpret the term "USB Controller" as a component that "controls the receipt,

8  storage, and routing of USB encoded data."[15]  *Id*. ¶ 35.

9        **E.      MCT's Construction of "VGA Controller" Is Contradicted by the Claims
             and Specification of the '788 Patent**

10

11        MCT's construction of "VGA controller" suffers from flaws similar to that plaguing its

12  construction of "USB controller."  MCT's construction is not necessarily incorrect; rather, it is

13  just incomplete, unhelpful and inaccurate in the context of the '788 Patent.  Again, there is no

14  dispute that the VGA controller is positioned between the bridge and the display device.  MCT

15  Br. at 11.  There is also no dispute that the VGA controller receives display signals from the

16  bridge and applies the VGA signals to the display device.  *Id*.  Again, DisplayLink and its expert

17  Dr. Jones, agree that MCT's definition is consistent with the '788 Patent – but it is woefully

18  lacking.[16]

19        Again, MCT ignores the '788 Patent when it asserts that the term "VGA controller."

20  MCT defines the term as a "device that communicates with a display device according to the

21  VGA standard and communicates with bridge in the signal form understood by the bridge."

22  _____

23        [15]   "USB encoded data" refers to data transmitted in a format set forth in the USB
24  specification.  Jones Decl. ¶ 37.

25        [16] It is erroneous to suggest that merely because Dr. Jones agrees that MCT's construction is
    consistent, he believes it is proper or that he does not otherwise take issue with the construction.
26  MCT's specific mischaracterization of Dr. Jones' testimony regarding "VGA controller" is set
    forth at footnote 15 above.  In addition, MCT attempts to confuse the issue by arguing that Dr.
27  Jones was testifying about a VGA controller "chip," but neither MCT, nor anyone else for that
    matter, can draw any relevant distinction between a "VGA controller" and a "VGA controller
28  chip."  Indeed, as used by Dr. Jones in his deposition, the two terms are interchangeable.

1    MCT Br. at 11-12.  As it did with "USB Controller," MCT seeks to remove the word

2    "controller" from the claim term.  The claimed "VGA controller" does more than merely

3    communicate with a bridge and/or display device.  As used in the '788 Patent, the VGA

4    Controller *controls* the routing of VGA signals to the display device.  Jones Decl. ¶ 42-43.

5           The claim language mandates that the claimed "VGA controller" controls the routing of

6    VGA signals to a display device.  '788 Patent at 4:65-67, 5:10-11, 6:42-43, 6:54-55; Jones Decl.

7    ¶ 42-43.  The claims state that the bridge circuit converts the USB based display signals into

8    corresponding VGA signals and then forwards VGA signals to the VGA controller.  '788 Patent

9    at 5:1-11, 6:45-55.  The claim goes on to state that the VGA controller "convey[s]" and

10    "appl[ies]" VGA signals to the display device.  *Id.* at 4:65-67, 5:10-11, 6:42-43, 6:54-55.

11          Like the claims, the '788 Patent specification teaches that the VGA controller controls the

12    routing of VGA signals from the bridge to a display device.  Jones Decl. ¶ 42.  The specification

13    states that VGA controller, after it receives VGA signals from the bridge, "forwards the VGA

14    signals to the display device 300 for display by the display device 300."  '788 Patent at 2:33-40;

15    Jones Decl. ¶ 42.  Accordingly, the Court should adopt DisplayLink's construction of "VGA

16    Controller."  The Court should interpret the term "VGA Controller" as a component that

17    "controls the routing of VGA signals."  Jones Decl. ¶ 41.

