# EXHIBIT 3

1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3              SAN JOSE DIVISION
4

5   DISPLAYLINK CORPORATION,
    a Washington corporation,
6
                  Plaintiff,
7
        vs.                        No. 5:07-CV-01998-RMW
8
    MAGIC CONTROL TECHNOLOGY,
9   CORPORATION, a Taiwanese
    corporation,
10
                  Defendant.
11   _____/

    AND RELATED CROSS-ACTION
12   _____/
13

14

15            Videotaped Deposition of
16              PAUL S. MIN, Ph.D.
17              January 8, 2008
18

    Pages 1-186
19  Reported by:
    SHARON LANCASTER
20  CSR No. 5468
21

22            SHARI MOSS & ASSOCIATES
            Certified Shorthand Reporters
23            877 Cowan Road, Suite A
            Burlingame, California 94010-1204
24                   (415) 402-0004
                     (650) 692-8900
25            FAX:  (650) 692-8909

## Page 2

INDEX

- - - - -

Page Number
EXAMINATION BY MR. DIETZEL............. 6
EXAMINATION BY MR. CAULEY.........182

--oOo--

EXHIBITS

Plaintiff's:

1    Curriculum Vitae of Dr. Min; 12 pages..... 9

2    U.S. Patent No. 7,203,788 B2; 10 pages....27
     (Bates Nos. DL 000009-18)

3    Joint Claim Construction and Prehearing...37
     Statement Pursuant to Patent Local
     Rule 4-3; 10 pages
     (No Bates numbers)

4    Universal Serial Bus Specification........118
     Revision 2.0, April 27, 2000; 650 pages
     (Bates Nos. DL 017528-8177)

## Page 4

APPEARANCES: (Continued)

WING, HARTMANN & GIBBS, PLC, 2033 Gateway
Place, Suite 500, San Jose, California, Telephone:
(408) 451-3935, represented by RICHARD F. CAULEY,
Attorney at Law, appeared as counsel on behalf of
Defendant and Counterclaim Plaintiff MCT, Corp.

ALSO PRESENT:
    GENE FRYE, Videographer

## Page 3

BE IT REMEMBERED that, pursuant to the laws
governing the taking and use of depositions, and on
Tuesday, January 8, 2008, commencing at 12:42 p.m.
thereof, at the offices of Wilson, Sonsini, Goodrich
& Rosati, 601 S. California Boulevard, Palo Alto,
California, before me, SHARON LANCASTER, a Certified
Shorthand Reporter in the State of California,
personally appeared

    PAUL S. MIN, Ph.D.,

called as a witness by the Plaintiff/Cross-Defendant,
who, being by me first duly sworn, was examined and
testified as is hereinafter set forth.

    WILSON, SONSINI, GOODRICH & ROSATI,
8911 Capital of Texas Highway North, Westech 360,
Suite 3350, Austin, Texas 78759-8497, Telephone:
(512) 338-5423, represented by BRIAN A. DIETZEL,
Attorney at Law, appeared as counsel on behalf of
Plaintiff and Counterclaim Defendant Displaylink
Corporation.
            ///
            ///

## Page 5

TUESDAY, JANUARY 8, 2008              12:42 P.M.

            P R O C E E D I N G S

    THE VIDEOGRAPHER:  Good afternoon.  We are
now on the record.
    This is the beginning of Video No. 1 of the
deposition of Dr. Paul Min, taken by the plaintiff,
in the matter of DisplayLink Corporation vs. Magic
Control Technology Corporation and related
counterclaims, in the U.S. District Court, Northern
District of California, San Francisco Division,
Action No. 5:07-CV-01998-RMW, held in the offices of
Wilson, Sonsini, Goodrich & Rosati, located at
601 South California Avenue, Palo Alto, California,
on January 8th, 2008.  And the time is approximately
12:42 p.m.
    The Court Reporter today is Sharon
Lancaster, in association with Shari Moss &
Associates.  My name is Gene Frye.  I am a certified
legal videographer and notary, in association with
Mediaxcellence.
    If there are no stipulations, will all
counsel please state your appearance for the record.
    MR. DIETZEL:  Brian Dietzel for DisplayLink,

| | |
|---|---|
| 1 Wilson, Sonsini, Goodrich & Rosati. | 1 transcript later as needed, subject to possible |
| 2 MR. CAULEY: Richard Cauley, Wang, | 2 statements at court? |
| 3 Hartmann & Gibbs, for Magic Control Technology. | 3 A. Okay. |
| 4 THE VIDEOGRAPHER: If there are no | 4 Q. We'll take breaks, if you need one. This |
| 5 stipulations, will the Court Reporter please swear in | 5 will probably go, as Mr. Cauley did earlier, every |
| 6 the witness. | 6 hour, hour and 15 minutes, something along those |
| 7 PAUL S. MIN, Ph.D., | 7 lines. |
| 8 having been first duly administered the oath, under | 8 A. Okay. |
| 9 penalty of perjury, testified as follows: | 9 Q. Feel free to ask if you need to step out. |
| 10 | 10 You are aware that the answers need to be |
| 11 EXAMINATION | 11 oral? |
| 12 BY MR. DIETZEL: | 12 A. Okay. |
| 13 Q. Okay, Dr. Min. We just spent three or four | 13 Q. Then, of course, we want to try to avoid |
| 14 hours going through the same routine, so you're | 14 talking over one another. We don't have the delay |
| 15 familiar with the process. | 15 between here and the U.K., so that should help us a |
| 16 Again, my name is Brian Dietzel. I'm with | 16 little bit there. |
| 17 Wilson, Sonsini, Goodrich & Rosati, representing | 17 And You understand that you're here |
| 18 DisplayLink Corporation in this case. | 18 testifying today on behalf of MCT and yourself? |
| 19 Can you please state your full name, home | 19 A. That's correct. |
| 20 and business address for the record, please. | 20 Q. And you understand that you're here today to |
| 21 A. My name is Paul Seungkyu Min, spelled | 21 give testimony on the issues of background and claim |
| 22 S-E-U-N-G-K-Y-U. Last name spelled M-I-N. My home | 22 construction for the '788 patent; is that correct? |
| 23 address is 53 Arundel Place, A-R-U-N-D-E-L, Place, | 23 A. That is correct. |
| 24 Clayton, C-L-A-Y-T-O-N, Missouri 63105. | 24 Q. Very good. Okay. I will start much as |
| 25 My business address is Department of | 25 Mr. Cauley did. |
| Page 6 | Page 8 |

| | |
|---|---|
| 1 Electrical and Systems Engineering, One Brookings | 1 THE WITNESS: Excuse me one second. Sharon, |
| 2 Drive, B-R-O-O-K-I-N-G-S, Drive, Campus Box 1127, | 2 am I supposed to see something going on here? |
| 3 St. Louis, Missouri 63130. | 3 (Referring to the electronic real-time transcript.) |
| 4 Q. Thank you. I'm going to go through some | 4 (Remarks off the record.) |
| 5 admonitions real quickly. We heard these earlier. | 5 MR. DIETZEL: We'll start by introducing |
| 6 A. Okay. | 6 Exhibit 1, which is the CV of Dr. Min. |
| 7 Q. You're aware of the significance of being | 7 That's a copy for you. |
| 8 under oath? | 8 (MIN Deposition Exhibit No. 1 was marked for |
| 9 A. Yes, I do. | 9 identification.) |
| 10 Q. The same consequences as being at trial, | 10 BY MR. DIETZEL: |
| 11 correct, in a courtroom. Okay? | 11 Q. Do you recognize Exhibit 1, Dr. Min? |
| 12 A. Yes. | 12 A. Yes. |
| 13 Q. There is a protective order in place. Not | 13 Q. What is it? |
| 14 that it should matter here, since we're going to be | 14 A. I do. |
| 15 talking about things in the general art -- | 15 This is the latest version of my professional |
| 16 A. Mm-hmm. | 16 CV. |
| 17 Q. -- of the '788 patent. So that should not | 17 Q. And by "latest," how recently has it been |
| 18 be an issue, but -- so that shouldn't limit what you | 18 updated? |
| 19 can tell me today. | 19 A. I believe perhaps a couple of months ago. I |
| 20 Of course, you're entitled to a clear | 20 don't recall exact date, but thereabouts. |
| 21 question. I'll do my best to start with those. But | 21 Q. Does your CV accurately depict your |
| 22 if you don't understand anything I'm asking, please | 22 qualifications? |
| 23 ask me to clarify. | 23 A. I believe so. |
| 24 A. Okay. | 24 Q. Does it accurately depict your academic |
| 25 Q. You're aware that we can amend the | 25 experience? |
| Page 7 | Page 9 |

3 (Pages 6 to 9)

1   A. Yes, it does.
2   Q. Does it accurately depict your work
3 experience?
4   A. Yes.
5   Q. Does it also include a complete list of any
6 articles and publications to which you are attributed
7 authorship?
8   A. I believe that is correct.
9   Q. So are you aware of any updates that you
10 might need to make to this today between the last
11 time you updated it and the time of our deposition
12 now?
13   A. Not as far as I'm concerned, no.
14   Q. Okay. Beginning with your latest degree,
15 can you briefly walk me through your educational
16 background.
17   A. Yes. The latest degree -- the last degree I
18 received is a Ph.D. in electrical engineering in 1987
19 from the University of Michigan in Ann Arbor. And
20 there, I have worked on certain electronic system
21 that does a diagnosis and detection of sensors and
22 actually is something that is very typical in the
23 electrical engineering Ph.D. thesis at the time.
24   Q. And before your Ph.D.?
25   A. I received a master's degree in electrical

*Page 10*

1 currently in now.
2   A. Yes. I am currently associate professor in
3 the department of electrical and systems engineering
4 with the Washington University in St. Louis.
5 I joined this department, with a different name,
6 17 years ago; it was just called electrical
7 engineering at the time.
8     In 1990, I went through the tenure process,
9 got promoted from assistant to associate and then
10 changed the name of the department. So now I'm an
11 associate professor in the department of electrical
12 and systems engineering.
13     Prior to that, I spent three years at
14 Bellcore. And now it's called Telcordia Technology,
15 I believe. Telcordia, T-E-L-C-O-R-D-I-A. Telcordia
16 Technology. I'm not sure exact legal name of it.
17 It just changed recently. I was there for three
18 years and working on communication networks and
19 equipment that went into different communication
20 networks and data centers and so forth.
21     While I'm being a professor at Washington
22 University, I've also started a couple of companies
23 over the past ten years. I held different positions
24 in those two companies. The name of companies are
25 listed in -- also as part of my professional

*Page 12*

1 engineering from the same department, same school.
2 And my coursework there was communication, control,
3 electronics, something more broader than -- you know,
4 much more narrowly focused to Ph.D. work than after.
5   Q. Prior to your master's degree, you earned a
6 B.S. in electrical engineering?
7   A. Yes. In the same department, same
8 university.
9   Q. Are there any degrees that you have that
10 aren't listed on your CV?
11   A. Any post-high school?
12   Q. Post-high school. Yes, sir. Sorry.
13   A. No, there is none.
14   Q. How about any post-high school education
15 that might be relevant to the technology of the '788
16 patent?
17   A. I believe my CV that you have here in front
18 of you, and myself also, accurately reflects my
19 background in that regard.
20   Q. Okay. Thank you.
21     Do you have any legal training?
22   A. I do not have any legal training.
23   Q. Moving to your work history, your
24 professional background, can you summarize your
25 employment history starting with the position you're

*Page 11*

1 experience. One of them being Erlang Technology, and
2 the other one being MinMax Technologies. I held
3 different positions in technical and managerial
4 positions in these two companies. And I've also done
5 some consulting work with different companies and
6 organizations, some of which is listed in this CV.
7   Q. At Erlang Technology --
8   A. Yes.
9   Q. -- that you mentioned, what kind of products
10 are associated with Erlang?
11   A. Erlang Technology is a company that provides
12 solutions for the Internet industry and some telecom
13 industry as well. So we make software and some
14 chipsets and some board solutions, and so forth, for
15 those industries. And I been doing that for eight --
16 almost nine years now in the company.
17   Q. With respect to Erlang, did any of your work
18 there involve universal serial bus?
19   A. Not working on that developing standard or
20 product, per se. But, you know, USB, the universal
21 serial bus, is so widely used, and, you know, you
22 always deal with certain connections that involves
23 USB or, you know, HDDV-15, which VGA plugs are made
24 of. So...
25   Q. And MinMax Technology, what kinds of

