# Exhibit 4

1  **WANG, HARTMANN & GIBBS, P.C.**
A Professional Law Corporation
2  Richard F. Cauley (SBN: 109194)
Franklin E. Gibbs (SBN: 189015)
3  Erick P. Wolf (SBN: 224906)
1301 Dove Street, Suite 1050
4  Newport Beach, CA 92660
Telephone: (949) 833-8483
5  Facsimile: (949) 833-2281

6

## UNITED STATES DISTRICT COURT

7

## NORTHERN DISTRICT OF CALIFORNIA

8

9

10  DISPLAYLINK CORPORATION, a Washington )       CASE NO.: 5:07-CV-01998-RMW
corporation,                          )
11                                     )       **DEFENDANT AND**
                                       )       **COUNTERCLAIM PLAINTIFF**
11            Plaintiff,               )       **MAGIC CONTROL**
                                       )       **TECHNOLOGY'S OPENING**
12       v.                            )       **CLAIM CONSTRUCTION BRIEF**
                                       )       **PURSUANT TO LOCAL RULE 4-5**
13  MAGIC CONTROL TECHNOLOGY           )
CORPORATION, a Taiwanese corporation; )
14                                     )
                                       )
15            Defendant.              )
    _____)
                                       )
16  AND RELATED COUNTERCLAIMS          )
    _____)
17

18

19

20

21

22

23

24

25

26

27

28  _____
    **DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING**
    **CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION……………………………………………...…..1

II.     CLAIM CONSTRUCTION……………………………………..2

III.    STIPULATED CLAIM CONSTRUCTIONS………………………...2

IV.     CONTESTED CLAIM CONSTRUCTIONS…………………………3

        A.      USB Controller……………………………………….3

                1.      MCT's Construction Is Firmly Grounded In The
                        Claims And Specification…………………………....3

                2.      DisplayLink's Construction is Riddled With Extrinsic
                        Evidence…………………………………………..4

        B.      FOR RECEIVING EXCLUSIVELY THERETHROUGH USB BASED
                DISPLAY SIGNALS………………………………...……4

        C.      USB BASED DISPLAY SIGNALS…………………………..…7

        D.      USB BASED DISPLAY SIGNALS FROM THE COMPUTER….9

        E.      VGA CONTROLLER…………………………………………11

                1.      MCT's Construction Is Firmly Grounded In The
                        Claims And Specification…………………………....11

                2.      DisplayLink's Construction is Riddled With Extrinsic
                        Evidence……………………………………………12

                3.      MCT's Intrinsic-Based Definition Is The Proper
                        Construction……………………………………...13

        F.      DISPLAY DEVICE……………………………………………14

        G.      BRIDGE………………………………………………...15

        H.      CONNECTING THE USB CONTROLLER AND THE VGA
                CONTROLLER ONE TO THE OTHER FOR THE PASSAGE
                OF DATA THEREBETWEEN……………………………...17

        I.      THE BRIDGE CIRCUIT CONVERTING THE USB BASED
                DISPLAY SIGNALS INTO CORRESPONDING VGA
                SIGNALS………………………………………………...18

i

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

1       J.      VGA (VIDEO GRAPHIC ARRAY)……………………......…..19

2           1.    All Variations Of VGA Share The Same Characteristic

3               Connecter……………………………………………...19

4           2.    The Patent Addresses VGA in A Broad Sense To Include

5               Evolving Technologies…………………………………..20

6           3.    In 2002, The Internet Was Widespread, As Were High

7               Resolution Graphics…………………………..…………21

8           4.    The '788 Patent Is Not Limited To Sunset Technology…22

       K.      USB (UNIVERSAL SERIAL BUS)……………………………...23

9  V.    CONCLUSION……………………………………………………25

1

**TABLE OF AUTHORITIES**

2

3 **Case Law**                                                                                      **Page**

4 Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1357 (Fed. Cir. 2004)………..7

5 Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)…………………………..2

6 Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 907 (Fed. Cir. 2005)…….20

Raytheon Co. v. Roper Corp., 724 F.2d 951, 957 (Fed. Cir. 1983)……………………...18

7 Specialty Composites v. Cabot Corp., 845 F.2d 981, 987 (Fed.Cir.1988)………………22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

# I.    INTRODUCTION

This claim construction is directed to U.S. Patent No. 7,203,788 ("the '788 patent") entitled "USB-to-VGA converter."  The '788 patent contains 19 claims - all of which are directed to a device for converting digital display signals into analog display signals.  Specifically, the claimed device converts USB ("Universal Serial Bus") signals from a computer's USB port into VGA ("Video Graphics Array") signals for a monitor.  Commercial embodiments of the invention, generically referred to as "USB-to-VGA adapters," are widespread.  These devices provide computers with the capability of supporting additional monitors through USB ports rather than internal video cards.

Prior to the '788 patent, adding a second monitor to a computer was difficult.  Computers generally came with one internal video card which had a single display port.  This port, usually a generic 15-pin VGA-type, was compatible with only one monitor at a time.  Moreover, monitors were generally not configured to work with other ports such as USB or parallel ports.  To add more monitors, a second internal video card would be required - necessitating the disassembly, reassembly, and reconfiguration of the computer.

The invention claimed in the '788 patent does away with internal video cards and the related hassle of installing and configuring them.  One merely connects the USB end of the adapter to a USB port, the VGA end to a monitor, and installs the supplied software.  In a matter of minutes the second monitor is fully operational.  The key to this invention is that it provides computers with the capability of driving multiple monitors without the necessity of adding internal video cards.

As to claim construction, DisplayLink's proposed definitions are largely based on extrinsic evidence, primarily in the form of non-technical dictionaries, rather than the intrinsic evidence contained in the claims, specification and prosecution history.  However, when reading the claims in light of the specification and prosecution history, one skilled in the art would not read these limitations into the '788 patent.  Here, MCT's almost exclusively intrinsic-based constructions properly define the claim terms in dispute and should be adopted by this Court.

1

## II.    CLAIM CONSTRUCTION

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal citations omitted).  "We have frequently stated that the words of a claim are generally given their ordinary and customary meaning".  Id.

"To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  Id at 1323.

