# Exhibit 10

WANG, HARTMANN, GIBBS & CAULEY, P.C.
A Professional Law Corporation
Richard F. Cauley (SBN: 109194)
Franklin E. Gibbs (SBN: 189015)
Erick P. Wolf (SBN: 224906)
1301 Dove Street, Suite 1050
Newport Beach, CA  92660
Telephone: (949) 833-8483
Facsimile:  (949) 833-2281

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DISPLAYLINK CORPORATION, a Washington corporation, | CASE NO.:  5:07-CV-01998-RMW |
| Plaintiff, | **DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL TECHNOLOGY'S REPLY BRIEF PURSUANT TO PATENT LOCAL RULE 4-5** |
| v. | |
| MAGIC CONTROL TECHNOLOGY CORPORATION, a Taiwanese corporation; | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

i

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL REPLY BRIEF PURSUANT TO PATENT LOCAL RULE 4-5
CASE NO.:  5:07-CV-01998-RMW**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION……………………………………………..…..1

II.   DISPLAYLINK'S CONSTRUCTIONS ARE AT ODDS WITH THE
WRITTEN RECORD OF THE  '788 PATENT…………………………..…….2

   A.     USB Controller……………………………………………….2

      1.   DisplayLink's Construction Contradicts Dr. Jones'
Admission……………………………………………….......2

      2.   The Jones Declaration Is Conclusory, is Based on Extrinsic
Evidence and Lacks Support from the Patent………..……….2

      3.   The Written Records Support MCT's Construction…..……….3

   B.     FOR RECEIVING EXCLUSIVELY THERETHROGH USB
BASED DISPLAY SIGNALS…………………………………….3

      1.   DisplayLink's Heavy Reliance on the Jones Declaration Is
Misplaced……………………………………………..………3

      2.   Jones' Mistaken Interpretation Of The Law Ignores Home
Diagnostics…………………………………………..………4

      3.   Contrary to DisplayLink's Argument, Jones Admits The
Patent Covers Control Signals………………………….…4

   C.     USB BASED DISPLAY SIGNALS………………………….…5

      1.   DisplayLink's Mischaracterizes The '788 Patent To Include
The Term "Encoded"…………………………………….....5

      2.   "Encoded" Is Another Extrinsic-based Term To Limit The
'788 Patent……………………………………………..…5

      3.   MCT's Construction Follows From The Plain Language
Of The Claim…………………………………………....5

   D.     USB BASED DISPLAY SIGNALS FROM THE COMPUTER…..6

      1.   DisplayLink Argues That "From The Computer" Give This
Term New Meaning……………………..……………….…6

      2.   DisplayLink Incorrectly Asserts That The Claims Require
The Image Be "Rendered"…………………………..………6

ii

E.      VGA CONTROLLER…………………………………..…..…..…..7

      1.    DisplayLink Uses Jones' Declaration To Import Extrinsic
            Routing Limitations…………………………………………7

      2.    DisplayLink's 400-page VGA Specification Does Not
            Support Routing………………………………..…..……….7

      3.    This Court Should Prohibit DisplayLink's Selective Use of
            Extrinsic Evidence……………….……………..….…....…..8

      4.    MCT's Intrinsic Construction Is Firmly Grounded In The
            Claims And Specification……………..……….…..………..8

F.      DISPLAY DEVICE……………….…………….……….…....……..8

      1.    DisplayLink Agrees that MCT's Construction Of Display
            Device Is Correct……………………………………….……8

      2.    DisplayLink's Claim Limitation Is Expressly Based On
            Dr. Jones' Opinion…………………………………………9

      3.    DisplayLink's Construction Is Tailored To Avoid
            Infringement…………………………………………..……9

G.      BRIDGE…..………………………………………………….......9

      1.    Dr. Jones Incorrectly Adds The "Two Or More Buses"
            Limitation To Bridge……………………………………..…9

      2.    DisplayLink's Construction Would Require More Than One
            Bridge………………………………………..…..…………10

H.      CONNECTING THE USB CONTROLLER AND THE VGA
        CONTROLLER ONE TO THE OTHER FOR THE PASSAGE
        OF    DATA THEREBETWEEN……………….…………………...10