18          **F.    MCT's Construction of "USB Based Display Signals" Is At Odds with the
              Language of the Claims, the Specification of the '788 Patent and the
19            Understanding of Persons of Ordinary Skill in the Field of the '788 Patent**

20          With respect to "USB Based Display Signals," MCT again attempts to broaden the scope

21    of a claim term beyond the meaning set forth in the patent.  MCT also again misapprehends the

22    dispute between the parties.  The dispute between the parties centers on whether "USB based

23    display signals" must actually *be display signals*, or, rather, whether they may merely *contain*

24    *display information*.[17,18]  MCT should not be allowed to remove the word "*based*" from the term

25    _____

26          [17]    MCT's assertion that Dr. Jones' testimony attempts to improperly limit the USB based
       display signals to moving pictures is grossly misplaced and in no way relates to the real dispute
27     between the parties.  MCT Br. at 9.  Quite plainly, the signals containing data representing an
       image that originates from a JPEG file are "display signals."  Dr. Jones' testimony, contrary to the
28     mischaracterization attempted by MCT, states that the '788 Patent does not define USB based

                                                                              (continued...)

1    "**USB based display signals**" so that it can interpret the term as referring to ***any*** USB signal

2    "**containing display information**."  MCT Br. at 7-8.  The '788 Patent expressly requires that the

3    claimed display signal itself, not some signal that "contains" display "information," be in a USB

4    encoded format.  Jones Decl. ¶ 45-47.

5        The '788 Patent provides clear guidance regarding the meaning of the term "USB based

6    display signals."  The claims expressly require that such signals meet the following criteria: (1)

7    the display signals must be ***USB based***; (2) the display signals must be ***from the computer***; and

8    (3) the display signals must be ***converted by the bridge*** into VGA signals for the display device.

9    '788 Patent at 4:57-64, 5:1-11, 6:32-40, 6:45-56; Jones Decl. ¶ 46.  In other words, the claims

10   expressly require "USB based display signals" be display signals received from a computer in a

11   USB format and these received signals be converted into a different format – *i.e.*, the VGA

12   format – for transmission to a display device.  *Id.*

13       Indeed, the reference in the claims to converting the "USB based display signals" into a

14   VGA display signal demonstrates the erroneous nature of MCT's construction.  To meet the

15   requirements of the claim, it is not enough for a USB signal to "contain some display

16   information."  MCT Br. at 7-8; Jones Decl. ¶ 46.  The claims expressly require that the display

17   signal itself, not just some display information, is received from the computer in USB encoded

18   format and that such USB formatted display signal is translated into a different display signal

19   _____

20       (...continued from previous page)
     display signals to include "JPEG files."  *Id.* Exh. B at 31:7-14.  A person of ordinary skill in the

21   art of the '788 Patent would readily acknowledge that JPEG file is data compressed according to
     the standard defined by the Joint Photographic Experts Group, usually with a file extension of

22   .jpeg or .jpg.  See, e.g., *Id.* Exh. B at 32:6-11.  Furthermore, no person of ordinary skill in the art
     of the '788 Patent would dispute that the data from a JPEG file, after rendering in the computer,

23   would constitute a display signal. *See, e.g., Id.* Exh. B at 33:14-21.  Moreover, this alleged
     limitation to "moving pictures" appears nowhere in DisplayLink's claim construction.

24       [18]  MCT tries to focus on the dispute on another red herring – whether "USB based display

25   signals" may include such control and/or packet information as required by the USB standard.
     As Dr. Jones explained in his deposition, "USB encoded display signals" of course include the

26   required packet information.  It is only logical that, to the extent the USB standard requires
     certain control or protocol information, such information would be included and would be ***USB***

27   ***based***.  That same logic does not apply to MCT's attempt to include, for example, audio signals –
     an entirely different type of signal mentioned nowhere in the '788 Patent – in the definition of

28   USB based display signals, and MCT's attempt to confuse the two issues should be rejected.

1    format – *i.e.*, VGA format.  *Id.*

2         There is no reference in the claims – or the specification – to extracting "some display

3    information" and converting only such extracted portion of such USB signal into a VGA display

4    signal.  Jones Decl. ¶ 48.  Like the claims, the '788 Patent specification confirms that the "USB

5    Based Display Signals" are display signals encoded in a USB format. *Id.* ¶ 47.   The specification

6    further states that the host computer processes and drives the displayed screen information for

7    transmission "via the USB interface" where the display signals are transmitted in "USB form."