*Page 13*

4 (Pages 10 to 13)

1  products or services were made there?
2      A. MinMax Technologies. The product there was
3  strictly a semiconductor chip for switching a chipset
4  for communication equipment.
5      Q. Your CV -- strike that.
6        What would you say is your area of technical
7  expertise?
8      A. All my professional career, I have always
9  worked on electronics-related area. So I made chips,
10  which is a major component in electronics. And
11  before making chips, I made systems, electronic
12  devices, boxes.
13        So I've worked always in the area of
14  electronics. Now, application area has been
15  different from time to time. Initially, I worked in
16  the control and automotive area. That's back in
17  '80s. And since coming to Bellcore, because of the
18  company being in Internet and telecom industry, my
19  focus has shifted to much more so communications
20  area. And more recently, I have done a lot of
21  areas -- a lot of work in computing application as
22  well.
23      Q. Your CV states that you have expertise in
24  switching, network performance analysis and control,
25  wireless communication, Internet security, network

Page 14

1  work in electronics and computer communications area.
2      Q. Are there any other areas that you think
3  would relate to USB?
4      A. ASIC development, obviously. You know, in
5  ASIC development, USB. The core for IPs, you know.
6  Most foundries provide them, so we can provide
7  built-in macros for USB connections. So these are
8  almost to second nature to people who do any kind of
9  work in computer and communications-related area.
10      Q. Any others that you would include?
11      A. Most -- I can, you know, name the names,
12  but, you know -- for example, in Internet security
13  work, a solution that we provided was built on what
14  is called a PCI form factor small card that can be
15  actually plugged into the backplane of a PC, as we
16  heard from Dr. Jones this morning. And PCI is very
17  commonly used backplane technology for computers.
18        So in that and USB connections to that board
19  was also designed in. And, once again, it's almost
20  too ubiquitous for all applications in electronics
21  systems development or solutions. So, you know, for
22  me to say that, you know, a certain one out of this
23  would be more limiting than necessary.
24      Q. Would you have similar comments if I asked
25  you the same question with respect to VGA?

Page 16

1  management, basic development. Is that accurate?
2      A. Yes.
3      Q. Are there any areas of expertise that you
4  would add to this list here?
5      A. I would just make a note that the expertise
6  as I mentioned to you in application areas. But
7  underlying skill that I developed all along apply to
8  all of these areas has been electronic systems and
9  design.
10      Q. Okay. Which of these areas of expertise
11  mentioned on your CV here relate to USB?
12      A. Switching, for example. You know, USB is
13  not exactly, you know, specific to switching. But
14  certainly I was -- I have been making switching
15  equipment. And whenever you build the equipment of
16  the complexity, you know, that typical switches
17  employ, the interfaces and connectors are always an
18  issue.
19        And another -- you know, for example,
20  another is when you build any type of electronic
21  devices with, say, CPU in it -- and these days the
22  CPUs have built-in USB driver, and they almost assume
23  that certain communication will be done through USB
24  port. So, you know, not knowing USB is just not
25  something that you can be, you know, whenever you

Page 15

1      A. No. I think my comments would be somewhat
2  different in VGA.
3        VGA is, as the name says, related to the
4  display technology. So display technology, also VGA
5  terminal, the device, the display device. So it's
6  really something that we use, because every time you
7  interface with a computer, you need to be able to see
8  it in front. So VGA is something that we are --
9  someone like myself, and myself specifically, you
10  know, are so familiar in using and knowing what it is
11  than actually having to work on it. So that would be
12  my comment.
13      Q. The last question, I think, here: Of the
14  areas of expertise listed here, and even the general
15  expertise that you discussed earlier, which of these
16  areas would you say is most relevant to the
17  technology of the '788 patent?
18      A. I would say ASIC development and some
19  switching work that I have done in the past. Those
20  two would be perhaps most relevant.
21      Q. Very good. Okay.
22        In your academic career either as a student
23  or your time as a professor, assistant professor, in
24  roles you have taken in teaching others, are there
25  courses that you teach on USB or VGA?

Page 17

5 (Pages 14 to 17)

1    A.  Not on those topics.  But those topics would
2  be mentioned and covered and -- for example, I'm
3  teaching a course in transmission engineering.
4  I mean, I have taught it.  And in those classes, I
5  talk about different electrical technology and
6  communication.  So, you know, we mention those, and,
7  you know, we talk about in different detail.
8    Q.  Your CV lists quite a few publications and
9  things that you have been involved with.  You're
10  apparently a pretty prolific writer.
11    Which, if any, of those either papers, the
12  patents, any of the documentation that's mentioned in
13  your CV -- do any of them describe or disclose
14  USB-to-VGA converters?
15    A.  Not specifically.  And I can tell you the
16  reason.
17    These publications are academic publications
18  that are peer reviewed by the peers and aimed for
19  publication in prestigious conference or journals.
20  And the standard practice in those conferences or the
21  journals is that, you know, we don't talk about
22  standard implementation, certain implementation
23  between, you know, one standard and another standard.
24  Those are more technical publications that might
25  happen inside a corporation or in the context of a

Page 18

1  patent, like the way the '788 patent is written.
2    Q.  Do you know offhand if any of those -- any
3  of your papers listed in your CV patent applications,
4  any of the documents, describe USB?
5    A.  Hmm.  Allow me one second.  (Witness
6  reviewing document.)
7    There are some more industrial conferences
8  that I may have attended in the past, and some of
9  those papers may be talking about the issues similar
10  at that level, although I cannot recall exactly
11  whether or not I mentioned USB or VGA as, you know,
12  possible choices of technology.
13    Q.  So other than what is mentioned in your CV
14  in Exhibit 1, is there any other academic or
15  professional experience that you have that you think
16  relates to the technology of the '788 patent?
17    A.  Not on top of my head right now.
18    Q.  Let's move on to another area, and that is:
19  How did you become to be an expert witness for MCT in
20  this litigation?
21    A.  Actually, Mr. Cauley's firm contacted me.
22  I think Mr. Cauley knew about me because I was an
23  expert witness for a different case just before this.
24  It's listed here in my CV under litigation support
25  experience.

Page 19

1    Oh, wait a minute.  Oh, this is not listed
2  here.  I'm sorry.  I apologize.
3    But just to conclude it, perhaps this CV was
4  something that you obtained for -- prior to that ITC
5  investigation.
6    MR. CAULEY:  Yes.
7    THE WITNESS:  There, I was just involved --
8  I will correct my statement that I made earlier.
9  There needs to be one extra litigation support
10  experience.
11  BY MR. DIETZEL:
12    Q.  Okay.
13    A.  Which was, I was an expert witness for the
14  case, ITC case between Aton, Aton Corporation -- I'm
15  not sure if that name is correct -- but Aton versus a
16  whole bunch of companies, which include the firm that
17  Mr. Cauley represented, RATOC?
18    MR. CAULEY:  Yes.
19    THE WITNESS:  RATOC, R-A-T-O-C.  And I was
20  the technical expert for that case.
21    At that time, I didn't really work with
22  Mr. Cauley at all.  In fact, I didn't know him.
23  He -- his firm -- the company that he was representing
24  at the time was a co-defendant with the company that
25  I was hired for doing expert witness.  So I guess he

Page 20

1  knew about me.  And that's -- I suspect that's how he
2  found me.  Although I don't know what else he did to
3  find me.
4  BY MR. DIETZEL:
5    Q.  So you guys were on the same side, but just
6  not working with the same defendant or --
7    A.  Yeah.
8    Q.  -- respondent?
9    A.  That's right.  I didn't know -- I didn't
10  know him or his firm at all.
11    Q.  What was the technology at issue in that ITC
12  investigation?
13    A.  KVM switch; keyboard, video display and
14  mouse.  But there we talk about a lot, you know, USB
15  port and, you know, HDVD-15 port.  That's HDVD-15.
16  HDVD-15 port and, you know, PS/2 port and all
17  different type of ports.
18    MR. CAULEY:  Brian, I'll get you the actual
19  name of that case.
20    MR. DIETZEL:  Okay.  Please.
21  BY MR. DIETZEL:
22    Q.  While we're on your litigation support
23  experience, let's go ahead and cover real quickly the
24  Broadcom v. Qualcomm.
25    A.  Yes.

Page 21

6 (Pages 18 to 21)

1    Q. Is that the one that is currently going on,
2  that seems to be making a lot of news recently?
3    A. I believe -- I don't -- I haven't really
4  spoken to the attorney since the trial and my part
5  was over. The part that I served as a witness in
6  May of last year, 2007, when I testified. And the
7  verdict came down, and I have not been involved in
8  the case at all after that.
9    Q. Okay. What was the technology at issue
10  there?
11    A. It was dual mode communication applied to a
12  CDMA network that Qualcomm was selling and promoting.
13    Q. In the Avaya v. Mitel Networks, Mitel
14  Networks?
15    A. I'm not really sure if I need to even list
16  there because I didn't really testify or anything.
17  But it was -- it was about the unifying messaging
18  system, and, you know, you can have a fax, e-mail,
19  voicemail coming into one system and display on your
20  form or computer.
21    Q. Yes. I've written a few patent applications
22  for that technology way back when.
23    Okay. Do you recall when you were first
24  engaged by Mr. Cauley and MCT in this litigation?
25    A. Not exact date, but about two months ago.

Page 22

1    Q. About two months ago?
2    A. Yes.
3    Q. So that would have been before the
4  December 14 -- before December 14th?
5    A. I think that's correct.
6    Q. So it would be early November?
7    A. Yeah.
8    Q. You said you hadn't worked with Mr. Cauley
9  and Wang Hartman before; is that correct?
10    A. That is correct.
11    Q. Have you worked with MCT in the past?
12    A. No.
13    Q. Do you know anyone at MCT?
14    A. No.
15    I'm sorry. I'll qualify that last
16  statement. I don't know who is working at MCT. I
17  may know somebody, but I'm not aware.
18    Q. Okay. Thank you.
19    When Mr. Cauley contacted you about
20  participating in this litigation, helping Wang
21  Hartman and MCT in this litigation, did he give you a
22  description of the nature of this case?
23    A. I believe I received a patent from
24  Mr. Cauley -- Mr. Cauley's colleague actually, and
25  then I read it. And it was -- you know, a patent is

Page 23

1  not very long. So I understood the topic pretty
2  well, but I didn't really understand the specific
3  nature of the litigation. And it was over the past
4  few weeks or two since the first contact by
5  Mr. Cauley's colleague that I began to understand
6  what the litigation was about.
7    Q. Mr. Cauley's colleague that contacted you,
8  do you remember who that was?
9    A. Erick Wolfe. I believe he spells it
10  E-R-I-C-K.
11    Q. You're here today to testify about claim
12  construction of certain disputed terms in the '788
13  patent.
14    Have you done any other investigation or
15  expert analysis on behalf of MCT for this litigation
16  besides your claim construction efforts? For
17  example, have you investigated DisplayLink's
18  products, their operation?
19    A. No, not particularly. I have some documents
20  that were forwarded by Mr. Cauley. But I haven't
21  really -- other than reading it for my own broad
22  understanding, I really haven't spent too much time,
23  you know, just to delve into a detail to be able to
24  do analysis. Not yet, actually.
25    Q. The documents that you mentioned Mr. Cauley

Page 24

1  providing you, were those marketing documents? Would
2  those be technical documents?
3    A. I believe there was one document that was
4  pretty extensive, a description of a chip datasheet.
5  I don't recall the exact number. It was a product
6  datasheet for one of the products that DisplayLink's
7  chipset was. Once again, I didn't really have a
8  chance to look through the whole detail of it.
9    Q. And you don't recall what product it related
10  to?
11    A. It was one of the chipsets that DisplayLink
12  makes.
13    Q. Do you have anyone working with you on this
14  case that assists you in your investigation, things
15  along those lines, other than --
16    A. Other than attorneys?
17    Q. Yes, sir.
18    A. No.
19    Q. The three litigations that you mentioned
20  before, did you participate in the claim construction
21  process in each of those?
22    A. Not the Broadcom vs. Qualcomm case. I was
23  not part of that. But the ITC case, I was.
24    Q. And what was the extent of your
25  participation in that?