Dictionaries are extrinsic evidence and are less reliable than the specification.  Id at 1318-19.  In contrast, "the specification is the single best guide to the meaning of a disputed term..." Id at 1321.  Here, MCT's proposed constructions are fully supported by the specification and do not rely upon dictionary definitions.

## III.    STIPULATED CLAIM CONSTRUCTIONS

MCT and DisplayLink stipulate to the following six (6) constructions:[1]

| TERM, PHRASE, OR CLAUSE | CLAIM(S) | AGREED CONSTRUCTION |
|---|---|---|
| the USB controller issuing a bus control command | 1 & 19 | The USB controller generating electrical signals representing a bus control command. |
| bus control command | 1 & 19 | Instruction for a task issued on electrical line(s) that specifies type, timing, location, and other details of the task to be performed. |
| the bridge receiving the bus control command | 1 & 19 | The bridge receiving electrical signals representing the bus control command. |
| VGA signals | 1 & 19 | DisplayLink maintains its positions that the term "VGA signals" is indefinite under 35 U.S.C. § 112, ¶ 2, but, in the alternative, DisplayLink agrees to MCT's construction: Signals according to the VGA standard. |
| the bridge ... issuing a first-in-first-out control signal to | 1 & 19 | The bridge generating signals instructing the USB controller to read data in the order in which it was |

---

[1] By stipulating to these constructions, MCT is not stipulating to the constructions of the incorporated terms "USB," "USB controller," "bridge," and "VGA," all of which are separately addressed in this claim construction brief. Accordingly, MCT's agreement with respect to the last two terms is limited to the term the term "first-in-first-out."

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

| the USB controller | | received by the USB controller. |
| to receive the USB based display signals from the USB controller in a first-in-first-out manner | 1 & 19 | To receive USB based display signals from the USB controller in the order in which they were received by the USB controller |

## IV.   CONTESTED CLAIM CONSTRUCTIONS

## A.  USB Controller.

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| USB controller | Component(s) that controls the receipt, storage, and routing of USB encoded data. | Device that communicates with the computer according to the USB standard and communicates with the bridge in the signal form understood by the bridge |

The USB controller of the '788 patent refers to a device positioned between the USB port of a host computer and the bridge of the USB-to-VGA converter.  Exhibit "A" to the Declaration of Erick P. Wolf ("Wolf Decl."), U.S. Patent No. 7,203,788, at Figure 1.  In operation, the USB controller receives display signals from the host computer in USB form and passes them on to the bridge in a first-in-first-out manner.  '788 Patent at Col. 2, lines 26-38.  MCT takes language directly from the claims to establish its construction of USB controller.  In contrast, DisplayLink's construction is without any support in the patent, relying instead on extrinsic evidence (primarily the testimony of Dr. Jones) to limit the term to a device "that controls the receipt, storage and routing" of USB "encoded" data.

1.   MCT's Construction Is Firmly Grounded In The Claims And Specification

The specification and claims consistently refer to the USB controller as a device that communicates with the computer according to the USB standard and communicates with the bridge in the signal form understood by the bridge.  See, e.g., '788 Patent, Col. 1, lines 47-56.  As set forth in claim 1, the USB controller is "…adapted to detachably connect to a USB port of the computer for receiving exclusively therethrough USB based display signals…"  '788 Patent at Col. 4, lines 61-63.  Here, the USB controller must communicate with the computer according

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

1   to the USB standard because USB based display signals are passed from the computer to the

2   USB controller.

3          Similarly, the communicative relation of the bridge and USB controller is defined in

4   claim 1: "…the bridge receiving the bus control command [from the USB controller] and issuing

5   a first-in-first-out control signal to the USB controller..."  '788 Patent at Col. 5, lines 4-7.  Here,

6   it is clear that the USB controller is communicating with the bridge in signal forms understood

7   by the bridge – particularly bus control commands and first-in-first-out signals.

8          2.  DisplayLink's Construction Is Riddled With Extrinsic Evidence

9          DisplayLink improperly incorporates "storage," "routing," and "encoded" into its

10  proposed construction of USB controller.  Not one of these terms appears <u>anywhere</u> in the patent.

11  Moreover, the term "USB controller" is not even mentioned in the 1500-page extrinsic USB

12  specification cited in support of DisplayLink's construction.  In fact, Dr. Jones is the only source

13  for this extrinsic evidence.  However, Dr. Jones failed to cite <u>any</u> authority for his presumption

14  that the USB controller of the '788 patent was the same or similar to the USB controller that he

15  envisioned.  Exhibit "B" to the Wolf Decl., Deposition of Alan Jones ("Jones Deposition") at

16  page 23, lines 14-17.  As "storage," "routing," and "encoded" do not appear in the USB

17  specification or in any other evidence provided by DisplayLink, other than the unsupported

18  testimony of Dr. Jones; DisplayLink has no basis for including these terms into the proposed

19  construction.

20         Finally, DisplayLink even admits that MCT's construction of USB Controller is accurate

21  – "Yes, that description [MCT's construction] is compatible with the USB controller in the

22  patent."  Jones Deposition at page 23, lines 22-23.

23  **B.  For Receiving Exclusively Therethrough USB Based Display Signals.**

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| for receiving exclusively therethrough USB based display signals (claims 1 & 19) | Indefinite under 35 U.S.C. § 112, ¶ 2 or, in the alternative, For receiving only USB based display signals into the USB controller. | For receiving all of the USB signals containing display information and forwarding them to the bridge in the signal form understood by |

4

| | | the bridge. |
|---|---|---|

The USB controller may be connected to the computer's USB port for receiving USB based display signals from the computer. '788 Patent at Col. 2, lines 26-29. The bridge is configured to receive these USB based display signals from the USB controller in a first-in-first-out manner. '788 Patent at Col. 2, lines 33-38. Here, the differences center on the <u>type</u> of information that the USB controller may receive.

MCT contends that, while it is true that all the USB based display information must be received by the USB controller, the claims, specification and prosecution history place no limitations on <u>other</u> information, such as sound signals or control signals, being received by the USB controller. DisplayLink, however, without support from the patent, attempts to define a USB controller as limited to receiving <u>only</u> display information. – and, indeed as discussed in section "C" below, only one <u>kind</u> of display information.