      1.    DisplayLink's Extrinsic-Based Definition Is Without
            Support……………………………………....…………………10

      2.    The Written Record Does Not Limit The Term To Video
            Or Display Data……………….……………….…..…….…10

I.       THE BRIDGE CIRCUIT CONVERTING THE USB BASED
        DISPLAY SIGNALS INTO CORRESPONDING VGA
        SIGNALS………………………………………………..…………11

iii

J.      VGA (VIDEO GRAPHICS ARRAY)…………………….………11

    1.    DisplayLink's Relies On Dr. Jones Exclusively To Limit

        VGA To Sunset Technology………….………….………11

    2.    Dr. Jones' Extrinsic Evidence Contradicts VGA As

        Limited To A Low-Resolution………………………..…12

    3.    DisplayLink Mistakenly Contends That VGA Is Limited

        To Just One Display Standard……………………………13

    4.    DisplayLink's Bright Line Distinction Is Without Merit…13

K.     USB (UNIVERSAL SERIAL BUS)…………………………....14

    1.    DisplayLink Incorrectly Reads The Patent To Be Limited

        To A Particular Standard…………………………………14

III. CONCLUSION……….………………………………………………...…15

iv

# TABLE OF AUTHORITIES

**Case Law**                                                                              **Page**

ACTV, Inc., v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003)…………..…..6

Brown v. 3M, 265 F.3d 1349, 1352 (Fed Cir. 2001)………………………..……5

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595, 125 L. Ed. 2d 469, 113
S. Ct. 2786 (1993)…………………………………………………………..….…….....7

Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1357 (Fed. Cir. 2004)..…...4

Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005)………....11

Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)…………….…*passim*

V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed. Cir. 2005)…12

## I.      INTRODUCTION

In accordance with <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005), MCT's constructions should be adopted by this Court as they comply with well-established rules of claim construction favoring intrinsic evidence over extrinsic evidence. Here, U.S. Patent No. 7,203,788 (the '788 patent) - including the specification, claims, and prosecution history - discloses and defines the eleven (11) terms at issue here with clarity. MCT's constructions are short and concise and derive their meaning from words found in the '788 patent's written record. DisplayLink even agrees that the majority of MCT's proposed construction are consistent with the '788 patent.

However, DisplayLink goes a step further and proposes constrained constructions based on extrinsic evidence not of record in the '788 patent. DisplayLink's constructions are based almost entirely on a twenty-seven (27) page expert declaration authored by Dr. Jones ("Jones Declaration") and attached to DisplayLink's Responsive Claim Construction Brief ("Responsive Brief"). DisplayLink cites to the Jones Declaration <u>over 100 times</u> in its twenty-six (26) page brief. The Jones Declaration refers to <u>over 500 hundred</u> pages of extrinsic evidence - some of which was not even produced to MCT before the February 11, 2008 Responsive Brief[1].

Indeed, unlike MCT, DisplayLink relies heavily on extrinsic evidence – disfavored by the Federal Circuit -- particularly the expert testimony presented in the Jones declaration and the <u>additional</u> extrinsic evidence cited therein.

---

[1] MCT will address DisplayLink's submission of evidence which was not properly disclosed under the Patent Local Rules in its Motion to Strike Portions of the Jones Declaration, which it will file later this week.

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL REPLY BRIEF PURSUANT TO PATENT LOCAL RULE 4-5**
**CASE NO.:  5:07-CV-01998-RMW**

**II.    DISPLAYLINK'S CONSTRUCTIONS ARE AT ODDS WITH THE WRITTEN
RECORD OF THE '788 PATENT**

**A.  USB Controller.**

1. <u>DisplayLink's Construction Contradicts Dr. Jones' Admission</u>

Although DisplayLink's expert admits that MCT's construction of the term USB
Controller is accurate,[2] DisplayLink now argues that MCT's construction "ignores the claims
and specification of the '788 patent."  Responsive Brief at page 13, lines 10-11.  Despite this
assertion, DisplayLink is unable to present any evidence in support of this allegation.
Accordingly, DisplayLink's initial argument that MCT's construction is inconsistent with the
'788 patent is without merit.

2. <u>The  Jones Declaration Is Conclusory, is Based on Extrinsic Evidence and Lacks
Support from the Patent</u>

As the Federal Circuit held in <u>Phillips v. AWH Corp.</u>, 415 F.3d at 1318, "[C]onclusory,
unsupported assertions by experts as to the definition of a claim term are not useful to a court.
Similarly, a court should discount any expert testimony 'that is clearly at odds with the claim
construction mandated by the claims themselves, the written description, and the prosecution
history, in other words, with the written record of the patent.'"  Ignoring this mandate,
DisplayLink argues that "USB Controller" should be limited by the Jones declaration (and the
extrinsic references cited therein):

> [i]nstead [referring to MCT's construction], the patent mandates that the 'USB
> controller' be an active device that controls the receipt, storage and routing of
> USB encoded data.