8    '788 Patent at 3:61-65, 4:39-43.  The '788 Patent specification also states that the patent permits

9    the image to be "transmitted from the host computer in USB form."  '788 Patent at 1:31-36.

10    These references in the specification make clear that the "USB based display signal" is the

11    display, or image, signal that is encoded in a USB format.  Jones Decl. ¶ 47.

12         Accordingly, the Court should adopt DisplayLink's proposed construction of "USB based

13    display signals."  The Court should interpret the term "USB based display Signals" in the '788

14    Patent as referring to "USB encoded display signals."  *Id.* ¶ 45.

15    **G.    MCT's Construction of "USB Based Display Signals From the Computer" Is**
       **Contrary to the Express Language of the Claims and the Specification of the**
16    **'788 Patent**

17         The dispute between MCT and DisplayLink regarding the claimed phrase "USB based

18    display signals *from the computer*" is very similar to the dispute regarding the proper

19    construction of the term "USB based display signals."  MCT seeks to expand the phrase beyond

20    the meaning set forth in the claims and specification by arguing that the phrase refers to "USB

21    signals that contain display information from the computer."  MCT Br. at 9-10.  DisplayLink

22    seeks a construction consistent with claim language and the specification of the '788 Patent by

23    asserting that the phrase refers to "USB encoded display signals representing the image rendered

24    by the computer."

25         As discussed above, the claims of the '788 Patent expressly require that "USB based

26    display signals" be display signals that are (1) *USB based*; (2) *from the computer*; and (3)

27    *converted by the bridge* into VGA signals for the display device.  '788 Patent at 4:60-64, 5:1-11,

28    6:36-41, 6:45-56; Jones Decl. ¶ 51.  These express requirements make it clear that the image that

1    will be visually presented by the display device originates at the computer.  Jones Decl. ¶ 51-54.

2    There is absolutely no suggestion in the claims or specification of the '788 Patent that the

3    rendered image shown by the display device originates anywhere other than the computer.  *Id.*

4    As mentioned above, the claims expressly require that the image (*i.e.*, display signals and

5    not merely information) originate with the computer.  The '788 Patent specification confirms the

6    plain language of the claims.  The specification teaches that the claimed "USB based display

7    signals" are rendered (or created) by the computer.  '788 Patent at 3:61-65, 4:39-43 (explaining

8    that computer processes and drives ***the displayed screen information*** for transmission "via the

9    USB interface."); Jones Decl. ¶ 53.  Accordingly, the Court should adopt DisplayLink's

10   proposed construction of "USB based display signals from the computer" and define the term to

11   mean "USB encoded display signals representing the image rendered by the computer."[19]

12   **H.    MCT's Construction of "For Receiving Exclusively Therethrough USB
             Based Display Signals" Ignores the Claim Language and the Specification of
13           the '788 Patent**

14   MCT ignores the claim language of the '788 Patent when it argues that the phrase "for

15   receiving exclusively therethrough USB based display signals" refers to "for receiving all of the

16   USB signals containing display information and forwarding them to the bridge in the signal form

17   understood by the bridge."  MCT Br. at 4-5.  The plain meaning of the claims demonstrate the

18   erroneous nature of MCT's construction.

19   As a threshold matter, there is nothing in the claimed phrase that relates to "forwarding."

20   '788 Patent at 4:60-64, 6:36-40; Jones Decl. ¶ 56.  Instead, the claim language of the phrase is

21   solely directed to "receiving exclusively" the USB based display signals.  '788 Patent at 4:60-64,

22   6:36-40.  Accordingly, the Court should, at the outset, reject the second half of MCT's

23   construction (*i.e.*, and forwarding them to the bridge in the signal form understood by the

---

25   [19]   As set forth at footnote 18 above, MCT's reliance on Dr. Jones' testimony about JPEG
26   files is a red herring.  The important point in construing the phrase "USB based display signals
      from the computer" is that the image (or display) must be rendered by the host computer.
27   Contrary to MCT's assertion, DisplayLink is not arguing that the '788 Patent is only compatible
      with videos because "images" are not "display signals."  Dr. Jones was merely drawing a
28   distinction between a JPEG file and an image itself.  DisplayLink's construction has nothing to
      do with this point, and is the only construction consistent with the '788 Patent.