Page 25

7 (Pages 22 to 25)

1    A. I was involved from the beginning, I guess.
2  We talked about all the terms, and then we made a
3  proposal. And then, of course, the other party also
4  made a proposal as to what that was going to be. And
5  we argued why one is more suited versus not.
6        And, as I understand it, you know, the
7  process in district court is a different form, the
8  ITC case, and we didn't have what they call the
9  Markman hearing in ITC. So we end up not deciding
10 on, you know, which is the right definition or
11 interpretation until when the judge basically handed
12 down a verdict.
13    Q. From your work on the ITC case, and then the
14 Avaya case, are you familiar with the concept of the
15 hypothetical "person of ordinary skill in the art"?
16    A. Yes.
17    Q. And what is your understanding of --
18 I guess, do you have an understanding what the
19 general definition of or how they describe the person
20 of ordinary skill in the art?
21    A. For this '788 patent?
22    Q. Well, not for that. But just the general
23 concept of what a person of ordinary skill in the art
24 is?
25    A. I think so. I don't mean to be legally

Page 26

1  correct on this, but it's just my understanding.
2  To me, that -- what that person should be
3  is -- those persons should be the target of this
4  patent disclosure. So when the person reads the
5  patent and the claims and specifications together,
6  the person has sufficient background to understand
7  what the inventor meant and what inventor is also
8  protecting.
9        MR. DIETZEL: All right. At this time, I
10 will introduce U.S. Patent 7,203,788.
11        (MIN Deposition Exhibit 2 was marked for
12 identification.)
13 BY MR. DIETZEL:
14    Q. Okay. Do you recognize this document,
15 Dr. Min?
16    A. Yes, I do.
17    Q. So if it's okay with you, we'll refer to
18 this as Exhibit 2, the '788 patent, as we have been
19 doing earlier today.
20        Have you read the '788 patent?
21    A. Yes.
22    Q. Did you understand the '788 patent?
23    A. Yes.
24    Q. In view of your understanding of the '788
25 patent, what would you say is the relevant art of the

Page 27

1  '788 patent? Or how would you describe the relevant
2  art of the '788 patent?
3    A. Relevant art, the field of art is, I would
4  say, USB technology and computer peripherals and
5  electronic system design. And those would be the
6  field of art for this patent.
7    Q. In your opinion, what kind of person would
8  be one of ordinary skill in the art of the '788
9  patent?
10    A. I believe one of ordinary skill in the art
11 would have a bachelor of science degree in electrical
12 engineering, computer science, computer engineering,
13 and for this particular patent, maybe a year or two
14 of experience in industry to appreciate the value of
15 this technology in the practical sense: Why would
16 inventor develop something like this? What is the
17 purpose of doing this? And, you know, some of
18 those commercial and business issues that the fresh
19 out of school student would not particularly
20 appreciate. So it takes maybe a year or two to do
21 that.
22    Q. You said may have a year or two of
23 experience in the industry. Which industry --
24    A. Electronics industry.
25    Q. Okay. How familiar would this person of

Page 28

1  ordinary skill in the art need to be with USB?
2    A. To understand this patent as the person read
3  it, not much.
4    Q. So would you say they wouldn't have to see
5  the -- they wouldn't have to have seen the USB spec
6  before reading the '788 patent to understand?
7    A. No. Because the spec doesn't really relate
8  to any details about USB spec.
9    Q. A similar question with respect to VGA. How
10 familiar would they need to be with VGA?
11    A. Not much, other than the fact that the VGA
12 is commonly used as the USB is.
13    Q. Would you say they would need to have any
14 knowledge or awareness of the USB/VGA standards
15 organizations?
16    A. I'm not sure if I understood your question.
17 Could you say a little differently?
18        Just aware of the existence of those
19 organizations or the part of it?
20    Q. I guess maybe a better way to ask it: Would
21 they need to have any familiarity with the USB or VGA
22 standards bodies to be considered a person of
23 ordinary skill in the art?
24    A. No, not necessarily.
25    Q. What did you do to prepare for today's

Page 29

1  deposition?
2      A. I read the patent, and I read some part of
3  prosecution history. I must confess that I didn't
4  read it entirely, word for word, for the prosecution
5  history. And I read the joint claim construction
6  proposal that I received a few days ago. And I spent
7  a couple hours yesterday with Mr. Cauley and his
8  colleague. That was it.
9      Q. You said you read some parts of the
10  prosecution history. Do you remember which parts in
11  particular you read? Is it just sort of random
12  samplings?
13      A. No. Just glancing through and see which
14  parts were relevant. Because there were a lot of,
15  you know, respondents going back and forth. So those
16  parts that I didn't feel was so important for me to
17  understand, I kind of skipped over. But, you know, I
18  can't tell you exactly. But I was just trying to
19  find the major points.
20      Q. Do you recall if you read the office action
21  rejections that came from the USPTO?
22      A. Not specifically in all detail. But, you
23  know, I have nine patents of my own, so I know how
24  the USPTO initially question your claims, and then
25  they will always conditionally reject and ask for

Page 30

1  your responses. And, you know, I know that process
2  pretty well. So I believe I have seen some of that,
3  but I do not recall all the details.
4      Q. Okay. Have you seen the products at issue
5  in this litigation?
6      A. I have not seen the product yet.
7      Q. So then you haven't operated any of the
8  accused products?
9      A. No.
10      Q. You haven't reverse engineered any of the
11  accused products?
12      A. No.
13      Q. Other than one specification that you
14  mentioned earlier as having been received from
15  Mr. Cauley --
16      A. Mm-hmm.
17      Q. -- do you have any other documents
18  concerning the accused products in this case?
19      A. About the accused products. I have a lot of
20  documents. There was several binders full. But I
21  didn't really spend any time on much of it. I've
22  seen -- I flipped it over, and Mr. Cauley was kind
23  enough to send all these documents for me to just
24  have as a reference. But I haven't really used it
25  for this particular process. There may have been

Page 31

1  others, but I don't recall if there is.
2      Q. So if you have them, you're not aware of it
3  yet. You haven't gotten to those?
4      A. No.
5      Q. Do you recall having to refer to anything
6  outside the patent to either arrive at or support the
7  claim construction positions in the joint claim
8  construction statement that you were mentioning
9  earlier?
10      A. I'm trying to recall whether or not I
11  actually used the USB2.0 spec, the standard document.
12  I may have glanced through, once again, just so that
13  I'm clear on certain details of that. But they were
14  not the source of all my interpretation.
15      Q. You said you may have referred back to the
16  USB specification. Can you recall if there was a
17  particular term at issue that may have prompted you
18  to at least consider referring to the USB spec?
19      A. Right. So I looked at and see if USB2.0
20  spec actually had a signal format defined for display
21  devices, for example. Because I wanted to make sure
22  that there was not any standard way of a
23  communicating display signal.
24          Another one, maybe I wanted to know if a VGA
25  type of device, display device was one of the target

Page 32

1  devices through any means possible in USB2.0 spec.
2  I just wanted to make sure that there was no special
3  provision for it. Just making sure that -- I didn't
4  think so, but I just wanted to make sure that that
5  was not the case.
6      Q. Okay. Moving on to the terms at issue in
7  this litigation. Were you involved with the
8  selection of terms to be construed?
9      A. No, I was not.
10      Q. Were you involved with developing the
11  initial constructions for the terms that are --
12      A. Yes, I was.
13      Q. So can you describe to me how that process
14  went? Did Mr. Cauley or one of his colleagues send
15  you a list of terms at issue?
16      A. Yes. I received basically a table with one
17  side listing all the terms that the two parties
18  decide to disagree, or maybe to construe the meaning
19  of. And then Mr. Cauley and his colleague asked me
20  to provide interpretation based on my understanding
21  as a person of ordinary skill, which I provided.
22      Q. In developing the constructions that you
23  proposed back to Mr. Cauley and his colleagues, what
24  documents did you refer to?
25      A. I think I used the patent for most -- mostly.

Page 33

9 (Pages 30 to 33)

1  In fact, I'm trying to think if there was any time
2  that I used anything else. I think I looked at one
3  of the textbooks, communication textbook, just to
4  make sure that the IEEE defined the bridge devices
5  had some special meaning. I teach IEEE chip
6  communication classes, you know, so I had those
7  textbooks right there, so I just looked at it. But I
8  didn't really use any text out of there.
9      I tried to interpret the terms that were --
10  terms and phrases that were given to me. Number one,
11  basically just reading the claims and see if some of
12  the terms were just well understood, and if not --
13  and that was -- and after that process is done, I
14  went back and make sure that what I have interpreted
15  is consistent with what's written in the
16  specification.
17      And as you recall, in this joint claim
18  construction proposal, I have a very little extrinsic
19  evidence that I could provide. I just did it mostly
20  based on my experience and understanding of what the
21  patent really means.
22  Q. So you don't recall ever asking for more
23  documents from Mr. Cauley or his colleagues?
24  A. I have not done that at all.
25  Q. You mentioned you reviewed portions of the

Page 34

1  A. No.
2  Q. Have you met with anyone at MCT?
3  A. No. Once again, I don't know anybody who is
4  there. As far as I'm aware, I have not met anybody.
5  But there might be some people that work for MCT that
6  I don't know but I might have met.
7  Q. Well, I was asking just in relation to this,
8  Have you met any.
9  A. No, I have not.
10  Q. Sorry. I should have been more clear. I
11  apologize.
12      Are you familiar with MCT's products, by any
13  chance?
14  A. No, not -- I -- you know, I can't say I am.
15  Q. So before we move forward, for the terms
16  that are in dispute --
17  A. Mm-hmm.
18  Q. -- you're here today, prepared to discuss
19  your constructions and your support therefor;
20  correct?
21  A. That is correct.
22  Q. And then for the terms in dispute, are you
23  prepared to discuss why DisplayLink's proposed
24  constructions are inaccurate or --
25  A. Yes, I am.

Page 36

1  file history for the '788 patent. Do you recall if
2  you reviewed any of the cited references?
3  A. No. Actually none.
4  Q. None?
5  A. No. I mean, when I first received the whole
6  binder full, I just flipped through just to make sure
7  what was in there. There was some patents.
8  I assumed that some of those might be the prior art
9  listed on the patent or some of them might be. But
10  I'm not really aware of specifically, you know, which
11  ones that I have to see to come up with any
12  definitions, and so forth.
13  Q. Have you seen DisplayLink's preliminary
14  invalidity contentions in this case?
15  A. No, I have not.
16  Q. Did you refer to any other MCT patents at
17  any point in time?
18  A. No. This is the only patent that I know
19  from MCT.
20  Q. You mentioned looking at communications
21  textbooks that you had from one of your classes.
22  A. Mm-hmm.
23  Q. Do you recall locating any other documents
24  or extrinsic evidence that you thought relevant to
25  the claim construction process?

Page 35

1  Q. Okay. Do you have an understanding of how
2  MCT defines the terms at issue in this litigation?
3  A. I'm sorry. Could you repeat that question?
4  Q. Do you have an understanding of how MCT
5  defines the terms at issue in this litigation?
6  A. I am trying to understand your question.
7      MR. CAULEY: It's just a setup question,
8  right?
9      MR. DIETZEL: Yes.
10      MR. CAULEY: I think he's referring to this.
11      THE WITNESS: Oh, okay.
12      I mean, I have provided all the preliminary
13  and the interpretation of all the terms myself. So
14  certainly I know what the terms mean in this part of
15  this joint proposal. But I wasn't sure if your
16  question is, How do you actually pick those terms to
17  be discussed. That, I don't know.
18  BY MR. DIETZEL:
19  Q. I understand. It's probably a poor
20  question. I shouldn't have wasted your time with it.
21      I'll introduce the Joint Claim Construction
22  Statement.
23      (MIN Deposition Exhibit 3 was marked for
24  identification.)
25

Page 37

10 (Pages 34 to 37)

1  BY MR. DIETZEL:
2      Q. Have you seen Exhibit 3 before today?
3      A. Yes, I have.
4      Q. Regarding the constructions -- MCT's
5  constructions that appear in this document and those
6  that you originally proposed and shared with
7  Mr. Cauley and his colleagues, are there any
8  differences between the constructions for each of the
9  terms, that you can recall?
10     A. No. I believe these are the terms that I
11 have provided the constructions for. Yeah, I mean
12 these are my constructions. I believe, as far as I
13 can tell, word for word, I think these are the
14 constructions of the claim phrases that I have
15 proposed.
16     Q. Okay. Referring to Exhibit 3, the Joint
17 Claim Construction Statement, at the bottom of page 3
18 we have a disputed term, "display device."
19     A. Yes, I see it.
20     Q. Prior to getting involved with the
21 MCT-DisplayLink litigation, did you have an
22 understanding of the definition of the term "display
23 device"?
24     A. Yes, of course.
25     Q. What was that?