As shown clearly in Fig. 1 of the patent, the term "receiving exclusively therethrough" refers to the process whereby display signals are sent by the USB port of the computer "exclusively" to the USB controller, and not to another structure – there is clearly only one double-headed arrow going between the USB port (210) transmitting those signals, with the endpoint being the USB controller (10).

The specification <u>does not</u>, as DisplayLink argues, limit the structure of the USB controller to receiving only USB based display signals but rather leaves open the possibility for receiving other types of signals:

> "A USB-to-VGA converter includes a <u>USB controller</u> connectable to a USB port of a <u>computer for receiving USB based display signals from the computer</u>…"

'788 Patent, Abstract (emphasis added).

> "The <u>USB controller</u> 10 is connectable to a USB port 210 of a host computer 200 <u>for receiving USB based display signals from the host computer 200</u>."

'788 Patent at Col. 2, lines 26-29 (emphasis added).

5

"The converter includes among its combination of features that of a <u>USB controller</u> 'external to the computer' which 'detachably' connects to the computer's USB port for '<u>receiving exclusively therethrough</u>' the '<u>USB based display signals from the computer</u>' as each of these independent Claim 1 and 19 also now clearly recites."

Exhibit "C" to the Wolf Decl., Supplemental Amendment and Statement of the Substance of Interview, dated March 2, 2006, page 8 (emphasis added).  As the above citations show, there is no instance in the specification, claims, or prosecution history where the USB controller is limited to receiving only USB based display information from the computer.  Rather, the "exclusively" limitation refers to the flow of USB display information from the computer "exclusively" from the USB port through the USB controller.  Specifically, as the aforementioned amendment clarifies, the USB based display information must pass exclusively into the detachable, external, USB-to-VGA converter.  The USB controller is not limited to receiving only USB based display signals, rather all USB based display signals from the USB port must be received by the USB controller.

DisplayLink distorts the '788 patent by making an essentially semantic argument – claiming that the term "exclusively" modifies the term "USB display signals" rather than the term "USB controller," arguing that the USB controller can only receive USB based display signals.  However, this argument is contradicted, not only by Fig. 1 of the patent, as shown above, but also by even DisplayLink's expert, who admitted that the claimed USB controller is capable of receiving more than just display signals, but control signals as well:

A.  Yes.  It's exclusively USB-based – <u>those signals will include the USB control signals.</u>  Where you say USB-based display signals, I take that to mean all the control setup signals that have to be going on the USB bus for this movement of those display signals and also the tokens that control the flow of those display signals.

Jones Deposition at page 25, lines 18-24 (emphasis added). Dr. Jones also admits that the USB controller may handle commands to and from the computer and at least four main data transport formats.  DisplayLink's argument is based entirely upon Dr. Jones'

6

1    mistaken belief that, because the '788 Patent does not explicitly identify USB based

2    signals other than display signals, the patent cannot cover any other USB based signals

3    covered by the patent:

4        A.  Well, the patent talks about receiving display signals over the USB bus and
            does not talk about receiving any other signals over the USB bus.
5        Q.  And where -- if you could just point where that is to me in the patent.
         A.  No, the patent -- I'm saying the patent doesn't as far as I can see the patent
6            contains no reference to any signals other than display signals being transported
7            across the USB bus.  So there are no references to audio signals or other signals.

8    Jones Deposition at page 26-27, lines 22-25, 1-7.  Dr. Jones' testimony – incorporating a

9    limitation into the claims solely from the absence of specific language in the specification is

10   diametrically opposed to well-established claim construction practice.  "A patentee may claim an

11   invention broadly and expect enforcement of the full scope of that language absent a <u>clear</u>

12   <u>disavowal</u> or contrary definition in the specification."  <u>Home Diagnostics, Inc. v. LifeScan, Inc.</u>,

13   381 F.3d 1352, 1357 (Fed. Cir. 2004) (emphasis added).

14       Here, while the claims include the limitation that the display signals must be sent to the

15   USB controller, there are no restrictions on other signals passing into the controller and further,

16   DisplayLink fails to identify any portion of the claims, specification, or prosecution history

17   supporting such a limitation. Accordingly, MCT's plain, intrinsically based construction should

18   be adopted.

19   **C.  USB Based Display Signals.**

20
| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
21
| USB based display signals | USB encoded display signals. | USB signals containing display information. |
22

23       As set forth in claim 1, USB based display signals first travel from the computer to the

24   USB controller.  '788 Patent at Col. 4, lines 60-64.  From the USB controller, the USB based

25   display signals travel to the bridge in a first-in-first-out manner.  '788 Patent at Col. 5, lines 6-7.

26   In the bridge, the USB based display signals are converted into corresponding VGA signals.

27

28
                                                    7

1   '788 Patent at Col. 5, lines 7-9.  Here, there is no restriction in the patent requiring that the

2   claimed "USB based display signals" be limited to only display information.  For instance, there

3   is no restriction prohibiting such "display signals" from <u>also</u> containing audio or control

4   information, as long as the display signals also contain display information.

5        Conversely, DisplayLink contends that the USB based display signals must be limited to

6   USB encoded display signals, despite the absence of any limiting language in the claims,

7   specification, or prosecution history.

8        DisplayLink's position is complicated by Dr. Jones' definition of "encoded:"

9        Q. Now, I'm just curious; what is "USB encoded data"?  What does that mean?
         A. That means data that is encoded in one of the USB formats.
10

11  Jones Deposition at page 17, lines 11-14.

12       Q. When you use the term "USB encoded display signals," are you referring to
            that packet with all of the packet information?  Is that what you mean by "USB
13          encoded"?
14       A. Yes.  Yes.  Display signals encoded and transported, according to the USB
            specification.
15

16  Jones Deposition at page 27, lines 18-23.  Thus, Dr. Jones admits that USB encoded display

17  signals do not just contain display information – these signals also contain encoding information

18  such as packet information according to the USB standard.  However, Dr. Jones limits "encoded"

19  display signals" to only display-related signals only because he was unable to find information

20  pertaining to other signals, such as audio signals, not because the claims, specification, or

21  prosecution history limited the patent solely to display signals:

22       Q.  Now, is your definition and your understanding of the term "USB display
            signals" as I guess not including audio, for example, is that based on something
23          you're finding in the patent, or is that something based on your understanding of,
            I guess, USB?
24       A. Yes.  In constructing what I think "USB based display signals" means, I'm
25          using my understanding of USB and my -- and what I take the terms "USB
            based display signals" to be both extrinsically and intrinsically from anything I
26          found in the patent.  So I haven't found parts of the patent that would say that a
            USB based display signal encodes anything other than display signals.
27

28

---

8

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING**
**CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

Jones Deposition at page 29, lines 9-22. Dr. Jones further limits his definition of "USB encoded display signals" by restricting them to a certain <u>type</u> of display signals – those that generate only moving pictures. Signals, which generate static images, such as JPEGs, bitmaps and screenshots, are, according to Dr. Jones, not "display signals."