Responsive Brief at page 14, lines 7-9 (citing Jones Decl. ¶ 36).  However, there is no intrinsic
support for the terms "storage," "routing" or "encoded" <u>anywhere</u> in the patent or the written

---

[2] "Yes, that description is compatible with the USB controller in the patent."  Exhibit "2" to MCT's Opening Claim
Construction Brief ("MCT's Opening Brief"), Deposition of Alan Jones ("Jones Deposition") at page 23, lines 22-
23.

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL REPLY BRIEF PURSUANT
TO PATENT LOCAL RULE 4-5
CASE NO.:  5:07-CV-01998-RMW**

1   record.  Even "USB controller" is not mentioned in the 1500-page USB specification cited by

2   Dr. Jones.

3       Here, Dr. Jones' declaration that the patent "mandates" these three terms - without any

4   evidence in the written record - is conclusory and without evidentiary support.  Dr. Jones'

5   declaration should therefore be discounted.  Moreover, DisplayLink's construction is at odds

6   with the written record and in contravention of <u>Phillips</u> as it imports "storage," "routing" and

7   "encoded" from the Jones declaration and the USB specification without any evidentiary basis.

8       3. <u>The Written Record Supports MCT's Construction</u>

9       The written record, including the specification and claims consistently refers to the USB

10  controller communicating with the computer according to the USB standard and with the bridge

11  in the signal form understood by the bridge.  <u>See, e.g.</u>, '788 Patent, Col. 1, lines 47-56 attached

12  to MCT's Opening Brief as Exhibit A.   Here, MCT does not rely on extrinsic evidence to

13  support its construction.   Furthermore, DisplayLink has even admitted the "compatibility" of

14  MCT's construction with the '788 patent.  Accordingly, rather than accepting DisplayLink's

15  inconsistent and extrinsic-based construction, this Court should adopt MCT's fully supported,

16  consistent construction which is based on the language of the <u>patent</u>.

17  **B.  For Receiving Exclusively Therethrough USB Based Display Signals.**

18      1. <u>DisplayLink's Heavy Reliance On The Jones Declaration Is Misplaced</u>

19      DisplayLink relies on the Jones Declaration to support its proposed construction that the

20  USB controller is only capable of receiving display signals:

21  > Because the claims (as indicated by the claim language and prosecution history)
22  > require that the USB based display signals (after conversion to corresponding
23  > VGA signals) are applied to the display device, the plain meaning of the claims
    > require that the phrase "for receiving exclusively therethrough USB based display
    > signals" refers to receiving only USB base display signals from the computer.

24

25  Responsive Brief at page 22, lines 15-19, Jones Decl. ¶¶ 55-59.  Here, Jones improperly

26  interprets this term to limit the USB controller to receiving only display signals without any

27  corresponding support in the written record.

28

3

2. <u>Jones' Mistaken Interpretation Of The Law Ignores Home Diagnostics</u>

Dr. Jones contends that because audio signals and similar information is not explicitly referred to in the patent, the USB controller's receipt of such signals is not covered by the patent:

> A.  Well, the patent talks about receiving display signals over the USB bus and does not talk about receiving any other signals over the USB bus.
> Q.  And where -- if you could just point where that is to me in the patent.
> A.  No, the patent -- I'm saying the patent doesn't as far as I can see the patent contains no reference to any signals other than display signals being transported across the USB bus.  So there are no references to audio signals or other signals.

Deposition of Alan Jones ("Jones Deposition") attached to MCT's Opening Brief as Exhibit B at page 26-67, lines 22-25, 1-7.  Again, this construction is diametrically opposed to the Federal Circuit's well-established claim construction principles:

> A patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a <u>clear</u> disavowal or contrary definition in the specification.

<u>Home Diagnostics, Inc. v. LifeScan, Inc.</u>, 381 F.3d 1352, 1357 (Fed. Cir. 2004) (emphasis added).  Here, there is no clear disavowal or contrary definition of the term.  In fact, there is no limitation anywhere in the written record that the USB controller could not receive other information, such as sound signals or control signals.