1    bridge).  The inclusion of such phrase merely introduces redundancy and confusion into the

2    claims.

3         Second, as discussed above, the "USB based display signal" portion of the phrase must

4    refer to "USB encoded display signals," not "USB signals containing display information."  *See*

5    Section F above.

6         Next, the intrinsic evidence of the '788 Patent shows that the phrase "receiving

7    exclusively therethrough USB based display signals" must refer to "receiving only USB based

8    display signals into the USB controller."  '788 Patent at 4:60-64, 6:36-40.  Taking the claims as a

9    whole, it is clear that the '788 Patent is expressly directed to a "USB-to-VGA converter" that

10   interconnects a computer to the display device "through a USB port of a computer."  *Id.* at 4:57-

11   59, 6:32-35.  The output of the claimed "converter" is the VGA signal applied to the display

12   device that will visually display the image received from the computer.  *Id.* at 5:10-11, 6:54-55;

13   Jones Decl. ¶¶ 57-58.  It is undisputed that a VGA signal is a signal defined by the VGA

14   standard.  MCT Br. at 2.  Specifically, a VGA signal is an analog signal that is converted into a

15   visual image by a display device.  Jones Decl. ¶ 58.  As explained in the claims, the VGA signal

16   is a signal that is created by the bridge when it "converts" the exclusively received USB based

17   display signals from the computer into "corresponding VGA signals" that will be sent to the

18   display device.  '788 Patent at 5:7-11, 6:52-56; Jones Decl. ¶¶ 56-57.  There is no suggestion

19   anywhere in the patent that any other kind of signal can be "received" by the "USB

20   controller."[20,21]

21   _____

22   [20]   Perhaps recognizing that the claim language does not support its construction, MCT
     relies on Figure 1 of the '788 Patent in support of its construction allowing other types of
23   information to be received by the USB controller.  Figure 1 supports no such thing.  Figure 1 is
     completely silent as to what is sent (or not sent, as the case is here) through the USB controller.
24   Indeed, the text corresponding to Figure 1 supports DisplayLink's construction.  '788 Patent,
     2:21-32 ("The USB controller 10 is connectable to a USB port 210 of a host computer 200 for
25   receiving USB based display signals from the host computer 200.").  Contrary to MCT's
     suggestion, DisplayLink is not reading in a limitation from the specification, it is relying on the
26   only enabling disclosure in the specification, as it must.

27   [21]   MCT also mischaracterizes Dr. Jones' testimony regarding "for receiving exclusively
     therethrough USB based display signals."  MCT Br. at 6-7.  In his testimony, Dr. Jones makes
28   clear that USB based display signals include not only data representing the image to be displayed
     but also the data which effects how the data representing the image is presented on the display

(continued...)

1    In sharp contrast to MCT, DisplayLink applied the principles of claim construction to the

2    claimed "receiving exclusively" phrase.  Specifically, DisplayLink started with the claim

3    language to determine its plain meaning and then examined the meaning of the claim language in

4    light of the specification and the prosecution history.

5    The plain language of the claims indicates that the inventions of the '788 Patent are

6    directed to "USB-to-VGA converter" for connecting a computer to a display device where (1)

7    the USB controller is external to the computer and (2) the VGA controller is external to the

8    computer.  *Id*. at 1:31-44, 4:57-59 (independent claim 1), 6:32-35 (independent claim 19).  The

9    claims further state that (1) the USB controller is "detachably connected to a USB port of the

10   computer *for receiving exclusively therethrough USB based display signals from the computer*

11   and (2) the VGA controller provides "connection to the display device for conveying VGA

12   signals to the display device."  *Id*. at 4:60-67, 6:36-45.  Finally, the claims state that the VGA

13   signals applied to the display device correspond to the exclusively received USB based display

14   signals.  *Id.* at 5:1-11, 6:45-56.