1      A. A display device literally is what it says
2  here: Electrical signal, converting that to images
3  that we can see.
4      And I listened to Dr. Jones this morning
5  regarding his statement about images -- just having
6  the image without displaying it. You know, he was
7  doing some investigation on the image processing
8  without really displaying.
9      But, to me, as a person of ordinary skill in
10 the art, without doing all this -- even Dr. Jones
11 mentioned this morning that a person of ordinary
12 skill in the art is a digital systems architect, and
13 he is not a person who does the imaging investigation
14 or anything.
15     The electronic persons would say "image."
16 It just means it's actually what is being displayed.
17 And, you know, we're not going to have an image
18 without being displayed in any -- you know, without
19 being displayed.
20     So I understood what Dr. Jones was saying
21 earlier on. But that's where the -- exactly what is
22 being said here, at least to the person of ordinary
23 skill in the art.
24     Q. Would you characterize your construction
25 here as the plain and ordinary meaning?

1      A. I believe so, yes.
2      Q. Is it correct to say that you believe the
3  construction here is the correct construction in view
4  of the '788 patent disclosure?
5      A. Yes, I believe it is.
6      Q. Your construction here is: "Device that
7  converts electrical signals to images."
8      A. That is correct.
9      Q. Do you contend that any electrical signals
10 can be converted to images?
11     A. Any electrical signal can drive a display
12 device. What results as an image may or may not make
13 any sense. It's no worse than driving an iPod with a
14 data file, for example. Some sound will come out,
15 obviously, because it's an electrical signal that
16 drives the speaker, but what comes out may or it may
17 not make any sense.
18     What I meant here is, in the context of
19 displaying something, what drives a display device is
20 an electrical signal of some kind. In this case, it
21 happens to be the VGA signals. And that VGA signal,
22 which is electrical, which we cannot see, is
23 converted by the display device so we can see it as
24 image. And that's really what I meant by display
25 device being a device that converts the electrical

1  signal to image.
2      Q. You would agree that the phrase "electrical
3  signals" is pretty broad?
4      A. Yes, it is actually a very broad term.
5      I didn't really say that imaging has to be
6  something that makes sense. If you put the
7  electrical signal to a display device, something will
8  show, because it's an electrical device. If you
9  drive that device with a signal, then something will
10 show. It may or may not be something that is useful,
11 but something will slow.
12     The display device does not have
13 intelligence enough to distinguish what it is
14 displaying makes sense to the human user. But it
15 will still display. So, you know, we don't need to
16 limit the signal to -- just to give the signal that
17 is comprehensible by a user or a human being.
18     Q. Do you contend that a person of ordinary
19 skill in the art would consider -- If reading your
20 construction, how would a person of ordinary skill in
21 the art define "electrical signals"?
22     A. Electrical signal has a really plain and
23 ordinary meaning. Electrical signal is just a
24 current -- C-U-R-R-E-N-T -- electrical current moving
25 over a conductor. That's an electrical signal. And

11 (Pages 38 to 41)

1 that's what drives the display device.
2 Q. Okay. You're familiar with Ethernet, the
3 network?
4 A. Sure.
5 Q. Electrical signals travel down the Ethernet
6 wires; correct?
7 A. That is correct.
8 Q. So do you have a display -- is it possible
9 to have a display device that converts Ethernet
10 signals to an image?
11 A. The Ethernet signal -- what is the best way
12 to say this here.
13 Ethernet signal obviously is not meant to be
14 an image. It doesn't really correspond to an image
15 that we can see it and understand, the human being,
16 that is, because it's the bit stream, ones and zeros.
17 And that has nothing to do with image. It is
18 probably some kind of a file that is being -- or the
19 packet that is being transported between the two ends
20 of that communication over the Internet.
21 If you were just to put that signal to a
22 display device, something may flicker on the screen.
23 And, as I said, it may not make any sense. It
24 probably wouldn't make any sense. It's like, you
25 know, connecting the output of your data transmission

Page 42

1 carry a signal on them that is an electrical signal?
2 A. That's correct.
3 Q. You wouldn't drive a display device with an
4 analog telephone signal, would you?
5 A. I wouldn't do that.
6 Q. I'm not sure if I asked this before, but is
7 it your position that all electrical signals can be
8 converted to an image by a display device?
9 A. I'm trying to answer that question in a most
10 concise manner without really going into all this
11 lecturing.
12 As long as the electrical signal stays
13 within the range of electrical limit -- for example,
14 you wouldn't want to put 115-volt electrical signal
15 to a display device that expects a 5-volt signal, for
16 example. It would blow. Or you wouldn't want to put
17 negative 10 volt when the display device expects zero
18 to 10.
19 I mean, you wouldn't want to do that. If
20 you do it, the display device would not know what to
21 do outside of the range that it's expecting. And as
22 long as you put a signal or signals in the range that
23 display device expects, then display device will do
24 something with it. And that being converting that
25 signal into image corresponding to that, whether it

Page 44

1 to an iPod to play that as a music. I mean, it may
2 not make any sense.
3 But the role of a display device is not to
4 decide whether or not something makes sense between
5 these two. The role of display device is to convert
6 whatever comes in to the image that is based on
7 whatever the signal is. And to a person of ordinary
8 skill in the art would know that the display device
9 does not have a role in deciding what is right or
10 wrong in terms of displaying to a person. What comes
11 in will be displayed, and that's what it is.
12 Q. Would a person of ordinary skill in the art
13 try to drive a display device with an Ethernet
14 signal?
15 A. Of course not. You know, there -- I mean,
16 maybe for fun, but not as a -- something that, you
17 know, would promote their professional path.
18 Q. An additional example of an electrical
19 signal would be a radio wave. Do you agree?
20 A. The radio wave would be electromagnetic
21 signal. It would not be electrical signal.
22 Q. Do you characterize light waves as
23 electromagnetic as well?
24 A. That, too, is electromagnetic.
25 Q. Copper wires coming in for an analog phone

Page 43

1 makes sense to the person who is viewing it is not
2 what display device decides. It will just do it. So
3 any electrical signal that's meeting the range of all
4 voltages that is expected from the display device, it
5 will display.
6 Q. I don't want to beat this horse too long.
7 A. Mm-hmm.
8 Q. So there is not a single electrical signal
9 that you can send to a display device that won't --
10 that falls within the voltage parameters of the
11 display device that you were just discussing, that
12 will not result in an image of any form being
13 displayed?
14 A. I think, generally speaking, what you said
15 is correct. As long as the voltage lies between the
16 range that display device expects, the display device
17 will display something.
18 Q. So going to the support you mentioned -- or
19 cite here in the Joint Claim Construction Statement,
20 Exhibit 3 for a display device being a device that
21 converts electrical signals to images.
22 A. Mm-hmm.
23 Q. I want to step through each of these and see
24 if you can show me where this is supported by the
25 patent itself, which I believe are all the citations

Page 45

12 (Pages 42 to 45)

1 here. So looking at the abstract --
2    A. Okay.
3    Q. -- can you show me what language in here
4 supports your construction?
5    A. It doesn't really say any specifically what
6 display device is from that particular paragraph.
7 And I think what is being stated here as intrinsic is
8 that the construction of that display device is a
9 device that converts electrical signals to images.
10    Having that thought as your definition and
11 reading this part of the patent itself, it is
12 consistent -- this definition is consistent in the
13 context of all the abstracts and all the lines that
14 is quoted. And, you know, this patent is really not
15 about display device. It is -- display device is a
16 target of this invention, really. So it doesn't
17 really talk about what it is.
18    Q. Looking at the abstract --
19    A. Okay.
20    Q. -- what electrical signals are mentioned
21 here as being applied to or received by the display
22 device?
23    A. It talks about VGA signal.
24    Q. Does it talk about any other electrical
25 signals being applied to or received by the supply

Page 46

1    A. It would be electrical signal, yes.
2    Q. What about in general?
3    A. In general, I think -- you know, signal, of
4 course, is something very broad. You can have a
5 smoke screen that's the signal, and then you can
6 project it on the screen. And, you know, there
7 may be others.
8    Q. Certainly, all electrical signals are not
9 display signals.
10    A. That is correct.
11    Q. Can you tell me if the '788 patent -- or let
12 me strike that and start over.
13    The '788 patent describes a USB-to-VGA
14 converter; correct?
15    A. That is correct.
16    Q. And then as we discussed in many instances,
17 if not all instances, in the patent itself it talks
18 about sending the VGA signals that result from the
19 USB-to-VGA conversion onto a display device.
20    A. That is correct.
21    Q. Do you recall any portion of the '788 patent
22 where it discusses converting the VGA signals that
23 result from the conversion into some other format,
24 some other signal format?
25    A. No.

Page 48

1 device?
2    A. In this particular case, no.
3    Q. What about lines at 1 -- column 1, lines 5
4 through 28?
5    A. Yeah, once again, the display signal -- the
6 electrical signal is in the form of VGA signals.
7    Q. And at column 1, lines 9 through 10, it
8 mentions a VGA display device, does it not?
9    A. Mm-hmm. Yes, it does.
10    Q. Column 1, line 20 through 21, I believe it
11 mentions VGA signals --
12    A. Yes.
13    Q. -- to the display device. Correct?
14    A. That's correct.
15    Q. Does it mention any other electrical signals
16 being applied to a display device in column 1, lines
17 5 through 28?
18    A. No. In fact, throughout the entire patent,
19 there is no mention of any other type of a display
20 device other than VGA.
21    Q. Okay. Would you say all display signals are
22 electrical signals?
23    A. You mean outside of the -- in general or in
24 the context of this patent?
25    Q. In the context of this patent.

Page 47

1    Q. Can you look at column 4, lines 33
2 through 35. That discusses the direct supply of VGA
3 signals to the display device; correct?
4    A. Give me just one minute to figure out the
5 exact context of what this is.
6    Okay.
7    Q. The question was: That mentions the direct
8 supply of VGA signals to a display device, correct,
9 column 4, lines 33 to 35?
10    For the record, "The VGA controller 20 is
11 coupled to the display control circuit 320 for direct
12 supply of VGA signals to the display device 300."
13    A. I think -- I think the statement in this
14 case is where the claimed invention is actually part
15 of the display device itself. So the circuitry that
16 converts the USB to VGA is actually part of that
17 display controller that is located inside of the
18 display device itself.
19    So in that context, what it says here is the
20 VGA signal is directly supply. I think what the
21 specification means here is all the conversion is
22 done inside of that display device so that we don't
23 really have to worry about the interface. I believe
24 that's what is -- what the specification implies.
25    Q. So this is the USB-to-VGA converter

Page 49

13 (Pages 46 to 49)

1 implemented within the display device itself, as
2 opposed to just simply external, in between --
3     A. Yes.
4     Q. -- the host or whatever the source of the
5 display signals are in the display device?
6     A. Right. I think you can see that from
7 Figure 6 that 300, which is the display device
8 itself, contains actually 100, which is the
9 converter. So the converter is actually part of the
10 display device.
11     Q. So within the context of the '788 patent,
12 you agreed that all display signals are electrical
13 signals?
14     A. Yes.
15     Q. Within the context of the '788 patent?
16     A. Yes, that's correct.
17     Q. However, you also agreed that all electrical
18 signals are not display signals.
19     A. Not all electrical signals are meant to be
20 display signal.
21     Q. Okay. How is one to determine what
22 electrical signals are included within your
23 construction for display device?
24     A. The electrical signal that forms within the
25 range of electrical voltages that display device

Page 50

1 expects. So, you know, you wouldn't want to put
2 1000-volt signal to -- in a display device. It will
3 just blow them. And so the electrical signal -- what
4 I meant by that here is those signals that forms the
5 level of voltages that -- within the range of what is
6 expected by a display device. As long as you have
7 those constrained, the display device will display
8 something. Not necessarily anything useful or even
9 comprehensible, but it will display something.
10     Q. You stated earlier that the '788 patent
11 discloses only VGA signals; correct? It doesn't
12 disclose an alternative form of display signal.
13     A. That is correct.
14     Q. Regarding the display device, does the '788
15 patent disclose anything other than a VGA?
16     A. No.
17     Q. Thank you.
18     Turning to DisplayLink's proposed
19 construction for display device, which is --
20     MR. CAULEY: Are we at a good time for a
21 break? I think we're at about an hour 20.
22     MR. DIETZEL: Yes. Let me just finish this
23 up real quick, if you don't mind.
24     MR. CAULEY: Okay. I thought you were going
25 to another term.