> Q. So would you consider, for example, a JPEG image file -- would you consider
> that to be a display signal?
> A. No, I would not.
> Q. And I'm just talking about USB display signals as used in the patent. And
> that's still your opinion?
> A. Yes.

Jones Deposition at page 31, lines 7-14. Dr. Jones cites <u>no support</u> in the '788 patent for this unusual definition of "display." In light of Dr. Jones' testimony, DisplayLink's proposed construction is unworkable - there is simply no support whatsoever for limiting display signals to moving pictures.

MCT's definition, which includes the possibility of display signals containing information not solely limited to display information, is the proper construction. Moreover, the display information itself necessarily includes image-related data that clearly falls under the broad definition of "display signals."

**D. USB Based Display Signals From The Computer.**

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| USB based display signals from the computer | Indefinite under 35 U.S.C. § 112, ¶ 2 or, in the alternative, USB encoded display signals representing the image rendered by the computer. | USB signals containing display information from the computer. |

For this construction, MCT adds the words "from the computer" to its construction of "USB based display signals." MCT hereby incorporates by reference that argument into this construction. DisplayLink however attempts to argue that "from the computer" provides this term with an entirely new meaning.

9

DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING
CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5

First, the term "rendered" in DisplayLink's proposed definition is not found in the '788 Patent. There is no reason to incorporate this limitation, other than to attempt to limit the scope of the '788 patent. While DisplayLink grasps at a definition limiting the display signals to those that are "rendered by the computer," MCT incorporates the more logical position, stating word-for-word the exact language from the additional part of the claim – "from the computer."

Another flaw in DisplayLink's proposed construction lies in the term "image." As detailed above, Dr. Jones does not consider a JPEG a display signal:

> Q. So would you consider, for example, a <u>JPEG image file</u> -- would you consider that to be a display signal?
> A. No, I would not.

Jones Deposition at page 31, lines 7-10. However, Dr. Jones then contradicts his prior testimony by stating that the term "image" could relate to display information including JPEG:

> Q. …What do you mean there by the term "image"?
> A. That is, the image is the information that is going to be used to construct the display. Or it's the information that is going to be used -- it's hard to define it without saying "image data." It's the information that is going to be used to make the image that shows up on the display. So it's the thing that is going to eventually result in the correct pixels being set in the correct places on the display.

Jones Deposition at pages 40-41, lines 20-25, 1-5.

> Q. Now, we were talking about JPEGs and bitmaps earlier. Why aren't those images, the way you use the term "image" here?
> A. It -- it could be. You could represent the -- the image itself could be represented in a format which used JPEG.

Jones Deposition at page 41, lines 15-20. Dr. Jones later backpedals to try to restrict his previously broad definition of "image":

> Q. I had thought that you --
> A. In this part -- in this part alone, just taking USB display signals from the computer in its generality, so we're not restricting this to something that a VGA controller would process. We're now saying it could be something that a JPEG decompressor could process, something that is not referred to in the patent.

10

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

1   Jones Deposition at page 21-22, lines 21-25, 1-3.  Accordingly, DisplayLink's position is riddled

2   with inconsistencies.  On one hand, DisplayLink argues that the '788 patent is only compatible

3   with videos because "images" are not "display signals."  On the other, DisplayLink defines the

4   phrase "from the computer" to mean "the image rendered by the computer."  In addition to the

5   fact that the terms "encoded" and "rendered" are never used in the '788 patent, the inconsistency

6   in "image" casts significant doubt on the reliability of Dr. Jones' testimony and the underlying

7   proposed DisplayLink construction.  By comparison, MCT's proposed construction is

8   straightforward and fully supported in the specification.  As such, this Court should adopt MCT's

9   construction.

10  **E. VGA Controller.**

11  

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| VGA controller | Component(s) that controls the routing of VGA signals pursuant to the VGA standard. | Device that communicates with a display device according to the VGA standard and communicates with the bridge in the signal form understood by the bridge. |

16

17          The VGA controller of the '788 patent refers to a device positioned between the bridge

18  and the display device.  '788 Patent at Figure 1.  The VGA controller receives VGA display

19  signals from the bridge and applies the VGA signals to the display device.  '788 Patent at Col. 2,

20  lines 38-40.   Here, MCT takes language directly from the claims to establish its construction of

21  VGA controller.  Conversely, DisplayLink relies on extrinsic evidence, particularly the

22  testimony of Dr. Jones, to come up with its narrow and unsupported construction.

23          1.  <u>MCT's Construction Is Firmly Grounded In The Claims And Specification</u>

24          The specification and claims consistently refer to the VGA controller as a device that

25  communicates with a display device according to the VGA standard and communicates with the

26  bridge in the signal form understood by the bridge.  <u>See, e.g.</u>, '788 Patent at Col. 1, lines 56-61.

27  As stated in claim 1, the VGA controller is "…adapted to connect to the display device for

28                                                  11

1    conveying VGA signals to the display device…." '788 Patent at Col. 1, lines 65-67.  Here, the

2    VGA controller communicates with the display device according the VGA standard because it

3    forwards VGA signals to the display device.

4          Similarly, claim 1 defines the communicative relation of the bridge and USB controller:

5    "…the bridge circuit converting the USB based display signals into corresponding VGA signals

6    and forwarding the VGA signals to the VGA controller..." '788 Patent at Col. 5, lines 7-11.

7    Here, the lines of communication are clearly compatible and as such, the VGA controller is

8    communicating with the bridge in a signal form understood by the bridge – the VGA signal

9    standard.