3. <u>Contrary to DisplayLink's Argument, Jones Admits The Patent Covers Control Signals</u>

In his deposition Jones admits that the USB controller is capable of receiving more than just display signals:

> A.  Yes.  It's exclusively USB-based – <u>those signals will include the USB control signals.</u>  Where you say USB-based display signals, I take that to mean all the control setup signals that have to be going on the USB bus for this movement of those display signals and also the tokens that control the flow of those display signals.

Jones Deposition at page 25, lines 18-24 (emphasis added).  Contrary to DisplayLink's extrinsically-based argument, the term "exclusively" refers to the flow of USB display information from the computer into the USB controller.  The USB controller is not limited to receiving only USB based display signals -- rather, all USB based display signals from the USB

1  port must be received by the USB controller.  Furthermore, DisplayLink fails to identify any

2  portion of the claims, specification, or prosecution history supporting its proposed limitation.

3  Accordingly, MCT's construction should be adopted.

4  **C.  USB Based Display Signals**

5      1. <u>DisplayLink Mischaracterizes The '788 Patent To Include The Term "Encoded"</u>

6      Dr. Jones contends that "[t]he '788 Patent <u>expressly</u> requires that the display signal itself,

7  not some signal that 'contains' display 'information,' be in a USB encoded format." Responsive

8  Brief at page 17, lines 2-4, Jones Decl. ¶¶ 45-47 (emphasis added).  However, this is not true –

9  the '788 patent never mentions the term "encoded."

10      2. <u>"Encoded" Is Another Extrinsic-based Term To Limit The '788 Patent</u>

11      The term "encoded" is never mentioned in the '788 patent.  Dr. Jones refers to the term

12  repeatedly in his declarations and DisplayLink repeatedly cites to his declaration for this

13  construction.  However, no matter how many times DisplayLink cites to the Jones Declaration,

14  "encoded" never appears in the written record.  DisplayLink's attempt to import limitations is

15  without support and the more DisplayLink is forced to cite to the Jones Declaration – over ten

16  different times - the less convincing its argument.

17      3. <u>MCT's Construction Follows From The Plain Language Of The Claim</u>

18      MCT's construction of "USB based display signals" as "USB signals containing

19  display information" follows directly from the plain meaning of the terms as disclosed in

20  the claims and specification.

21      In some cases, the ordinary meaning of claim language as understood by a person
22      of skill in the art may be readily apparent even to lay judges, and claim
        construction in such cases involves little more than the application of the widely
23      accepted meaning of commonly understood words.

24  <u>Phillips v. AWH Corp.</u>, 415 F.3d at 1314.  <u>See</u> <u>Brown v. 3M</u>, 265 F.3d 1349, 1352 (Fed Cir.

25  2001) (holding that the claims did "not require elaborate interpretation").  Here, ordinary and

26  plain meaning is found in the construction of these terms - there is no need to import abstract

27

28

5

**DEFENDANT AND COUNTERCLAIM PLAINTIFF MAGIC CONTROL REPLY BRIEF PURSUANT**
**TO PATENT LOCAL RULE 4-5**
**CASE NO.:  5:07-CV-01998-RMW**

1    limitations from the Jones Declaration.  MCT's construction follows directly from the plain

2    language of the claims and specification and as such should be adopted by this Court.

3    **D.  USB Based Display Signals From The Computer**

4        1. <u>DisplayLink Argues That "From The Computer" Gives This Term New Meaning</u>

5    MCT's construction simply adds the words "from the computer" to its construction of "USB

6    based display signals." DisplayLink however attempts to argue that "from the computer"

7    provides this term with an entirely new meaning – in contravention of the plain language of the

8    claim.

9        "Quite apart from the written description and the prosecution history, the claims

10   themselves provide substantial guidance as to the meaning of particular claim terms."  <u>Phillips v.</u>

11   <u>AWH Corp.</u>, 415 F.3d at 1314.  As the court noted in <u>ACTV, Inc. v. Walt Disney Co.</u>, 346 F.3d

12   1082, 1088 (Fed. Cir. 2003), "the context of the surrounding words of the claim also must be

13   considered in determining the ordinary and customary meaning of those terms."  Here, the

14   surrounding words "from the computer" mean exactly what they say – display signals coming

15   from the computer.  DisplayLink fails to cite any authority to the contrary.