15   Each of the above recited limitations were important to the patentability of the '788

16   Patent.  During the prosecution of the '788 Patent, in March 2006, MCT amended claim 1 in

17   response to an interview with the PTO examiner to change the language of the claim from the

18   rejected phrase "for receiving USB based display signals" to the claimed phrase "for receiving

19   *exclusively therethrough* USB based display signals."  Jones Decl. ¶ 59; Exh. 2  at DL000106-

20   107.  MCT explained that the change was made to clarify scope of claims 1 and 19 such that the

21   "converter includes among its combination of features that of a USB controller 'external to the

22   computer' which 'detachably' connects to the computer's USB port for 'receiving exclusively

23   therethrough' the 'USB based display signals from the computer."  *Id*. ¶ 59; Exh. 2, DL000113.

─────────────────────

24

25   (...continued from previous page)
device.  MCT Br. Exh. B at 25:3-26:15.  Dr. Jones' testimony reflects the experience of a person
26   of ordinary skill whom would readily acknowledge that display signals are made up of more than
data representing the image to be displayed and further that in order to transmit data over a USB
27   link, the data must be packaged according to one of the USB Specifications.  MCT Br. Exh. B at
25:3-26:15, 27:18-28:16.  Clarifying the understanding of a person of ordinary skill in the art of
28   the '788 Patent, Dr. Jones further testified that USB based display signals would not include, for
example, audio signals.  Id. at 29:9-22.

1    The specification of the '788 Patent further confirms DisplayLink's construction.  The

2    patent states that "an object of the present invention is to provide a USB-to-VGA converter

3    which converts USB based display signals from a host computer into VGA signals that can be

4    received and recognized by a display device whereby *image to be displayed can be transmitted*

5    *from the host computer in USB form*."  '788 Patent at 1:31-36.  The patent further states that a

6    "further object to the invention is to provide a USB-to-VGA converter that allows for *direct*

7    *transmission* of USB signals from a host computer to a display device without adding any

8    display interface card inside the host computer."  *Id.* at 1:41-45.  Finally, the patent states that the

9    "USB controller 10 is connectable to a USB port 210 of a host computer 200 *for receiving USB*

10   *based display signals from host computer 200*."  *Id.* at 2:26-29.  The above references in the

11   specification make clear that the claimed USB-to-VGA converter is specifically designed to act

12   as a conduit between the computer and its external monitor and that the claimed USB controller

13   of the converter exclusively receives USB based display signals from the host computer.  Jones

14   Decl. ¶ 56-58.  The controller of the '788 Patent is not designed to receive other types of signals.

15   Because the claims (as indicated by the claim language and prosecution history)[22] require

16   that the USB based display signals (after conversion to corresponding VGA signals) are applied

17   to the display device, the plain meaning of the claims require that the phrase "for receiving

18   exclusively therethrough USB based display signals" refers to receiving only USB based display

19   signals from the computer.  Jones Decl. ¶ 55-59.  Accordingly, the Court should adopt

20   DisplayLink's construction that the phrase "for receiving exclusively therethrough USB Based

21   Display Signals" refers to "receiving only USB based display signals into the USB controller."

**I.    MCT's Construction of "Bridge" Is At Odds with the Intrinsic Evidence of the '788 Patent**

24   MCT again misapprehends the dispute between the parties regarding the definition of the

---

[22] As discussed previously, the claims expressly require that the actual "display signal" that contains the image that will be displayed be (1) transmitted in USB format (*i.e.*, be "USB based") from the computer to the USB controller and (2) converted into a "corresponding" VGA signal that is applied to the display device.  Jones Decl. ¶ 56-58.