Page 51

1     MR. DIETZEL: Oh, no. Sorry. I was just
2 going to have him critique our position real quick.
3     MR. CAULEY: Oh. Go ahead.
4 BY MR. DIETZEL:
5     Q. So DisplayLink's construction for display
6 devices, electronic devices, for visually
7 representing VGA signals. What about that
8 construction is incorrect?
9     A. I wouldn't say this is incorrect. I think a
10 display device is not, you know, just visually
11 representing VGA signal. A VGA signal happens to be
12 the one that is within the context of this patent.
13 So that's okay.
14     But I don't think it's incorrect, per se.
15 But I would have said it a little differently the
16 way -- you know, the way that I have said it here.
17 Visually representing is like images. And the signal
18 itself is a VGA signal. And the device is electronic
19 device; therefore, it processes electrical signals.
20 So, you know, they are not too different in this
21 particular case.
22     Q. Other than the support that is mentioned
23 here, your list of intrinsic evidence here, do you
24 have any other evidence to support your construction
25 as being the proper construction for this term?

Page 52

1     A. No. I think just being a person of ordinary
2 skill in the art and having worked in electronics
3 area for the past 30 years, that's really where my
4 construction really came about.
5     MR. DIETZEL: All right. Why don't we go
6 forward with the break.
7     MR. CAULEY: All right. Thank you.
8     THE VIDEOGRAPHER: The time is approximately
9 2:01 p.m. We are now off the record.
10     (Brief recess taken.)
11     THE VIDEOGRAPHER: The time is approximately
12 2:20 p.m. We are back on the record.
13 BY MR. DIETZEL:
14     Q. One last question on display device before
15 we move on.
16     I think I had left off asking you if you had
17 any additional intrinsic evidence to support your
18 construction. You responded to that.
19     But I wanted to ask if there was any
20 additional evidence that you wanted to rely on other
21 than the intrinsic evidence that is cited in the
22 Joint Claim Construction Statement for MCT to
23 contradict DisplayLink's proposed construction.
24     A. Once again, I'm not contradicting what
25 DisplayLink has constructed. Certainly the -- what

Page 53

14 (Pages 50 to 53)

1  DisplayLink proposed is part of what is being
2  proposed here. I just have a little more broad --
3  which does or preclude having VGA signal. But, you
4  know, can be much more general.
5       Just looking at the term "display device" by
6  itself, I don't think there was anything else that I
7  really needed to determine what the claim terms would
8  mean.
9       Q. Okay. Very good.
10      In Exhibit 3, the Joint Claim Construction
11  Statement, would you mind turning to page 5, please.
12  And I think I would like to discuss the two terms
13  listed there, I guess, in the middle of the page,
14  technically the first one being the bridge dot, dot,
15  dot issuing FIFO control signal, and then the next
16  one being to receive USB based display signals in the
17  FIFO manner, essentially.
18      Before we do that, I would like to ask a
19  couple questions real quick. Is it your understanding
20  that -- you said you have some patent experience of
21  your own back and forth between the PTO and
22  understand the process.
23      A. Mm-hmm.
24      Q. So is it your understanding that the
25  invention in a patent is defined by the claims;

Page 54

1  and ordinary meaning, right?
2  BY MR. DIETZEL:
3      Q. But that would still be a meaning; correct?
4      A. Oh, okay.
5      Q. Even if it's plain and ordinary.
6      A. Yes.
7      Q. Okay. Turning to Claim 1 of the '788
8  patent, particularly going to column 5, line 1 up
9  there that says the element "a bridge disposed
10  external to the computer."
11      A. Yes.
12      Q. So starting at -- I guess it's about line 2,
13  after the comma, says, "The bridge receiving the bus
14  control command and issuing a first-in-first-out
15  control signal to the USB controller to receive the
16  USB based display signals from USB controller in a
17  first-in-first-out manner."
18      A. Right.
19      Q. That portion of Claim 1 covers the two terms
20  we're going to be discussing now.
21      A. Mm-hmm.
22      Q. Looking at this language we just read from
23  Claim 1, do you agree that the bridge is required to
24  issue a first-in-first-out control signal and to
25  receive USB based display signals from the controller

Page 56

1  correct?
2      A. That is correct.
3      Q. And then drilling down a little further, the
4  scope of the claims is defined by the terms within
5  the claims themselves; correct?
6      MR. CAULEY: Objection. Form.
7      You can answer.
8      THE WITNESS: I'm trying to understand that
9  question.
10      I'm not really sure if I am qualified to
11  answer that question in legal way. The claims has
12  terms and phrases that are put together for one of
13  ordinary skill in the art to understand what it
14  means. If that's what you are referring to, then I
15  would agree with you. But I would not be able to
16  tell you what that means in a legal sense.
17  BY MR. DIETZEL:
18      Q. I understand.
19      So each part of the claim must be given
20  meaning, and that's part of this Markham process,
21  correct?
22      MR. CAULEY: Objection. Form.
23      THE WITNESS: Right. Does every term has to
24  have a meaning? Can some of them be -- I understand
25  that some of them could just mean ordinary -- plain

Page 55

1  in a first-in-first-out manner?
2      A. I mean, that's what the claim limitation
3  states.
4      Q. Okay. And turn specifically to the control
5  signal. The claim says "a first-in-first-out control
6  signal."
7      A. Mm-hmm.
8      Q. And then the manner in which it receives
9  data, it says at line 7, it is to receive display
10  signals "from the USB controller in a
11  first-in-first-out manner"; correct?
12      A. That's -- I mean, that's what the limitation
13  states.
14      Q. Do you agree that issuing -- strike that.
15  Start over.
16      Do you agree that the issuing mentioned in
17  line 4 and the "to receive" mentioned at the end of
18  line 5, beginning of line 6, are two different
19  operations within the context of Claim 1?
20      A. Yes.
21      Q. Is it your understanding that the operation
22  of issuing is an affirmative act by the bridge?
23      A. Could you clarify what you mean by
24  "affirmative act."
25      Q. Let me see if I can --

Page 57

15 (Pages 54 to 57)

1    MR. CAULEY: Belatedly, objection to form.
2  BY MR. DIETZEL:
3    Q. Another way to state it might be, it's the
4  bridge itself that has to issue the FIFO control
5  signal, the first-in-first-out control signal,
6  according to the language of Claim 1; correct?
7    A. I'm pretty sure have to do that.
8    Q. And the bridge has to receive the USB based
9  display signals from the USB controller in a
10  first-in-first-out manner according to the language
11  in Claim 1; correct?
12    A. I'm not sure what you mean by "bridge has
13  to." I believe this is describing a sequence of
14  operation. Bridge issues some augment which is stated
15  here as a first-in-first-out control signal. And as
16  a result of that or the consequence or the -- related
17  to that action, the bridge will receive.
18      You used the phrase "have to" or "has to."
19  I'm not sure if that's a correct statement. But
20  bridge will receive it that is sent by -- something
21  that is sent by the USB controller.
22    Q. Okay. MCT's proposed construction for the
23  claim term -- it's about line 12 on page 5 of the
24  Joint Claim Construction Statement, Exhibit 3.
25    A. Okay.

Page 58

1    Q. This is the element "the bridge...issuing a
2  first-in-first-out control signal to the USB
3  controller." MCT's instruction is, "The bridge...
4  generating electrical signals representing a time
5  sequence control signal to the USB controller."
6    A. Mm-hmm.
7    Q. Can you tell me what is meant by "a time
8  sequence control signal"?
9    A. It means the bridge requests the receipt of
10  the display data, in this case, to be sent in the
11  proper order, time order. So the display signal has
12  a time order starting from the certain pixel location
13  wrapping around.
14      And if it's associated with a motion, of
15  course there is a frame-by-frame time limit. So
16  there is a sequence of those data, the information
17  associated with the display.
18      And the first-in-first-out control signal,
19  to me, is to receive those data in a proper sequence
20  as in like the first, to the second, to the third and
21  so forth, to the display device to display in
22  sequence how the ordinary display device -- including
23  the VGA display device -- work. That's really what I
24  mean by "time sequence control signal."
25    Q. You're familiar with last-in-first-out that

Page 59

1  Dr. Jones mentioned earlier today?
2    A. Yes, I am aware of that. Certainly, this is
3  not what I meant by that. I meant, you know, the --
4  I understand what the stack operation is. You put it
5  on the stack, and then you push it and pop it. So in
6  this case, your sequence is actually reversed over
7  that stack.
8      But the last-in-first-out stack does not
9  always reverse the entire thing. It will reverse in
10  certain segments until the stack becomes empty, and
11  then you start again. So it's not even like proper
12  time sequence, as Dr. Jones mentioned. It is only
13  doing that single operation of a stack going deep and
14  then becoming empty again. During that period of
15  time, the sequence will be reverse. But in the long
16  scale of things, it's not time reversed.
17    Q. Do you contend that last-in-first-out is not
18  a time sequence control?
19    A. No, not in the overall display signals plan
20  of operation.
21    Q. And why is that?
22    A. Well, stack is finite. So if you push it
23  in, the stack will be full. Then you can't put in
24  anymore at that point, and so you have to start
25  taking it out.

Page 60

1      So let's say 1 at the bottom, 2, 3, 4, 5 to
2  10, say, so 10 is at the top. So you build a stack
3  from 1 to 10 and then you take it out, 10, 9, 8, 7,
4  6, all the way to 1. And then what do you do next?
5      Suppose your stack is beginning to fill
6  again, 11, 12, 13, 14, 15, 16, and then take it out,
7  20, which is at the top in this case, 20, 19, 18, 17.
8  So look at the sequence of the packet. It will be
9  10, 9, 8, 7, 6 to 1 and then go to 20, 19, 18, 17 to
10  11. So that is not a time sequence.
11    Q. Why is that not a time sequence?
12    A. Because the sequence is not continuous. I
13  mean, you know, it's somewhat random. And the
14  example that I just gave you is a nice example. For
15  example, where, you know, it fills up all the way and
16  then emptied all the way. What if you filled it just
17  a little bit and then take it out and then start
18  filling again; it can go up and down this way. Then
19  there is no predictable way of determining what the
20  time sequence is.
21    Q. So what part of a time sequence limits your
22  construction to be something that would not include
23  LIFO?
24    A. The sequence to me -- to me, the time
25  sequence means it is order according to the sequence

Page 61

16 (Pages 58 to 61)

SHARI MOSS & ASSOCIATES                    (415) 402-0004
                    (415) 402-0004

feddff36-9c5d-4976-bedf-ac500a4a86ed

1  in time.
2      Q. So you have given the example you gave a
3  while ago.
4      A. Mm-hmm.
5      Q. But let's stick with the first portion of
6  the example, where you said you've got ten slots --
7      A. Okay.
8      Q. -- and you're processing last-in-first-out.
9      A. Okay.
10     Q. So you deposit one, you deposit two, all the
11  way up to ten --
12     A. Yes.
13     Q. -- and then you start taking stuff out.
14     A. Yes.
15     Q. Then it's 10, then it's 9, then it's 8 that
16  comes off first.
17     A. Yes.
18     Q. Is that not a time sequence control?
19     A. Oh, doing that small portion, that first ten
20  packets, it happened to be ordered backward. But
21  what happens after that?
22         The time sequence for here, it means it's
23  the entire time period during this device is in
24  operation. So you cannot just have a small portion
25  of it time sequence and not the rest of it.