10          2.   DisplayLink's Construction Is Riddled With Extrinsic Evidence

11          As in its definition of USB controller, DisplayLink once again improperly imports the

12   term "routing" into its definition of VGA Controller.  However, "routing" is found nowhere in

13   the '788 patent – it is merely a limitation created by the extrinsic testimony of Dr. Jones.  Apart

14   from Dr. Jones' testimony, DisplayLink cites no evidence - extrinsic or otherwise – that the

15   VGA controller routes signals.

16          First, Dr. Jones' entire testimony on VGA controller is muddled.  Dr. Jones blurs the line

17   between interpreting the term "VGA controller" as defined in the specification and "VGA

18   controller chip" referred to in his testimony:

19          "…And the VGA controller is the thing that controls that video graphics array.
           It was in common use as a term you – for instance, you could buy a <u>VGA</u>
20         <u>controller chip</u>, which is a chip that is programmed by registers and a memory
           aperture on a computer and generates video signals according to the VGA
21         standard."

22

23   Jones Deposition at page 45, lines 18-24.  Contrary to Dr. Jones' testimony, the so-called "chip is

24   never mentioned in the '788 patent.  Without any intrinsic or extrinsic basis Dr. Jones contends

25   that "routing" should apply to a VGA controller chip not mentioned in the '788 patent:

26         Q.  What do you mean by the term "routing" in that definition?
           A.  The controller is the thing that decides where the VGA signals will go.  So
27         when they are addressing data signals to place a character at a particular location

28                                              12
     ─────────────────────────────────────────────────────────────────
     DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING
     CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5

in the screen, the VGA controller will make sure it gets to the <u>right place in the memory chip</u>. From that memory chip, the VGA controller will arrange for the character byte to be read and translate it into pixels that will go on the screen through a translator. So the VGA controller moves data from one place to another, <u>routes it around on the chip</u> or on the <u>VGA adapter card</u> according to the VGA standard.

Jones Deposition at pages 45-46, lines 25, 1-13. Similar to the "chip", the "VGA adapter card" is not mentioned in the '788 patent either. Rather, this is another case of Dr. Jones attempting to apply extrinsic evidence to the '788 patent to support DisplayLink's restrictive construction.

Similarly, even after providing an extrinsic 400-page VGA specification, DisplayLink is still unable to find support for "routing." As the term does not appear in the VGA specification or in any other evidence provided by DisplayLink, Dr. Jones' conclusory statements alone are insufficient to support DisplayLink' construction.

3.  <u>MCT's Intrinsic-Based Definition Is The Proper Construction</u>

MCT's construction is based on language pulled directly from the claims. Conversely, DisplayLink's construction stresses abstract, extrinsic limitations that are merely the opinion of Dr. Jones. Also, Dr. Jones even agrees with MCT's definition:

> Q. …Now, other than VGA standard, do you disagree with that definition?
> A. I should just check the diagram in the patent. Yes, that's -- the <u>MTC</u> [sic] <u>definition</u> [of VGA controller] <u>is consistent with the patent</u>.

Jones Deposition at page 26-27, lines 23-25, 1-3.

As shown above, Dr. Jones takes issue with the construction of VGA in terms of the VGA standard. As discussed infra, VGA is a broad term - contrary to DisplayLink's extraordinarily narrow and unsupported proposed construction. Accordingly, this Court should adopt MCT's intrinsic-based construction of VGA controller.

**F. Display Device.**

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| Display Device | Electronic device for visually | Device that converts |

13

| | representing VGA signals. | electrical signals to images. |
|---|---|---|

The display device referenced in the '788 patent displays VGA signals received from the VGA controller of the USB-to-VGA converter.  '788 Patent at Col. 2, lines 38-40.  Here, DisplayLink argues that the display information should be limited to VGA signals, while MCT relies on the '788 claim language.

First, Dr. Jones' agrees to MCT's construction:

> Q. …And Magic's definition is:  "Device that converts electric signals to images."  Do you disagree with that definition?
> A. That's a generic definition of a display device.  On its own, I do not disagree with that definition…. in the context of this patent, yes, they are converting electrical signals to images...

Jones Deposition at pages 62-63, lines 15-25, 1-3.  However, while DisplayLink concedes that the patent supports MCT's construction, DisplayLink argues that "VGA signals" should be limited to sunset technology developed in 1987 by IBM:

> Q.  And so when we're talking about VGA signals, then, why don't I make sure that I understand what your definition of the term "VGA signals" in your definition means.
> A.  Yes.  By "VGA signals," I mean signals as defined in the IBM VGA specification that we have referred to.  So that specification defines the layout of the signals and the timing of the signals and so forth.  So it defines what a VGA signal is.

Jones Deposition at page 63, lines 10-18.  DisplayLink's only disagreement with MCT's definition relates to the type of VGA signals:

> Q.  So, do you have a disagreement with Magic's definition other than, I guess, the implicit inclusion of signals other than VGA signals as you define them?
> A.  Yes, that would be correct.
> Q.  So that's the only difference?
> A.  I -- I don't -- Yes.

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

1   Jones Deposition at page 63, lines 19-25.  As VGA is the underlying point of disagreement in the

2   construction of display device (as well as a number of further terms mentioned below), MCT

3   incorporates by reference its argument relating to VGA

4   Moreover, DisplayLink's definition is also based on additional extrinsic evidence

5   including the IEEE 100 Dictionary as well as the Computer Dictionary.  According to <u>Phillips</u>,

6   dictionaries are <u>extrinsic evidence</u> and are less reliable than the specification.  <u>Phillips</u> at 1318-

7   19.  In contrast, "the specification is the single best guide to the meaning of a disputed term..."

8   <u>Id</u> at 1321 (emphasis added).

9   Here, MCT's proposed constructions are fully supported by the specification and do not

10   rely upon dictionary definitions.  For the reasons set forth above and in the VGA argument

11   below, this Court should accept MCT's intrinsic-based construction.