16       2. <u>DisplayLink Incorrectly Asserts That The Claims Require The Image Be "Rendered"</u>

17        "Rendered" is not found in the written record of the '788 Patent.  This term stems from

18   the extrinsic testimony of Dr. Jones:

19       The specification teaches that the claimed 'USB based display signals' are
         <u>rendered</u> (or created) by the computer.
20

21   Responsive Brief at page 19, lines 6-7, Jones Decl. ¶ 53 (emphasis added).  Here, DisplayLink

22   fails to cite any intrinsic evidence in support of "rendered."  Rather, these are conclusory, expert-

23   based statements prohibited by <u>Phillips</u>.  While DisplayLink grasps at this definition to limit

24   display signals to those that are "rendered by the computer," MCT incorporates the more logical

25   position, stating word-for-word the exact language from the additional part of the claim – "from

26   the computer."  As such, this Court should adopt MCT's intrinsic-based construction.

27

28

6

**E. VGA Controller**

    1. <u>DisplayLink Uses Jones' Declaration To Import Extrinsic Routing Limitations</u>

    Here, DisplayLink relies on extrinsic evidence to advance the same kind of argument it makes for USB controller.  Specifically, DisplayLink contends that VGA controller is limited to a device that controls the "routing" of VGA signals.  However, "routing" is nowhere in the '788 patent – it is merely an extrinsic limitation created by Dr. Jones:

> As used in the '788 Patent, the VGA Controller controls the <u>routing</u> of VGA signals to the display device.

Responsive Brief at page 16, lines 3-4, Jones Decl. ¶¶ 42-43 (emphasis added).  There is absolutely <u>no support</u> for a VGA Controller controlling "routing" in the '788 patent.  Here, DisplayLink's position is entirely dependent on the Jones Declaration - not on the written record of the '788 patent.  The written record makes no mention of routing, either in the context of a USB controller or, in this case, a VGA controller.

    2. <u>DisplayLink's 400-page VGA Specification Does Not Support Routing</u>

    DisplayLink repeatedly asserts that the VGA specification of the late 1980s limits the '788 patent to an antiquated 640-by-480 screen resolution.   However, DisplayLink fails to point out that the same specification does not support a VGA controller incorporating "routing."

> [T]here is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question. In the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff.

<u>Phillips v. AWH Corp.</u>, 415 F.3d at 1318.  Here DisplayLink leaves MCT and the Court with the task of filtering the extrinsic evidence.  As the Supreme Court noted in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 595 (1993), "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."

    DisplayLink's construction relies on the extrinsic evidence, namely the 400 page VGA specification and the Jones Declaration.  DisplayLink then selectively picks and chooses from both sources to arrive at its construction.  This selective use of the extrinsic evidence erodes

7

1    DisplayLink's credibility and provides this Court with ample reason to discount DisplayLink's

2    proposed constructions.

3        3. This Court Should Prohibit DisplayLink's Selective Use Of Extrinsic Evidence

4        DisplayLink chooses to rely on the testimony of Dr. Jones, rather than the VGA

5    specification to define VGA controller.  DisplayLink's failure to address the VGA specification

6    demonstrates that it is comfortable picking and choosing limitations from different extrinsic

7    source without concern for consistency.

8        4. MCT's Intrinsic Construction Is Firmly Grounded In The Claims And Specification

9        The specification and claims consistently refer to the VGA controller as a device that

10   communicates with a display device according to the VGA standard and with the bridge in the

11   signal form understood by the bridge.  See, e.g., '788 Patent at Col. 1, lines 56-61.  Claim 1

12   defines the communicative relation of the bridge and USB controller:

13       …the bridge circuit converting the USB based display signals into corresponding
         VGA signals and forwarding the VGA signals to the VGA controller...
14

15   '788 Patent at Col. 5, lines 7-11.  Here, the VGA controller is communicating with the bridge in

16   a signal form understood by the bridge.  Indeed, Dr. Jones even agrees with MCT's construction:

17       Q. …Now, other than VGA standard, do you disagree with that definition?
         A.  I should just check the diagram in the patent.  Yes, that's -- the MTC [sic]
18       definition [of VGA controller] is consistent with the patent.

19   Jones Deposition at page 26-27, lines 23-25, 1-3 (emphasis added).  In view of DisplayLink's

20   failure to properly address the intrinsic evidence of record and in view of DisplayLink's selective

21   reference to extrinsic evidence, this Court should adopt MCT's sound, intrinsic-based

22   construction of VGA controller.