1    term "bridge."  MCT's construction is not necessarily wrong; it just fails to provide any

2    clarification, and it fails to consider the context of the '788 Patent.  MCT does not explain what it

3    means by "different domains" or "fixed path."  As a result, its construction is open-ended and

4    unnecessarily confusing.  The claim language and specification of the '788 Patent provide clear

5    guidance as to the meaning of the term "bridge," and such guidance should not be ignored.

6    Jones Decl. ¶ 61.

7         As shown in independent claims 1 and 19, the claims of the '788 Patent expressly state

8    that a "bridge" receives a "bus control command."  '788 Patent at 5:1-11, 6:45-56.  This

9    reference to "bus control command" clearly indicates that the claims require the bridge to

10   connect to a bus between the USB controller and the bridge.  *Id.* at 5:1-11, 6:45-56.  The claims

11   imply and the specification confirms that the bridge also connects to a second bus that exists

12   between the bridge and the VGA controller.  *Id.* at 2:41-54, Fig. 2 (showing the bridge connects

13   to the VGA controller via a PCI or AGP bus); Jones Decl. ¶ 62.  Thus, the claims require that the

14   bridge connect to at least two buses (the bus between the USB controller and the bridge and the

15   bus between the bridge and the VGA controller).  Jones Decl. ¶ 62-63.

16        DisplayLink's construction of "bridge" as a "component for communicating between two

17   or more buses using different interface standards" is fully consistent with language of the claims

18   and the specification of the '788 Patent.  As noted above, the claims and specification of the '788

19   Patent require the claimed bridge to connect to at least two buses.  DisplayLink's construction

20   provides for "two or more buses."  Further, DisplayLink's construction of "bridge" is consistent

21   the express function performed by the claimed bridge.  In the claims, the bridge converts the

22   USB based display signal into a corresponding VGA signal.  '788 Patent at 5:1-11, 6:36-45.  It is

23   undisputed that the USB and VGA are two different standards (if the two standards were the

24   same, there would be no need to convert).  Consequently, DisplayLink's construction properly

25   notes that buses connected to the bridge use different interface standards.  Jones Decl. ¶ 60, 63.

26        The Court should adopt DisplayLink's construction that the term "bridge" refers to a

27   "component for communicating between two or more buses using different interface standards."

28

DISPLAYLINK'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO.: 5:07-CV-01998-RMW

- 23 -

1

**J.    MCT's Construction of "Connecting the USB Controller and the VGA Controller One to the Other for the Passage of Data Therebetween" Is At Odds with the Claim Language and Specification of the '788 Patent**

2

3      MCT again misapprehends the dispute between the parties.  Here, the dispute revolves

4  around whether the "data" to be passed between the USB controller and the VGA controller must

5  be video or display date, or whether it can be any electrical signals as MCT suggests.  MCT

6  ignores the language of the claims and the teachings of the '788 Patent specification when it

7  asserts that the phrase "connecting the USB controller and the VGA controller one to the other

8  for the passage of data therebetween" refers to "connecting the USB controller to the VGA

9  controller to exchange electrical signals."  MCT Br. at 17-18.  The plain language of the claim

10  requires the passage of "data" not electrical signals.  '788 Patent at 5:1-11.  MCT's attempt to

11  greatly expand the scope of its claims should be rejected.

12      Furthermore, a review of the claims as a whole reveals that the data referred to in the

13  phrase "connecting the USB controller and the VGA controller one to the other for the passage

14  of data therebetween" is video or display data.  Jones Decl. ¶ 65.  The claims require that the

15  USB controller exclusively receive USB based display signals from the computer.  '788 Patent at

16  4:60-64, 6:36-40.  The claims further require that the bridge convert the USB based display

17  signals it receives from the USB controller into VGA signals and then forward such VGA signals

18  to the VGA controller.  *Id.* at 5:1-11, 6:45-56.  Thus, express claim limitations indicate that the

19  data "passed" between the USB controller and VGA controller in the disputed phrase is, in fact,

20  video (or display) data.[23]