Page 62

1      A. But it's not just -- let's say -- let's say
2  you want to display your display device for, say, one
3  second, just one second. I mean, I don't know why
4  anybody would do that. But let's say just display
5  for one second. Even the earliest version of VGA,
6  the IBM, the one that Dr. Jones mentioned earlier,
7  the a 640 by 480. That's the resolution. And each
8  pixel can be, you know, 16 -- 16 different colors
9  or -- you know, as I said. Then we are talking about
10  several mega -- mega -- maybe several megabits or
11  megabytes. I don't have a, you know, calculator. So
12  it's a substantial amount of data for just one-tenth
13  of a screen. And you do that, say, 70 times or
14  60 times during the second, and that's how it's done.
15         So even for one second, that's a lot of
16  data, a lot amount of information. I don't think you
17  are going to put that in a LIFO, for example. Not to
18  mention even ten seconds or in a minute. So putting
19  display signals in a LIFO would make no sense. Or in
20  that matter, any active memory that you want to
21  display on.
22     Q. Do you agree that a last-in-first-out is not
23  the same as first-in-first-out?
24     A. I agree with that. Of course.
25     Q. So even based on the limited examples that

Page 64

1      Q. Where does your construction say that a time
2  sequence is the entire time period?
3      A. Electrical signal is a continuous signal; it
4  continues forever. You know, in the scheme of
5  things, "forever" means duration of the interaction.
6         The electrical signal comes one after
7  another continuously, and that's how the display
8  device works. You don't just send small, like ten
9  packets and stop and say I sent it in LIFO.
10     Q. There is a beginning and an end to --
11     A. Right.
12     Q. -- most, if not all, transactions; correct?
13     A. Oh, sure. But, you know, you cannot -- in a
14  LIFO transaction, during the beginning to the end, in
15  any reasonable amount of display of signal being
16  transmitted, you will not have time signals intact.
17     Q. That's because you're assuming memory
18  limitations?
19     A. Memory is limited. It's not assumption.
20  It's a fact. Every memory is limited.
21     Q. It's not possible to have a memory that
22  would hold an entire transmission from beginning to
23  end?
24     A. It depends on how short the transmission is.
25     Q. Exactly.

Page 63

1  we discussed earlier, granted some of them may be
2  extremes, may be -- I won't say impossible, but
3  wouldn't commonly be implemented in industry. But it
4  is possible to have a transaction burst that fits
5  within a last-in-first-out organized memory, where it
6  fits from beginning to end so that that is taken out
7  in the time sequence you described earlier, one
8  through X, and then it comes off X back down to one.
9      A. Mm-hmm.
10     Q. So that LIFO process, based on what I
11  understand you telling me earlier, would fall within
12  a time sequence that you have included in your
13  constructions here?
14     A. When I say "time sequence," I meant the
15  ordering in a proper ordering. That's really what I
16  meant.
17         But if you want to include the reversed time
18  sequence for LIFO transactions, that would be
19  reversed time sequence. I didn't really imply -- or
20  the person of ordinary skill in the art, when we say
21  "time sequence," it means properly ordered timing.
22  You know, that really was not what I was implying by
23  "time sequence" at all.
24     Q. You say "properly ordered timing." How is
25  properly ordered timing determined? Does that not

Page 65

17 (Pages 62 to 65)

1  depend on your application?
2      In some applications, LIFO may be a proper
3  ordered timing. In some applications, FIFO may be a
4  proper ordered time. Is that not correct? I should
5  say in general.
6      A. So it says it's issuing a first-in-first-out
7  control signal to USB controller to receive the
8  USB-based display signal. I mean to a person of
9  ordinary skill in the art, the display signal as --
10  and especially in the context of a VGA, which is the
11  further limitation down the stream -- it just means
12  starting from the top, from the left to right, how
13  the VGA screen would be painted by pixel by pixel.
14  So to a person of ordinary skill in the art, it's
15  very clear terminology when you say "proper
16  sequence." It's one pixel at a time from left to
17  right, top to bottom. And that's what the sequence
18  is.
19      Q. So that's the way we should interpret
20  generating electrical signals representing a time
21  sequence control, is -- let's see if I can get your
22  language -- one pixel at a time from left to right,
23  and then top to bottom on the display?
24      A. Well, once again, what I meant here is, when
25  you say "time sequence," that is understood as a

Page 66

1  person of ordinary skill in the art would read this
2  claim limitation.
3      Q. Would you say FIFO is -- the concept of
4  first-in-first-out is well known in the industry?
5      A. Of course, yes.
6      Q. How long has FIFO been around? Do you know?
7      A. It certainly predates me.
8      Q. It seems like they're fairly old. Correct?
9      A. Mm-hmm.
10      Q. In your opinion, does the '788 patent
11  redefine the term FIFO, or first-in-first-out?
12      A. No.
13      Q. So it's plain and ordinary meaning to anyone
14  dating from before your time, even getting into --
15      A. Yeah. Let me -- just to clarify one thing,
16  though. I think FIFO as a device is not what is
17  meant here, I don't believe. I believe it's just
18  FIFO as an algorithm.
19      Q. Sort of memory management concept rather
20  than --
21      A. Not even memory. You can have a FIFO as
22  a -- you know, any operation. It doesn't have to be
23  electronic operation. Even, you know, it could be,
24  you know, somebody coming to a motor vehicles office,
25  you know, standing in line.

Page 67

1      I don't think FIFO here is meant to be a
2  device -- the memory device FIFO, the buffer, as
3  Dr. Jones was alluding to this morning. I think it's
4  broader than that. It's just the algorithm or the
5  order that -- you know, the sequence of
6  transaction -- using once again his word -- be
7  honored according to that time sequence. There is
8  really nothing that says here talking about buffer or
9  memory.
10      Q. In the intrinsic evidence you cite for each
11  of these two disputed terms, I believe it's the same
12  for both of them.
13      A. Yes.
14      Q. Is there any of that intrinsic evidence that
15  defines -- strike that. Start over.
16      Is first-in-first-out redefined as a time
17  sequence in any of the intrinsic evidence that you
18  cite here?
19      A. Not intrinsically. First-in-first-out would
20  be a term that is well understood by, you know, a
21  person of ordinary skill in the art.
22      Q. Would you say that first-in-first-out is
23  self-defining?
24      A. I'm not sure. I'm not sure if, say, my
25  ten-year-old daughter would understand what

Page 68

1  first-in-first-out means. I think she may have an
2  idea of what it is. But I think first-in-first-out
3  is a term that is used widely among the people who
4  would be a person of ordinary skill in the art.
5      Q. The portion of your construction the bridge
6  generating -- or sorry. Strike that.
7      The portion of your construction generating
8  electrical signals, can you explain what you mean
9  there?
10      A. I was trying to interpret what issuing
11  means. What does issuing whatever this is control
12  signal means.
13      To me, the issuing signal to another
14  electrical device, which in this case is USB
15  controller, is generating an electrical signal
16  representing the first-in-first-out control, which
17  is, as I mentioned before, telling the time sequence
18  control signal. So that's really what I meant by
19  that.
20      Q. So an example of generating electrical
21  signals would be creating a command packet and
22  sending it down a pathway --
23      A. Yeah, that's right.
24      Q. -- from the bridge --
25      A. Right.

Page 69

18 (Pages 66 to 69)

1  Q. -- of the USB controller, for example?
2  A. Everything is really electrical signal.
3  And, once again, electrical signal that is, you know,
4  acceptable in this -- I mean, it's implied that we're
5  not doing anything outrageous like any electrical
6  signal, but something that is expected by USB
7  controller.
8  Q. But expected to be received by the USB
9  controller?
10  A. In the format, that is.
11  Q. Okay. Turning to DisplayLink's construction
12  for each of these two terms. Is it your opinion that
13  DisplayLink's construction is inaccurate?
14  A. I think -- I think there is some inaccuracy
15  associated with what is being said here.
16  If you look at USB message passing scheme,
17  there is a -- what is being sent, there is no
18  guarantee. Let me repeat that.
19  What is being sent from a device, the
20  sending device, there is no guarantee that it is
21  going to be received by the receiving device. And
22  USB specs specifically says how to deal with all
23  these error conditions. So what is being received by
24  the receiving endpoint is not necessarily in a proper
25  order or timing that is to be displayed as a part of

Page 70

1  the display signal.
2  So as I read this specification -- I'm
3  sorry -- the claims, and knowing what this device is
4  all about, to display the signal in a way, the
5  first-in-first-out is really associated with the
6  signal itself, not really by what is happening at the
7  USB controller. The USB controller may or may not
8  get the proper display signal in the order, and there
9  might be some missing and there may be some things
10  that are not quite correct in terms of both
11  communication between the host to USB controller.
12  And those are not really captured properly by just to
13  the order USB controller is received. That is really
14  not the most important thing in terms of constructing
15  a proper display signal. The proper display signal
16  is really the order of the pixel-by-pixel
17  information, which was really what was sent from the
18  host computer. That's really more important thing.
19  So I would have to say that the order in
20  which it was received by the USB controller is really
21  not an accurate statement for what the bridge is
22  supposed to do in terms of getting the data in.
23  So, you know, the way I said it is a time
24  sequence; that is, time sequence is not necessarily
25  what is happening on the USB controller. It is a

Page 71

1  time sequence associated with the display data
2  itself. We want those data to be received in order.
3  Q. But it's a particular time sequence, as
4  you've said more than once. You want -- frame 1 to
5  frame 60 are coming across or from the upper
6  left-hand down to the lower right-hand corner of the
7  display. If data is coming across either in that
8  order or in some other order, you want to extract
9  from the USB controller in the order from upper
10  left-hand corner to lower right-hand corner.
11  A. Yeah.
12  Q. That's how the display works; correct?
13  A. Yes, that's right.
14  Q. So that's the proper -- that's the timing
15  sequence to which you refer?
16  A. That's correct.
17  Q. Okay. So it's not necessarily a generic
18  timing sequence, it's the -- I guess it's the timing
19  sequence bound by the requirements of the target
20  device, the display device.
21  A. That is correct.
22  Q. Because if I recall correctly, it doesn't
23  sound like you disagree that read broadly, last-in-
24  first-out can mean a time sequence.
25  A. No, that's not what I meant at all. I mean

Page 72

1  I agree with you, what you just said.
2  Q. Okay. Other than the intrinsic record that
3  you cite for each of those two terms and your
4  knowledge as a person of skill in the art, your
5  understanding of FIFO, display device technology,
6  display technology generally, is there any other
7  intrinsic or extrinsic evidence on which you relied
8  to support your construction for these two terms
9  we're discussing?
10  A. No.
11  Q. And as far as your position that
12  DisplayLink's proposed construction for these two
13  terms is imprecise or inaccurate, your support for
14  that -- is that the same as your support for why your
15  constructions are proper?
16  A. Yes.
17  MR. DIETZEL: Why don't we take a quick
18  break.
19  THE VIDEOGRAPHER: This concludes Videotape
20  No. 1 in today's deposition. The time is
21  approximately 2:55 p.m. We are now off the record.
22  (Brief recess taken.)
23  THE VIDEOGRAPHER: The time is approximately
24  3:04 p.m. This is the beginning of Videotape No. 2
25  of the deposition of Dr. Paul Min on January 8th,

Page 73

19 (Pages 70 to 73)

1  2008. We are now on the record.
2  BY MR. DIETZEL:
3      Q. Okay, Dr. Min. I would like to refer you to
4  page 4 of Exhibit 3 of the Joint Claim Construction
5  Statement. The term I want to discuss is the only
6  one that appears there, and that's "bridge."
7      A. Mm-hmm.
8      Q. The MCT construction for this particular
9  term is: "Device that converts electrical signals
10 between different domains in the form understood by
11 the receiving domains, through which each signal
12 travels over a fixed path."
13     A. Mm-hmm.
14     Q. Do you believe that to be the correct
15 construction?
16     A. I believe it is.
17     Q. And on what do you base your opinion that
18 that is the proper construction?
19     A. First of all, as Dr. Jones this morning
20 concurred, "bridge" is a term of art in many
21 different ways. And by that, I mean a person of
22 ordinary skill in the art knows what a bridge is in
23 general and applies that general knowledge to the
24 specific situation that the bridge is disclosed here.
25 And based on that ground, I believe that what we have

Page 74

1  proposed here, as shown in the second column -- I'm
2  sorry, the third column under MCT's proposed
3  construction is the correct one.
4      Q. Okay. So outside of the '788 patent, how
5  would you define the term "bridge"?
6      A. Bridge has many meanings. Of course, you
7  know, bridge could be, you know, bridge over the
8  troubled water, or anything. Right? So --
9      Q. In the electronics industry, then. How
10 about that.
11     A. Even within the electronics industry, it
12 could have a communication bridge. You know, I think
13 Dr. Jones alluded to some aspect of that this morning
14 as well.
15     Or it could be bridges just converting
16 between two different parts of electrical domain
17 or -- so "bridge" just means there is a certain
18 conversion between two or more different segments
19 that are connected by the bridge. So it carries over
20 that general meaning of a bridge, the structure
21 bridge, into the electrical systems domain, but it
22 gets specialized depending on the application.
23     Q. You said a certain conversion between two or
24 more different segments.
25     A. Domain, yes.