12   **G. Bridge.**

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| Bridge | Component(s) for communicating between two or more buses each using different interface standards. | Device that converts electrical signals between different domains in the form understood by the receiving domains, through which each signal travels over a fixed path. |

19   In the '788 patent, a "bridge" is a device which connects the USB controller and the

20   VGA controller.  '788 Patent" at Figure 1.  The bridge receives an instruction (bus control

21   command) from the USB controller and issues a first-in-first-out control signal to the USB

22   controller to receive USB based display signals from the USB controller in a first-in-first-out

23   manner.  '788 Patent at Col. 2, lines 33-36.  The bridge converts the USB based display signals

24   into corresponding VGA signals and forwards the VGA signals to the VGA controller.  '788

25   Patent at Col. 2, lines 36-38.

26   Here, DisplayLink again tries to interpret claim language using Dr. Jones' extrinsic

27   testimony rather than the patent itself.  There is absolutely no support in the patent for a "bridge"

28

15

1  communicating between two or more buses (buses here generally refer to subsystems such as

2  USB and VGA interfaces that transfer data between components).

3      As shown in Fig. 1 of the '788 patent, the bridge is clearly connected between two

4  controllers, namely the USB controller on one end and the VGA controller on the other.  Indeed

5  the invention of the patent is that data comes from one USB controller, through the bridge, and to

6  a VGA controller on a fixed path.  The circuitous paths imagined by DisplayLink would, under

7  the patent, require more than one bridge.

8      DisplayLink argues that the IEEE Dictionary's definition of "bridge" may imply more

9  than one bus on either side of the bridge.  However, this general definition of "bridge" finds no

10 support in the patent, which claims a particular type of bridge, which performs a certain function.

11 Indeed, Dr. Jones also admits that the bridge, in the context of the '788 patent, connects one bus

12 to the other:

13      Q.  And what's your understanding of what a bridge is in the context of this
        patent?
14      A.  Well, this bridge is a bridge that is bridging buses.  So it's not -- it's not a
        bridge as in road bridge or network bridge.  It's a bridge that is going between
15      two buses...

16

17  Jones Deposition at page 65, lines 11-16.  Dr. Jones also admits that the signals going over the

18 bridge follow a "fixed path:"

19      Q. [referring to the diagram in Fig. 1] Isn't that a fixed path?
        A.  This is a high-level fixed path.  This is not -- it's not a fixed path for
20      electrical signals to follow, no.  Each of those double pairs of arrows is
        completely -- or can be very different sets of electrical signals.  But, yes, it's a
21      fixed path for the video data to go from one set of arrows to another, to another,
        to the display device.  There isn't a different branching path outside the box.  So
22      at a high level, it's a fixed path.  But it's not a fixed path for electrical signals....
        yes, it's a fixed path for the video data to go from one set of arrows to another, to
23      another, to the display device...

24

25 Jones Deposition at pages 77-78, lines 22-25, 1-5.  Once again, DisplayLink relies

26 solely upon the  "conclusory, unsupported" testimony, which, as the Phillips court

27 noted, is "not useful to a court."  Phillips, 415 F.3d at 1318.

28

16

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING
CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

1    Here, DisplayLink fails to establish any support for its contention that the bridge

2   communicates between more than two buses.  Similarly, nothing in the claims or written

3   description requires that each bus use a different interface.  Finally, Dr. Jones, even admits that

4   there is a fixed path for video data to follow through the bridge.  For these reasons, this Court

5   should adopt MCT's intrinsically based construction.

6   **H.  Connecting The USB Controller And The VGA Controller One To The Other For The**

7   **Passage Of Data Therebetween.**

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| connecting the USB controller and the VGA controller one to the other for the passage of data therebetween | Connecting the USB controller to the VGA controller such that the VGA controller can receive video data only from the USB controller via the bridge. | Connecting the USB controller and the VGA controller to exchange electrical signals. |

13    This term relates to the bridge's function of connecting the USB controller and VGA

14   controller together.  This connection enables USB based display signals from the USB controller

15   to be translated into VGA display signals for the VGA controller.  Here the difference in

16   constructions is readily apparent – MCT contends that the claimed "data" which is passed

17   between the USB controller and the VGA controller is not limited to a particular kind of data, but

18   is simply electrical signals.  DisplayLink, on the other hand, distorts the claim language by

19   restricting it "only" to "video data" for which there is no support in the patent and which,

20   significantly would not include either the audio data or JPEG image data described by Dr. Jones.

21    While the preferred embodiment identifies data passing from the USB controller to the

22   bridge and then to the VGA controller, there is no evidence that the claims limit this data as

23   being solely display-only information, and not, for example, audio, control, or JPEG image

24   information.

25

26

27

28

17

**I. The Bridge Circuit Converting The USB Based Display Signals Into Corresponding VGA Signals.**

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| The bridge circuit converting the USB based display signals into corresponding VGA signals | The bridge circuit converting the USB based display signals into [preceding terms defined above] PCI type or AGP type, or equivalent bus topology, encoded display signals for passage to the VGA controller. | The bridge circuit translating the USB signals containing display information into corresponding display signals according to the VGA standard. |

The bridge of the '788 patent "…converting the USB based display signals into corresponding VGA signals..." receives USB based display signals from the USB controller and converts those USB based display signals into VGA signals. '788 Patent at Col. 5, lines 8-9. After conversion, the bridge forwards "…the VGA signals to the VGA controller …" '788 Patent at Col. 5, lines 9-10. Here, DisplayLink seeks to limit the scope of the claims to a particular embodiment discussed in the specification. Specifically, DisplayLink argues that the USB based display signals must be converted into the specific "bus topologies," specifically "PCI type or AGP type, or equivalent bus topology" referred to in the specification. In contrast, MCT's claim construction is based on the claim language itself.

"That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." Raytheon Co. v. Roper Corp., 724 F.2d 951, 957 (Fed. Cir. 1983). DisplayLink's proposed construction, in fact, attempts to incorporate a misreading of the specification, which states:

> "The firmware interface 31 is also connected to the display interface conversion device 33 by a control bus B and a data bus C for transmission of a DMA control signal, a firmware control signal and a control command therebetween for allowing the display interface conversion device 33 to convert the USB based display signals into the corresponding VGA signals D which can be of PCI type or AGP type, but is not limited thereto."

'788 Patent at Col. 2, lines 46-53 (emphasis added). The specification's statement that the format of the VGA signals is "not limited" to PCI or AGP is a strong statement by the inventor that these were simply examples of appropriate formats – not any kind of exclusion of other

18

1   types of formats. There is no basis in the patent for imposing any restriction on this term.