23   **F.  Display Device**

24       1. DisplayLink Agrees that MCT's Construction Of Display Device Is Correct

25       DisplayLink agrees that MCT's construction of a "device that converts electrical signals

26   to images" is correct:

27       "DisplayLink agrees with MCT and its own expert Dr. Jones – it certainly can"

28
                                        8

Responsive Brief at page 11, line 20.  However, DisplayLink attempts to import further limitations into the term – in this case limiting the display device to an outdated 640-by-480 screen resolution.

### 2. DisplayLink's  Claim Limitation Is Expressly Based On Dr. Jones' Opinion

Here, Dr. Jones, rather than the '788 patent, imports the 640-by480 screen resolution limitation into DisplayLink's proposed construction:

> "Thus, the claims make clear that the claimed 'display device' does not convert any type of electrical signals into images but is instead limited to converting VGA signals into images."

Responsive Brief at page 12, lines 12-14, Jones Decl. ¶ 33 (emphasis added).  Here, other than the Jones Declaration, there is absolutely no support for DisplayLink's one-sided limitation.

### 3. DisplayLink's Construction Is Tailored To Avoid Infringement

DisplayLink seeks to avoid infringement by limiting the claim to outdated, low-resolution technology.  However, there is no support in the written record for 640-by-480 resolution technology.  Even if this Court were to include Jones' extrinsic evidence, MCT's underlying definition of "VGA" should control.  Specifically, under any interpretation of display device, there is no support for the proposition that the '788 patent is limited to the fifteen (15) year old sunset technology.  Accordingly, the Court should adopt MCT's intrinsic-based construction.

## G. Bridge

### 1. Dr. Jones Incorrectly Adds The "Two Or More Buses" Limitation To Bridge

After admitting that "MCT's construction is not necessarily wrong," DisplayLink turns to Dr. Jones to add limitations to the claims – this time by construing "bridge" to incorporate two or more buses:

> Thus the claims require that the bridge connect to at least two buses (the bus between the USB controller and the bridge and the bus between the bridge and the VGA controller).

Responsive Brief at page 10, lines 13-15, Jones Decl. ¶ 33.  However, DisplayLink's proposed limitation "two or more" is nowhere in the written record of the '788 patent.  Here, DisplayLink

9

1  is using Dr. Jones' extrinsic testimony to add limitations into the claims in contravention of

2  Phillips and the plain and ordinary meaning of the claim term.

3          2. DisplayLink's Construction Would Require More Than One Bridge

4          As shown in Fig. 1 of the '788 patent, the bridge is clearly connected between two

5  controllers, namely the USB controller on one end and the VGA controller on the other.  Indeed

6  the invention of the patent is that data comes from one USB controller, through the bridge, and to

7  a VGA controller on a fixed path.  The circuitous paths imagined by DisplayLink would, under

8  the patent, require more than one bridge.

9          DisplayLink fails to establish any support for its contention that the bridge communicates

10  between more than two buses.  Similarly, nothing in the written record requires that each bus use

11  a different interface.  For these reasons, this Court should adopt MCT's intrinsically-based

12  construction.

13  **H.  Connecting The USB Controller And The VGA Controller One To The Other For The**

14  **Passage Of Data Therebetween**

15          1. DisplayLink's Extrinsic-Based Definition Is Without Support

16          DisplayLink contends that "data" passed between the USB controller and VGA controller

17  is limited to "video or display data":

18          Furthermore, a review of the claims as a whole reveals that the data referred to in
            the phrase 'connecting the USB controller and the VGA controller one to the
19          other for the passage of data therebetween' is video or display data.

20  Responsive Brief at page 24, lines 12-14, Jones Decl. ¶ 65.  Here, DisplayLink's imposed

21  limitation of "video or display data" is merely Dr. Jones' extrinsic opinion which is based

22  entirely on extrinsic evidence outside of the '788 patent.

23          2. The Written Record Does Not Limit The Term To Video Or Display Data

24          There is absolutely no limitation in the written record that the data passed between VGA

25  controller and the USB controller must be limited to "only" video or display data.  The word

26  "only" does not appear in the claims or the specification or anywhere else in connection with this

27  term.  Here, the preferred embodiment only identifies data passing from the USB controller to

28
                                              10

the bridge and then to the VGA controller.  There is no limitation requiring this information to be display-only information.  DisplayLink's proposed extrinsic-based limitations are without merit as they incorporate additional, unsupported limitations into the claims.  As such, MCT's plain and concise intrinsic-based construction should be adopted by this Court.