21      Contrary to MCT's accusations and methodology, DisplayLink applied the appropriate

22  principles of claim construction to correctly interpret the above-mentioned phrase as referring to

23  "connecting the USB controller to the VGA controller such that the VGA controller can receive

24  video data only from the USB controller via the bridge."  Jones Decl. ¶ 64.  It is undisputed that

25  the claims are directed to a USB-to-VGA converter that is external to a computer and where the

26  _____

27      [23]    See discussion of MCT's red herring argument regarding JPEG files above at footnotes 18 and 20.  See also discussion of inclusion of control information, and exclusion of audio signals, at footnotes 19 and 22 above.

28

DISPLAYLINK'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO.: 5:07-CV-01998-RMW

- 24 -

1  "image to be displayed can be transmitted from the host computer in USB form." '788 Patent at

2  1:31-36; Jones Decl. ¶ 65, Exh. 3.  In other words, all the video data for an image from the host

3  computer is received by the USB controller.  '788 Patent at 4:60-64, 6:36-41.  It is undisputed

4  that the bridge connects the USB controller to the VGA controller.  As discussed above, the

5  claims themselves teach that the "data" referred to in this phrase is video data.  As a result, all

6  the intrinsic evidence supports DisplayLink's construction of this phrase.

7      For the above reasons, the Court should adopt DisplayLink's construction of "connecting

8  the USB controller and the VGA controller one to the other for the passage of data

9  therebetween."  The Court should find that the phrase refers to "connecting the USB controller to

10  the VGA controller such that the VGA controller can receive video data only from the USB

11  controller via the bridge."

12  **K.    MCT's Construction of "The Bridge Circuit Converting the USB Based
          Display Signals into Corresponding VGA Signals" Ignores the Intrinsic
13        Evidence**

14      MCT repeats its previous claim construction error by arguing that the phrase "the bridge

15  circuit converting the USB based display signals into corresponding VGA signals" refers to "the

16  bridge circuit translating USB signals containing display information into corresponding display

17  signals according to the VGA standard."  MCT Br. at 18-19.  As discussed above, the term "USB

18  based display signals" refers to USB encoded display signals, not any type of USB signal that

19  merely contains display information.  *See* Section F above.  The term "bridge" is also defined

20  above.  *See* Section I above.

21      DisplayLink agrees with MCT that "VGA signals" refers to display signals according to

22  "the VGA standard."  MCT Br. at 2 ("VGA signals" refer to "signals according to the VGA

23  standard").[24]  Accordingly, in an effort to further narrow the disputes between the parties,

24  DisplayLink will accept MCT's construction of this claimed phrase provided that the

25  DisplayLink construction of "USB based display signals" and "bridge" are used.

26

27      [24]  The reference to "the VGA standard" is an admission that the term "VGA" refers to the
28  technology set forth in IBM specification for VGA.  Jones Decl. ¶ 28-31.

1    Dated:  February 11, 2008                WILSON SONSINI GOODRICH & ROSATI
                                             Professional Corporation
2

3                                     By:    _____/s/ Stefani E. Shanberg_____
                                             JAMES C. YOON, State Bar No. 177155
4                                            STEFANI E. SHANBERG, State Bar No. 206717
                                             BRIAN DIETZEL, *Pro Hac Vice*
5                                            WILSON SONSINI GOODRICH & ROSATI
                                             Professional Corporation
6                                            650 Page Mill Road
                                             Palo Alto, CA 94304-1050
7                                            Telephone:  (650) 493-9300
                                             Facsimile:   (650) 565-5100
8                                            Email:  jyoon@wsgr.com
                                             Email:  sshanberg@wsgr.com
9                                            Email:  bdietzel@wsgr.com

10                                           Attorneys for Plaintiff and Counterclaim Defendant
                                             DISPLAYLINK CORPORATION
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISPLAYLINK'S RESPONSIVE CLAIM                      - 26 -
CONSTRUCTION BRIEF
CASE NO.: 5:07-CV-01998-RMW