Page 75

1      Q. So can you explain to me what you mean by
2  "segments" or "domains," as you stated?
3      A. Yes. The bridge sits in between one side --
4  let's just give an example, you know, just having two
5  domains only, from Domain A and Domain B. You could
6  have more than that. But let's say just we are
7  concerned -- we are concerned with two domains,
8  Domain A and Domain B.
9      Domain A has certain electrical signal
10 scheme that it uses to exchange information, data,
11 processing, whatever the test that it needs to
12 perform. And then Domain B, say, have its own.
13     And the bridge, it will perform a function
14 that in case if Domain A needs to work with or
15 communicate with Domain B, or vice-versa, the bridge
16 will perform the conversion process, so that whatever
17 A is requesting or needs to be performed for A is
18 understood by the B domain. That's what really
19 bridge is doing for the case of two domains.
20     Q. In the context of the '788 patent, what are
21 the domains?
22     A. We have a domain of a USB and domain of a
23 VGA. So we have two domains, starting from USB side
24 to the VGA side. Okay?
25     Q. Are there any other domains mentioned other

Page 76

1  than USB and VGA in the '788 patent?
2      A. Not in the '788 patent.
3      Q. Would you define VGA as a bus protocol?
4      A. VGA is -- I mean, you know, bus could mean
5  so many different things. And bus in general is a --
6  first of all, you have to have a -- the conductors
7  lay in the straight linear direction, so it's
8  stretching out. And bus also has addressing scheme,
9  because a bus allows more than one device to be
10 attached. So when electrical signal is assigned to a
11 bus, it not only has to say what to do, but also has
12 to say who is going to do it by telling addressing
13 scheme.
14     And VGA is really not a bus. Because what
15 is being attached on the other side is just terminal.
16 It doesn't really have an address; it's just where
17 the endpoint is.
18     So this definition, VGA being the bus on the
19 other side, as proposed by the DisplayLink is
20 actually incorrect. Because, you know, it doesn't
21 have to be bus. I mean, the VGA is really not a bus
22 on the other side. Although, within the domain
23 between the VGA controller to bridge could be a bus,
24 because it's internal to the invention that is being
25 described. But it doesn't have to be.

Page 77

20 (Pages 74 to 77)

1    Q. Certainly, in a VGA controller there are
2  signals transmitted along media; correct?
3    A. You mean VGA controller transmits out or to
4  VGA controller something is being transmitted?
5    Q. Even within the VGA controller, signals are
6  transmitted as they are processed.
7    A. Right. So this was one of the issues that
8  Dr. Jones this morning was talking -- describing. He
9  was saying that inside of any device, there is all
10  kinds of electrical signals being passed along. And,
11  therefore, you know, you don't know where those
12  electrical signal is going to go and so forth.
13  Perhaps he was thinking electrical signal at a much,
14  much too low of level.
15      Here we are talking about -- and if you
16  see -- let me just give you an example. When I say
17  "electrical signal," that is really -- the electrical
18  signal is associated with like a message level. It's
19  a pretty high-level term that I'm trying to use here.
20  And I think my interpretation is quite consistent in
21  that regard. So we're not talking about, you know,
22  small microscopic electrical charges going back and
23  forth between two nan gates within the -- you know,
24  we're not talking about that.
25      We're talking about the signal that contains

Page 78

1  that's what is being described throughout the patent.
2      The patent does not go into the level of the
3  microscopic gate and transistor level. The patent
4  talks about functional block level. And a person of
5  ordinary skill would not extract or extrapolate the
6  description that is in the patent claims language, as
7  well as the specification, would not think from there
8  to, Oh, what does nan gate inside interface would do?
9  That's really not going to happen by the person -- a
10  person of ordinary skill in the art.
11      Q. So if I understand you correctly, an example
12  of what you're saying is, you've got Box A, Box B, and
13  maybe they are connected by a PCI bus. So a person
14  of ordinary skill in the art is only going to worry
15  about how the PCI transmission is going to go
16  forward, the electrical signal -- how it's going to
17  be packaged across whatever media is in between your
18  two endpoints.
19      A. Well, I mean, that's not exactly what I
20  meant. What I was just describing to you right now
21  was, if a patent describes the flow of data at a
22  level that is the functional block diagram level,
23  like how this patent 79 -- '788 patent describes, as
24  a person of ordinary skill would read the patent, the
25  person would stay at that level to understand the

Page 80

1  the information or some functional information being
2  transmitted between different functional blocks.
3  That's really, you know, what is being described as
4  my proposed construction.
5      Q. Okay. But your proposed construction,
6  everywhere you use "electrical signal," it doesn't
7  say that that is at a transaction level or at a
8  message level.
9      Like the plain and ordinary meaning of
10  electrical signals, as you just mentioned, can be the
11  little pulses that go between nan gates down at the
12  transistor level, the logic level. It's your
13  testimony just above says that that's not really what
14  you were talking about; you were talking at a higher
15  level.
16      A. Let me try to answer the question.
17      I'm, of course, speaking on behalf or from a
18  point of view by a person of the ordinary skill in
19  the art. When that person sees the block diagram
20  where the arrows are shown here, here is one arrow
21  going to a block and coming out of that block. And
22  that person of ordinary skill would not really be
23  worried about, you know, nan gate creeping up or
24  down. The person would be considering, at the level
25  that I'm addressing, which is at a block level. And

Page 79

1  same level as the patent is being described, he --
2  the person would stay at that level.
3      The person would not, you know, go into the
4  level like, Okay, what does the transistor inside of
5  that 54 will do? Would that be charged up, charged
6  down? The person would not do that. And that's why
7  the patent needs to be read in the context of the
8  claims language as well as the specification. And
9  from there, one can decide what level it is being
10  described. And the way that I have interpreted it,
11  the different claim phrases, I believe is consistent
12  with the level that is being described.
13      Q. Well, the patent talks about USB, it talks
14  about VGA, it mentions PCI, it mentions AGP.
15      A. Mm-hmm.
16      Q. Which are all bus level sort of protocols,
17  except for the VGA, which you just mentioned is not
18  really probably a bus topology --
19      A. No.
20      Q. -- like PCI, AGP and USB are. Those are
21  all --
22      A. That's right.
23      Q. -- standard processes. You've got media
24  connecting two points. And PCI, AGP, USB all have a
25  packet form that goes along with it.

Page 81

21 (Pages 78 to 81)

1   A. Yes.
2       Q. And it sounds like what you're describing,
3   for example, in the '788 patent, you've got a host
4   system that's got a USB controller and a USB output
5   on it. You've got the USB-to-VGA converter of the
6   invention that is external to the host system. Those
7   are connected by a USB wire.
8       So if I understand what you're telling me
9   now, the electrical signals that one would think of,
10  if they were worried about what is happening in
11  between the host and the USB-to-VGA converter over
12  the USB link to the USB media, would be at the USB
13  level. It wouldn't be at what is going down each of
14  the four wires, the D-plus, D-minus.
15      A. I mean, this is not exactly like where I can
16  draw the line in between. I mean, there might be the
17  USB level and then D-plus, D-minus, as you mentioned.
18  And then, you know, there might be other level.
19      But the extreme, really, down here is
20  clearly not the case, such as, you know, which
21  transistor is being charged up and down. I mean
22  certainly we know that is not what this patent is
23  about. And I think the person -- as the person reads
24  the specification and the claims language would have
25  a general understanding, and then I think the general

Page 82

1   because those are certainly electrical signals.
2       But once you put all of that -- and based on
3   your description now and put all of that in the
4   context of the '788 patent, you're saying electrical
5   signals has this additional meaning, which brings it
6   up higher than logic electricity that Dr. Jones was
7   talking about.
8       A. Yes, that's correct. That is correct.
9       Q. What would you say is the difference between
10  domains and interface standards, the domains being
11  used in your construction and the interface standards
12  of DisplayLink's?
13      A. There is nothing that says the bridge has to
14  connect between two interface standards. Okay?
15  That's what the -- a construction by DisplayLink. It
16  says different interface standard.
17      The bridge doesn't have to work between the
18  two standards. It could be bridge within somebody's
19  own circuitry. And, in fact, if I look at the patent
20  carefully here, what is shown in Figure 1, inside of
21  that USB-to-VGA converter, the block 10 and 20 is
22  connected by the 30 -- the bridge in between.
23      Just reading the patent, we know that
24  between USB port, which is part of a host computer
25  the block 200 and the USB controller, which is part

Page 84

1   understanding would be at a block diagram level.
2       Here in the figure we look at the USB
3   controller. And then inside of the bridge device in
4   the figure -- Figure 2, for example, of the '788
5   patent, it's got smaller block inside of one of the
6   elements of the invention, which is USB-to-VGA
7   converter. So here, you know, the patent talks
8   about -- in fact -- in the claims language as well as
9   in the specification -- some of the specific form of
10  data.
11      So we're talking about that level where the
12  information is being exchanged between the different
13  blocks of the invention, not inside of a small part
14  of a block and what the transistor would do inside of
15  that. There is really no basis for worrying about at
16  that level, because the patent really does not talk
17  about that.
18      Q. I understand.
19      But your terminology, "electrical
20  signals" --
21      A. Is between the blocks, once again.
22      Q. But the plain and ordinary meaning of
23  electrical signals includes everything that you just
24  described all the way to the signals that Dr. Jones
25  was talking about this morning, in between nan gates,

Page 83

1   of a USB-to-VGA converter, which is labeled as block
2   10 -- between those two, yes, you have to talk in
3   standard USB, because that's what USB connection is.
4       And also between VGA controller 20 to
5   display device 300, you have to be VGA signal at that
6   point because that's, once again, the standard.
7       But there is nothing that says between 10
8   and 30, which is the USB controller, and bridge needs
9   to be standard; there is no mentioning that signal
10  has to be a standard signal. It just has to convey
11  the USB based display signal. But the interface does
12  not have to be standard. In fact, it would be
13  expensive to meet standard inside of one's own
14  product. Why would anybody comply to a standard
15  inside of one's own product?
16      There is nothing -- the patent says in the
17  claims language or specification that says interface
18  between 10 and 30, which is the USB controller and
19  bridge, and then also interface between the bridge
20  and the VGA controller has to be any kind of
21  standard. It could be completely proprietary, to
22  make the device more reliable and cheaper.
23      So my objection here is -- one of the
24  objections here is based on the fact that it calls
25  for different interface standard. It doesn't have to

Page 85

22 (Pages 82 to 85)

1  be.
2      Q.  So you're reading into standards something
3  like a USB, a PCI, an AGP.  Is that what you're
4  reading as interface standard?
5      I don't see why interface standard here
6  wouldn't include what you just mentioned, if you say
7  a proprietary communication protocol in between
8  blocks.
9      A.  I wouldn't call that a standard.  I mean,
10  the word "standard" here has a meaning.  "Interface
11  standard," it's a term of art.  When one says
12  "interface standard," it means what you just said.
13      Q.  Something that's been adopted by the
14  industry?
15      A.  Exactly.
16      Q.  Okay.  The portion of MCT's construction
17  "through which each signal travels over a fixed
18  path," can you show me where in your citations of
19  intrinsic evidence this is a limitation is
20  associated with the disputed term bridge?
21      A.  First of all, before even I go to intrinsic
22  evidence, bridge is different from router or
23  switches.  I think Dr. Jones has also mentioned that
24  this morning as well.
25      Bridge means it's a connection between the