2   DisplayLink's addition of the term "or equivalent bus topology" is not only without support in

3   the patent, but raises more questions than it answers – what is an "equivalent" bus topology to

4   PCI and AGP?

5   Accordingly, MCT's definition, relying on the plain claim language, and devoid of any

6   extrinsic evidence is the proper construction.

7   **J. VGA (Video Graphics Array).**

8

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| VGA | Video Graphics Array, the technology described in IBM Corporation, Personal System/2 Hardware Interface Technical Reference (1988 and as updated in 1991) and in IBM Personal System/2 and Personal Computer BIOS Interface Technical Reference (1991). | VGA has an ordinary and customary meaning to a person of ordinary skill in the art. VGA generically refers to all video display standards compatible with any 15-pin VGA port/plug. |

15   In 2002, the term "VGA" was well known to a person of ordinary skill in the art and had

16   an ordinary and customary meaning that was part of the widely used vocabularies of such a

17   person. Declaration of Paul Min ("Min Decl.") at page 8. While IBM developed the original

18   VGA specification in the late 1980s, many companies have since developed and sold VGA

19   products around the world. Min Decl. at page 8. As electronic technologies evolved over the

20   years, the VGA products also evolved to improve the resolutions and colors in the display

21   devices for increasingly advanced computer applications. Min Decl. at page 8. Today, there are

22   many variations of VGA, including SVGA, XGA, , SXGA, UXGA, and QXGA and their

23   corresponding counterparts for widescreen display devices. Min Decl. at page 8.

24   1. All Variations Of VGA Share The Same Characteristic Connector

25   A person of ordinary skill in the art reading the '788 Patent would understand that a

26   common feature between VGA, XGA, SVGA is the compatibility of the signals with the

27   characteristic VGA 15-pin port/plug: Min Decl. at page 9.

28   19

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**



When a person of ordinary skill in the art in 2002 saw a connector plug/port shown above, the person would have associated it with VGA, generally and generically, regardless of specific variations of VGA being supported. – for example, there is no such thing as an "SVGA connector" or an "XGA connector."[2] Min Decl. at page 9.

    2.  <u>The Patent Addresses VGA In A Broad Sense To Include Evolving Technologies</u>

The '788 Patent also refers to VGA in a broad sense as it applies to the invention:

> "The present invention relates <u>generally</u> to a USB (Universal Serial Bus) to <u>VGA</u> (Video Graphics Array) converter, and in particular to a USB-to-VGA converter connectable between a USB port of a computer and a VGA display device."

'788 Patent at Col. 1, lines 5-9 (emphasis added).  The Federal Circuit has addressed the use of the term "generally":

> "[W]e held that "the phrase '<u>generally</u> parallel' envisions some amount of deviation from exactly parallel," and that "words of approximation, such as 'generally' and 'substantially,' are descriptive terms 'commonly used in patent claims 'to avoid a strict numerical boundary to the specified parameter.'"

<u>Playtex Prods., Inc. v. Procter & Gamble Co.</u>, 400 F.3d 901, 907 (Fed. Cir. 2005) (emphasis added).  Here, "generally" is used as an expansive term in connection with VGA.  Further support is found in the '788 Patent written description, which broadly portrays the invention:

---

[2] Indeed, DisplayLink and its customers themselves use the term "VGA" generically in their promotional literature, referring to the accused product as a "USB to VGA converter."  Presumably DisplayLink's product converts USB display signals to a more advanced standard than the 1991 VGA specification.

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

1   "Based on the above description of the operation process of the USB-to-VGA
2   converter 100, the USB-to-VGA converter 100 can work with <u>any computer</u>
    <u>systems</u> running under any operation systems."

3   '788 Patent at Col. 3, line 66, Col. 4, lines 1-2.  The specification goes on to define "any

4   computer systems":

5   A <u>computer system comprises a display device</u> connected to a host machine of
6   the computer system for receiving display signals from the host computer and
    displaying messages associated with the display signals.

7

8   '788 Patent at Col. 1, lines 12-14 (emphasis added).  There is no indication in the specification

9   that the claimed converter would only work with display devices which only used the 1991

10  standard

11  Again, the written description further supports a broad, generic use of the term VGA by

12  reference to a VGA signal:

13  "A USB cable can simply connect the display device to the host computer and
    allows for transmission of <u>display signals</u> in USB form that has a broad
14  bandwidth and low signal lose. The USB signal is then converted <u>into a VGA</u>
    <u>signal for proper display by the display device</u>."
15

16  '788 Patent at Col. 4, lines 36-44 (emphasis added).  The patent discloses no limitations on the

17  types of display signals from the computer other than the signals must be in USB form.  There is

18  no limitation to the type of display device, including a higher resolution XGA or SVGA device,

19  which would require that the display signals also have that higher resolution.

20  3.  <u>In 2002, The Internet Was Widespread, As Were High Resolution Graphics</u>

21  In 2002, a person of ordinary skill in the art would have known that the resolutions and

22  colors supported by original VGA were not adequate to display typical web pages, games, and

23  pictures, for example.  Min Decl. at page 9.  It would have been inconceivable for such a person

24  to limit his use of the term "VGA" to the original VGA, which was then 13 years old.  Min Decl.

25  at page 9.  Such a person would have known that the original VGA could easily extend to XGA

26  and SVGA as the computers and display devices improved.  Min Decl. at page 9.

27

28

21

However, DisplayLink ignores these drastic changes in the computer industry.  There is ample evidence that a person of ordinary skill in the art in 2001 would have known that all VGA signals, regardless of specific variations like XGA or SVGA, were based on combining three colors of red, green, and blue (collectively "RGB").  Min Decl. at page 10.  The person would have known that the RGB scheme and the 15-pin VGA connector port/port were the basis for all variations of VGA.  Min Decl. at page 10.