**I.  The Bridge Circuit Converting The USB Based Display Signals Into Corresponding VGA Signals**

In view of DisplayLink's agreement to accept MCT's intrinsic-based construction, MCT and DisplayLink agree that the Court's construction of "USB based display signals" and "bridge" are the only points of disagreement.  See Responsive Brief at page 25, lines 23-25. Notably, DisplayLink has dropped its reliance on "PCI type or AGP type, or equivalent bus topology" and adopted MCT's plain meaning construction.

**J.  VGA (Video Graphics Array)**

1. DisplayLink Relies On Dr. Jones Exclusively To Limit VGA To Sunset Technology

MCT and DisplayLink agree that VGA is a common denominator among display technologies used in personal computing today.  See Responsive Brief at page 3, lines 19-20 (citing Jones Decl. ¶ 13-14).  Moreover, "[a]s noted above, since 1987, the PC has connected to monitors through a VGA (15-pin) port.  Id at page 3, lines 26-27.  However, the written record does not support DisplayLink's far-reaching contention that VGA is limited to only 640-by-480 screen resolution.  Here, DisplayLink relies exclusively on Dr. Jones to create its definition for "VGA":

> As indicated in the '788 Patent specification, a person of ordinary skill in the field of the '788 Patent understands that the term 'VGA' is an abbreviation for 'Video Graphics Array.'  Such a person would understand that VGA referred to the 640-by-480 video technology in the IBM Specification for VGA.

Responsive Brief at page 10, lines 11-14, Jones Decl. ¶ 65 (emphasis added).  The only "support" for this limitation comes extrinsically from Exhibits 4 and 5 which relate to the original 1980s-era VGA specification.  In 2002, however, the technology in Exhibits 4 and 5 was at least a decade old.  Rather than look at all the evidence available to one skilled in the art, Dr. Jones has looked at the old VGA specifications in a vacuum, contrary to Medrad, Inc. v. MRI

11

1    Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) where the Court stated "We cannot look at

2    the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning

3    in the context of the written description and the prosecution history." Id. Similarly, Dr. Jones'

4    contention is at odds with V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed.

5    Cir. 2005) stating that "The [intrinsic record] usually provides the technological and temporal

6    context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art

7    at the time of the invention." Id. Here, the technological context of the '788 patent related to

8    devices and technologies in existence in early 2000, not in either 1988 or 1991 as DisplayLink's

9    contends.

10           2. Dr. Jones' Extrinsic Evidence Contradicts VGA As Limited To A Low-Resolution

11           Dr. Jones refers to DisplayLink's Exhibits 11-14 in his declaration to illustrate supposed

12    "[e]arly efforts at sending video over a USB, particularly USB-VGA conversion…" Jones Decl.

13    ¶ 22[3]. Dr. Jones incorrectly contends that these references refer to early versions of "USB-VGA

14    conversion." Notwithstanding Dr. Jones misunderstanding, one of the supposed USB-VGA

15    converters refers to high-resolution VGA technology that contradicts Dr. Jones' limitation of

16    VGA.

17           Specifically, Exhibit 14 (U.S. Patent Application No. 2002/0135584) (cited as a USB-

18    VGA converter) is clearly not limited to a 640-by-480 VGA display resolution:

19           As shown in FIG. 1, a dual monitor includes a main monitor 32 configured by a
             15.1-inch LCD panel and having a 1024.times.768 resolution, and a sub-monitor
20           34 configured by a 6.4-inch LCD panel and having a 640.times.480 resolution.
             The main monitor 32 displays video data output by a main video graphic adaptor
21           (VGA) 14 mounted on a computer 10, and the main VGA 14 is configured by an
             accelerated graphic port (AGP) VGA or a PCI VGA.
22

23    Exhibit 14 at page 2, ¶¶ 0031-32 (emphasis added). This patent application clearly refers to high

24    resolution VGA, particularly 1024-by-768. This "high resolution" VGA capability cited by Dr.

25

26    _____

27    [3] Contrary to Jones' declaration, Exhibit 11 (U.S. Patent App. No. 2004/002615) does not refer to VGA. Similarly,
      Exhibit 13 (U.S. Patent App. No. 2003/0120849) does not refer to VGA.
28
                                                    12

1  Jones specifically contradicts DisplayLink's contention that VGA must be limited to a 640-by-

2  480 display resolution.