Page 86

1  control flow that will go between these blocks and it
2  kind of disappears as a -- the control ends at that
3  point.
4      There is nothing that says the control
5  signal going into the bridge and finishing it there
6  is not a proper description under the term -- let me
7  see -- the "convert."  The "convert" means the bridge
8  will take in the signal and do something to it, and
9  then -- and sending it out to VGA controller nothing.
10  That's also conversion as well.
11      So what I meant here is that for each of
12  type of signal, each signal -- when I say "each
13  signal" it means the signal is a continuous stream
14  that keeps coming.  Right?  It's a display signal,
15  USB based display signal that keeps coming that each
16  signal that continues will continue to be traveling
17  over a fixed path.  That signal, continuous signal,
18  will not change path during the period of that
19  transmission.  That's what bridge is.  Bridge does
20  not do any decision on where that same signal should
21  be routed at any given point in time.
22      And that's a -- that's a -- that's a term
23  that is well understood by a person of ordinary skill
24  in electronics, communication, computer.  I think
25  that the bridge just means that.  Therefore, the

Page 88

1  two or more sections or domains or, according to him,
2  bus or whatever.  There is no decision of a routing
3  made in bridge.  What he said, Dr. Jones said, was
4  there is some routing done because of all those
5  electrical signals being at a much lower level than
6  the block diagram level.
7      As an example, if you look at Figure 2, the
8  data signal -- okay?  So this dotted line of the
9  box 30 is the bridge.  Okay?  The bridge connects
10  between the USB controller 10 and VGA controller 20.
11  All of the display signals that comes in through 10
12  into the bridge 30 goes out to 20.  It just gets
13  appropriately prepared so that the VGA controller 20
14  can make the display device which will come after the
15  VGA controller to display.  All of the signal comes
16  in, gets properly converted or translated and then
17  goes to VGA controller.  I think that's -- you know,
18  that's pretty obvious.  So that's for the display
19  signal.
20      The control signal, actually, as Dr. Jones
21  mentioned, some of the control signal is really for
22  communicating to certain functional block inside of
23  the bridge.  For example, that first-in-first-out
24  controller to a USB controller, back, I guess,
25  further going to a USB host, there is a certain

Page 87

1  signal that comes over the bridge would not have any
2  header processing, would not do any header
3  processing.
4      Q.  Then you included this portion of the
5  construction, the "through which each signal travels
6  over a fixed path" to ensure bridge is differentiated
7  from the routers and the switches that you mentioned
8  earlier?
9      A.  That's correct.  Yeah, that's right.
10      Q.  And that's based on what someone of ordinary
11  skill in the art would define a bridge, Because it
12  doesn't have that functionality in it.
13      A.  Right.  I think Dr. Jones this morning
14  mentioned that as well.
15      Q.  So within the bridge itself, is there a
16  fixed path within the bridge?
17      A.  For type of signal, yeah.  The control
18  signal, I think is specified very clearly in the
19  claims language.  There is a FIFO control signal
20  going from the first-in-first-out controller to the
21  USB controller, USB controller issuing a bus command,
22  and there is DMA signals going from the USB
23  controller to the display at the firmware interface.
24      It's spelled out precisely as to what these
25  signals are.  There is no choice by which that

Page 89

23 (Pages 86 to 89)

| | |
|---|---|
| 1 these type of signal would take a different path in a<br>2 different point in time based on some condition.<br>3     Q. Can there be different paths within the<br>4 bridge; let's say some data comes across encrypted,<br>5 some comes across decrypted -- or I guess unencrypted<br>6 rather, to be more precise.<br>7     A. Those would be two different types of<br>8 signals. If signal format is different, then they<br>9 are two different types of signals.<br>10     So if the signal is coming in and before --<br>11 initially, that first part of the signal is going<br>12 through, the bridge will be configured so that it<br>13 knows exactly what that transaction is; in other<br>14 words, okay, you need to decrypt it and do whatever<br>15 you need to do, and then start sending. So beginning<br>16 from the first bit of that data, it will stay in that<br>17 path.<br>18     Q. But at some point it has to make a decision,<br>19 does it not? If you're getting -- you know, we've<br>20 got a USB link coming into the bridge, right?<br>21     A. Yes.<br>22     Q. Or we've got get a path between the USB<br>23 controller and the bridge. So if encrypted data<br>24 comes from the USB controller to the bridge over that<br>25 same path, later some decrypted data or unencrypted<br><br>Page 90 | 1     Q. So in my example, then, would a device that<br>2 included that functionality, that received that<br>3 packet, made a determination whether it needed<br>4 decryption or some further processing, would that<br>5 device then not be a bridge because it would include<br>6 routing capabilities?<br>7     A. Once again, if a signal is coming in as<br>8 decrypted -- I'm sorry -- encrypted or not<br>9 encrypted -- that's probably a better terminology --<br>10 then, before that signal is sent, the bridge will be<br>11 configured. It's probably not the bridge that will<br>12 make the decision. The host computer will have to<br>13 tell that the signal is encrypted or decrypted --<br>14 encrypted or not encrypted. Because the bridge has<br>15 no way of knowing what that is unless the source<br>16 tells the bridge; the source of that signal tells the<br>17 converter, saying this is encrypted data.<br>18     The converter will just act upon however it<br>19 is being configured, and that's not a real-time<br>20 operation. The real-time operation is for a stream<br>21 of a signal, the bridge will make a decision as to<br>22 where it needs to send. And that's not what's<br>23 happening here.<br>24     Q. What I'm taking from what you're explaining<br>25 to me is that you agree that a bridge would not be a<br><br>Page 92 |
| 1 data may come across?<br>2     A. That's why I put the adjective "each<br>3 signal." I'm not talking about just the signal being<br>4 all the way through. It's called "each signal."<br>5 So when that format changes, it's a different signal.<br>6     Q. Okay. So the different signal comes in,<br>7 nonetheless, when it's received by the bridge, the<br>8 bridge will determine whether or not it needs to be<br>9 decrypted or whether it's unencrypted data and can<br>10 just be proposed; correct?<br>11     A. No. No.<br>12     Q. So that would be a routing --<br>13     A. No, no. Either -- No. I think the routing<br>14 is a real-time operation. Okay? The routing<br>15 switching, these are real-time operations. So to do<br>16 routing, that means you're making a decision on where<br>17 to route in real time.<br>18     The operation you just mentioned is a<br>19 configuration. It's more like a configuration<br>20 process: telling the bridge what to do in the<br>21 beginning of the session, or beginning of the<br>22 transmission. You configure the bridge, and then the<br>23 bridge -- it's converter bridge in that way<br>24 permanently during that period of the signal being<br>25 active.<br><br>Page 91 | 1 device that would make a decision whether or not to<br>2 decrypt a received batch of data. For example, you<br>3 have whatever other further processing needed by the<br>4 device. We're using the example of unencrypted and<br>5 encrypted data.<br>6     So if we're talking about -- we've got a<br>7 box, you know, we've got our USB controller, we've<br>8 got a link to a box out the other side; VGA data goes<br>9 to a VGA controller.<br>10     If I send encrypted data into that box, that<br>11 box then checks the data to determine whether or not<br>12 it's encrypted, and then if it's encrypted, sends it<br>13 down one path, if it's not encrypted, sends it down<br>14 another path. Obviously, the one path being<br>15 decryption for further processing, the other path<br>16 being whatever magic happens to produce the signal to<br>17 go out the other side of the box. That that box<br>18 would then not be characterized as a bridge. All of<br>19 that transaction could be performed in real time, the<br>20 packet comes in, analyze it, decide which way it<br>21 goes.<br>22     A. I want to be more precise here.<br>23     Bridge would not inspect data that is coming<br>24 in on a packet-by-packet basis by looking at the<br>25 header. Bridge would not do that. Okay?<br><br>Page 93 |

24 (Pages 90 to 93)

1    The bridge works on the stream of signal.
2  Okay? If a packet comes in continuously, belonging
3  to that same stream, it will do the same forwarding
4  according to a path that is set. It does not make
5  decision on which way it needs to do it.
6    Now, if the path is associated with a
7  different processing, the bridge would not perform
8  that packet-by-packet function. And that is a worse-
9  stated function of a bridge; the bridge will not do
10  that. The bridge will just forward the same stream
11  of a signal to the same path at all times.
12    Q. So is it correct to say that the bridge
13  has -- at a high level it has one purpose, and that's
14  to take in something packaged according to Domain A,
15  convert that to Domain B and then pass it out onto
16  domain -- or to Domain B, whatever that may be?
17    A. That's right.
18    Q. And nothing else. So it looks at -- if it
19  comes out packaged in protocol XYZ and it needs to go
20  into protocol ABC, that's what it does; it takes in
21  XYZ, changes everything it needs to to put it in ABC
22  protocols, and then sends that out the other side?
23    A. Well, once again, I want to be clear that
24  there is a difference between bridges and routers and
25  switches, the difference being one that makes a

Page 94

1  in the patent, a stream of signals -- or in this case
2  maybe if it's a bus, it can be a bundle of signals
3  that are bundled together -- a stream of a signal or
4  signals bundled together will travel over a fixed
5  path. That path is known precisely, it doesn't
6  change; it always goes into that path as long as that
7  signal is active. Now, if you turn it back on and
8  you configure that bridge again to do something
9  differently, you can do so. But while that signal
10  that I just mentioned to you is being transmitted in
11  an active session, it stays on.
12    Q. So in a switch or the router scenario, or
13  devices that you were discussing as being different
14  from a bridge, those would look at something in the
15  packet and then make a decision.
16    A. Right.
17    Q. It doesn't need to go down one, two, three
18  or four?
19    A. That's correct.
20    Q. So something that makes that sort of
21  decision falls into the switch or the router category
22  probably, but not the bridge category?
23    A. That is correct. That's what differentiates
24  bridge from the switching mode.
25    Q. Okay. I think before we went down that

Page 96

1  real-time routing decision. Okay? Meaning the path
2  decision. The bridge would not change the path of
3  the signal traveling in the real time. That does not
4  preclude doing anything else. That's okay. That's
5  not what differentiates bridge from switch and
6  router. What differentiates bridge from switch,
7  router and those communication devices is a presence
8  or absence of real-time routing decisions.
9    The bridge could have, as an additional
10  function, you know, encryption or decryption. That
11  is okay. That is not what differentiates bridge from
12  router or switch. So when we say bridge in a
13  specific way, "bridge," that means it has no routing
14  function.
15    So that's really what I meant by a fixed
16  path. This does not preclude doing anything else. I
17  mean, you can do whatever else you want. But you
18  just cannot change the path in real time.
19    Q. Explain to me what you mean by the "path"
20  again.
21    A. The "path" means on a functional block
22  level. Because that's what this patent is about;
23  this patent is all about at a block, functional
24  blocks, all the diagrams, and so forth.
25    On a functional block level that is stated

Page 95

1  discussion, I was asking which of your citations to
2  the intrinsic record requires this through which --
3  or not requires -- discloses this each signal travels
4  over a fixed path.
5    A. Right. I think in the context of explaining
6  the operation of a bridge circuit, I think it starts
7  from column 2, line 40, and it says, "Also referring
8  to FIG. 2, the bridge 30 comprises..." from there on
9  all the way to, let's say, column 3, line 44, it
10  talks about different -- a black within the bridge.
11    And if you look at it there, it's very clear
12  that each type or each signal type has a precise path
13  so the display data will come down from the USB
14  controller to the first-in-first-out controller and
15  then pass along to display interface conversion
16  device to VGA controller. That's the path for the
17  display information itself.
18    And then there is a control related to the
19  DMA access. That comes to USB controller to firmware
20  interface to display interface, which will act upon
21  and batch it from the first-in-first-out controller.
22    So for each type of signal or each signal,
23  it has a precisely known path, and that is disclosed
24  fully in those sections that I just mentioned to you.
25  There is no "ifs" and "buts," really. That's what

Page 97

25 (Pages 94 to 97)