4.  The '788 Patent Is Not Limited To Sunset Technology

DisplayLink's proposed construction incorporates the entire IBM VGA specification of 1987-1991 as a limitation on the claims of the patent and imposes strict limitation on the resolution being supported by the invention which is not found in the specification or in the file history, as a limitation to the term "VGA" in the claims.  As the Federal Circuit held in Specialty Composites v. Cabot Corp., 845 F.2d 981, 987 (Fed. Cir. 1988):

"[w]here a specification does not require a limitation, that limitation should not be read from the specification into the claims."  Nowhere in the specification is there any mention of the original IBM VGA specification referenced repeatedly in DisplayLink's claim constructions.  Indeed, DisplayLink's expert testified that the only reason his definition of the term "VGA" does not include SVGA or XGA is because those specifications are not specifically identified in the specification:

> Q. Is there anything in the patent that would in your mind restrict the definition of VGA just to the original VGA standard?
> A. The use of the term VGA.  There is nothing in the patent that widens it to SVGA or XGA or other standards.
> Q. So it's your --
> A. there is nothing to say that the term VGA doesn't mean a coffee pot.  But there is no evidence that the term VGA means anything other than the IBM VGA standard.

Jones Deposition at page 59, lines 15-24.  Without any justification, DisplayLink draws a bright line between including updates to VGA in 1991 qualifying as VGA on the one hand, and yet on the other hand excluding the XGA and SVGA standards – even though these standards retain the VGA signal characteristics, the compatibility with the 15-pin configuration, and rely upon RGB.

22

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**

The '788 Patent makes no such distinctions.  XGA, SVGA, and VGA are all related display standards based upon the original VGA standard.  (Decl. of Min ¶ ).  There is no evidence in the '788 Patent or prosecution history that would sever this relationship such that VGA would not refer to SVGA, XGA, or other related specifications.  As such, this Court should adopt MCT's construction.

In summary, VGA has an ordinary and customary meaning which was well understood by one skilled in the art at the time of the application for the patent (and which is still being used by DisplayLink today).  DisplayLink's assertion that the term VGA as used in the claims must be limited to IBM's sunset technology is absurd.  This decade-old technology, has no application to the '788 patent.  In fact, the original VGA display resolution, original VGA specification, or any of the antiquated extrinsic VGA references that DisplayLink relies on are not even mentioned in the patent.  This Court should adopt the clear construction that VGA generically refers to all video display standards compatible with any 15-pin VGA port/plug.

**K.  USB (Universal Serial Bus).**

| Disputed Claim Limitation | DisplayLink's Construction | MCT's Construction |
|---|---|---|
| USB | Universal Serial Bus, the technology described in the Universal Serial Bus Specification Revision 2.0 and its predecessor revisions. | USB has an ordinary and customary meaning to a person of ordinary skill in the art. USB generically refers to any serial bus specifications which support USB based display signals from the host computer and which are compatible with any USB port/plug. |

It is common for a computer system to be attached to peripheral devices such as inkjet and laser printers.  These devices usually have a cable that attaches on one end to the computer.  One way these devices connect to a computer is through a USB port on the computer.  The USB port and USB cable are built based upon an industry accepted USB standard.  USB is generically

23

1    understood in the field to refer to USB without any reference to particular versions of the

2    standard.

3          The area of disagreement on the construction of the term is with the scope of the term.

4    DisplayLink desires to restrict the term to a particular version and earlier versions of the USB

5    standard.  Thus, any future versions of the USB standard would be outside of the scope of the

6    definition.  MCT sees no reason to restrict the term arising from the patent or what a person of

7    ordinary skill in the art would understand USB to mean.  DisplayLink limits USB to only

8    Revision 2.0 and before that existed at the time of the invention.  However, the written

9    description has no such limitations.  The '788 Patent states:

10         "The present invention relates <u>generally</u> to a <u>USB</u> (Universal Serial Bus) to
           VGA (Video Graphics Array) converter, and in particular to a USB-to-VGA
11         converter connectable between a USB port of a computer and a VGA display
           device."
12

13   '788 Patent at Col. 1, lines 5-9 (emphasis added).

14         As discussed supra, the term "generally" is not a term of limitation, but rather broadens

15   the scope of the term USB.  This is in step with what a person of ordinary skill in the art reading

16   the '788 Patent would understand.  A person of ordinary skill in the art would associate USB

17   with the unique and characteristic USB port/plug.  Min Decl. at page 7.  Also, a person of

18   ordinary skill in the art would understand that the '788 Patent specification does not limit USB to

19   any particular version. Min Decl. at page 7.

20         The claims of the '788 Patent support MCT's position:

21         2. The USB-to-VGA converter as claimed in claim 1, wherein the USB
           controller comprises a <u>USB socket</u>.
22         4. The USB-to-VGA converter as claimed in claim 1, wherein the converter is
           encased in an adaptor which comprises a <u>USB socket</u> for connection with the
23         <u>USB port of the computer</u>.
24         7. The USB-to-VGA converter as claimed in claim 6, wherein the USB
           controller comprises a <u>USB socket</u> for connection with the <u>USB port of the</u>
25         <u>computer</u>.

26

27

28
                                                    24
      DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING
               CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5

1    A USB socket and port are not limited to a particular version of USB.  Min Decl. at page

2   7.  There is no mention in the specification or prosecution history of a USB standard 2.0 or

3   earlier.  "Where a specification does not require a limitation, that limitation should not be read

4   from the specification into the claims."  <u>Specialty,</u> 845 F.2d at 987.  It is improper to incorporate

5   such a limitation into the claims.

6    As discussed supra, the use of the USB port and cable in the specification was not used in

7   a limiting fashion as to a particular version of USB.  A person of ordinary skill in the art at the

8   time of the invention reading the patent would understand that the hardware would support later

9   version of USB and the patent would therefore not be limited to any particular version of USB.

10  Min Decl. at page 7.  Here, the Court should adopt MCT's straightforward construction, as it

11  does not incorporate limitations from extrinsic sources as DisplayLink has into the term.

12  **V.     CONCLUSION**

13    For all of the aforementioned reasons, in particular MCT's reliance on intrinsic evidence

14  to support its proposed claim constructions, this Court should adopt the MCT constructions.

15

16  Dated:  January 28, 2008            WANG, HARTMANN & GIBBS

17

18                                      By:   /s/Richard F. Cauley
                                              Richard F. Cauley
19
                                        Attorneys for Defendant and Counter Plaintiff
20                                      MAGIC CONTROL TECHNOLOGY
                                        CORPORATION
21

22

23

24

25

26

27

28
**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S OPENING
CLAIM CONSTRUCTION BRIEF PURSUANT TO LOCAL RULE 4-5**