3      3. <u>DisplayLink Mistakenly Contends That VGA Is Limited to Just One Display Standard</u>

4      DisplayLink argues that because the specification does not explicitly refer to

5  contemporary (as of 2002) display standards such as SVGA, XGA, SXGA, UXGA, or QXGA,

6  the '788 patent is limited to the original VGA specification. <u>See</u> Responsive Brief at page 10,

7  lines 7-9. However, DisplayLink's position is in direct contravention of what one skilled in the

8  art would understand "VGA" to include.

9      Specifically, VGA products evolved over the years to improve the resolutions and colors

10  in display devices for increasingly advanced computer applications. These variations of VGA

11  include SVGA, XGA, , SXGA, UXGA, and QXGA and their corresponding counterparts for

12  widescreen display devices. Moreover, all of these standards share the same VGA connector. A

13  person of ordinary skill in the art reading the '788 Patent would understand that a common

14  feature among all variation of VGA is the compatibility of the signals with the characteristic

15  VGA 15-pin port/plug: <u>See</u> Declaration of Paul Min ("Min Decl.") attached to MCT's Opening

16  Brief, at page 8. Here, it is clear that VGA in the '788 patent is not limited to the 640-by-480

17  display resolution - it relates to all variations of VGA.

18      4. <u>DisplayLink's Bright Line Distinction Is Without Merit</u>

19      DisplayLink draws a bright line between including updates to VGA in 1991 qualifying as

20  VGA on the one hand, and yet on the other hand excluding the XGA and SVGA standards –

21  even though these standards retain the VGA signal characteristics, the compatibility with the 15-

22  pin configuration, and rely upon RGB. The '788 Patent makes no such distinctions. XGA,

23  SVGA, and VGA are all related display standards based upon the original VGA standard. Min.

24  Decl. at 8.

25      In summary, VGA has an ordinary and customary meaning understood by one skilled in

26  the art. MCT never limited the term to the original VGA display resolution, original VGA

27  specification, or any of the extrinsic VGA references DisplayLink relies on. This Court should

28

13

adopt the clear construction that VGA generically refers to all video display standards compatible with any 15-pin VGA port/plug.

**K.  USB (Universal Serial Bus)**

      1. <u>DisplayLink Incorrectly Reads The Patent To Be Limited To A Particular Standard</u>

DisplayLink's position on USB is similar to the position it takes with VGA – it seeks to limit USB to a particular standard in existence at a particular time:

> Rather, column 1, lines 6-10 of the patent expressly state that USB refers to the 'Universal Serial Bus' standard.

Responsive Brief at page 7, lines 14-15.  Here however, this is a misstatement as the patent merely states that USB is an abbreviation for "Universal Serial Bus."  There is no limitation or reference to a particular standard.  USB in the patent may refer to things other than the "standard" such as "a USB controller connectable to a USB port." ('788 patent Abstract).  If DisplayLink's construction for USB were adopted (similar to VGA), any future versions of the USB standard would presumably fall outside of the scope of the claims.  Similar to the argument relating to VGA, the written description has no such limitations:

> "The present invention relates <u>generally</u> to a <u>USB</u> (Universal Serial Bus) to VGA (Video Graphics Array) converter, and in particular to a USB-to-VGA converter connectable between a USB port of a computer and a VGA display device."

'788 Patent at Col. 1, lines 5-9 (emphasis added).  The term "generally" is not a term of limitation, but rather broadens the scope of the term USB.  This is in step with what a person of ordinary skill in the art reading the '788 Patent would understand.  A person of ordinary skill in the art would associate USB with the unique and characteristic USB port/plug.  Also, a person of ordinary skill in the art would understand that the '788 Patent specification does not limit USB to any particular version. Min Decl. at page 7.  Accordingly it follows that MCT's proposed construction is proper as it does not incorporate limitations from extrinsic sources into the claim term.

14

III.    **CONCLUSION**

      For all of the aforementioned reasons, in particular MCT's reliance on intrinsic evidence to support its proposed claim constructions, this Court should adopt the MCT constructions.

                            Respectfully Submitted

Dated:  February 18, 2008          WANG, HARTMANN, GIBBS & CAULEY

                            By:   /s/Richard F. Cauley
                                  Richard F. Cauley
                            Attorneys for Defendant and Counter Plaintiff
                            MAGIC CONTROL TECHNOLOGY
                            CORPORATION