1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

     DISPLAYLINK CORPORATION,      )  CV-07-01998-RMW
5                                  )
                     PLAINTIFF,    )  SAN JOSE, CALIFORNIA
6                                  )
                VS.                )
7                                  )  MAY 13, 2008
     MAGIC CONTROL TECHNOLOGY,     )
8                                  )
                     DEFENDANT.    )  PAGES 1-128
9    _____)

10

11                  TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE RONALD M. WHYTE
12                UNITED STATES DISTRICT JUDGE

13

     A P P E A R A N C E S:
14

15   FOR THE PLAINTIFF:  WILSON SONSINI GOODRICH ROSATI
     DISPLAYLINK         BY:  JAMES YOON
16                            STEFANI SHANBERG
                              MONICA MUCCHETTI ENO
17                       650 PAGE MILL ROAD
                         PALO ALTO, CA  94304
18

19   FOR THE DEFENDANT:  WANG, HARTMANN, GIBBS, CAULEY
     MCT                 BY:  RICHARD CAULEY
20                            ERICK WOLF
                              FRANKLIN EUGENE GIBBS
21                       1301 DOVE STREET, STE 1050
                         NEWPORT BEACH, CA  92660
22

23   ALSO PRESENT:       ADRIAN VANDENHAVEN
                         ROBIN BREWER
24

25   OFFICIAL COURT REPORTER: SUMMER CLANTON, CSR,
                              CERTIFICATE NUMBER 13185

                                                              1

1

                    INDEX OF PROCEEDINGS
2

3        DEFENDANT'S

4        **DR. PAUL MIN**
              DIRECT EXAM BY MR. CAULEY          P. 25
5             CROSS EXAM BY MR. YOON             P. 41

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      SAN JOSE, CALIFORNIA          MAY 13, 2008

2                  P R O C E E D I N G S

3              (WHEREUPON, COURT CONVENED AND THE

4      FOLLOWING PROCEEDINGS WERE HELD:)

5              THE CLERK:  CALLING CASE C-07-01998.

6      DISPLAYLINK VERSUS MCT, ON FOR CLAIMS CONSTRUCTION

7      HEARING AND A FURTHER CMC.

8              STATE YOUR APPEARANCES, PLEASE.

9              MR. CAULEY:  GOOD AFTERNOON, YOUR HONOR.

10     RICHARD CAULEY, WANG, HARTMANN, GIBBS & CAULEY,

11     APPEARING FOR MCT.  AND WITH ME HERE ARE MY

12     COLLEAGUES ERIC WOLF AND FRANKLIN EUGENE GIBBS.

13             I ALSO HAVE WITH ME MY EXPERT, PAUL MIN,

14     WHO IS SITTING IN THE BACK.

15             MR. YOON:  GOOD AFTERNOON, YOUR HONOR.

16     JIM YOON WITH WILSON, SONSINI, GOODRICH & ROSATI.

17     WITH ME TODAY IS MY PARTNER STEFANI SHANBERG AND MY

18     COLLEAGUE MONICA MUCCHETTI ENO.

19             ALSO IN THE BACK IS ADRIAN VANDENHAVEN,

20     WHO IS THE VICE PRESIDENT OF STRATEGIC ENGINEERING

21     AT DISPLAYLINK, AND ALSO ROBIN BREWER.

22             THE COURT:  OKAY.  MY UNDERSTANDING, IF I

23     RECALL CORRECTLY, IS THAT YOU WANTED SOME INITIAL

24     TIME TO GIVE ME A TUTORIAL.

25             MR. YOON:  YES, YOUR HONOR.

                                                    3

```
 1                AS I UNDERSTAND, THE PROCEDURE TODAY IS

 2     THAT BOTH SIDES WILL PUT ON A 15-MINUTE TUTORIAL,

 3     THEN DR. MIN WILL TAKE THE STAND FOR TESTIMONY AND

 4     CROSS-EXAMINATION.  AND THEN WE WOULD BEGIN ARGUING

 5     THE CLAIM TERMS IN THE ORDER OF THE ORDER.

 6                THE COURT:  ALL RIGHT.

 7                WHO IS GOING TO GO FIRST ON THE TUTORIAL?

 8                MR. CAULEY:  YOUR HONOR, I THINK THE

 9     AGREEMENT WAS THAT WE WOULD.

10                THE COURT:  OKAY.  GO FOR IT.

11                MR. CAULEY:  MY COLLEAGUE, MR. WOLF, WILL

12     OPERATE THE EQUIPMENT.  IS THAT -- IS HE GOING TO

13     BE IN THE WITNESS BOX, YOUR HONOR?

14                THE COURT:  IT'S PROBABLY EASIEST.  ARE

15     YOU GOING TO BE POINTING TO THINGS?

16                THE WITNESS:  YES.

17                THE COURT:  WHEN YOU NEED TO STEP DOWN TO

18     POINT, FEEL FREE TO DO SO.

19                THE CLERK:  LET ME SWEAR YOU IN FIRST.

20     PLEASE RAISE YOUR RIGHT HAND.

21                (WHEREUPON, THE WITNESS WAS SWORN.)

22                THE WITNESS:  I DO.

23                THE COURT:  FOR THE RECORD STATE YOUR

24     NAME AND SPELL YOUR FIRST AND LAST NAME.

25                THE WITNESS:  MY NAME IS PAUL MIN.
```

1    P-A-U-L, AND LAST NAME MIN, M-I-N.

2            THE CLERK:  THANK YOU.

3            THE WITNESS:  GOOD AFTERNOON, YOUR HONOR.

4            THE COURT:  GOOD AFTERNOON.

5

6                    **PAUL MIN**,

7    BEING CALLED AS A EXPERT ON BEHALF OF THE

8    DEFENDANT, HAVING BEEN FIRST DULY SWORN, TESTIFIED

9    AS FOLLOWS:

10

11           THE WITNESS:  YOUR HONOR, I WILL BE

12   TALKING FOR THE NEXT 15 MINUTES, VERY HIGH LEVEL

13   TUTORIAL BACKGROUND RELATED TO THE TECHNOLOGY.

14           ONCE AGAIN MY NAME IS PAUL MIN.  I'M AN

15   ASSOCIATE PROFESSOR AT THE WASHINGTON UNIVERSITY IN

16   ST. LOUIS.  I WORK THERE IN THE DEPARTMENT OF

17   ELECTRICAL SYSTEMS ENGINEERING FOR THE PAST

18   18 YEARS.

19           HERE'S A QUICK OUTLINE.  BASIC ITEMS THAT

20   I'M GOING TO TALK ABOUT IS VIDEO GRAPHICS ARRAY IN

21   THE CONTEXT OF A VIDEO DISPLAY DEVICES.  AND

22   UNIVERSAL SERIOUS BUS, IN THE CONTEXT OF MANY

23   COMPUTER PERIPHERALS.

24           AND TO SET THE STAGES, I'M GOING TO SPEND

25   THE FIRST FEW MINUTES TALKING ABOUT THE COMPUTERS

1      AND HOW COMPUTING WAS TAKING PLACE DURING THE TIME

2      THAT THE VIDEO DISPLAY DEVICE AND VGA, ALONG WITH

3      THE USB STANDARDS, WERE FORMING.

4              MOVING TO SLIDE THREE, JUST TO -- SO THAT

5      I CAN POINT OUT DURING THE 1980S, THIS IS WHEN THE

6      PERSONAL COMPUTING BEGAN.  PRIOR TO THAT, OF

7      COURSE, COMPUTERS WERE AVAILABLE BUT MORE IN THE

8      CONTEXT OF MAIN FRAME SHARED COMPUTING, MUCH LIKE

9      THOSE THAT I USED TO HAVE IN SCHOOL, THE

10     TIMESHARING DEVICES.  SO WE SEE TWO COMPUTERS, ONE

11     FROM IBM IN 1981 AND THEN ANOTHER ONE FROM APPLE

12     COMPUTERS, MACINTOSH, IN 1984.

13             MOVING TO THE NEXT SLIDE.  AND JUST TO

14     FOLLOW THROUGH AS A RESULT, PLAINTIFFS -- BECAUSE

15     IN PART, THE INTERNET BECOMES QUITE POPULAR.  AND

16     DURING THE 1990'S, OF COURSE, THE WORLDWIDE WEB.

17     IN SHORT, WWW. STARTED IN 1991.

18             THE PUBLIC INTERNET BEGAN AND THE

19     TELECOMMUNICATION ACT IN 1996.  AND THE REST IS, OF

20     COURSE, HISTORY AS WE KNOW.  THERE'S AN EXPLOSION

21     OF USERS AND A DIFFERENT TYPE OF COMPUTERS.  AND

22     WIDE VARIETY OF COMPUTER PERIPHERALS THAT ARE

23     CONNECTED TO COMPUTERS.

24             NOW, IN THE SAME TIME SCALE I'VE SHOWN

25     HERE, THE VERY FIRST VGA SPECIFICATION, WHICH I

1    WILL USE THE ORIGINAL VGA TO DESCRIBE THAT, WAS

2    SPECIFIED BY IBM IN 1987.  AND A FEW YEARS LATER,

3    THE VERY FIRST USB SPEC THAT'S IN USE, 1.0, WAS

4    DEFINED IN 1995.  AND USB WAS AT THAT TIME IN 1995,

5    DEFINED BY INTEL.

6         MOVING TO NEXT SLIDE.  SO HERE'S YOUR

7    COMPUTER AND PERIPHERALS, LIKE THE WORDS SAY, WORK

8    TOGETHER WITH THE COMPUTERS, AND THEY ARE

9    CONNECTED.  AND AS THE TIME GOES, YOU KNOW, JUST A

10   NUMBER AND DIFFERENT TYPES OF THE PERIPHERALS

11   EXPONENTIALLY MULTIPLIED INTO VERY LARGE NUMBERS.

12        MOVING INTO SEVEN.  IN YEAR 2002 -- AND

13   THIS, AS I UNDERSTAND, IS THE YEAR THAT THE PATENT

14   WAS FILED -- APPLICATION FOR THAT WAS FILED.  AMONG

15   OTHERS, CERTAINLY THESE WERE VERY POPULAR TYPES OF

16   PERIPHERALS.

17        VIDEO DISPLAY, WE CALL THEM MONITORS, AND

18   OF COURSE THERE ARE KEYBOARDS, MOUSE AND PRINTERS,

19   SPEAKERS AND MICROPHONES.  THEY WERE VERY COMMONLY

20   USED IN THAT TIME FRAME.  AND THERE ARE SOME

21   DIRECTIONS, THE VIDEO DISPLAY, FOR EXAMPLE, IS AN

22   OUTPUT DEVICE FROM THE COMPUTER, THE KEYBOARD IS AN

23   INPUT INTO THE COMPUTER, AND SO FORTH.

24        NOW, ONE THING I WOULD LIKE TO ASK YOU TO

25   PAY ATTENTION TO IS THE DATA SPEED THAT IS INVOLVED

7

1    WITH THE VIDEO DISPLAY AS OPPOSED TO THE REST OF

2    THE DEVICES, COMPUTER PERIPHERALS, THAT HAVE LOW TO

3    SOMETIMES MEDIUM SPEED.  BUT IN COMPARISON WITH

4    VIDEO DISPLAY, IT IS SUBSTANTIALLY LOW IN DATA

5    SPEED.

6            MOVING TO SLIDE A.  SO WE LOOK AT THE

7    VIDEO DISPLAY DEVICE IN A SEPARATE CONTEXT FROM THE

8    REST OF THE PERIPHERALS.  OF COURSE, THE VIDEO

9    DISPLAY DEVICE DISPLAYS IMAGES, VIDEO SPECS,

10   SOMETHING THAT WE CAN VISUALIZE ON THE DISPLAY

11   DEVICE.  AND AS I HAVE JUST POINTED OUT IT INVOLVES

12   A HIGH DATA SPEED AND WHICH RESULTED IN THE

13   CONNECTION FROM THE COMPUTER TO THE VIDEO DISPLAY

14   DEVICE IN A -- USING THE MULTIPLE CONDUCTORS WHICH

15   WE'LL CALL A PARALLEL CONNECTION.

16           AS I HAVE ILLUSTRATED EARLY ON, IN 1987

17   JUST SHORTLY AFTER IBM INTRODUCED THE PS2 LINE OF

18   PERSONAL COMPUTERS, IBM DEFINED THE VERY FIRST

19   ORIGINAL VIDEO GRAPHICS ARRAY, VGA.  AND THE IMPACT

20   IN THE INDUSTRY WAS QUITE SIGNIFICANT.

21           BEFORE THE ORIGINAL VGA WAS SPECIFIED,

22   OFTEN COMPUTERS WERE INCOMPATIBLE WITH VIDEO

23   DISPLAY DEVICES FROM DIFFERENT MANUFACTURES.  AND

24   AFTER, AND PERHAPS SINCE THEN, THE VIDEO DISPLAY

25   DEVICES AND COMPUTERS ARE MUCH MORE COMPATIBLE.

1    AND TODAY WE DON'T REALLY WORRY ABOUT NOT HAVING

2    DISPLAY DEVICE THAT ARE INCOMPATIBLE WITH THE

3    COMPUTERS THAT WE MIGHT BUY.

4          AND ONE IMPORTANT FACTOR THAT PERHAPS I

5    WANT TO SPEND A MINUTE OR SO IS THE TERM CALLED

6    RESOLUTION.  RESOLUTION IS BASICALLY, IN A

7    NUTSHELL, HOW MUCH OF A DETAIL CAN YOU SEE IN A

8    PICTURE.

9          HERE WE HAVE A VERY NICE PICTURE OF AN

10   ANIMAL SITTING DOWN.  AND LOOKING AT SOME SMALL

11   PORTION OF IT AND BELOW THAT PART, NOW WE SEE, OF

12   COURSE, A STRUCTURED PATTERN THAT LOOK LIKE

13   COMBINATION OF TILES.  AND IN FACT, EACH OF THOSE

14   TILE-SHAPED SQUARES IS WHAT WE CALL PIXEL.  AND THE

15   RESOLUTION IS BASICALLY DEFINED IN TERMS OF AN

16   NUMBER OF HORIZONTAL PIXELS AND VERTICAL PIXELS ON

17   DISPLAY SCREEN.  THE MORE YOU HAVE THOSE, THE MORE

18   DETAIL YOU SEE, PERHAPS THE HIGHER QUALITY THE

19   VIEWERS WILL FEEL.

20         BUT THAT DOESN'T COME IN FREE, OF COURSE.

21   THE MORE PIXELS THAT YOU PUT HERE, IT INVOLVES THE

22   MORE AMOUNT OF DATA.  AND ESPECIALLY IF YOU ARE

23   DISPLAYING SOME MOVING PICTURES THAT NEEDS

24   REFRESHING THE SCREEN AT A CERTAIN FIXED RATE, THEN

25   OF COURSE THAT MUCH MORE THE DATA SPEED WOULD BE

9

1      NEEDED TO KEEP UP WITH THAT QUALITY OF VIDEO

2      DISPLAY.  SO THAT IS AN ISSUE THAT THE PEOPLE IN

3      VIDEO DISPLAY CONCENTRATE ON.

4           SLIDE NUMBER TEN.  NOW, THE REST OF THE

5      PERIPHERALS, THE LIST OF THE POPULAR PERIPHERALS IN

6      2002, THIS DATA SPEED SUBSTANTIALLY LOWER THAN THE

7      VIDEO DISPLAY.  WE CAN IMAGINE THE MOUSE -- THE

8      DATA COMMUNICATION BETWEEN THE COMPUTER TO THE

9      COMPUTER MOUSE WOULD BE SOMETHING THAT IS VERY LOW.

10     AND WE CAN MENTION, PERHAPS, THE SPEAKERS AND

11     MICROPHONE MIGHT BE HIGHER, BUT NOT COMPARISON WITH

12     A VIDEO DISPLAY WHERE A VERY SUBSTANTIAL AMOUNT OF

13     DATA WOULD NEED TO BE EXCHANGED.

14          SLIDE 11, PLEASE.  SO ALL OF THESE OTHER

15     PERIPHERALS AVAILABLE IN THE YEAR 2002, THEY

16     PERFORM VARIOUS INPUTS AND OUTPUT FUNCTIONS.  AND

17     COMPARED WITH THE VIDEO DISPLAY, THEY ARE

18     SUBSTANTIALLY LOWER IN THEIR SPEED.  SO INSTEAD OF

19     HAVING MULTIPLE CONDUCTORS THAT WE TRY TO USE THE

20     TERM PARALLEL CONNECTION BETWEEN THE COMPUTER AND

21     PERIPHERAL, IT WOULD BE ADEQUATE TO ACTUALLY HAVE A

22     SINGLE PAIR -- ONE PAIR OF CONDUCTORS TO

23     COMMUNICATE BETWEEN COMPUTER AND THE PERIPHERALS

24     WHICH YOU WILL CALL A SERIAL CONNECTION.

25          NOW, IN 1995, ONE OF THE INDUSTRY GIANTS,

1      INTEL, HAS CHAMPIONED A SPECIFICATION CALLED

2      UNIVERSAL SERIOUS BUS, IN SHORT, USB.  AND BEFORE

3      USB, ONCE AGAIN, THERE WERE MANY CONNECTORS FOR

4      DIFFERENT PERIPHERALS.  BUT AFTER USB, MOST

5      PERIPHERALS BEGAN ADOPTING THEM.  SO THE USB AND

6      VGA HAD A VERY SIMILAR IMPACT IN THE COMPUTER

7      INDUSTRY AS A WHOLE.

8            SLIDE 12.  THIS IS MY LAST SLIDE.  JUST

9      KIND OF PUTTING VGA AND USB IN A SAME SLIDE

10     TOGETHER.  SO HERE'S A BEGINNING.  THE YEAR IS

11     DIFFERENT, OF COURSE.  THE ORIGINAL VGA WAS IN

12     1987, USB WAS IN 1995.  BUT JUST PUTTING THEM IN

13     THE COLUMN BEGINNING, THEY ARE BOTH DRIVEN BY ONE

14     COMPANY WHO WILL MEASURE AND IS A SIGNIFICANT

15     PLAYER.  IBM BEING THE VGA CHAMPION, AND THE INTEL

16     BEING THE CHAMPION FOR USB.

17           SEVERAL YEARS GOING FORWARD IN 2002, OF

18     COURSE, DURING THAT PERIOD, EACH THE VIDEO DISPLAY

19     STANDARDS AND THE USB STANDARDS SPECIFIED FASTER

20     AND MORE FLEXIBLE THE TECHNOLOGY.  BUT AT THE SAME

21     TIME, SOME DIFFERENT VERSIONS OR DIFFERENT VIDEO

22     DISPLAY STANDARDS CAME ABOUT IN THE INDUSTRY AND

23     SOME OF THE THEM ARE LISTED HERE.  AND THE USB, THE

24     SAME WAY.  AND FOLLOWING VERSION 1.0, TO 1.1, TO

25     2.0.

1          IN 2002, THEY BOTH BECAME THE INDUSTRY

2     STANDARD, AND THE LATER THE VIDEO DISPLAY STANDARD,

3     SUCH AS SVGA AND XGA, CONTINUED TO USE THE SAME

4     ORIGINAL CONNECTOR THAT WAS DEFINED BY THE IBM IN

5     1987, AND USB 2.0 WHICH WAS THE LATEST VERSION AT

6     THE TIME IN 2002.

7          IN ADDITION TO USING THE ORIGINAL

8     CONNECTORS, IT ALSO SPECIFIED TWO ADDITIONAL

9     STANDARDS THAT ARE SMALLER VERSION, SO THAT AS THE

10    COMPUTER PERIPHERAL DIVERSIFIED AND THEY BECAME

11    SMALLER, THE CONNECTION COULD BE MADE INTO SMALLER

12    DEVICES.

13         AND THAT IS THE END OF MY TUTORIAL.  AND

14    I WILL BE HAPPY TO ANSWER ANY QUESTIONS

15         THE COURT:  OKAY.  THANK YOU.

16         JUST OUT OF CURIOSITY, WHEN WAS THE APPLE

17    2 COMPARED TO THE IBM B-P150

18         THE WITNESS:  THE APPLE MACINTOSH WAS

19    1984.

20         THE COURT:  WASN'T THERE AN APPLE II

21    BEFORE THE MACINTOSH?

22         THE WITNESS:  NO, I DON'T KNOW THAT DATE.

23    I'M SORRY.  I CAN FIGURE IT OUT FOR YOU.

24         THE COURT:  NO, THAT'S ALL RIGHT.  I JUST

25    REMEMBER FROM THE PERSONAL COMPUTER I HAD.

1          MS. SHANBERG:  GOOD AFTERNOON,

2    YOUR HONOR.  I'M GOING TO BE PRESENTING

3    DISPLAYLINK'S TUTORIAL.

4          BEFORE I GET STARTED I WANTED TO GO AHEAD

5    AND HAND A COPY OF THE MARKMAN SLIDES AND THE

6    TUTORIAL.  DISPLAYLINK'S TUTORIAL PRESENTATION IS

7    ACTUALLY QUITE COMPLIMENTARY TO WHAT YOU JUST HEARD

8    FROM DR. MIN.

9          THE COURT HEARD ABOUT THE IMPORTANCE OF

10   PERIPHERAL DEVICES TO THIS CASE.  AND DISPLAYLINK

11   AGREES THAT PERIPHERAL DEVICES, IN THE WAY THAT

12   PERIPHERAL DEVICES ARE ATTACHED TO PERSONAL

13   COMPUTERS, IS ONE IMPORTANT ASPECT OF THIS CASE.

14         DISPLAYLINK THINKS IT WOULD BE USEFUL FOR

15   THE COURT TO GAIN AN UNDERSTANDING OF SOME OF THE

16   TECHNICAL PROBLEMS THAT EXIST IN THE FIELD OF ART

17   RELATING TO CONNECTING PERIPHERAL DEVICES TO

18   COMPUTERS IN ORDER TO GAIN CONTEXT FOR THIS CASE.

19         SO IF YOU COULD TURN TO MY SLIDE TWO.  AS

20   LONG AS PERSONAL COMPUTERS HAVE EXISTED, SO HAVE

21   PERIPHERAL DEVICES.  AND, OF COURSE, WHEN WE TALK

22   ABOUT PERIPHERAL DEVICES, WE ARE TALKING ABOUT THE

23   DEVICES THAT ALLOW HUMAN USERS TO INTERACT WITH A

24   PERSONAL COMPUTER.  SO WE ARE TALKING ABOUT THINGS

25   LIKE KEYBOARDS AND MONITORS, MODEMS AND PRINTERS.

1          AND, OF COURSE, WITH THESE PERIPHERAL

2   DEVICES COMES THE NEED TO CONNECT THE DEVICES TO

3   THE PERSONAL COMPUTER.  AND FOR EACH DEVICE THAT

4   YOU SEE IN THE MANY, MANY OTHER PERIPHERAL DEVICES

5   THAT EXIST, THERE ARE SPECIFICATIONS IN THE

6   INDUSTRY THAT EXPLAIN HOW THE CONNECTION IS TO BE

7   EFFECTUATED AND HOW THE INTERACTION BETWEEN THE

8   COMPUTER AND PERIPHERAL WILL BE ACCOMPLISHED.

9          MONITORS ARE THE MOST USED PERIPHERAL

10  DEVICE HISTORICALLY AND TODAY.  AND, OF COURSE,

11  THIS IS THE PRIMARY WAY THAT A HUMAN BEING

12  INTERACTS WITH THEIR PERSONAL COMPUTER.

13         EARLY ON, THERE WERE TWO PRIMARY VIDEO

14  GRAPHICS STANDARDS.  THERE WAS MDA WHICH WAS A

15  MONOCHROME DISPLAY, AND CGA WHICH WAS THE FIRST

16  COLOR GRAPHICS ADAPTER.  EACH OF THESE EARLY

17  STANDARDS WAS PRIMITIVE IN ITS FUNCTIONALITY AND

18  ESPECIALLY IN THE RESOLUTION AND THE NUMBER OF

19  COLORS IT DISPLAYED.

20         AND YOU CAN SEE, YOUR HONOR, WHEN WE TALK

21  ABOUT MONITORS WE ARE NOT JUST TALKING ABOUT THE

22  PERSONAL IBM MONITOR BUT ALSO MONITORS THAT ARE

23  USED IN A HOST OF DIFFERENT APPLICATIONS SUCH AS AT

24  THE AIRPORT, YOUR KIOSK TO CHECK IN, YOU KNOW, BY

25  RADIOLOGISTS AT YOUR DOCTOR'S OFFICE OR OTHER USES

1    IN YOUR DOCTOR'S OFFICE, AIR TRAFFIC CONTROL

2    MONITORS, AND EVEN THE DISPLAYS ON AN ATM MACHINE.

3    SO MONITORS ARE UBIQUITOUS PERIPHERAL DEVICES.

4         IN 1987, AND DR. MIN TOUCHED ON THIS, IBM

5    FOUND A MUCH IMPROVED DISPLAY INTERFACE CALLED VGA,

6    AND THAT'S VIDEO GRAPHICS ARRAY.  AND AS IS ALWAYS

7    DONE IN THE INDUSTRY, WHEN A NEW AND IMPROVED

8    STANDARD ARISES, IBM RECORDED THIS STANDARD

9    COVERING THE VGA VIDEO GRAPHICS ADAPTER -- VIDEO

10   GRAPHICS ARRAY GRAPHICS ARCHITECTURE, IN A SERIES

11   OF TECHNICAL BULLETINS THAT WERE UPDATED, ACTUALLY,

12   BACK IN 1981.

13        PRIOR TO VGA, VIDEO GRAPHICS ARRAY BY

14   IBM, DISPLAY DEVICES WERE OFTEN MANUFACTURER

15   SPECIFIC.  AND WITH VGA THERE AROSE AN INDUSTRY

16   STANDARD, PC TO DISPLAY INTERFACE, THAT REMAINS THE

17   SEMINAL TECHNOLOGY AMONG DISPLAY INTERFACES TODAY.

18   IT REMAINS SUPPORTED BY PC'S TODAY.  AND IT'S

19   ACTUALLY USED ON MOST HANDHELD AND MOBILE DEVICES

20   FOR SURFING THE INTERNET.

21        VGA ENABLED A HIGHER RESOLUTION, A

22   GREATER PALETTE OF COLORS, AND AN ABILITY TO

23   SIMULTANEOUSLY DISPLAY 256 COLORS; WHEREAS MGA,

24   PRIOR TO VGA, ONLY ALLOWED ONE, AS IT'S NAME

25   SUGGESTS, MONOCHROME, AND CGA ONLY ALLOWED FOR 16

1    COLORS.

2              GOING ON TO THE NEXT SLIDE.  THERE ARE A

3    NUMBER OF DIFFERENT VIDEO GRAPHICS STANDARDS.  THE

4    COMPUTER INDUSTRY IS RAPIDLY CHANGING, AND

5    DIFFERENT GROUPS OF COMPUTER USERS HAVE DIFFERENT

6    DEMANDS, AND FOR EACH OF THESE DEMANDS A STANDARD

7    IS PROMULGATED IN RESPONSE.

8              THESE VIDEO GRAPHICS STANDARDS HAVE,

9    AGAIN, THEIR OWN SPECIFICATIONS THAT ARE WRITTEN BY

10   DIFFERENT COMPANIES IN INDUSTRY ORGANIZATIONS.  THE

11   DIFFERENCES AMONG THESE STANDARDS ARE VAST.  THEY

12   DIFFER IN TERMS OF RESOLUTION, BIT RATE, AND THE

13   HARDWARE REQUIRED FOR THE DISPLAY.

14             VGA, WHICH YOU CAN SEE IN THE UPPER

15   LEFT-HAND CORNER OF THIS GRAPH, REMAINS A

16   FUNDAMENTAL TECHNOLOGY.  SOME OF THESE TECHNOLOGIES

17   CAME UP EARLIER THAN VGA, OTHERS CONTEMPORARY WITH

18   VGA.  MANY ARE NEWER, AND OF COURSE WE WILL SEE

19   MORE AND MORE OF THESE ARISE FOR DIFFERENT

20   APPLICATIONS IN THE FUTURE.

21             SO MOVING ON TO THE NEXT SLIDE.

22   DISPLAYLINK THINKS THE USEFUL CONTEXT IN WHICH TO

23   ADDRESS THE FIELD OF THIS CASE IS TO TALK ABOUT

24   SOME PROBLEMS THAT HAVE EVOLVED WITH REGARD TO

25   CONNECTING PERIPHERAL DEVICES TO COMPUTERS.

1          COMPUTERS HAVE ALWAYS BEEN FRAUGHT FROM

2     EXPANDABILITY PROBLEMS, AND USERS' NEEDS JUST

3     BECOME MORE AND MORE SOPHISTICATED AND MORE AND

4     MORE DEMANDING AS TIME GOES ON.

5          SO A PC USER DESIRES TO CONNECT AS MANY

6     PERIPHERALS TO THEIR COMPUTER AS THEY CAN USING AS

7     FEW PORTS AS POSSIBLE.  SO THE PROBLEMS CAN BE

8     SUMMARIZED AS FOLLOWS:  THERE'S THE PORT PLUG

9     PROBLEM, WHICH WE'LL ILLUSTRATE IN THE A MINUTE,

10    AND IT SIMPLY ADDRESSES THE FACT THAT, EARLY ON,

11    THERE WAS AN INDIVIDUAL PORT REQUIRED FOR EVERY

12    SINGLE PERIPHERAL DEVICE IN AN INDIVIDUAL PLUG THAT

13    WAS UNIQUE TO THAT PORT FOR PLUGGING IN WHICH LEAD

14    TO, OF COURSE, EXPANDABILITY PROBLEMS.

15         AND THEN THE NEED FOR CONVERTERS.  UPON

16    THE MOVE TO A UNIVERSAL PORT, PEOPLE WANTED TO

17    CONTINUE USING THEIR OLD LEGACY DEVICES, SO

18    CONVERTERS WERE NECESSARY.  AND NOWADAYS, ONE OF

19    THE BIGGER PROBLEMS FACING THIS FIELD OF TECHNOLOGY

20    IS THE DESIRE TO ATTACH MULTIPLE PERIPHERALS

21    THROUGH A SINGLE UNIVERSAL PORT.

22         SO MOVING ON, WE ARE GOING TO GET INTO

23    MORE DETAIL ABOUT THE PORT PLUG PROBLEM.  WHAT YOU

24    CAN SEE HERE IS THE BACK PLANE OF A TYPICAL PC

25    BEFORE PC'S MOVED TO UNIVERSAL PERIPHERAL

1    INTERFACES.  AND AS YOU CAN SEE THERE ARE A LIMITED

2    NUMBER OF PORTS.  AND EACH PORT IS UNIQUE TO A

3    PARTICULAR PERIPHERAL DEVICE.  SO YOU HAVE YOUR

4    KEYBOARD AND YOUR MONITOR, AND YOUR PARALLEL PORT

5    FOR YOUR PRINTER OR MODEM.  AND THIS IS PROBLEMATIC

6    BECAUSE THERE WAS A LIMITED SPACE AND LIMITED

7    ABILITY TO ADD PERIPHERAL DEVICES TO PC'S.

8            SO IF YOU TURN TO THE NEXT SLIDE, YOU

9    WILL SEE AN ILLUSTRATION OF HOW THIS IS PROBLEMATIC

10    WITH REGARD TO THE PORT PLUG PROBLEM AND THE

11    LIMITED NUMBER OF SPACES ON THE BACK OF A PC.  IT

12    CAN LEAD TO ALL KINDS OF WIRING PROBLEMS BECAUSE

13    THERE'S A LOT OF DIFFERENT WIRES REQUIRED, EACH ONE

14    HAS TO GO IN A PARTICULAR PORT.  EACH ONE HAS A

15    DIFFERENT SIZE, A DIFFERENT RIGIDITY, AND IT HAS TO

16    CORRESPOND TO A PERIPHERAL DEVICE SITTING IN A

17    PARTICULAR PLACE ON YOUR DESK.

18            SO THE UNIFORM PORT PLUG FOR EACH

19    PERIPHERAL CAUSED ALL KINDS OF INEFFICIENCIES AND

20    EXPANDABILITY PROBLEMS WITH THE PC.

21            NOW, THE ANSWER TO THIS PROBLEM WAS THE

22    UNIVERSAL SERIAL BUS STANDARD.  SO FACED WITH THESE

23    DIFFICULTIES, THE INDUSTRY CAME UP WITH THE

24    UNIVERSAL SERIAL BUS STANDARD.  IT WAS A

25    SIGNIFICANT STEP TO RESOLVING THIS PORT PLUG

18

1    PROBLEM.

2            AND USB 1.0 WAS INTRODUCED IN 1995.  IT

3    WAS WRITTEN BY THE USB IMPLEMENTER'S FORUM AND

4    PUBLISHED BY A STANDARD THAT CAN BE USED BY ANY

5    ENGINEERS THAT WANT TO INCORPORATE USB TECHNOLOGY

6    INTO THE TECHNOLOGY THEY'RE DEALING WITH.

7            THE SECOND VERSION OF USB WAS USB 1.1.

8    THAT CAME UP IN SEPTEMBER OF 1998, PRIMARILY TO

9    SOLVE CERTAIN PROBLEMS THAT EXISTED WITH USB 1.0.

10   AND FINALLY USB 2.0 WAS INTRODUCED IN APRIL OF

11   2000, AND THAT REMAINS THE LATEST VERSION OF USB

12   STANDARD THAT EXISTS TODAY.

13           SO GOING ON TO THE NEXT SLIDE.  THIS IS

14   SOMETHING DR. MIN TOUCHED ON IN HIS TUTORIAL WAS

15   THAT USB 1.0 AND 1.1 WERE NOT FAST ENOUGH TO HANDLE

16   THE FAST DATA RATES THAT ARE REQUIRED BY DISPLAY

17   DEVICES AND MONITORS.

18           SO USB 1.0 AND 1.1 WENT PART OF THE WAY

19   TOWARDS SOLVING THE PORT PLUG PROBLEM BECAUSE NOW

20   CAN PLUG IN YOUR KEYBOARD, MOUSE, MODEM, YOUR

21   PRINTER AND CERTAIN OTHER PERIPHERAL DEVICES TO THE

22   USB PLUG.  BUT YOU COULDN'T PLUG YOUR MONITOR INTO

23   THE USB PLUG UNTIL USB 2.0.

24           AND WITH USB 2.0, YOU HAD THE FIRST

25   UNIVERSAL STANDARD WITH SUFFICIENT SPEED TO HANDLE

1    VIDEO DISPLAY.  AND USB 2.0 WAS STILL ONLY FAST

2    ENOUGH TO HANDLE THE ORIGINAL IBM VGA WITHOUT ANY

3    KIND OF COMPRESSION OR FRAME BUFFERING.  IT'S NOT

4    FAST ENOUGH TO HANDLE THE MORE ADVANCED VIDEO

5    GRAPHICS DISPLAYS -- STANDARDS -- THAT WE TALKED

6    ABOUT EARLIER.  BUT WITH USB 2.0, USERS DO NOW HAVE

7    THE ABILITY TO CONNECT ALL OF THEIR PERIPHERALS TO

8    THEIR PC USING A STANDARD INTERFACE.

9            LET'S GO INTO THE NEXT SLIDE.  SO THIS

10   LED TO THE NEED FOR CONVERTERS BECAUSE USERS STILL

11   WANTED TO USE THEIR LEGACY PERIPHERAL DEVICES WITH

12   THIS NEW PLUG INTERFACE.  AND, OF COURSE, THE

13   LEGACY PERIPHERAL DEVICES HAD THE OLD PLUG

14   INTERFACE ATTACHED TO THEM.

15           SO EARLY ADOPTERS DIDN'T WANT TO THROW

16   AWAY THEIR OLD PRINTER, THEIR OLD MODEM, OLD

17   KEYBOARD OR OLD MONITOR, SO THEY NEEDED A CONVERTER

18   TO CONVERT ONE TECHNOLOGY STANDARD TO ANOTHER.

19   CONVERTERS ARISE EVERY TIME THERE IS A NEW

20   TECHNOLOGY STANDARD, SO THAT THEY DIDN'T WASTE

21   THEIR OLD PERIPHERAL DEVICES OR GO TO THE EXPENSE

22   OF REPLACING THEM WITH BRAND NEW PERIPHERAL DEVICES

23   EVERY TIME THE STANDARD CHANGED.

24           SO HERE IN THIS NEXT SLIDE YOU CAN SEE

25   CONVERTERS.  AND, OF COURSE, YOU KNOW, CONVERTERS

1   ARISE EVERY TIME STANDARDS IMPROVE.  AND YOU'VE GOT

2   HERE USB TO PCI CONVERTER, A PCI TO VGA CONVERTER

3   FOR YOUR MONITOR, A USB TO SERIAL PORT CONVERTER

4   FOR YOUR MODEM, A USB TO PARALLEL PORT FOR YOUR

5   PRINTER, AND USB TO PS2 FOR YOUR MOUSE AND

6   KEYBOARD.

7           IT'S WITH THIS CONVERTER PROBLEM, THE

8   '788 PATENT FILED BY MCT IN DECEMBER 2002,

9   PRIMARILY DEALS.  AND YOU CAN SEE THE TITLE OF THE

10  PATENT IS USB TO VGA CONVERTER.  IT PROVIDES A WAY

11  TO ATTACHING A MONITOR TO A USB PORT IN A COMPUTER.

12  AND EACH INDEPENDENT CLAIM OF THE PATENT ALSO

13  BEGINS WITH A PREAMBLE THAT DISCLOSES THIS USB TO

14  VGA CONVERTER.

15          MOVING ALONG TO THE NEXT PROBLEM THAT

16  AROSE AS THE NEEDS OF COMPUTER USERS BECAME MORE

17  SOPHISTICATED, AND THAT'S THE DESIRE TO ATTACH

18  MULTIPLE PERIPHERALS THROUGH A SINGLE PORT -- NOT

19  THROUGH A UNIFORM PORT BUT THROUGH A SINGLE PORT.

20          AND YOU SWITCH TO THE NEXT SLIDE, HERE

21  YOU CAN SEE THE SIDE OF A PERSONAL COMPUTER THAT

22  HAS TWO USB SLOTS.  AND THAT'S A COMMON NUMBER OF

23  SLOTS TO HAVE ON THE SIDE OF A COMPUTER.  BUT ON

24  THE OTHER SIDE OF THE SCREEN YOU SEE THE PROBLEM.

25          THERE ARE FOUR PERIPHERAL DEVICES THAT A

21

1    COMPUTER USER MAY WANT TO ATTACH TO THIS COMPUTER

2    AND, OF COURSE, THERE'S MANY OTHERS.  THERE ARE

3    CAMERAS, IPODS, THERE IS ALL KINDS OF PERIPHERAL

4    DEVICES THAT A USER MAY WANT TO CONNECT.

5         SO WHAT YOU HAVE HERE IS SIMILAR TO THE

6    TRADITIONAL PROBLEM OF UNIVERSAL INTERFACE -- THE

7    NEED FOR A UNIVERSAL INTERFACE AND THE PORT PLUG

8    PROBLEM MANIFESTING ITSELF WITH THE REGARD TO THIS

9    USB PORT.

10        AND AS USERS WANT TO ATTACH MORE AND MORE

11   PERIPHERALS THROUGH THEIR USB, THEY HAVE AN OPTION.

12   IF YOU SEE THE NEXT SLIDE, THEY DID USE TWO USB

13   CABLES, ONE FOR EACH MONITOR.  BUT, OF COURSE,

14   THAT'S EXTREMELY LIMITING BECAUSE YOU CAN ONLY

15   ATTACH TWO USB PERIPHERAL DEVICES THROUGH THAT

16   METHOD.

17        SO THEN AROSE THE USB HUB WHICH ALLOWS

18   USERS TO CONNECT MULTIPLE PERIPHERAL DEVICES

19   THROUGH A SINGLE PORT.  BUT IT'S A COMPLICATED

20   PROBLEM BECAUSE JUST LIKE DR. MIN EXPLAINED THAT

21   THE USB INTERFACE ISN'T FAST ENOUGH TO HANDLE A LOT

22   OF DIFFERENT DISPLAY DEVICES OR MONITORS, IT'S

23   CERTAINLY NOT FAST ENOUGH TO HANDLE MULTIPLE

24   PERIPHERAL DEVICES THROUGH ONE USB INTERFACE.  SO

25   IT REQUIRES THINGS LIKE FRAME BUFFERING AND

1    COMPRESSION IN ORDER TO GET THIS KIND OF

2    EXPANDABILITY.

3              SO MOVING ON TO THE NEXT SLIDE.  ONE

4    EXAMPLE OF A TECHNOLOGY THAT'S TRYING RESPOND TO

5    USERS' DESIRES TO CONNECT MULTIPLE PERIPHERALS, AND

6    PARTICULARLY MULTIPLE DISPLAY DEVICES AND MULTIPLE

7    MONITORS, TO THEIR PC IS THE TECHNOLOGY OF

8    DISPLAYLINK.  DISPLAYLINK FOCUSES ON THIS PROBLEM

9    IN PROVIDING THE ABILITY TO CONNECT MULTIPLE

10   MONITORS THROUGH A SINGLE PORT.

11             HERE YOU CAN SEE AN EXAMPLE OF FOUR

12   MONITORS ATTACHED THROUGH A SINGLE USB CONNECTER.

13   AND, OF COURSE, THIS USER ALSO HAS THEIR KEYBOARD

14   AND MOUSE ATTACHED, PRESUMABLY, THROUGH THE USB.

15             THE PROBLEM OF CONNECTING MULTIPLE

16   MONITORS IS AN ESPECIALLY DIFFICULT ONE AND IT'S AN

17   ESPECIALLY IMPORTANT ONE.  IT'S ESPECIALLY

18   DIFFICULT BECAUSE THE BIT RATE REQUIRED FOR

19   MONITORS IS JUST SO HIGH.  AND ESPECIALLY IMPORTANT

20   BECAUSE STUDIES ARE SHOWING THAT PRODUCTIVITY

21   INCREASES SUBSTANTIALLY WITH THE ADDITION OF

22   MULTIPLE MONITORS.

23             SO IF WE MOVE ON TO THE LAST SLIDE --

24   BILL -- WHAT YOU SEE HERE IS NEW TECHNOLOGY

25   ALLOWING FOR PRESENTATION OF EXTREMELY HIGH

1    RESOLUTION STANDARDS THROUGH A SINGLE USB PORT.

2           THE PROBLEM HERE IS THE USB PORT CAN ONLY

3    HANDLE A CERTAIN BIT RATE.  SO THE FACT THAT A

4    SINGLE USB PORT IS DRIVING ALL OF THESE VARIOUS

5    DISPLAY DEVICES DEMONSTRATES THE INCREDIBLE

6    ADVANCES IN THE FIELD OF TECHNOLOGY AND THE

7    INNOVATIONS IN THIS TECHNICAL SPACE REQUIRED TO RUN

8    THAT KIND OF BIT RATE THROUGH A SINGLE USB DEVICE.

9           SO WE HOPE THAT YOU KNOW THIS EXPLANATION

10   OF THE EVOLVING PROBLEMS THAT EXIST IN THE FIELD OF

11   ATTACHING PERIPHERAL DEVICES TO PERSONAL COMPUTERS

12   PROVIDES A USEFUL CONTEXT FOR THE COURT AS IT HEARS

13   THE REST OF THE MARKMAN HEARING.

14           THANK YOU.

15           THE COURT:  YOU MAY PROCEED.

16           MR. CAULEY:  YOUR HONOR, WE WOULD LIKE TO

17   CALL DR. PAUL MIN TO THE STAND.

18           THE COURT:  ALL RIGHT.

19           MR. CAULEY:  DR. MIN IS ALREADY SWORN.

20

21                    **PAUL MIN**,

22   BEING CALLED AS A EXPERT ON BEHALF OF THE

23   DEFENDANT, HAVING BEEN PREVIOUSLY SWORN, WAS

24   EXAMINED AND TESTIFIED AS FOLLOWS:

25

1             **DIRECT EXAMINATION BY MR. CAULEY**

2

3      BY MR. CAULEY:

4      Q.   DR. MIN, I KNOW YOU ALREADY GAVE YOUR

5      BACKGROUND AND EDUCATION IN THE TUTORIAL BUT WHY

6      DON'T YOU GIVE IT AGAIN.  WHY DON'T YOU JUST

7      BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND?

8      A.   YOUR HONOR, I RECEIVED A BS IN ELECTRICAL

9      ENGINEERING IN 1982.  I GOT MY MASTER'S OF SCIENCE

10     IN ELECTRICAL ENGINEERING IN 1984.

11             IN 1987, RECEIVED A PHD IN ELECTRICAL

12     ENGINEERING FROM THE UNIVERSITY OF MICHIGAN.  AND

13     IN '87 UNTIL '90 I WAS AT BILTMORE, NOW THEY CALL

14     THEMSELVES THE UNIVERSITY OF TECHNOLOGY.

15             AND SINCE 1990, I CAME TO WASHINGTON

16     UNIVERSITY IN ST. LOUIS, AND I HAVE BEEN A FACULTY

17     MEMBER THERE FOR THE PAST 18 YEARS.

18             MR. CAULEY:  I BELIEVE I AGREED WITH

19     MR. YOON, OR AT LEAST WITH COUNSEL FOR DISPLAYLINK,

20     THAT THEY WOULD NOT OBJECT TO DR. MIN GIVING EXPERT

21     TESTIMONY HERE TODAY, AND DO NOT OBJECT TO HIS

22     QUALIFICATIONS.

23             MR. YOON:  THAT'S CORRECT, YOUR HONOR.

24     WE RESERVE THE RIGHT TO CROSS-EXAMINE DR. MIN BUT

25     WE DON'T OBJECT TO HIM TESTIFYING.

1          MR. CAULEY:  THANK YOU, YOUR HONOR.

2    Q.   DR. MIN ARE YOU FAMILIAR WITH THE TERM A

3    PERSON OF ORDINARY SKILL IN THE ART?

4    A.   YES.

5    Q.   DO YOU HAVE AN OPINION AS TO WHAT THE

6    EDUCATIONAL BACKGROUND OF A PERSON OF ORDINARY

7    SKILL IN THE ART, IN THE OF THE '788 PATENT IN

8    2002?

9    A.   YES.

10   Q.   WHAT'S YOUR OPINION?

11   A.    IT IS MY OPINION THAT A PERSON SKILLED IN THE

12   ART WOULD HAVE HAD, IN 2002, A MINIMUM OF BACHELORS

13   OF SCIENCE DEGREE IN ELECTRONIC ENGINEERING,

14   COMPUTER SCIENCE OR COMPUTER ENGINEERING, AND ONE

15   YEAR OF EXPERIENCE IN ELECTRONIC INDUSTRY.

16   Q.   WHAT TYPE OF TEST WOULD A PERSON OF ORDINARY

17   SKILL IN THE ART BE SKILLED IN?

18   A.    AGAIN, IT'S MY OPINION THAT SUCH A PERSON

19   WOULD HAVE DESIGNING DIGITAL ELECTRONIC CIRCUITS

20   THAT INVOLVES TIMING AND CONTROL SIGNALS, AND SOME

21   EXPERIENCE IN PROGRAMMING MICROPROCESSORS AND SO

22   FORTH.

23   Q.   DR. MIN, DISPLAYLINK'S EXPERT, DR. JONES, DOES

24   NOT INCLUDE COMPUTER ENGINEERING AS ONE OF THE

25   AREAS OF FORMAL EDUCATION THAT HE WOULD INCLUDE AS

1    A PERSON OF ORDINARY SKILL IN THE ART.  DO YOU VIEW

2    THAT AS A SIGNIFICANT DISTINCTION?

3    A.   YES, I BELIEVE SO.

4    Q.   AND WHY IS THAT?

5    A.   THE GENERAL AREA OF THE '788 PATENT IS IN

6    COMPUTER PERIPHERALS.  AND COMPUTER ENGINEERS ARE

7    TRAINED TO DEAL WITH COMPUTER ARCHITECTURES AND

8    DEVICES THAT SURROUND THE PROCESSORS AND SO FORTH.

9         SO IT IS MY OPINION THAT COMPUTER

10   ENGINEERS WOULD HAVE BEEN AMPLY TRAINED TO

11   APPRECIATE '788 PATENT AND UNDERSTAND THE MERITS.

12   Q.   DR. JONES ALSO SAID A PERSON OF ORDINARY SKILL

13   IN THE ART ALWAYS NEEDS TO BE A DIGITAL SYSTEM

14   ARCHITECT; DO YOU AGREE WITH THAT?

15   A.   PERSONALLY, I'M NOT QUITE SURE WHAT THAT TERM

16   EXACTLY MEANS, BUT BASED ON THE DESCRIPTION GIVEN

17   BY DR. JONES, I BELIEVE SUCH A PERSON WOULD BE AT A

18   SOMEWHAT SUPERVISORY LEVEL SUPERVISING SEVERAL

19   ENGINEERS AND DIGITAL ELECTRONICS, AND PERHAPS EVEN

20   INFLUENTIAL IN SETTING THE PRODUCT DIRECTIONS AND

21   SO FORTH.

22        SO IT IS MY OPINION THAT WOULD NOT BE A

23   NECESSARY QUALIFICATION TO BE A PERSON OF ORDINARY

24   SKILL IN THE ART FOR THE '788 PATENT.

25        MR. CAULEY:  THANK YOU, DR. MIN.

1          COULD YOU PUT UP SLIDE SIX.  I'M GOING TO

2     TALK ABOUT USB.

3     Q.   MCT'S PROPOSED DEFINITION OF USB IS ANY SERIAL

4     BUS SPECIFICATION WHICH SUPPORT USB-BASED DISPLAY

5     SIGNALS FROM THE HOST COMPUTER AND WHICH ARE

6     COMPATIBLE IN THE USB PORT/PLUG.

7          DO YOU AGREE WITH THAT CONSTRUCTION?

8     A.   I DO.

9     Q.   AND WHY IS THAT?

10    A.   FIRST OF ALL, THE PATENT IS SUBSET.  THE

11    PATENT IS ABOUT THE INVENTION IN THE PATENT, IT'S

12    ABOUT A GENERALLY RELATED TO THE USB TECHNOLOGY.

13    AND THERE IS REALLY NOTHING THAT SAYS WHICH VERSION

14    OR WHICH SPECIFIC THAT THE USB TO VGA CONVERTER WAS

15    RELATED TO.

16          AND ALSO, THE PATENT ALSO SAYS THE

17    INVENTION WOULD WORK WITH ANY OPERATING SYSTEM AND

18    MANY COMPUTERS.  SO JUST READING THE PATENT ITSELF,

19    TO ME, IS QUITE CLEAR THAT USB -- THE TERM USB WAS

20    USED PRETTY GENERICALLY.

21    Q.   SO I THINK YOU SAID IN YOUR TUTORIAL THAT AS

22    OF 2002, AND EVEN TODAY, THERE ARE THREE DIFFERENT

23    VERSIONS OF USB; CORRECT?

24    A.   THREE DIFFERENT VERSIONS THAT BECAME KNOWN TO

25    PUBLIC AND USED.  AND THEY ALL SHARED CERTAIN

28

1    COMMON CHARACTERISTICS SUCH AS THEIR CONNECTORS,

2    AND THE NUMBER OF CONDUCTORS IN THE BUS, FOUR

3    CONDUCTORS BEING EXACT, AND THE DATA ASSIGNMENT ON

4    EACH OF THE CONDUCTORS.  AND EACH VERSION, EACH

5    SUCCEEDING VERSION, PROVIDED THE APPLICABLE

6    COMPARABILITY.

7            IN OTHER WORDS, IF YOU HAD AN OLDER USB

8    DEVICE WHEN THE NEXT VERSION CAME ABOUT, THAT OLDER

9    VERSION TECHNOLOGY WOULD STILL WORK AND THE NEW

10   VERSION WOULD ACCOMMODATE THE OLDER VERSION OF THE

11   TECHNOLOGY.  SO THERE'S A CONTINUITY, AND THE

12   EVOLUTION -- THE EVOLVING TECHNOLOGY THAT STARTED

13   FROM 1.0, TO 1.1, TO 2.0, AND TO A PERSON OF

14   ORDINARY SKILL IN THE ART WOULD NOT BE CONFUSED

15   THAT THERE WOULD NOT BE ANYTHING MORE THAT'S COMING

16   OUT IN THE FUTURE.

17   Q.   AND WOULD A PERSON OF ORDINARY SKILL IN THE

18   ART IN 2002 HAVE BEEN AWARE THAT THERE HAD BEEN

19   DIFFERENT VERSIONS OF USB RELEASED?

20   A.   OF COURSE.

21   Q.   AND WOULD THEY BE AWARE THAT THERE WAS AN

22   EVOLVING STANDARD?

23   A.   OF COURSE.

24   Q.   NOW, I WANT YOU TO TAKE A LOOK AT THE PICTURE

25   AT THE TOP.

1          THE COURT:  LET ME ASK A QUESTION.

2          IF WE ARE AT VERSION 2.0 ON USB

3     CURRENTLY, WHAT PRACTICAL DIFFERENCE DOES IT MAKE

4     BETWEEN THESE TWO DEFINITIONS AS APPLIED TO THIS

5     CASE?

6          MR. CAULEY:  THE PRACTICAL DIFFERENCE IS

7     WHETHER IT WOULD APPLY TO SUBSEQUENT VERSIONS OF

8     USB AS THEY ARE RELEASED.

9          THE COURT:  BUT AS OF NOW, IT WOULDN'T

10    MAKE ANY DIFFERENCE?

11         MR. CAULEY:  AS OF RIGHT TODAY, IT

12    WOULDN'T MAKE ANY DIFFERENCE BECAUSE I DON'T

13    BELIEVE THERE'S ANOTHER VERSION OF USB AFTER 2.0,

14    BUT 3.0 IS COMING OUT.  AND THERE MAY BE SUBSEQUENT

15    VERSIONS DURING THE LIFE OF THE PATENT OF USB, SO

16    THAT'S A REAL DISTINCTION.

17    Q.   DR. MIN, COULD YOU LOOK AT PICTURE AT THE

18    UPPER LEFT CORNER?

19    A.   YES.

20    Q.   AND LOOK AT THOSE SOCKETS?

21    A.   YES.

22    Q.   WHAT ARE THOSE SOCKETS CALLED?

23    A.   USB SOCKET OR USB PORT.

24    Q.   AND WOULD SOMEONE OF ORDINARY SKILL IN THE ART

25    CALL THEM THAT IN 2002?

1    A.    YES.

2    Q.    OKAY.  IF YOU COULD LOOK AT MIDDLE PICTURE, IN

3    2002, WHAT WOULD A PERSON OF ORDINARY SKILL IN THE

4    ART WOULD HAVE CALLED THOSE?

5    A.    USB PLUGS.

6    Q.    AND I GUESS THERE'S A CABLE BEHIND THOSE, WHAT

7    WOULD THEY HAVE CALLED THAT?

8    A.    USB CABLES.

9    Q.    AND SO IT'S YOUR OPINION THAT IN 2002, A

10   PERSON OF ORDINARY SKILL IN THE ART WOULD HAVE USED

11   THE TERM USB GENERICALLY TO REFER TO ALL VERSIONS?

12   A.    YES.

13   Q.    AND WHEN YOU SAY BACKWARDS COMPATIBILITY,

14   WOULD A PERSON OF ORDINARY SKILL IN THE ART -- AND

15   THAT MEANS THAT IF I HAVE A COMPUTER THAT ONE, I

16   THINK AS COUNSEL NOTED, A LEGACY COMPUTER THAT

17   WOULD ONLY PUT OUT DATA AT A USB 1.0 RATE, AND I

18   HAD A USB 2.0 PLUG, IT WOULD STILL WORK?

19   A.    IT WOULD STILL WORK.

20         MR. YOON:  EXCUSE ME.  OBJECTION,

21   YOUR HONOR.

22         I KNOW WE ARE PRESSED FOR TIME, BUT THE

23   QUESTIONS GETTING LONGER AND LONGER AND MORE

24   LEADING.

25         MR. CAULEY:  I'M FINISHED WITH USB.

31

1    Q.    WELL, ACTUALLY, LET ME JUST ASK -- IF YOU

2    COULD LOOK AT DISPLAYLINK'S DEFINITION.

3    A.    YES.

4    Q.    UNIVERSAL SERIOUS BUS, THE TECHNOLOGY

5    DESCRIBED IN THE UNIVERSAL SERIAL BUS SPECIFICATION

6    REVISION 2.0 AND IT'S PREDECESSOR REVISIONS; DO YOU

7    AGREE WITH THAT?

8    A.    I WOULD DISAGREE THAT.

9    Q.    AND WHY?

10   A.    BECAUSE TO A PERSON OF ORDINARY SKILL IN THE

11   ART, READING THE PATENT AND CLAIMS, IT'S CLEAR THAT

12   THERE'S NO LIMITATION TO A CERTAIN VERSION OF IT.

13            AND EVEN IN THE FUTURE, BASED ON THE

14   PRECEDING -- THE VERSIONS OF USB AND HOW THEY

15   MAINTAIN THE CONTINUITY AND BACKWARD COMPATIBILITY

16   IN TERMS OF A SIMILAR FORMAT AND THE TYPE OF

17   CONNECTORS, TO PERSON OF ORDINARY SKILL IN THE ART

18   WOULD HAVE UNDERSTOOD THAT WHAT COMES LATER

19   PROBABLY BETTER AND FASTER AND MORE FLEXIBLE, BUT

20   STILL WOULD BE COMPATIBLE IN BACKWARD WAY AND WILL

21   MAINTAIN CONTINUITY IN TERMS OF ALL CONNECTORS AND

22   SIGNALS.

23            MR. CAULEY:  WOULD YOU PUT UP SLIDE TEN.

24            THE COURT:  HOW WOULD -- HOW WOULD

25   SOMEBODY ORDINARILY SKILLED IN THE ART HAVE DEFINED

1    USB IN 1995?

2              THE WITNESS:  IN 1995?

3              THE COURT:  RIGHT.

4              THE WITNESS:  THAT'S WHEN THEY FIRST CAME

5    OUT.

6              THE COURT:  RIGHT.

7              THE WITNESS:  SO THAT WOULD BE CHAMPION

8    BY INTEL.  SO PERHAPS AT THAT TIME IT WAS NOT AS

9    WELL KNOWN.  IT WAS AN INDUSTRY GIANT SAYING THAT

10   WE HAVE A SOLUTION TO ALL THOSE CONNECTOR PROBLEMS

11   THAT AMONG ALL THESE DIFFERENT PERIPHERALS.  STILL

12   BASICALLY SUGGESTING THE USB 1.0 AS A SOLUTION.

13   AND IT TOOK A FEW YEARS BEFORE EVERYBODY CAUGHT UP.

14             THE COURT:  SO WHEN DID SOMEONE

15   ORDINARILY SKILLED IN THE ART BEGIN REFERRING TO

16   USB AS A GENERIC REFERENCE TO A TYPE OF BUS AS

17   OPPOSED TO THE INVENTION BY -- OR INTEL'S PRODUCT?

18             THE WITNESS:  SO ACTUALLY, AFTER IT WAS

19   INTRODUCED, THE VERSION THAT BECAME MOST POPULAR

20   AND USED WIDELY WAS 1.1.

21             AND AT THAT TIME THAT WAS REALLY THE ONLY

22   VERSION THAT WAS USED.  SO IN THAT REGARD,

23   YOUR HONOR, I THINK EARLY ON WHEN PEOPLE SAY USB,

24   THEY HAVE NO CONFUSION WHATSOEVER BECAUSE THERE WAS

25   ALREADY ONE VERSION.

1      WHEN THE 2.0 CAME ABOUT, PEOPLE JUST

2   CONTINUED TO USE THE TECHNOLOGY AS USB, NOTING THAT

3   THE NEW VERSION OF COURSE IS A FASTER AND HAD MORE

4   FEATURES.  SO IT WAS PROBABLY SHORTLY AFTER THE 1.1

5   WAS RELEASED IN '98, '99, IN THAT TIME FRAME.

6          THE COURT:  OKAY.

7          MR. CAULEY:  SLIDE TEN.

8   Q.   MCT'S DEFINITION OF VGA IS THAT VGA IS A

9   NORMAL AND CUSTOMARY MEANING TO THE PERSON OF

10  ORDINARILY SKILL IN THE ART.  VGA GENERICALLY

11  REFERS TO ALL VIDEO DISPLAY STANDARDS COMPATIBLE

12  WITH ANY 15 PIN VGA PORT/PLUG.

13          DO YOU AGREE WITH THAT?

14  A.   I DO.

15  Q.   AND WHY?

16  A.   ONCE AGAIN, THE PATENT ITSELF STATES VERY

17  GENERALLY THAT THE INVENTION IS VERY GENERALLY

18  RELATED TO THE VGA TECHNOLOGY.  AND ALSO, IT'S

19  STATED CLEARLY THAT THE INVENTION WOULD WORK WITH

20  ANY OPERATING SYSTEM IN ANY COMPUTERS.

21          AND ONCE AGAIN, THE VGA BEING SUCH A WELL

22  KNOWN TERM WITH SEVERAL DIFFERENT VARIATIONS OF IT

23  IN THE INDUSTRY WIDELY USED, AND TO ME IT'S -- AND

24  TO A PERSON OF ORDINARY SKILL IN THE ART, THE

25  PERSON WOULD GO, NO, THAT VGA WOULD BE A GENERIC

1      TERM THAT IMPLIES MANY OF THESE DIFFERENT

2      VARIATIONS.

3                  THE COURT:  WHAT DOES 15-PIN VGA

4      PORT/PLUG -- WHAT DOES VGA MEAN IN THAT?

5                  THE WITNESS:  IT'S A VIDEO GRAPHICS

6      ARRAY.

7                  THE COURT:  WHAT DOES THAT REFER TO?

8                  THE WITNESS:  THE VGA PORT?

9                  THE COURT:  NO, VGA.

10                 THE WITNESS:  YES.

11                 THE COURT:  COULD IT -- IT'S A VIDEO

12     GRAPHICS ARRAY, BUT IS IT A PARTICULAR --

13                 THE WITNESS:  NO.  THIS PORT IS USED FOR

14     ALL VARIATIONS THAT DISPLAY ANALOG VIDEOS USING THE

15     THREE COLOR SCHEME, THE RED, GREEN AND BLUE

16     COMBINED.

17                 THE COURT:  IS THERE SOMETHING OTHER THAN

18     A 15-PIN VGA PORT PLUG?  IS THERE A 15-PIN

19     SOMETHING ELSE PORT?

20                 THE WITNESS:  NO.  THAT'S WHAT IT IS.

21     BY MR. CAULEY:

22     Q.   OKAY.  IN 2002, FOR CONSUMERS AND BUSINESSES

23     IN THE COMPUTERS THAT THEY WOULD USE AND THE

24     MONITORS THEY WOULD USE, WHAT VIDEO STANDARD WERE

25     THEY USING?

1    A.   IN 2002, IT'S MY OPINION THAT PERHAPS THE MOST

2    POPULAR ONE WOULD HAVE BEEN THE XGA WHICH IS,

3    AGAIN, DEFINED BY THE IBM AT A LATER YEAR.  AND

4    MAYBE SOME PEOPLE USE SVGA, AND THERE ARE OTHER

5    VARIATIONS OF IT TOO.

6    Q.   JUST TO FOLLOW UP WHAT HIS HONOR WAS

7    MENTIONING UP IN THE PICTURES, THAT THE TOP, IN

8    2002, WHAT WOULD THAT SOCKET HAVE BEEN CALLED ON

9    THE UPPER RIGHT?

10   A.   VGA PORT.

11   Q.   AND THAT WOULD HAVE HOOKED UP TO AN XVGA OR

12   SVGA MONITOR?

13   A.   THAT SAME PORT WOULD BE USED FOR ALL OF THE

14   MONITORS THAT HAVE XGA OR SVGA OR EVEN A LATER

15   VERSION OF DIFFERENT VIDEO STANDARD, THEY WOULD BE

16   CONNECTED TO THE SAME PORT.

17   Q.   A PERSON ORDINARILY SKILLED IN THE ART WOULD

18   HAVE CALLED IT A VGA PORT OR SOCKET?

19   A.   THEY WOULD HAVE CALLED IT A VGA PORT.

20   Q.   IN THE UPPER LEFT-HAND CORNER, WHAT ARE THOSE?

21   A.   THOSE ARE VGA CABLES.  I'M NOT SEEING THE REST

22   OF IT, BUT IT'S THE TWO ENDS OF THE CONNECTORS.

23   CONNECTED IN BETWEEN, THAT IS NOT PROBABLY NOT

24   SHOWN HERE, ARE THE CABLE.  IT'S CALLED VGA CABLE.

25   Q.   AND WOULD THOSE HAVE CONNECTED UP TO SVGA?

1    A.    TO THE MONITOR TO THE SVGA CABLE?  HAVING

2    CAPABILITY?  OF COURSE.

3    Q.    OKAY.

4            THE COURT:  WHAT WOULD HAVE TO CHANGE IN

5    THAT SOCKET IN THE UPPER RIGHT THAT WOULD CAUSE YOU

6    TO SAY IT'S NOT A VGA PORT?

7            THE WITNESS:  UM, REALLY NOTHING.  THE

8    SAME SOCKET WOULD WORK -- I MEAN, OF COURSE, THE

9    ELECTRONIC BEHIND MUST BE FAST ENOUGH TO DISPLAY

10   THE HIGHER RESOLUTION VIDEO, SO THE COMPUTER ITSELF

11   HAS TO BE BETTER.

12           BUT IN TERMS OF ALL THE CONNECTORS AND

13   THE USEABLE SIGNALS FROM THOSE INDIVIDUAL PINS,

14   THEY ARE THE SAME.

15           THE COURT:  EXCUSE ME IF THIS IS A DUMB

16   QUESTION, BUT LET'S SAY THERE ARE ONLY 14 PINS.

17           THE WITNESS:  YES.

18           THE COURT:  WOULD IT THEN BE A VGA PORT?

19           THE WITNESS:  I WOULD SAY ONE OF THOSE

20   SIGNIFICANT CHARACTERISTICS IS THAT PARTICULAR

21   CONNECTOR PORT.  SO I WOULD SAY THAT IT MIGHT NOT

22   LOOK -- OR PERHAPS, ONE MIGHT NOT THINK THAT THEY

23   ARE VGA PORT.

24           THE COURT:  HOW ABOUT WITH 17 -- 16?

25           THE WITNESS:  OF COURSE, I'M ANSWERING

1    YOU HYPOTHETICALLY.

2              ONCE AGAIN, THE 15-PIN WITH THE

3    SPECIFICALLY ASSIGNED SIGNAL ASSIGNED TO EACH.  SO

4    FOR EXAMPLE, ONE OF THE PINS MIGHT BE THE STRENGTH

5    OF THE RED.  ANOTHER ONE MIGHT BE STRENGTH OF THE

6    BLUE.  SO IT'S A VERY SET STANDARD AS TO HOW TO USE

7    THOSE PINS TO COMMUNICATE BETWEEN COMPUTER TO THE

8    VIDEO DISPLAY.  NOW, IF YOU START CHANGING THAT, I

9    WOULD SAY THAT YOU HAVE LOST THE ORIGINAL

10   CHARACTERISTICS OF VGA.

11             THE COURT:  WHERE DO YOU FIND WHAT SIGNAL

12   GOES INTO WHAT PIN?

13             THE WITNESS:  IT IS SPECIFIED BY THE

14   ORIGINAL IBM, THE MANUAL THAT DEFINES --

15             THE COURT:  SO EVEN THE SPECIFICATION FOR

16   THE VGA HAS THE SAME SIGNALS AND THE SAME NUMBER OF

17   PINS AS THE SPECIFICATION FOR THE SVGA.

18             THE WITNESS:  THE SAME SIGNAL, SAME

19   NUMBER OF PINS, JUST A FASTER DISPLAY AND SAYING

20   HOW MANY PIXELS YOU HAVE.  THAT'S THE DIFFERENCE,

21   BASICALLY.

22             THE COURT:  SO, DO YOU AGREE WITH THE

23   DEFINITION THAT SAID SOMETHING LIKE, VGA

24   GENERICALLY REFERS TO A SOCKET THAT HAS 15 PINS

25   THAT RECEIVE SPECIFIC SIGNALS AS IDENTIFIED IN THE

1    IBM SPECIFICATION?

2            THE WITNESS:  UM, YOUR HONOR, IF YOU

3    CLARIFY THAT THE SIGNAL BEING -- THE NATURE OF THE

4    SIGNAL WITHOUT REALLY SAYING HOW FAST THE SIGNALS

5    ARE, YES.  I AGREE WITH THAT DEFINITION.

6            THE COURT:  WHAT'S THE NATURE OF A

7    SIGNAL?

8            THE WITNESS:  MEANING WHICH PIN IS USED.

9            SO FOR EXAMPLE, ONE PIN MIGHT BE HOW

10   STRONG THE RED SIGNAL MIGHT BE, AND HOW STRONG THE

11   BLUE SIGNAL WOULD BE, AND HOW STRONG THE GREEN

12   SIGNAL WOULD BE FOR EACH OF THE PIXELS.

13           THE DIFFERENCE, BASICALLY, BETWEEN THE

14   DIFFERENT VIDEO DISPLAY STANDARDS IS HOW MANY

15   PIXELS YOU HAVE.  SO HOW FAST DOES THE SIGNALS HAVE

16   TO CHANGE TO CORRESPOND WITH EACH DOT ON THE

17   SCREEN?  AND HOW MANY TIMES DO YOU HAVE TO SCAN

18   ACROSS, GO DOWN FROM THE TOP TO THE BOTTOM?  AND

19   HOW MANY TIMES ARE GOING TO REFRESH THE SCREEN?

20           IT REALLY COMES DOWN TO THE SPEED AS

21   OPPOSED TO THE NATURE OF SIGNALS.

22           THE COURT:  SO THE NATURE OF THE SIGNAL

23   REMAINS THE SAME?

24           THE WITNESS:  YES.

25           THE COURT:  AND THE NUMBER OF THE PINS

1    REMAINS THE SAME?

2              THE WITNESS:  YES.

3              THE COURT:  IT'S JUST A MATTER OF SPEED

4    THAT CHANGES.

5              THE WITNESS:  THAT'S THE PURPOSE OF

6    CHANGE, YES.

7    BY MR. CAULEY:

8    Q.   ONE MORE QUESTION, DR. MIN.

9              I WANTED TO REFER YOU TO THE PATENT, IT'S

10   COLUMN THREE, LINES 54 TO 56.  IT SAYS "THE

11   OPERATION PROCESS DISCUSSED HEREIN IS BASED ON THE

12   WINDOWS OPERATION SYSTEM RELEASED BY MICROSOFT

13   COMPANY."  ARE YOU FAMILIAR WITH THAT OPERATING

14   SYSTEM?

15   A.   OF COURSE.

16   Q.   WHAT WAS THE MOST CURRENT VERSION OF WINDOWS

17   THAT WAS OUT IN DECEMBER OF 2002?

18   A.   IT WOULD BE WINDOWS XP, WHICH STILL, FOR MANY

19   PEOPLE, IS THE CHOICE.

20   Q.   NOW, WOULD WINDOWS XP DISPLAY USING THE

21   ORIGINAL 1987 OR 1991 VGA SPECIFICATION?

22   A.   NO.  IF YOU GO TO WINDOWS XP CONTROL PANEL AND

23   TRY TO CHOOSE THE 640X480, IT WOULD NOT LET YOU DO

24   THAT.

25              MR. CAULEY:  I HAVE NO FURTHER QUESTIONS,

1    YOUR HONOR.

2              THE COURT:  OKAY.

3              MR. YOON?

4              MR. YOON:  YES.  THANK YOU, YOUR HONOR.

5    IF I COULD APPROACH THE WITNESS FOR A MOMENT.  I

6    WANT TO HAND HIM A COPY OF THE BINDERS IN CASE HE

7    WANTS TO LOOK AT THE ORIGINAL DOCUMENT.

8              THE COURT:  SURE.

9

10             **CROSS-EXAMINATION BY MR. YOON**

11

12   BY MR. YOON:

13   Q.   YOU WON'T BE ON LONG ENOUGH TO NEED A LOT OF

14   WATER.

15   A.   THANK YOU SO MUCH.

16             BILL, COULD I HAVE PARAGRAPH 23 OF DR.

17   JONES' EXPERT DECLARATION REGARDING THE LEVEL OF

18   ORDINARY SKILL IN THE ART.

19   Q.   BEFORE I ASK YOU SOME QUESTIONS ABOUT YOUR

20   OPINION, SIR, I WANTED TO CLARIFY ONE THING ABOUT

21   THE UNDERSTANDING OF ORDINARY SKILL IN THE ART.

22             BOTH YOU AND DR. JONES AGREE THAT A

23   PERSON OF ORDINARY SKILL IN THE ART COULD HAVE

24   EITHER A DEGREE IN ELECTRICAL ENGINEERING OR A

25   DEGREE IN COMPUTER SCIENCE; CORRECT?

41

1    A.    THAT IS CORRECT.

2    Q.    AND NEITHER YOU NOR DR. JONES HAS A DEGREE IN

3    COMPUTER ENGINEERING AS REQUIRED?

4    A.    THAT IS CORRECT AS WELL.

5    Q.    IT'S AN "OR" INSTEAD OF AN "AND," RIGHT SIR?

6    A.    YES.

7    Q.    ADDITIONALLY, YOU DR. JONES BOTH AGREE THAT

8    THERE WOULD BE EXPERIENCE IN HARDWARE DESIGN,

9    INCLUDING WORK IN THE CONCEPTS OF TIMING, DATA,

10   THROUGHPUT, AND HOW THE DEVICE WOULD NEED TO

11   INTERACT WITH THE INTENDED SYSTEM; CORRECT?

12   A.    THAT IS CORRECT AS WELL.

13   Q.    AND YOU DON'T DISAGREE THAT THE PERSON OF

14   ORDINARY SKILL IN THE ART WOULD HAVE SOME

15   EXPERIENCE IMPLEMENTING DEVICES THAT COMPLY WITH

16   WELL KNOWN STANDARDS SUCH AS USB OR VGA?

17   A.    YES.

18   Q.    OKAY.  SO LET'S TALK ABOUT THE FIRST OPINION

19   REGARDING USB OR UNIVERSAL SERIOUS BUS.

20        THE COURT:  WHAT DIFFERENCE DOES IT MAKE

21   AS TO WHICH, OR WHOSE, DEFINITION OF ORDINARY SKILL

22   IN THE ART IS ADOPTED?

23        MR. YOON:  WELL, I GUESS THERE'S A

24   PRACTICAL ONE, YOUR HONOR, AND THEN THERE'S, I

25   GUESS, AN ACADEMIC ONE.  WE WILL START WITH THE

1      PRACTICAL ONE.

2              WITH REGARDS TO THE INFRINGEMENT IN THIS

3      CASE, I DON'T THINK IT MAKES A DIFFERENCE AS TO ONE

4      OR THE OTHER.  THE ISSUE, I BELIEVE, IS THAT

5      OUTSIDE OF THE SCOPE OF THE MERITS OF THIS CASE,

6      MCT HAS A LICENSING PROGRAM THAT IT WANTS TO PUSH.

7      AND IT WANTS TO CLAIM ANY TYPE OF CONVERTER

8      TECHNOLOGY, AND THAT IT'S VERY FOCUSED ON GETTING A

9      CONSTRUCTION BECAUSE THE ISSUE HERE IS THAT ON THE

10     MCT CONSTRUCTION, IT'S ANY SERIAL BUS, IT'S NOT A

11     VERSION OF THE UNIVERSAL SERIAL BUS SPEC.  THEIR

12     CONSTRUCTION IS ANY SERIAL BUS THAT SUPPORTS OR IS

13     COMPATIBLE WITH THE --

14             THE COURT:  WHAT DIFFERENCE DOES THE

15     LEVEL OF ORDINARY SKILL IN THE ART MAKE TO WHETHER

16     THAT'S CORRECT OR INCORRECT?

17             MR. YOON:  ACTUALLY, I DON'T BELIEVE IT

18     DOES, YOUR HONOR.  I WAS NOT GOING TO HAVE THAT AS

19     PART OF MY CROSS-EXAMINATION, BUT COUNSEL HAS

20     EMPHASIZED SOMEHOW THAT THE ABSENCE OF COMPUTER

21     ENGINEERING WAS SIGNIFICANT, SO I THOUGHT I WOULD

22     AT LEAST POINT OUT THE LEVEL OF COMMONALTY.  BUT I

23     DON'T BELIEVE IT MAKES DIFFERENCE, WHATSOEVER.

24             THANK YOU, YOUR HONOR

25     Q.   ON THE SCREEN IS THE COMPUTING CONSTRUCTIONS

1    OF USB, DR. MIN, DO YOU SEE THAT?

2    A.   YES.

3    Q.   NOW, YOU AGREED THAT THE TERM USB WAS A WELL

4    KNOWN TERM TO INDIVIDUALS OF ORDINARY SKILL IN THE

5    ART AS OF THE FILING OF THE '788 PATENT; CORRECT?

6    A.   YES.

7    Q.   AND YOU AGREE THAT USB IS DEFINED BY THE

8    VARIOUS USB SPECIFICATIONS?

9    A.   THAT IS CORRECT.

10   Q.   OKAY.  AND FOR EXAMPLE, ANY DEVICE THAT USES A

11   USB PORT OR PLUG HAS TO CONFORM WITH THE USB

12   SPECIFICATION?

13   A.   THAT'S RIGHT.

14   Q.   AND FOR EXAMPLE, IF SOMEONE WANTED TO DESIGN A

15   SYSTEM THAT IMPLEMENTED USB, THEY WOULD TURN TO THE

16   USB SPECIFICATION, IS THAT FAIR TO SAY?

17   A.   I WOULD AGREE WITH YOU.

18   Q.   OKAY.  SO LET'S TALK ABOUT THE RELATIONSHIP

19   BETWEEN USB AND DISPLAY SIGNALS FOR A MOMENT.  YOU

20   WOULD AGREE THAT A USB BASED DISPLAY SIGNAL IS A

21   SIGNAL ENCODED ACCORDING TO THE USB SPECIFICATION;

22   CORRECT?

23        MR. CAULEY:  I'M GOING TO OBJECT.  I

24   THINK IT'S BEYOND THE SCOPE OF DIRECT.

25        THE COURT:  OVERRULED.  GO AHEAD.

1          THE WITNESS:  UM, I MEAN, OF COURSE,

2     WITHOUT REALLY GETTING INTO THE SPECIFIC WORDS, I

3     AGREE WITH THAT CONCEPT, YES.

4          MR. YOON:  OKAY.  AND IF I COULD HAVE ON

5     THE SCREEN, A COPY OF THE JOINT CLAIM CONSTRUCTION

6     STATEMENT, AND IN PARTICULAR, THE DEFINITIONS OF

7     USB CONTROLLER.

8     Q.   AND DO YOU SEE THAT THE MCT CONSTRUCTION OF

9     USB CONTROLLER IS:  A DEVICE THAT COMMUNICATES WITH

10    THE COMPUTER ACCORDING TO THE USB STANDARD.

11         DO YOU SEE THAT?

12    A.   I DO.

13    Q.   AND AT YOUR DEPOSITION, YOU TESTIFIED THAT THE

14    USB STANDARD WOULD BE UNDERSTOOD BY A PERSON OF

15    ORDINARY SKILL IN THE ART TO REFER TO THE LATEST

16    AVAILABLE USB STANDARD SPECIFICATION; CORRECT?

17    A.   I DON'T RECALL THAT STATEMENT, EXACTLY.  CAN

18    YOU POINT OUT --

19    Q.   YES.  SO YOU HAVE THE BINDER --

20         BILL, IF YOU COULD CALL UP DR. MIN'S

21    JANUARY 2008 DEPOSITION TESTIMONY AT PAGE 108, LINE

22    16, TO PAGE 107, LINE FIVE -- 106, LINE 16, TO 107

23    LINE FIVE.

24         SO DR. MIN YOU COULD SEE THAT THE FIRST

25    QUESTION WAS YOU WERE READ THE MCT CONSTRUCTION OF

1    USB CONTROLLER DEVICE THAT COMMUNICATES WITH THE

2    COMPUTER ACCORDING TO THE USB STANDARD; DO YOU SEE

3    THAT?

4    A.   I DO.

5    Q.   AND THEN YOUR QUESTION WAS ASKED:

6         "QUESTION:  WHAT IS THE USB STANDARD THAT

7    YOU REFERRED TO THERE?"

8         AND YOUR ANSWER WAS,

9         "ANSWER:  OKAY.

10        SO THE PATENT WAS FILED IN 2002, THAT WAS

11   THE APPLICATION DATE, SO TO FOLLOW THE STRICT

12   GUIDELINE OF BEING THE YEAR BEFORE.  SO IT WILL BE

13   WHATEVER THE LATEST USB STANDARD THAT WAS AVAILABLE

14   IN 2001.  AND THAT WOULD BE WHAT, AT THAT TIME, A

15   PERSON OF ORDINARY SKILL IN THE ART WOULD LOOK AT

16   THAT.  I MEAN, THAT'S REALLY WHAT IS MEANT BY USB

17   STANDARD."

18        DO YOU SEE THAT?

19   A.   YES, I DO.

20   Q.   AND YOU STILL AGREE WITH THAT TESTIMONY;

21   CORRECT?

22   A.   SURE.  I DO.

23        WHY DON'T WE TURN THAT OFF, BILL.

24   Q.   SO, NOW GOING BACK TO SLIDE SEVEN, AND YOU

25   WOULD AGREE, DR. MIN, THAT DISPLAYLINK'S

46

1    CONSTRUCTION OF USB INCLUDES ALL VERSIONS OF THE

2    USB SPECIFICATION IN EXISTENCE AT THE TIME THE '788

3    PATENT WAS FILED; CORRECT?

4    A.   IT DOES INCLUDE ALL OF IT AT THE TIME THE

5    APPLICATION WAS FILED.

6    Q.   AND IT INCLUDED LATEST VERSION WHICH IS THE

7    VERSION 2.0?

8    A.   THAT IS CORRECT AS WELL.

9    Q.   AND DISPLAYLINK'S CONSTRUCTION OF USB DOES NOT

10   LIMIT THE TERM USB TO ANY ONE PARTICULAR VERSION OF

11   THE USB SPEC; CORRECT?

12   A.   IT LIMITS TO WHAT IS AVAILABLE -- WHAT WAS

13   AVAILABLE AT THE TIME THE PATENT WAS FILED.

14   Q.   BUT INCLUDES ALL OF THEM THAT EXISTED AS OF

15   THAT TIME?

16   A.   AS OF THAT TIME, YES.

17   Q.   NOW LET'S -- AS A TECHNICAL MATTER, LET'S TALK

18   ABOUT THE FUTURE FOR A MOMENT.  YOU AGREE THAT

19   FUTURE STANDARDS COULD BE CALLED USB BUT COULD BE

20   SOMETHING ENTIRELY DIFFERENT THAN VERSION 2.0;

21   CORRECT?

22   A.   IT IS ALL CALLED USB 3.0, AND WE KNOW THAT.

23   Q.   BUT IN THE FUTURE, DO YOU AGREE THAT THE

24   TECHNOLOGY COULD BE TOTALLY DIFFERENT THAN WAS

25   EXISTING AT THE TIME OF THE FILING OF THIS PATENT?

1    A.   AS I MENTIONED, IT IS POSSIBLE BUT UNLIKELY.

2    Q.   OKAY.  AND YOU ALSO AGREE THAT IT'S POSSIBLE

3    THAT FUTURE VERSIONS OF THE USB SPECIFICATION COULD

4    BE INCOMPATIBLE WITH THE '788 PATENT; CORRECT?

5    A.   ONCE AGAIN, IT IS POSSIBLE BUT UNLIKELY.

6              MR. YOON:  AND YOUR HONOR, JUST FOR A

7    MOMENT -- YOU ASKED COUNSEL A QUESTION JUST ON THIS

8    ONE AS TO WHY IT MATTERS, I GUESS.

9              SINCE IT MAKES NO DIFFERENCE FOR

10   INFRINGEMENT OF THIS CASE, AND AS OF TODAY,

11   REVISION 2.0 IS THE LATEST VERSION.  SO IT DOESN'T

12   MAKE ANY EFFECT IN THIS CASE.

13             I DO THINK THIS GOES TO THE LICENSING

14   PROGRAM.  I THINK THE COURT CAN'T DECIDE THINGS IN

15   A VACUUM.  THE ISSUES OF INFRINGEMENT WOULD BE

16   BASED ON WHETHER OR NOT THE TECHNOLOGY WAS

17   SUBSTANTIALLY THE SAME OR WAS SUBSTANTIALLY

18   DIFFERENT.

19             WE CAN'T DO THAT IN SPECULATION.  AND

20   WHAT MCT IS SEEKING HERE IS A STATEMENT, IN A

21   VACUUM, THAT ALL FUTURE VERSIONS WOULD

22   AUTOMATICALLY BE COVERED BY THE PATENT.  AND I

23   THINK THAT'S WHERE THE DISPUTE LIES, BUT REALLY,

24   YOUR HONOR, NOT IN THE MERITS OF THIS PARTICULAR

25   CASE RIGHT NOW.

1    Q.   SO LET'S TALK ABOUT VGA FOR A MOMENT.

2    A.   OKAY.

3    Q.   NOW, THE PATENT DESCRIBES A USB TO VGA

4    CONVERTER; CORRECT?

5    A.   YES.

6    Q.   AND YOU'VE NEVER DESIGNED A USB TO VGA

7    CONVERTER; IS THAT RIGHT?

8    A.   I HAVE NOT DONE THAT.

9    Q.   YOU AND NEVER SUPERVISED SOMEONE WHO DID THAT?

10   A.   THAT IS CORRECT AS WELL.

11   Q.   AND YOU NEVER WORKED FOR A COMPANY THAT DID

12   IT?

13   A.   THAT'S RIGHT.

14   Q.   AND WITH RESPECT TO THE DISPLAY DEVICES OF THE

15   '788 PATENT, YOU NEVER, FOR EXAMPLE, DESIGNED A VGA

16   MONITOR?

17   A.   I HAVE NOT DESIGNED A VGA MONITOR.

18   Q.   OKAY.  NOW, LET'S TALK ABOUT WHAT THE PATENT

19   SAYS ABOUT VGA, DOCTOR.

20   A.   OKAY.

21          NOW, IF I COULD HAVE AN EXCERPT FROM

22   COLUMN 1, LINE 7 OF THE '788 PATENT ON THE SCREEN.

23   Q.   I HAVE IT ON THE SCREEN BUT YOU ARE WELCOME TO

24   CHECK IT AS WELL.

25          THE '788 PATENT STATES THAT VGA REFERS TO

49

1    THE VIDEO GRAPHICS ARRAY, THAT'S WHAT THE PATENT

2    SAYS; CORRECT, SIR?

3    A.   YES.

4    Q.   AND ON THE SCREEN NOW -- COULD I HAVE SLIDE

5    15, BILL -- IS DISPLAYLINK'S CONSTRUCTION OF VGA.

6    AND DO YOU SEE THAT?  IT IS THE VIDEO GRAPHICS

7    ARRAY AS DESCRIBED BY THE IBM TECHNICAL REFERENCES

8    RELATING TO VGA?

9    A.   THAT'S WHAT IT SAYS, YES.

10   Q.   OKAY.  NOW, YOU AGREE THAT THE VGA STANDARD,

11   THE ONE DEFINED BY IBM AND DESCRIBED IN

12   DISPLAYLINK'S CONSTRUCTION, IS RELEVANT TO THE '788

13   PATENT; CORRECT?

14   A.   COULD YOU REPEAT THAT QUESTION?  I DIDN'T

15   CATCH IT.

16   Q.   YOU AGREE THAT THE IBM VGA STANDARD IS

17   RELEVANT TO THE '788 PATENT?

18   A.   IT IS RELEVANT IN A VERY MINOR WAY.

19   Q.   OKAY.  AND I BELIEVE YOU REFERRED TO THAT VGA

20   STANDARD AS THE ORIGINAL VGA?

21   A.   THAT'S RIGHT.

22   Q.   OKAY.  AND YOU ALSO AGREE THAT, IN YOUR

23   OPINION, IN 2001, WHICH YOU REFER TO AS THE STRICT

24   ONE YEAR BEFORE DATE, VIRTUALLY ALL PERSONAL

25   COMPUTERS SUPPORTED THE ORIGINAL VGA; CORRECT?

1    A.   MOST OF THEM DID IT, YES.

2    Q.   OKAY.  AND EVEN TODAY, THE ORIGINAL IBM VGA

3    STANDARD IS SUPPORTED BY MOST COMPUTERS AND DISPLAY

4    DEVICES?

5    A.   IT IS SUPPORTED AS A MEANS TO DISPLAY THE

6    FLASH SCREEN WHEN YOU FIRST TURN ON THE COMPUTER

7    FOR THE FIRST 10 SECONDS, AND THEN AFTER THAT IT'S

8    NO LONGER RELEVANT.

9    Q.   EVEN TODAY, THE ORIGINAL IBM VGA STANDARD IS

10   SUPPORTED AND USED BY MOST COMPUTERS AND DISPLAY

11   DEVICES; CORRECT?

12   A.   THAT IS CORRECT.

13   Q.   NOW, LET'S TALK ABOUT SUPER VIDEO GRAPHICS

14   ARRAY OR SVGA.  NOW, THE VGA SPECIFICATION WAS

15   WRITTEN BY IBM; CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   NOW, THE SUPER VGA SPECIFICATION WAS NOT

18   WRITTEN BY IBM, WAS IT, SIR?

19   A.   THEY WERE WRITTEN BY THE CLONE MAKERS AT THE

20   TIME, THE IBM CLONE MAKER.

21   Q.   THE SUPER VIDEO GRAPHICS ARRAY SPECIFICATION

22   WAS NOT WRITTEN BY IBM; CORRECT?

23   A.   THAT'S RIGHT.

24   Q.   AND SVGA WAS AVAILABLE AT THE TIME THE '788

25   PATENT WAS FILED; CORRECT?

51

1    A.    THAT IS CORRECT.

2    Q.    THERE IS NO MENTION OF SUPER VGA GRAPHICS

3    ARRAY ANYWHERE IN THE TEXT OF THE '788 PATENT;

4    CORRECT?

5    A.    THAT IS CORRECT.

6    Q.    NOW, LET'S TALK ABOUT THE DIFFERENCES BETWEEN

7    THE SUPER VIDEO GRAPHICS ARRAY TECHNOLOGY DEVELOPED

8    BY COMPANIES OTHER THAN IBM AND THE VGA TECHNOLOGY

9    DEVELOPED BY IBM.

10    A.    OKAY.

11    Q.    IF YOU PUT AN SVGA SIGNAL INTO A VGA MONITOR,

12    THE MONITOR WOULD NOT BE ABLE TO DISPLAY THE SIGNAL

13    CORRECTLY; CORRECT?

14    A.    THAT IS RIGHT.

15    Q.    SO EVEN THOUGH YOU HAD THE SAME PLUG, I TOOK

16    AN SVGA SIGNAL AND I PLUGGED IT INTO THE VGA

17    MONITOR, THE VGA MONITOR WOULD NOT DISPLACE THE

18    SVGA SIGNAL CORRECTLY?

19    A.    THAT IS CORRECT.

20    Q.    OKAY.  NOW, LET'S TALK ABOUT EXTENDED GRAPHICS

21    ARRAY ALSO KNOWN AS XGA.  NOW, XGA WAS A

22    SPECIFICATION WRITTEN BY IBM; CORRECT?

23    A.    THAT'S RIGHT.

24    Q.    AND, IN FACT, XGA WAS A SPECIFICATION MADE IN

25    RESPONSE TO THE SUPER VIDEO GRAPHICS ARRAY

1    SPECIFICATION WRITTEN BY THE CLONE MAKERS?

2    A.   I WOULDN'T SAY IN RESPONSE, BUT IT WAS

3    SUBSTANTIALLY BETTER THAN SVGA.

4    Q.   BUT IBM, COMPETING WITH THESE CLONE MAKERS,

5    CAME OUT WITH THE XGA STANDARD; CORRECT.

6    A.   I DON'T KNOW IF IT WAS REALLY IN COMPETITION,

7    BUT IBM DID COME UP WITH XGA.

8    Q.   AND XGA, THOUGH, DID COME UP SUBSEQUENT TO

9    SVGA?

10   A.   THAT'S CORRECT.

11   Q.   NOW, IBM WROTE THE VGA SPECIFICATION; CORRECT?

12   A.   YES.

13   Q.   AND IBM WROTE THE EXTENDED GRAPHICS ARRAY

14   SPECIFICATION; CORRECT?

15   A.   THAT'S RIGHT.

16   Q.   IBM DIDN'T CALL THE EXTENDED GRAPHICS ARRAY

17   SPECIFICATION VGA 2.0, DID IT?

18   A.   THEY DID NOT.

19   Q.   NOW, LET'S TALK ABOUT THE DIFFERENCES BETWEEN

20   THE TWO TECHNOLOGIES XGA, WHICH WAS MADE BY IBM

21   LATER IN TIME, AND VGA.

22        IF YOU PUT AN XGA SIGNAL INTO A VGA

23   MONITOR, THAT WOULDN'T BE DISPLAYED CORRECTLY,

24   WOULD IT, SIR?

25   A.   IT WOULD NOT.

1   Q.   AND XGA EXISTED AT THE TIME THE '788 PATENT

2   WAS FILED AS WELL; CORRECT?

3   A.   THAT'S RIGHT.

4   Q.   AND NOW YOU SAID, I BELIEVE, DURING DIRECT,

5   THAT THE MOST POPULAR FORMAT WAS SUPER VIDEO

6   GRAPHICS ARRAY AT THE TIME THE '788 PATENT WAS

7   FILED; CORRECT?

8   A.   I THINK I SAID EITHER XGA OR SVGA, BUT THOSE

9   TWO ARE VERY POPULAR.

10   Q.   OKAY.   THERE IS NO MENTION OF EXTENDED GRAPHIC

11   ARRAY OR XVGA ANYWHERE IN THE TEXT OF THE '788

12   PATENT; CORRECT?

13   A.   THAT'S RIGHT.

14   Q.   AND HAD MCT WANTED TO, THEY COULD HAVE

15   MENTIONED SVGA AND XGA IN THE SPECIFICATION OF THE

16   PATENT; CORRECT?

17   A.   THAT'S RIGHT.   THERE ARE JUST TOO MANY

18   DIFFERENT STANDARDS TO SPECIFY ONE AT A TIME.   SO

19   THAT'S WHY I BELIEVE IT'S VGA.   THE TERM WAS USED

20   GENERICALLY TO COLLECTIVELY INCLUDE ALL OF THOSE.

21   Q.   BUT ALSO IN THE CLAIM DRAFTING THEY COULD HAVE

22   USED VIDEO STANDARD, OR GENERICALLY, ALL VIDEO

23   STANDARDS COMPATIBLE WITH THE PIN, 15 PINS.   BUT

24   INSTEAD, THEY CHOSE TO USE THE TERM VGA; CORRECT?

25   A.   BUT THAT IS THE TERM THAT THEY USED, YES.

1    Q.    NOW, LET'S TALK ABOUT USB 2.0 FOR A MOMENT.

2    A.    OKAY.

3    Q.    I THINK YOU MENTIONED IN YOUR TUTORIAL BUT I

4    WILL ASK YOU HERE.  USB 2.0 WAS THE FIRST VERSION

5    OF THE USB SPECIFICATION THAT PROVIDED ENOUGH BIT

6    RATE FOR ACCEPTED VIDEO; CORRECT?

7    A.    YES.

8    Q.    ALL RIGHT.  NEITHER 1.0 OR 1.5 MEGABITS A

9    SECOND, OR 1.1 AT 12 MEGABITS PER SECOND WERE FAST

10   ENOUGH?

11   A.    THAT'S RIGHT.

12   Q.    NOW, I BELIEVE THAT USB 2.0 PROVIDED A BIT

13   RATE OF 480 MEGABITS PER SECOND.

14   A.    SOMETHING IN THERE, YES.

15   Q.    NOW, LET'S TALK ABOUT EXTENDED GRAPHICS ARRAY

16   OR XGA, ONE OF THE STANDARDS YOU SAY VGA COVERS.

17   A.    YES.

18   Q.    AS A TECHNICAL MATTER, A USB 2.0 CONNECTION

19   WOULD NOT PROVIDE ENOUGH BIT RATE FOR AN XVGA VIDEO

20   SIGNAL TO DISPLAY PROPERLY ON A MONITOR WITHOUT

21   SOME TYPE OF COMPRESSION; CORRECT?

22   A.    THAT IS CORRECT.

23   Q.    THE '788 PATENT DOESN'T SAY ANYTHING ABOUT THE

24   HOST COMPUTER USING COMPRESSION, DOES IT, SIR?

25   A.    IT DOES NOT.

1    Q.   WELL, LET'S SEE WHAT THE '788 PATENT ACTUALLY

2    SAYS, THOUGH.

3              IF I COULD HAVE SLIDE 65 ON THE SCREEN.

4    SO YOU ARE WELCOME TO LOOK AT THE PATENT.

5    Q.   THE PATENT SAYS IN COLUMN 2, LINES 9 AND 10,

6    THAT FIGURE 4 PROVIDES AN ILLUSTRATION OF HOW THE

7    HOST COMPUTER ISSUES USB BASED DISPLAY SIGNALS TO A

8    USB CONTROLLER; THAT'S WHAT IT SAYS, RIGHT, SIR?

9    A.   IT DOES.

10   Q.   AND IF COULD YOU COULD GO DOT NEXT SLIDE,

11   WHICH IS SLIDE 66 IN THE MARKMAN PRESENTATION.

12   THESE ARE THE STEPS THAT ARE DESCRIBED IN THE

13   SPECIFICATION OF THE '788 PATENT.

14             MR. YOON:  YOUR HONOR, THIS IS LOCATED ON

15   THE COLUMN 3, LINES 52 TO 65.

16   Q.   YOU ARE WELCOME TO LOOK ON THE SCREEN, DR.

17   MIN, OR CHECK THE ACTUAL TEXT, OKAY?

18   A.   OKAY.

19   Q.   NOW, SO THIS IS WHAT THE EXAMPLE GIVEN IN THE

20   '788 PATENT OF HOW THE HOST COMPUTER SYSTEM

21   GENERATES THE USB DISPLAY SIGNAL; CORRECT?

22   A.   YES.

23   Q.   AND YOU WOULD AGREE THAT STEPS 400 TO 430

24   OCCURRED INSIDE THE HOST COMPUTER; CORRECT?

25             MR. CAULEY:  YOUR HONOR, I AM GOING

1    OBJECT.  THIS IS BEYOND THE SCOPE OF DIRECT.

2              THIS IS A TERM THAT DR. MIN WAS NOT

3    PRESENTED ON DIRECT FOR.

4              MR. YOON:  YOUR HONOR, THIS GOES TO THE

5    HEART OF WHAT THEY WOULD UNDERSTAND VGA, AND I WILL

6    TIE IT TOGETHER, YOUR HONOR.

7              THE COURT:  I'LL ALLOW IT.

8              MR. YOON:  OKAY.

9    Q.   SO YOU AGREE THAT 400 TO 430 OCCURRED INSIDE

10   THE HOST COMPUTER; CORRECT?

11   A.   YES.  I AGREE.

12   Q.   OKAY.  SO IN STEPS 420 AND 430, THE HOST

13   COMPUTER'S GRAPHIC GRAPHIC ENGINE AND GRAPHIC

14   DRIVER GENERATES THE IMAGES THAT WILL BE DISPLAYED

15   TO THE DISPLAY DEVICE; CORRECT?

16   A.   THAT'S RIGHT.

17   Q.   AND IN STEP 440, THE GENERATED IMAGE IS

18   TRANSMITTED TO THE DISPLAY DEVICE VIA THE USB

19   INTERFACE; CORRECT?

20   A.   THAT'S RIGHT.

21   Q.   THERE'S NO DISCUSSION OF COMPRESSING THE

22   GENERATED IMAGINE RESULTING FROM STEP 30 BEFORE

23   IT'S TRANSMITTED VIA THE USB INTERFACE; CORRECT?

24   A.   THAT'S RIGHT.  THERE IS NO COMPRESSION ISSUE

25   HERE.

1   Q.   NOW, IF YOU GO TO SLIDE 56 OF THE MARKMAN

2   PRESENTATION, THE '788 PATENT TALKS ABOUT DIRECTLY

3   TRANSMITTING USB SIGNALS FROM THE HOST COMPUTER TO

4   THE USB DISPLAY DEVICE.   THAT'S IN COLUMN 1, LINES

5   41 TO 44; IS THAT RIGHT, SIR?

6   A.   YES.

7   Q.   NOW, SIR, A PERSON OF ORDINARY SKILL IN THE

8   ART AT THE TIME THE '788 PATENT WAS FILED WOULD

9   UNDERSTAND THAT USB 2.0 DID NOT HAVE THE BANDWIDTH

10  SUFFICIENT TO DIRECTLY TRANSMIT THE XGA SIGNALS

11  WITHOUT COMPRESSION; CORRECT?

12  A.   THAT'S RIGHT.

13  Q.   AND THIS PATENT IS ENTITLED USB TO VGA

14  CONVERTER; CORRECT?

15  A.   THAT IS CORRECT AS WELL.

16  Q.   AND THIS PATENT DOES NOT TEACH HOW TO TRANSMIT

17  AN XGA SIGNAL TO A MONITOR; CORRECT?

18  A.   THAT IS CORRECT.   I MEAN IT DOESN'T REALLY

19  TALK ABOUT XGA SIGNAL BEING SPECIFICALLY PART OF

20  THIS TRANSMISSION.

21        MR. YOON:   COULD YOU TURN THAT OFF, BILL.

22  Q.   LET'S TALK NOW ABOUT SUPER XGA KNOWN AS XGA,

23  ULTRA XGA, AND THEN QUAD XGA, OKAY SIR?

24  A.   YES.

25  Q.   AND IF I COULD HAVE YOUR DECLARATION ON THE

1    SCREEN AT PAGE 8, THE MIDDLE PARAGRAPH.

2            NOW, IT'S YOUR OPINION, SIR, THAT THE

3    TERM VGA COVERS NOT ONLY SVGA AND XGA, BUT SUPER

4    XGA, ULTRA XGA AND QUAD XGA; DO YOU SEE THAT, SIR?

5    A.   YES.

6    Q.   AND ALSO IT COVERS THEIR COUNTERPARTS FOR

7    WIDESCREEN DISPLAY DEVICES IF AVAILABLE?

8    A.   YES.

9    Q.   OKAY.  NOW, THE BIT RATE DEMANDS FOR SUPER

10   XGA, ULTRA XGA, AND QUAD XGA ARE MUCH HIGHER THAN

11   THE BIT RATE DEMANDS OF XGA; CORRECT?

12   A.   THAT'S RIGHT.

13   Q.   SO CERTAINLY WITH USB 2.0 YOU COULDN'T

14   TRANSMIT THOSE WITHOUT COMPRESSION EITHER?

15   A.   COMPRESSION IN A SENSE THAT -- AS YOU KNOW,

16   THE USB 2.0 HAS A FIXTURE OF THE BIT RATE.  SO THE

17   GRAPHICS ENGINE, WHATEVER THE AVAILABLE BIT RATE,

18   WOULD HAVE TO MATCH THAT UPPER LIMIT, BUT IT

19   DOESN'T REALLY TALK ABOUT COMPRESSION.

20   Q.   SO LET'S TALK ABOUT.  -- THERE'S NO MENTION OF

21   SXGA IN THE '788 PATENT?

22   A.   NO.

23   Q.   AND OF COURSE THERE'S NO MENTION OF EITHER

24   QXGA OR UXGA; CORRECT?

25   A.   THAT IS CORRECT.

1    Q.   NOW LET'S JUST TALK ABOUT -- THERE IS A LOT OF

2    DISCUSSION ABOUT THIS 15-PIN PLUG AND HOW VGA IS

3    RELATED TO THIS 15-PIN PLUG.

4    A.   OKAY.

5         BILL, COULD I HAVE COLUMN 2, LINES 14 TO

6    16 ON THE SCREEN.

7    Q.   NOW, COLUMN 2 IS ON THE '788 PATENT DESCRIBING

8    FIGURE 6.  AND THAT'S ONE EMBODIMENT OF THE USB TO

9    VGA CONVERTER FOR CONNECTING A DISPLAY DEVICE TO A

10   HOST COMPUTER; CORRECT?

11   A.   YES.

12        NOW, IF I COULD ACTUALLY HAVE FIGURE 6 ON

13   THE SCREEN.

14   Q.   SO HERE'S FIGURE 6.  YOU ARE FAMILIAR WITH

15   THIS FIGURE, RIGHT DR. MIN?

16   A.   YES.

17   Q.   SO 200 WOULD BE THE HOST COMPUTER, CORRECT?

18   A.   THAT'S RIGHT.

19   Q.   WE COULD HIGHLIGHT THAT.  300 WOULD BE THE

20   DISPLAY DEVICE?

21   A.   YES.

22   Q.   100, SIR, WOULD BE THE USB TO VGA CONVERTER?

23   A.   LET ME JUST DOUBLE CHECK THAT.

24   Q.   ABSOLUTELY, SIR.

25   A.   I THINK THAT'S RIGHT, YES.

60

1    Q.   IT'S IN COLUMN 4 OF THE PATENT.

2    A.   YES.

3    Q.   NOW, IN THIS EXAMPLE OF THE CLAIMED USB TO VGA

4    CONVERTER, NO VGA PLUG IS USED, IS THERE, SIR?

5    A.   THERE IS NO VGA PLUG HERE.

6    Q.   RIGHT.  IN FACT, THEY HAVE A USB PLUG 510 AND

7    ANOTHER USB PLUG 510; CORRECT?

8    A.   YES.

9    Q.   SO YOU COULD HAVE A USB TO VGA CONVERTER

10   WITHOUT A VGA PLUG, RIGHT SIR?

11   A.   IN THIS EMBODIMENT, THAT IS CORRECT, YES.

12   Q.   AND THIS IS THE EMBODIMENT DISCLOSED IN

13   PATENT, CORRECT?

14   A.   YES.

15   Q.   AND LASTLY, COULD I HAVE IN THE SCREEN, SLIDE

16   17, THAT SHOWS YOU CLAIM 1 AND CLAIM -- DEPENDENT

17   CLAIM 3.  YOU ARE FAMILIAR WITH THESE CLAIMS;

18   CORRECT, DR. MIN?

19   A.   YES.

20   Q.   OKAY.  AND IF YOU LOOK THE CLAIM 1, THE TERM

21   "VGA PLUG" DOES NOT APPEAR ANYWHERE IN CLAIM 1 DOES

22   IT, SIR?

23   A.   IT DOES NOT.

24   Q.   THE TERM VGA PLUG DOES APPEAR IN DEPENDENT

25   CLAIM NUMBER 3, DOESN'T IT?

1   A.   IT DOES.

2   Q.   SO YOU CAN PRACTICE THE VGA OF CLAIM 1 WITHOUT

3   USING A VGA PLUG; CORRECT?

4   A.   I MEAN AS ONE OF THE EMBODIMENTS SHOWS, THAT'S

5   THE CASE.

6   Q.   SO VGA DOES NOT NECESSARILY MEAN VGA PLUG,

7   DOES IT, SIR?

8   A.   IT DOES NOT.  VGA AND VGA PLUG IS NOT ONE AND

9   THE SAME, NO.

10   Q.   THANK YOU SIR.

11          MR. YOON:  NO FURTHER QUESTIONS.

12          THE COURT:  ANYTHING FURTHER?

13          MR. CAULEY:  I HAVE NO QUESTIONS,

14   YOUR HONOR.

15          THE COURT:  IF -- HOW DO YOU DISTINGUISH

16   A NON-VGA PORT PLUG FROM A VGA PORT PLUG?  HOW

17   WOULD YOU --

18          THE WITNESS:  I MEAN, JUST LOOKING AT THE

19   SHAPE OF THE CONNECTORS, YOU MEAN?

20          THE COURT:  IF I ASKED YOU, "TELL ME THE

21   DIFFERENCE," HOW WOULD YOU DESCRIBE IT?

22          THE WITNESS:  THE VGA, FIRST OF ALL --

23   FIRST OF ALL, IT HAS FIVE PINS THAT ARE STAGGERED

24   IN THREE ROWS, EACH HAVING FIVE PINS.  SO

25   MULTIPLIED BY 3 BECOMES 15, AND HAS THE WELL KNOWN

1   CONNECTOR SHAPE.

2            AND MORE THAN THAT, YOUR HONOR, IS THE

3   WAY THE SIGNALS ARE USED.  THE SIGNALS ARE DEFINED

4   FOR EACH OF THOSE PINS.  WHAT THOSE SIGNALS THROUGH

5   THOSE PINS ARE FOR.

6            THE COURT:  AND I FIND THAT THE

7   DEFINITION OF WHAT THOSE PINS ARE FOR WHERE?

8            THE WITNESS:  IT START BACK FROM 1987.

9   IT'S THE SAME STANDARD USED THROUGHOUT.

10            THE COURT:  OKAY.  THANK YOU.

11            MR. YOON:  YOUR HONOR, WOULD YOU LIKE TO

12   TAKE YOUR BREAK NOW AND THEN WE CAN COME BACK AND

13   BEGIN ARGUMENT, OR WOULD YOU LIKE TO GET INTO THE

14   SOME OF THE TERMS?

15            THE COURT:  WHY DON'T WE TAKE A BREAK AND

16   COME BACK AND GO THROUGH THE TERMS.

17            MR. YOON:  OKAY.  THANK YOU, YOUR HONOR.

18

19            (WHEREUPON A RECESS WAS TAKEN.)

20

21            MR. YOON:  EXCUSE ME, YOUR HONOR.  JUST

22   IN THE TERMS OF TIME MANAGEMENT BECAUSE WE HAVE TEN

23   TERMS WE ARE DISPUTING, IS THERE A SPECIFIC TIME

24   THE COURT WANTS THE HEARING TO END?  PROBABLY

25   SOONER RATHER THAN LATER SO WE CAN MANAGE OUR TIME.

1          THE COURT:  YOU HAVE PROBABLY AN HOUR.

2          MR. YOON:  OKAY.  UNDERSTOOD, YOUR HONOR.

3          MR. CAULEY:  SO I THINK WHAT WE ARE GOING

4     TO DO IS WE ARE GOING TO DO ONE TERM AT A TIME AND

5     THEN ARGUE BACK AND FORTH AND THEN GO TO THE NEXT

6     ONE.

7          THE COURT:  OKAY.

8          MR. CAULEY:  IF YOUR HONOR WILL FORGIVE

9     MY COUGHING.  I WILL KEEP MY WATER AT HAND.

10         THE COURT:  OKAY.

11         MR. CAULEY:  IF YOU COULD GO TO SLIDE

12    ONE.  I'M GOING TO GIVE A BACKGROUND OF JUST THE

13    MCT PRODUCT, THAT'S THE ONE ON THE RIGHT, JUST FOR

14    IDENTIFICATION PURPOSES -- I THINK THEY SHOWED

15    THEIRS.

16         THIS PATENT IS BROAD.  IT'S DIRECTED TO A

17    LOW COST SOLUTION.  I WANT TO DIRECT YOUR ATTENTION

18    TO COLUMN 4, LINES 36 TO 39.  IT SAYS:  THE PRESENT

19    INVENTION IS AIMED TO PROVIDE A SIMPLE AND LOW COST

20    MEASURE FOR CONNECTING A HOST COMPUTER TO A DISPLAY

21    DEVICE WITHOUT A HARDWARE BASED DISPLAY INTERFACE

22    CARD MOUNTED INSIDE THE HOST COMPUTER.

23         IT'S REALLY BROAD.  IT'S MEANT TO BE A

24    VERY BROAD INVENTION.

25         COLUMN 3, LINES 66, TO COLUMN 4, LINE 2,

1     SAYS:  BASED UPON THE ABOVE DESCRIPTION, THE

2     OPERATION PROCESS OF THE USB TO VGA CONVERTER, THE

3     USB TO VGA CONVERTER CAN WORK WITH ANY COMPUTER

4     SYSTEMS RUNNING UNDER ANY OPERATION SYSTEMS.

5               SO -- SLIDE 2 -- SAYING -- SO WHAT WE'VE

6     GOT HERE IS WE'VE GOT A VERY BROAD PATENT THAT,

7     ESSENTIALLY, DR. JONES HAS TRIED TO REWRITE

8     IMPORTING TERMS THAT AREN'T ANYWHERE IN THE PATENT.

9               YOU KNOW -- I MEAN I'VE SEEN PEOPLE PULL

10    SPECIFICATIONS INTO THE CLAIMS.  WHAT DR. JONES HAS

11    DONE, AND THIS IS WHY WE DON'T RELY ON EXTRINSIC

12    EVIDENCE, IS HE'S BROUGHT IN THINGS THAT AREN'T

13    EVEN IN THE SPECIFICATIONS AND TRIED TO IMPORT THEM

14    INTO THE CLAIMS.  HE'S NOT MADE UP TERMS, BUT HE'S

15    PUT TERMS IN HIS DEFINITIONS THAT AREN'T IN THE

16    SPECIFICATIONS.  THEY AREN'T IN THE CLAIMS, AND WE

17    DON'T KNOW WHAT THEY MEAN.

18              WHAT WE'VE GOT HERE IS WE'VE -- I THINK

19    AS DR. MIN WAS TESTIFYING FOR USB AND VGA -- WE'VE

20    GOT EASILY UNDERSTOOD GENERIC TERMS THAT WERE

21    UNDERSTOOD BY EVERYBODY THAT ARE USED COMMONLY IN

22    THE COMPUTER INDUSTRY IN 2002.  THEY ARE USED

23    COMMONLY IN THE COMPUTER INDUSTRY NOW, AND THEY ARE

24    UNDERSTOOD BY EVERYONE.  AND --

25              THE COURT:  ISN'T THAT EXTRINSIC

1    EVIDENCE?  I MEAN IT SEEMED TO ME THAT THIS PATENT

2    REALLY DOESN'T -- I MEAN, ANYWHERE, EXPRESSLY, VGA

3    OR USB, AND WE ARE REALLY THEN SAYING, OKAY, WHAT

4    DID THOSE TERMS MEAN TO SOMEONE ORDINARILY SKILLED

5    IN THE ART AT THE TIME?

6             AND DR. MIN WAS, I THINK, CLEARER WHEN HE

7    SAID THAT, INITIALLY, THAT YOU WOULD REFER TO THE

8    IBM SPEC, BUT THEN OVER TIME IT BECAME GENERIC.

9    WHEN DID THAT TAKE PLACE, IT SEEMS TO ME, IS

10   TOTALLY EXTRINSIC EVIDENCE, ISN'T IT?

11            MR. CAULEY:  I THINK TO THE EXTENT AND

12   THAT'S WHY WE DESIGNATE IT AS YOUR HONOR NOTED,

13   THAT DR. MIN FOR THOSE TWO SPECIFIC TERMS,

14   SPECIFICALLY TO SAY WHAT A PERSON OF ORDINARY SKILL

15   IN THE ART WOULD HAVE UNDERSTOOD THOSE TERMS TO

16   MEAN IN 2002.

17            AND I THINK THAT PART OF THE BASIS FOR

18   HIS OPINION, NOT JUST HIS EXPERIENCE IN THE

19   INDUSTRY, BUT ALSO LOOKING AT THE PATENT ITSELF,

20   ALSO SHOWS THAT THE PATENT IS ALSO USING THOSE

21   TERMS GENERICALLY.

22            I THINK FOR THE MOST PART, OTHER THAN

23   THOSE TWO TERMS, ALL OF OUR BASIS FOR ALL OF OUR

24   TERMS IS ENTIRELY INTRINSIC.  AND EVEN FOR USB AND

25   VGA, I WOULD SAY IT'S AT LEAST HALF INTRINSIC.  AND

1    THE ONLY INTRINSIC PART IS THE PERSON OF ORDINARY

2    SKILL IN THE ART'S KNOWLEDGE OF WHAT THOSE TERMS

3    ARE.

4         NEXT SLIDE.  SO, THIS IS JUST A GENERAL

5    DESCRIPTION TO SAY THAT WE ARE PRIMARILY RELYING ON

6    THE CLAIM LANGUAGE AND THE WRITTEN DESCRIPTION AND

7    THE PROSECUTION HISTORY.  PRIMARILY, WE ARE RELYING

8    ON THE LANGUAGE OF THE CLAIMS.

9         NEXT SLIDE.  AND EXTRINSIC EVIDENCE -- I

10   THINK, PRIMARILY, WHAT THEY ARE USING AREN'T EVEN

11   TECHNICAL TREATISES OR PRIOR ART.  THERE'S A LITTLE

12   OF THAT, BUT A LOT OF WHAT THEY'RE RELYING ON IS

13   DR. JONES' OWN KNOWLEDGE OUT OF HIS DECLARATION.

14   AND I BELIEVE THAT THAT'S, AS THE PHILLIPS CASE

15   TEACHES US, IS THE LEAST FAVORED KIND OF EXTRINSIC

16   EVIDENCE.  SO I THINK THAT'S PRIMARILY WHAT WE ARE

17   VIEWING DISPLAYLINK AS RELYING ON.

18        NEXT SLIDE.  SO LET'S GET TO USB.  I

19   THINK THE -- THERE'S TWO DISPUTES HERE WHICH ARE

20   KIND OF INTERLINKED WITH EACH OTHER:  IS THE TERM

21   USB GENERIC AS USED IN THE PATENT?  AND IS THE

22   PATENT LIMITED TO USB 1.0, 1.1 AND 2.0, EXCLUDING

23   ANY FUTURE VERSIONS?

24        AND I THINK AS YOUR HONOR NOTED, AS OF

25   THE PRESENT DATE, IT DOESN'T REALLY MATTER BECAUSE

1    THERE IS NO COMPUTER THAT'S USING ANY FUTURE

2    VERSIONS.  BUT THIS PATENT DOESN'T EXPIRE FOR A

3    WHILE, AND WE BELIEVE IT SHOULD APPLY TO VERSIONS

4    OF THE PATENT THAT ARE -- IT SHOULD APPLY TO

5    VERSIONS OF USB THAT COME UP IN THE FUTURE, AS LONG

6    AS THOSE ARE COMPATIBLE WITH A USB PORT OR PLUG.

7    AS LONG AS YOU COULD PLUG THEM INTO A USB PORT, USE

8    A USB PLUG, AND AS FAR AS WE ARE CONCERNED, THAT

9    THAT IS COVERED BY USB IN THE PATENT.

10        AND I THINK THAT ONE OF THE -- THERE'S A

11   LOT OF REFERENCES IN THE PATENT TO HOW GENERAL IT

12   IS -- SLIDE FIVE -- THE SPECIFICATION REFERS TO USB

13   GENERALLY.  IT SAYS:  THE PRESENT INVENTION RELATES

14   GENERALLY TO USB TO VGA CONVERTER.

15        THERE'S NOTHING IN THE SPECIFICATIONS

16   THAT MENTIONS ANY OF THE VERSIONS.  THERE WERE, AS

17   DR. MIN DESCRIBED, THREE VERSIONS OF USB THAT WERE

18   PUBLISHED AS OF 2002, AND IT DOESN'T MAKE A

19   REFERENCE TO ANY OF THEM BY NAME.  IT REFERS TO

20   THEM ALL AS ONE.  AND SO I THINK THAT SUPPORTS THE

21   USE OF THE TERM AS UNDERSTOOD AS BEING GENERAL.

22        THE PART THAT I READ FROM COLUMN 3, IT

23   APPLIES TO ANY COMPUTER SYSTEM.  AND I THINK IF YOU

24   LOOK AT COLUMN 4, IT GENERALLY DESCRIBES -- COLUMN

25   4, LINES 15 ALL THE WAY DOWN TO 35, IT TALKS

1    GENERALLY ABOUT USB SOCKETS, USB PLUGS, USB CABLES,

2    USB PORT, AND IT'S CLEAR THAT THE PATENT IS USING

3    THE TERM USB IN A GENERIC MANNER.

4         AND I THINK ONE OF THE ISSUES THAT

5    DISPLAYLINK RAISED IS WHETHER THIS APPLIES TO

6    FUTURE TECHNOLOGY.

7         AND WHAT THEY HAD SAID IN THEIR BRIEF WAS

8    THAT THE USB COULD NOT ENCOMPASS FUTURE VERSIONS OF

9    THE STANDARD.  AND I BELIEVE THAT'S CONTRARY TO THE

10   FEDERAL CIRCUIT'S VIEW ON CLAIM CONSTRUCTION.  AND

11   I WILL JUST REFER THE COURT TO THE RECENT DECISION

12   IN INNOGENETICS VERSUS ABBOTT LABORATORIES.

13        512 FEDERAL CIRCUIT 3D, 1316.  AND IT'S

14   FEDERAL CIRCUIT 2008.  AND IT READS AT PAGE 1371 TO

15   72, "OUR CASE LAW ARISES -- ALLOWS FOR AFTER

16   ARISING TECHNOLOGY TO BE CAPTURED WITHIN THE

17   LITERAL SCOPE OF VALID CLAIMS THAT ARE DIRECTED

18   BROADLY ENOUGH."

19        AND THAT CASE CITES, AND I WILL ALSO

20   MENTION, SUPERGUIDE CORPORATION VERSUS DIRECTTV

21   ENTERPRISES, INC.  358 F 3D 870, WHICH IS FEDERAL

22   CIRCUIT 2004.  IN THAT CASE THEY WERE TALKING

23   ABOUT -- THEY HAD A CLAIM LIMITATION THAT TALKED

24   ABOUT A REGULARLY RECEIVED TELEVISION SIGNAL.

25        AND AT THAT TIME THERE WAS NO SUCH A

1    THING AS DIGITAL SIGNALS AT THE TIME THAT PATENT

2    WAS APPLIED FOR.  BUT THE FEDERAL CIRCUIT FOUND IT

3    DID APPLY TO THIS FUTURE TECHNOLOGY.

4         AND THE COURT SAID "HAD THE PATENTEES

5    INTENDED TO LIMIT THE DISPUTED CLAIM TERMS TO

6    ANALOG TECHNOLOGY, THEY COULD HAVE EASILY DONE SO

7    BY SPECIFICALLY MODIFYING THE DISPUTED CLAIM

8    LANGUAGE WITH THE TERM 'ANALOG'."  AND SAID THE

9    COURT, "THE LAW DOES NOT REQUIRE THAT AN APPLICANT

10   DESCRIBE IN A SPECIFICATION, EVERY CONCEIVABLE AND

11   POSSIBLE FUTURE EMBODIMENT OF HIS INVENTION."

12        SO WE WOULD SAY THE VERY BROAD USE OF THE

13   TERM USB IS BROAD ENOUGH TO ENCOMPASS ALL VERSIONS

14   OF USB EVEN IF THEY ARE COME UP WITH LATER.  IF THE

15   INVENTOR HAD MEANT TO RESTRICT HIS INVENTION THE

16   WAY DISPLAYLINK WANTS TO, TO THE USB VERSIONS THAT

17   WERE CURRENT AS OF 2002, HE COULD HAVE DONE SO.

18        JUST LIKE THE COURT MENTIONS IN

19   SUPERGUIDE, HE COULD HAVE SAID IT RELATES TO

20   CURRENT VERSIONS OF THE USB AND WE WOULD HAVE

21   KNOWN.  BUT HE DIDN'T DO THAT, HE USED THE TERM USB

22   GENERICALLY THROUGHOUT THE PATENT.  SO WE THINK

23   THAT THAT'S A BROAD, GENERIC TERM THAT APPLIES TO

24   ALL VERSIONS OF USB THAT ARE COMPATIBLE WITH THE

25   USB PORT AND PLUG, EVEN IF THEY COME UP LATER.

1          THE COURT:  AND HOW DO YOU DEFINE THE USB

2     PORT AND PLUG?

3          MR. CAULEY:  THE USB PORT AND PLUG, AS

4     IT'S GENERALLY UNDERSTOOD TODAY, THE ONE THAT'S IN

5     CURRENT USE --

6          THE COURT:  HOW DO YOU DEFINE IT?

7          MR. CAULEY:  IT WOULD BE A USB PORT AND

8     PLUG THAT WOULD MEET THE CURRENT SPECIFICATIONS.

9     THE PORT AND PLUG WOULD MEET THE CURRENT

10    SPECIFICATIONS, BUT YOU MIGHT HAVE A USB STANDARD

11    THAT WOULD BE HIGHER THAN THAT, THAT WOULD STILL

12    USE THE USB PORT AS PRESENTLY USED.  IT WOULD BE

13    INCOMPATIBLE WITH THOSE, I THINK, THAT IT WOULD NOT

14    COME UNDER IT --

15         THE COURT:  THE CURRENT USB PORT AND

16    PLUG?

17         MR. CAULEY:  USB PORT AND PLUG.

18         THAT'S ALL I HAVE ON THAT, YOUR HONOR.

19         THE COURT:  OKAY.

20         MR. YOON?

21         MR. YOON:  YES, YOUR HONOR.  A COUPLE OF

22    THINGS.

23         I HAVE A PRACTICAL SUGGESTION FIRST THAT

24    MAYBE CAN SAVE US SOME PAIN, BUT THEN I ALSO HAVE

25    SOME CRITIQUES TO WHAT COUNSEL JUST SAID.

1          THE PARTIES HAVE TWO DISAGREEMENTS -- TWO

2     FUNDAMENTAL DISAGREEMENTS.  ONE IS THAT WE HEAR

3     ARGUMENTS FROM MCT, BUT WHAT THEY ARGUE ABOUT AND

4     WHAT THE TEXT OF THEIR CONSTRUCTION IS ARE TWO

5     DIFFERENT THINGS.  I'M GOING TO GET TO THAT.

6          THE SECOND ISSUE, YOUR HONOR, IS THE

7     ISSUE OF:  DOES IT COVER FUTURE VERSIONS OF THE

8     STANDARD?  AND YOUR HONOR, OUR ISSUE WITH THIS HAS

9     ALWAYS BEEN, AND COUNSEL HAS JUST ARTICULATED IT,

10    IS WE DON'T KNOW WHAT THE FUTURE STANDARD HAS.  WE

11    DON'T KNOW WHAT PLUGS THE FUTURE STANDARD WOULD

12    USE.  WE DON'T KNOW WHAT TECHNIQUES THEY MIGHT

13    HAVE.

14          AND THIS COURT, IN A VACUUM, SHOULD NOT

15    HAVE TO GUESS WHETHER IT FALLS WITHIN THE SCOPE OF

16    THE CLAIM OR NOT BECAUSE YOU DON'T HAVE A RECORD IN

17    WHICH YOU CAN MAKE A DECISION.

18          CLAIM CONSTRUCTION ORDERS ARE INTERIM

19    ORDERS, YOUR HONOR.  YOU COULD ISSUE AN ORDER AND

20    IF A NEW PRODUCT CAME UP OR USB STANDARD CAME UP

21    DURING THE CASE, WE COULD COME BACK AND REVISIT THE

22    ISSUE.

23          ALSO IN YOUR DECISION, YOUR HONOR, YOU

24    COULD SAY THAT AT THIS TIME, THE COURT DOESN'T MAKE

25    ANY DECISION ONE WAY OR THE OTHER AS TO ABOUT

1    FUTURE VERSIONS.

2              SO I THINK THAT IS THE WAY TO HANDLE THE

3    ISSUE.  I MEAN, THIS COURT SHOULD NOT BE MAKING A

4    DECISION WITH SOMETHING GOING TEN YEARS OUT, WHEN

5    IT DOESN'T HAVE A RECORD BEFORE IT.  AND THIS COURT

6    IS NOT REQUIRED TO IN ITS ORDER.

7              SO MY SUGGESTION ON THAT, YOUR HONOR,

8    WOULD BE THE COURT RESERVE JUDGMENT ON THE FUTURE

9    ISSUE.  BUT AS TO THE ACTUAL CONSTRUCTION THE

10   PARTIES DISPUTE YOUR HONOR, AT THE TIME THE '788

11   PATENT WAS FILED, THE PLAIN AND ORDINARY MEANING OF

12   THE UNIVERSAL SERIAL BUS, USB, AS YOU HEARD FROM

13   DR. MIN, UNDISPUTEDLY WAS THE THEN EXISTING

14   VERSIONS OF THE USB STANDARD, WHICH AT THE TIME OF

15   FILING WAS USB 2.0 AND IT'S PREDECESSORS.  THAT IS

16   UNDISPUTED AND YOU HEARD DR. MIN TESTIFY TO THAT

17   FACT.

18             USB IS NOT A GENERIC TERM THAT REFERS TO

19   ANY SERIAL BUS SPECIFICATION WHICH SUPPORTS

20   UNDEFINED USB BASED DISPLAY SIGNALS FROM A HOST

21   COMPUTER AND WHICH ARE "COMPATIBLE" WITH ANY USB

22   PORT AND PLUGS.

23             APPARENTLY, YOUR HONOR, COUNSEL,

24   RECOGNIZING THE PROBLEM WITH FUTURE PRODUCTS, HAS

25   MODIFIED THE CONSTRUCTION.  IT'S NOW ANY USB PORT

1    AND PLUG THAT EXISTED AS OF THE FILING DATE OF THE

2    PATENT.

3         BUT YOU CAN SEE THE PROBLEM, YOUR HONOR.

4    THEIR POSITION IS NOT THAT WE'VE LIMITED IT

5    SOMEHOW; IN FACT, WE RECOGNIZE ALL EXISTING

6    VERSIONS OF USB.  WE WON'T SAY TEN YEARS FROM NOW

7    THAT THERE'S A USB VERSION THAT'S COVERED.  WE

8    CERTAINLY DO NOT BELIEVE IT COVERS ANY SERIAL BUS

9    SPECIFICATION, IT COVERS THE USB SPECIFICATION THAT

10   IS THE INDUSTRY STANDARD, INDUSTRY ACCEPTED.

11        IF I COULD HAVE SLIDE 11, PLEASE.

12        THE PATENT IS VERY CLEAR ON THIS,

13   YOUR HONOR.  IT SAYS THAT USB REFERS TO UNIVERSAL

14   SERIAL BUS.  THE PATENT DOES NOT SAY IT REFERS TO

15   ANY TYPE OF SERIAL BUS.  IT REFERS TO THE UNIVERSAL

16   SERIAL BUS.

17        NOW, YOUR HONOR, IT WAS VERY INTERESTING

18   WHEN COUNSEL STARTED -- COUNSEL SAID THIS WAS A

19   GENERAL PATENT, THEN IT WAS A REALLY GENERAL

20   PATENT, THEN IT WAS A VERY GENERAL PATENT, THEN IT

21   WAS A VERY GENERAL, BROAD PATENT.

22        IT'S CLEAR THE CLASSIC PLAINTIFF WAY

23   THEY'RE TRYING TO EXPAND THE SCOPE OF THE CLAIM.

24   THE WORD "GENERALLY" IN THE BACKGROUND OF THE

25   INVENTION DOES NOT MODIFY OR ALTER THE MEANING OF

74

1    USB OR VGA.  IT JUST SAYS IT RELATES GENERALLY TO A

2    USB TO VGA CONVERTER.

3            COUNSEL KEEPS GRABBING THE WORD GENERALLY

4    TO SOMEHOW SUGGEST THAT CHANGES OR MODIFIES THE

5    MEANING.  AND I THINK, YOUR HONOR, THE TWO CASES

6    COUNSEL CITED, THE INNOGENETICS CASE WHERE THE

7    COUNSEL QUOTED, "OUR CASE LAW ALLOWS FOR AFTER

8    ARISING TECHNOLOGY TO BE CAPTURED WITHIN THE

9    LIBERAL SCOPE OF VALID CLAIMS."  THAT OCCURS IN THE

10   INFRINGEMENT SECTION OF THE OPINION, YOUR HONOR.

11   THAT DOESN'T OCCUR IN THE CLAIM CONSTRUCTION.

12           USB MEANS WHAT USB MEANS TO A PERSON OF

13   ORDINARY SKILL.  VGA MEANS WHAT VGA MEANS.

14           SIMILARLY, YOUR HONOR, THE ISSUE IN THE

15   SUPERGUIDE CASE THAT COUNSEL HANDED TO ME BEFORE

16   THE HEARING WAS NOT THE MEANING OF THE TERM USB OR

17   VGA, THE ACTUAL TERM, BUT INSTEAD OF WHETHER OR NOT

18   THE "PHRASE REGULARLY RECEIVED TELEVISION SIGNALS"

19   WOULD COVER DIGITAL AS WELL AS ANALOG.

20           AND THE FEDERAL CIRCUIT CORRECTLY SAID

21   THAT THE PATENT IS NOT LIMITED TO THE PREFERRED

22   EMBODIMENT, AND THE PHRASE "REGULARLY RECEIVING

23   TELEVISION SIGNALS" DOESN'T MENTION EITHER ANALOG

24   OR DIGITAL.

25           HERE, YOUR HONOR, THE QUESTION IS:  WHAT

1    IS THE MEANING OF THE ACTUAL TERM?  AND IT'S

2    UNDISPUTED THAT USB REFERS TO THE TECHNOLOGY SET

3    FORTH IN THE INDUSTRY STANDARD SPECIFICATIONS.  IT

4    DOES NOT REFER TO ANY TYPE OF SERIAL BUS STANDARD

5    THAT SOMEHOW SUPPORTS SOME ASPECT OF USB AND IS

6    "COMPATIBLE" WITH SOME TYPE OF USB CONNECTOR.

7            IF I COULD HAVE SLIDE 12.

8            YOUR HONOR, IF YOU LOOK AT THE BRIEFING

9    AND THE CONSTRUCTIONS THAT WERE SUBMITTED TO THIS

10   COURT, IN IT'S OPENING BRIEF MCT SAID -- IT'S PAGES

11   23 AND 24 -- "THE USB PORT AND USB CABLE ARE BUILT

12   UPON AN INDUSTRY ACCEPTED USB STANDARD."  THAT'S

13   ALL THAT DISPLAYLINK SAYS IT IS.  IT'S THE INDUSTRY

14   STANDARD SPECIFICATION THAT EXISTED AT THE TIME OF

15   FILING.

16           MCT'S DEFINITION OF USB CONTROLLER IS "A

17   DEVICE THAT COMMUNICATES WITH THE COMPUTER

18   ACCORDING TO THE USB STANDARD."

19           AGAIN, IT DOESN'T GENERICALLY REFER TO

20   ANY TYPE OF SERIAL BUS STANDARD, IT REFERS TO THE

21   INDUSTRY ACCEPTED USB STANDARD.

22           AND IF I COULD HAVE DEPENDENT CLAIMS 2

23   AND 4 ON THE SCREEN.

24           YOUR HONOR, I THINK THESE CLAIMS ARE VERY

25   TELLING, YOUR HONOR.  YOU WILL SEE THIS REPEATS

1      ITSELF ON VGA.  DEPENDENT CLAIM 2 AND DEPENDENT

2      CLAIM 4 OF THE PATENT ADD, AS A LIMITATION, A USB

3      SOCKET, WHICH IS ANOTHER WAY OF SAYING A USB PLUG.

4            SO YOU HAVE THE USB SOCKET, YOU HAVE THE

5      USB SOCKET CONNECTED TO THE USB PORT.  THOSE ARE

6      DEPENDENT CLAIMS.

7            THE TERM USB WHICH OCCURS IN THE

8      INDEPENDENT CLAIM, IS NOT DEFINED BY THE SOCKET OR

9      PLUG.  THOSE ARE DEPENDENT CLAIMS.

10            BILL, IF I COULD HAVE CLAIM 1 ON THE

11      SCREEN, PLEASE.  I THINK THAT WAS SLIDE 8 OR 9,

12      BILL.  I THINK SLIDE 9 -- NEXT ONE -- SLIDE 9.

13            SO, YOUR HONOR, HERE IS CLAIM 1 ON THE

14      SCREEN.  AND CLAIM 1 YOU CAN SEE USB APPEARS THERE

15      AND IT TALKS ABOUT A USB PORT, A USB CONTROLLER,

16      USB BASED DISPLAY SIGNALS.  IT DOES NOT RECITE A

17      SOCKET OR PLUG.  THAT AGAIN OCCURS IN THE DEPENDENT

18      CLAIM.  THE TERM USB DOES NOT REFER TO ANYTHING

19      THAT USES A "USB PLUG".

20            AND IF I COULD -- MCT SLIDE 11 ON THE

21      SCREEN FOR A MOMENT.

22            YOUR HONOR, THIS IS THE ONE I SHOWED YOU

23      EARLIER.  THE WORD "GENERALLY," HERE IN THE

24      BACKGROUND OF THE INVENTION, WAS NOT MEANT TO

25      MODIFY OR ALTER THE NORMAL MEANING OF THE TERM USB.

1        THAT'S THE ISSUE BEFORE THE COURT HERE.

2                AND IF I COULD HAVE SLIDE 5, PLEASE.

3                YOU KNOW, YOUR HONOR, I KNOW THAT YOU

4        HEAR THE PHILLIPS CASE A LOT, BUT THE KEY FIND HERE

5        IS THAT PHILLIPS WAS ABSOLUTELY CLEAR THAT THE

6        ORDINARY CUSTOM MEANING OF THE CLAIM TERM IS

7        DEFINED AS OF THE EFFECTIVE FILING DATE OF THE

8        APPLICATION.  THAT IS WHAT PHILLIPS SAYS THE

9        ORDINARY TERM IS.

10               DISPLAYLINK'S CONSTRUCTION APPLIES THE

11       ORDINARY MEANING OF USB THAT EXISTED AS OF THE

12       FILING DATE OF THE PATENT.  AND AS DR. MIN

13       TESTIFIED, THAT'S WHAT WE IDENTIFIED.

14               THANK YOU, YOUR HONOR.

15               THE COURT:  I'M CURIOUS.  BOTH OF YOU CAN

16       RESPOND TO THIS.  OBVIOUSLY, DICTIONARY DEFINITIONS

17       HAVE HAD THEIR UPS AND DOWNS WITH THE FEDERAL

18       CIRCUIT.

19               MR. YOON:  YES, YOUR HONOR.

20               THE COURT:  AND THIS CASE, HOWEVER, IN

21       SOME WAYS, STRIKES ME AS ONE WHERE THE DICTIONARY

22       DEFINITION IN 2001 OR '02 MIGHT BE VERY

23       ENLIGHTENING AS TOO WHAT SKILL SOMEONE SKILLED IN

24       THE ART THOUGHT WHAT VGA OR USB MEANT.

25               MR. YOON:  WELL, WITH REGARDS TO THE USB

1    ONE -- BILL, COULD I HAVE SLIDE 13 ON THE SCREEN.

2         THE PARTIES AGREE THAT THE INDUSTRY

3    UNDERSTOOD THE -- HAD A UNIVERSAL SERIAL BUS

4    SPECIFICATION.  THAT WAS -- UNLIKE A GENERAL

5    DICTIONARY, YOUR HONOR, THIS CASE CERTAINLY --

6    THERE'S NO DISPUTE THAT THERE WERE INDUSTRY

7    ACCEPTED SPECIFICATIONS.

8         AND WHAT THE USB SPECIFICATION 2.0 SAYS:

9    THIS SPECIFICATION SETS FORTH THE TECHNOLOGY

10   REQUIRED TO DESIGN AND BUILD SYSTEMS AND

11   PERIPHERALS THAT ARE COMPLIANT WITH THIS STANDARD.

12        CERTAINLY YOUR HONOR, WE AGREE THAT USB

13   IS DEFINED BY THE USB SPEC.  OF COURSE, THERE IS NO

14   DICTIONARY IN 2002 THAT WOULD TELL YOU ABOUT THE

15   FUTURE, BUT AS TO WHAT THE MEANING OF USB IS WE

16   ABSOLUTELY AGREE, YOUR HONOR, THAT IN THE CONTEXT

17   OF USB, I DON'T THINK THERE'S A DISPUTE BETWEEN THE

18   PARTIES.

19        AS TO VGA YOUR HONOR, THERE IS A DISPUTE

20   WHICH WE ARE GOING TO GET TO NEXT.  AND YOU HEARD

21   WITH THE TESTIMONY OF DR. MIN, WE IDENTIFIED ALL

22   THE VGA SPECS.  SUPER VGA WAS DONE BY A DIFFERENT

23   COMPANY, XGA WAS SOMEONE ELSE.

24        THE COURT:  LET'S LET HIM GET THERE

25   FIRST -- OR WAS YOUR AGREEMENT -- WHO GOES NEXT?

1          MR. YOON:  NO.  ARE WE GOING TO DO VGA

2     NEXT?  HE GOES FIRST ON VGA.

3          THE COURT:  OKAY.  GO AHEAD.

4          MR. CAULEY:  SO WE JUST BOUNCE BACK AND

5     FORTH.

6          SLIDE 9.  AGAIN, THIS IS PRETTY MUCH THE

7     SAME ISSUE AS THE LAST ONE BUT IT'S A LITTLE BIT

8     DIFFERENT BECAUSE FOR USB, WHAT DISPLAYLINK IS

9     TRYING TO EXCLUDE IS FUTURE VERSIONS OF USB.

10          IN THIS ONE THEY ARE TRYING TO EXCLUDE

11    CURRENT VERSIONS OF VGA BY SAYING THAT A PATENT

12    THAT WAS APPLIED NEAR 2002 AND USES THE TERM VGA IS

13    REFERENCING A STANDARD THAT WAS WRITTEN IN 1988.

14    AND NO OTHER STANDARD.  AND NOT EVEN REFERENCING

15    THE STANDARDS THAT WERE BEING ACCUSED CURRENTLY.

16          DR. MIN TALKED ABOUT, AND I THINK

17    DR. JONES ALSO AGREED, THAT THE STANDARDS THAT WERE

18    BEING USED BY ESSENTIALLY YOU AND ME, IN 2002,

19    WERE -- VGA WASN'T BEING USED BY NORMAL PEOPLE IN

20    BUSINESSES AND IN THEIR HOMES.

21          SLIDE 13.  AND THIS IS -- THE RESOLUTION

22    OF VGA IS 640 BY 480.  AND SO HE WAS ASKED --

23    BASICALLY, WHO WOULD USE THAT?  AND SAY, INDUSTRIAL

24    COMPUTERS, POINT OF SALE TERMINALS, RAILWAY

25    STATIONS.  CONSUMERS WOULD USE XVGA -- XGA AS VGA

1    XGA.

2              THIS IS A PATENT THAT'S BEING APPLIED FOR

3    IN 2002 FOR A PRODUCT THAT'S MEANT TO BE USED IN A

4    LOW COST ENVIRONMENT -- AND WHEN I SAY THE PATENT

5    IS GENERAL -- WHEN I SAY THAT THE PATENT SAYS THE

6    USB TO VGA CONVERTER CAN WORK WITH ANY COMPUTER

7    SYSTEMS RUNNING UNDER ANY OPERATION SYSTEMS, I'M

8    NOT SURE IT GETS MORE GENERAL THAN THAT.

9              DISPLAYLINK'S CONSTRUCTION WOULD RESTRICT

10   THIS TO ESSENTIALLY NOTHING.  AS DR. MIN NOTED, THE

11   CURRENT VERSION OF WINDOWS, WINDOWS XP WHICH CAME

12   OUT SHORTLY BEFORE THE PATENT WAS APPLIED FOR,

13   DOESN'T EVEN RUN VGA.  IT RUNS, I THINK AS COUNSEL

14   IS TRYING TO SPLIT THE DIFFERENCE, COMPUTERS THAT

15   RUN WINDOWS XP WILL SHOW SOMETHING WITH A

16   RESOLUTION OF VGA IN THE SPLASH SCREEN WHEN THE

17   COMPUTER FIRST STARTS UP, AS DR. MIN NOTED, BUT

18   THEN THEY DON'T RUN IT.  WHEN IT'S ACTUALLY RUNNING

19   WINDOWS IT ISN'T COMPATIBLE WITH VGA.

20             AND AS THE PATENT NOTES IN COLUMN 3, LINE

21   54, "THE OPERATION DISCUSSED HEREIN IS BASED ON THE

22   WINDOWS OPERATION SYSTEM RELEASED BY MICROSOFT

23   COMPANY."

24             SO THIS HAS TO RUN ON A WINDOWS-BASED

25   COMPUTER.  THERE'S A WINDOWS BASED COMPUTER IN 2002

1    THAT DOESN'T EVEN SUPPORT THIS STANDARD AT ALL.

2    AND AS DR. JONES NOTES, IT'S ESSENTIALLY -- IT'S A

3    USELESS STANDARD.  IT DOESN'T RUN ON -- IT RUNS IN

4    INDUSTRIAL APPLICATIONS AND RAILWAY STATIONS.

5         SO AGAIN, JUST LIKE USB, AND AS DR. MIN

6    NOTED, IN A PERSON OF ORDINARY SKILL IN THE ART IN

7    2002 AND TODAY THEY REFER TO VGA PLUGS, VGA PORTS

8    AND VGA CABLES.  AND IT JUST DOESN'T, YOU KNOW, IT

9    DOESN'T APPLY TO, -- IT'S NOT USED IN -- THE TERMS

10   VGA PORTS, PLUGS AND CABLES ARE USED IN THE PATENT

11   THROUGHOUT AND NOT SAYING -- NOT DIRECTING IT TO

12   PARTICULAR VERSIONS OF THE VIDEO STANDARD.

13        THE COURT:  HOW DO YOU DEFINE VGA?

14        MR. CAULEY:  WE WOULD DEFINE VGA AS BEING

15   THE GENERIC TERM FOR VIDEO DISPLAY STANDARDS THAT

16   WORK WITH THAT PLUG THAT'S UP IN THE UPPER

17   RIGHT-HAND CORNER.

18        IF BASICALLY, YOU CAN SHOVE VIDEO THROUGH

19   THAT PLUG USING THOSE PINS, THEN WE WOULD DEFINE

20   THAT AS VGA.  I THINK THAT'S CLEAR THAT THAT'S WHAT

21   THE INVENTOR MEANT.  THAT THE INVENTOR WAS USING

22   THE TERM GENERICALLY.  AND AS DR. MIN NOTED, ALL OF

23   THOSE OTHER STANDARDS USE THAT SAME PLUG WITH THE

24   SAME NUMBER OF PINS.

25        THE COURT:  IT'S THE SAME SIGNALS.

1          MR. CAULEY:  SAME SIGNALS.

2          THE COURT:  ON EACH PIN.

3          MR. CAULEY:  IT'S DIFFERENT DATA RATES

4     BUT IT'S STILL USING THE SAME PLUG, SAME CABLES.

5          THE COURT:  SO YOU WOULD BE HAPPY WITH A

6     DEFINITION THAT SAID THAT IT HAD TO HAVE THE SAME

7     PIN LAYOUT WITH THE PINS RECEIVING THE SAME

8     SIGNALS.

9          MR. CAULEY:  IT WOULD HAVE TO BE

10    COMPATIBLE WITH THAT, BECAUSE I THINK AS MR. YOON

11    NOTED WAS THAT IN ONE OF THE EMBODIMENTS, THERE IS

12    A USB TO USB, BECAUSE THE VGA CONVERTER IS INSIDE

13    THE MONITOR, IT'S PHYSICALLY INSIDE THE MONITOR

14    CABINET.

15         WE WOULD SAY THAT VIDEO SIGNALS THAT ARE

16    COMPATIBLE WITH THAT PIN STRUCTURE, WHETHER OR NOT

17    IT'S ACTUALLY GOING THROUGH THAT PIN STRUCTURE.

18    BUT IF THE VIDEO SIGNALS COULD BE TRANSFERRED

19    THROUGH A MONITOR TO THAT 15-PIN PLUG WE WOULD SAY

20    THAT'S VGA, WHETHER OR NOT IT'S ACTUALLY DOING

21    THAT.

22         I JUST WANTED TO NOTE TO THE COURT THAT

23    ON SLIDE 14, THAT THE HIGHLIGHTED PORTION,

24    DISPLAYLINK, ITSELF, USES THE TERM USB AND VGA

25    GENERICALLY.  I'M PRETTY SURE FROM SHANBERG'S

1     PRESENTATION THAT DISPLAYLINK PRODUCTS ARE NOT

2     HOOKING UP TO RAILWAY STATION MONITORS AND

3     INDUSTRIAL APPLICATIONS.  IT SHOWED THEM CONNECTING

4     UP TO FIVE DIFFERENT KINDS OF VIDEO DISPLAYS, BUT

5     STILL, THIS IS RIGHT FROM THEIR WEBSITE, THAT THEY

6     USE THE TERM VGA GENERICALLY.  AND WE BELIEVE THAT

7     THE INVENTOR DID TOO.

8             THAT'S ALL I HAVE, YOUR HONOR.

9             IF WE COULD HAVE SLIDE 15 ON THE SCREEN,

10    BILL.

11            AS A COUPLE OF THINGS, YOUR HONOR, AS A

12    PRELIMINARY MATTER.  I THINK COUNSEL HAS NOW

13    DEMONSTRATED THAT THEIR CONSTRUCTION IS FATALLY

14    INDEFINITE.  IT'S NO LONGER WHETHER YOU ACTUALLY

15    HAVE -- IT CAN BE ANY VIDEO STANDARD.  EVEN IF YOU

16    DON'T USE A VGA PLUG.

17            IF YOU, THEORETICALLY, COULD USE THE PLUG

18    AND, THEORETICALLY, THAT SOMETHING COULD SUPPORT

19    THAT 15 PINS, IT NOW FALLS WITHIN THE SCOPE OF VGA.

20    I MEAN, THAT DEMONSTRATES THEY ARE TRYING TO EN

21    COMPASS EVERYTHING.  THEIR INSTRUCTION, CONTRARY TO

22    THE HISTORY LECTURES WE'VE BEEN GETTING, IS NOT

23    THAT IT COVERS A CERTAIN SET OF WELL KNOWN

24    STANDARDS THAT THE INDUSTRY BELIEVED WOULD BE VGA.

25    NO.  THEY SAY IT'S GENERICALLY REFERRING TO ALL

1    VIDEO STANDARDS COMPATIBLE WITH ANY 15-PIN VGA PORT

2    OR PLUG WHETHER OR NOT YOU EVEN USE THE PLUG.  IT

3    COVERS EVERYTHING.  AND THAT'S WHAT THEY ARE TRYING

4    TO SAY WHEN THEY SAY "VERY BROAD, VERY GENERAL."

5          BASICALLY, YOUR HONOR, THE OTHER ISSUE IS

6    THIS IS VERY DIFFERENT THAN THE SITUATION WITH USB.

7    IN USB THERE WAS USB 1.0, THERE WAS USB 1.1, AND

8    THERE WAS USB 2.0, ALL OF WHICH WERE PREPARED BY

9    THE SAME GROUP AND ORGANIZATION.  THEY WERE ALL

10   INDUSTRY ACCEPTED; THEY ALL WENT THROUGH THE

11   PEER-REVIEW PROCESS.

12         HERE, AND I BELIEVE MS. SHANBERG SHOWED

13   IN TUTORIAL, YOU HAVE THE INDUSTRY FLOODING THE

14   MARKET WITH DIFFERENT SPECIFICATIONS FOR VIDEO.

15   NONE OF THESE HAVE ANY RELATIONSHIP COMPANY-WISE,

16   AUTHOR-WISE OR ANYTHING.

17         DR. MIN, FOR EXAMPLE, TESTIFIED THAT

18   SUPER VGA WAS NOT AT ALL PREPARED BY IBM.  XGA

19   WHICH WAS PREPARED BY IBM.  IT'S TELLING THAT IBM

20   DID NOT CALL THAT VGA 2.0, THEY CALLED IT SOMETHING

21   TOTALLY DIFFERENT, THE EXTENDED GRAPHICS ARRAY, AND

22   THAT'S A KEY POINT.

23         MCT CONSTRUCTION VIOLATES THE MOST

24   FUNDAMENTAL BASIC ASSUMPTION OF CLAIM CONSTRUCTION.

25   IT'S WHAT THE TERM MEANS TO SOMEONE OF ORDINARY

1      SKILL IN THE ART AT THE TIME THE PATENT WAS FILED.

2           HERE, THEY ARE TRYING TO CAPTURE THE

3      FUTURE, AGAIN, BY SAYING IT REFERS TO ALL STANDARDS

4      COMPATIBLE WHETHER OR NOT YOU USE THE PLUG.  LET'S

5      SEE WHAT THE PATENT SAYS.

6           MR. YOON:  IF I COULD HAVE SLIDE 19 OF MY

7      MARKMAN PRESENTATION ON THE SCREEN.

8           THE PATENT SAYS VGA VIDEO GRAPHICS ARRAY.

9      IT VERY CLEAR, INSTEAD OF REFERRING TO VGA AS

10     COUNSEL SUGGESTED IN SOME GENERAL TERM, THE PATENT

11     EXPRESSLY SAYS VIDEO GRAPHICS ARRAY.  IT DOESN'T

12     SAY "EXTENDED GRAPHICS ARRAY," IT DOESN'T SAY

13     "SUPER VIDEO GRAPHICS ARRAY," IT DOESN'T SAY "QUAD

14     EXTENDED GRAPHICS ARRAY."  IT SAYS "VIDEO GRAPHICS

15     ARRAY."

16          AND IT'S UNDISPUTED AT THE TIME THE

17     PATENT WAS FILED, THAT XGA, EXTENDED GRAPHICS

18     ARRAY, AND SVGA WERE IN EXISTENCE.

19          THE PURPOSE OF A PATENT IS TO PROVIDE

20     NOTICE.  IT'S TO PUT THE PUBLIC ON NOTICE AS TO

21     WHAT THE CLAIM COVERS AND DOES NOT COVER.  AND WHAT

22     MCT DOES IS SAY, FORGET THE NOTICE FUNCTION, IT

23     COVERS EVERYTHING.  THEY KNEW ABOUT XGA AND SVGA;

24     THEY NEVER IDENTIFIED IT; THEY NEVER DISCLOSED IT.

25     INSTEAD, THEY EXPRESSLY TIED THE TERM VGA TO THE

1    TERM VIDEO GRAPHICS ARRAY, A TERM THAT ORIGINATED

2    WITH IBM.

3           AND YOUR HONOR, YOU ASKED THE QUESTION, I

4    BELIEVE, ABOUT DICTIONARY DEFINITIONS.  IT'S

5    UNDISPUTED THAT THE ONLY DOCUMENT THAT SAID VGA,

6    VIDEO GRAPHICS ARRAY, ARE THE SPECIFICATIONS THAT

7    WE IDENTIFIED, THE IBM SPECIFICATIONS.

8           YOU NOTICE THAT COUNSEL DID NOT SUBMIT

9    THE SPECIFICATIONS FOR XGA OR SVGA OR QXGA BECAUSE

10   THEY DON'T SAY THEY ARE VGA, THEY SAY THAT THEY ARE

11   XGA.  AND A PERSON OF ORDINARY SKILL IN THE ART

12   WILL UNDERSTAND THAT, AND THAT IS A KEY POINT HERE,

13   YOUR HONOR.

14          MR. YOON:  IF WE COULD GO TO SLIDE 11.

15          NOW, AGAIN, YOUR HONOR, I WON'T BELABOR

16   THE POINT.  THEY TAKE THE WORD "GENERALLY" AND THE

17   FIELD OF THE INVENTION TO SAY THAT IT BASICALLY

18   SUCKS ALL MEANING OUT OF THE TERM VGA TO COVER ALL

19   VIDEO STANDARDS THAT, THEORETICALLY, COULD BE

20   COMPATIBLE WITH THE 15-PIN PLUG WHETHER YOU USE IT

21   OR NOT.

22          THE WORD "GENERALLY" DOES NOT TRANSFORM

23   VIDEO GRAPHICS ARRAY INTO EXTENDED GRAPHICS ARRAY.

24          MR. YOON:  IF I COULD SLIDE 21, PLEASE.

25          NOW, YOUR HONOR, YOU CAN CHECK THE RECORD

1    THAT PEOPLE SUBMITTED, YOU ALSO HEARD THE TESTIMONY

2    OF DR. MIN.  COUNSEL MAKES A BIG DEAL THAT WINDOWS

3    RELEASED XP SHORTLY BEFORE THE PATENT.  THE FACT IS

4    WHEN IT RELEASED SHORTLY, IT TAKES A WHILE FOR THE

5    TECHNOLOGY TO BECOME POPULAR.

6         THEY DON'T DENY THAT WINDOWS 95, WINDOWS

7    98, WINDOWS 2000 USED VGA, AND THAT THEIR OWN

8    EXPERT TESTIFIED THAT MOST WINDOW COMPUTERS -- THIS

9    IS MR. JONES, WE WILL GET TO DR. MIN IN A SECOND --

10   BUT DR. JONES SAID THAT MOST WINDOWS-BASED PERSONAL

11   COMPUTERS INCLUDE SUPPORT FOR VGA AS PROMULGATED BY

12   IBM IN 1987.

13        DR. MIN, YOU HEARD HIM TESTIFY, ADMITTED

14   THAT AS OF THE FILING DATE OF THE PATENT, MOST

15   COMPUTERS USED VGA.  AND EVEN TODAY MOST COMPUTERS

16   SUPPORT IT.

17        THERE'S AN ARGUMENT AS TO THE EXTENT OF

18   THE SUPPORT, BUT THIS TECHNOLOGY IS STILL IN USE.

19   AND THIS IS PARAGRAPH 10, RIGHT.  AND ALSO,

20   YOUR HONOR, WE WILL COME DOWN TO IT, PARAGRAPH 14

21   OF DR. JONES' DECLARATION, IS TELLING -- WHICH AS A

22   PERSON OF ORDINARY SKILL WOULD UNDERSTAND -- THAT

23   VGA REFERS TO MORE THAN A 15-PIN CONNECTOR.  AS WE

24   ARE GOING TO SEE, THAT'S SUPPORTED BY THE SPEC IN

25   THE CLAIMS.

1              MR. YOON:  IF WE COULD HAVE SLIDE 20,

2      PLEASE.

3              NOW, INTERESTING ENOUGH, YOUR HONOR, THIS

4      IS THE DEFINITION OF VGA SIGNALS ON THE SCREEN IN

5      THE JOINT CLAIM CONSTRUCTION STATEMENT.

6              THE PARTIES AGREE THAT VGA SIGNALS REFER

7      TO SIGNALS ACCORDING TO THE VGA STANDARD.  THAT IS

8      IN THE PARTY'S JOINT CLAIM CONSTRUCTION STATEMENT;

9      MCT AGREED TO THAT.  TODAY THEY WALKED AWAY FROM

10     THAT.  IT REFERS TO THE VGA STANDARD, SINGULAR, NOT

11     A MULTIPLICITY OF STANDARDS.

12             IF I COULD HAVE THE NEXT SLIDE, PLEASE.

13     SLIDE 22.

14             YOUR HONOR, YOU'VE ASKED A LOT OF

15     QUESTIONS ABOUT THE PINS AND THE SIGNALS AND

16     WHETHER OR NOT SOMEHOW THE PINS WOULD SOMEHOW BE

17     COEXTENSIVE WITH THE STANDARD.

18             IT'S UNDISPUTED, AND YOU HEARD DR. MIN

19     ADMIT, THAT SVGA SIGNALS WOULD NOT APPLY.  BUT

20     PARAGRAPH 13 OF DR. JONES' DECLARATION -- AND THIS

21     IS UNDISPUTED.  THEY DEPOSE THE MAN TWICE; THEIR

22     EXPERT TOOK THE STAND.  IT'S IMPORTANT TO KNOW THAT

23     THE VGA STANDARD IS NOT CAPABLE OF SUPPORTING SVGA

24     SPECIFIC COMMANDS AND/OR INSTRUCTIONS.

25             MR. YOON:  NOW, IF WE COULD GO BACK TO

1    THE PREVIOUS SLIDE, BILL.

2         THE VGA STANDARD IS WHAT CAUSES --

3    DEFINES VGA SIGNALS.  NOW, DR. MIN ADMITTED HERE ON

4    THE STAND, HE ALSO ADMITTED IT ON THE DEPO, THAT

5    IF AN XGA SIGNAL OR SVGA SIGNAL WERE TO APPLY TO A

6    MONITOR THAT HAS ONLY THE CAPABILITY TO DISPLAY THE

7    ORIGINAL VGA SIGNAL, IT WOULD NOT DISPLAY

8    CORRECTLY.  AND YOU HEARD DR. MIN TESTIFY TO THAT

9    TODAY.

10        IF I COULD HAVE SLIDE 17.

11        YOUR HONOR, AND THIS IS THE KEY POINT.

12   CLAIM CONSTRUCTION BEGINS WITH THE CLAIMS.  IT

13   BEGINS WITH THE WORDS OF THE CLAIMS.  AND CLAIM 1

14   REFERS TO A VGA CONVERTER.  CLAIM 1 REFERS TO A VGA

15   CONTROLLER, VGA SIGNAL, AND NOWHERE IN CLAIM 1 IS

16   THERE A REFERENCE TO A VGA PLUG.  THE PATENT DOES

17   NOT DEFINE VGA AS BEING COEXTENSIVE OR EQUAL TO THE

18   PLUG.

19        YOU CAN PRACTICE THIS INTENTION WITHOUT

20   USING THE VGA PLUG, AND THAT'S WHAT'S ADMITTED BY

21   DR. MIN.

22        MR. YOON:  AND IF COULD I COULD JUST PUT

23   ON THE SCREEN FOR A SECOND, SLIDE 25.

24        I WON'T REPEAT OR DISCUSS ABOUT FIGURE 6,

25   YOUR HONOR, BUT THAT WAS THE USB TO VGA CONVERTER

90

1     THAT USED ONLY USB CONNECTORS AND DID NOT HAVE A

2     VGA PLUG, YET IT WAS A USB TO VGA CONVERTER.  VGA

3     TECHNOLOGY IS THE SIGNALS, THE INSTRUCTIONS THAT

4     ARE SET FORTH IN THE VGA SPEC.  IT WOULD BE

5     IMPROPER TO COLLAPSE THAT INTO A PHYSICAL PLUG.

6               MR. YOON:  IF I COULD HAVE SLIDE 27,

7     PLEASE.

8               YOUR HONOR -- AND HERE'S A KEY POINT.

9     YOUR HONOR, THIS IS NOT A CASE -- AND I THINK

10    THAT'S EXTREMELY IMPORTANT -- THIS IS NOT IN A CASE

11    OF AFTER-ACQUIRED TECHNOLOGY.  YOUR HONOR, IBM CAME

12    OUT WITH THE VGA STANDARD IN 8'7.  SVGA WAS

13    INTRODUCED IN '89.  XGA WAS INTRODUCED IN '90.

14              IBM CAME OUT WITH THE REVISED VGA

15    STANDARD IN 1991.  IF IBM MEANT VGA TO COVER XGA,

16    XGA WOULD HAVE BEEN CALLED VGA 2.0, OR VGA WOULD

17    HAVE INCORPORATED OR SOMEHOW BEEN USED IN XGA.

18              AT THE TIME THE '788 PATENT WAS FILED,

19    YOUR HONOR, SVGA, XGA AND VGA ALL EXISTED.  THEY

20    CHOSE ONLY TO USE VIDEO GRAPHICS ARRAY.  AND THAT

21    THE SPECIFICATION FOR VIDEO GRAPHICS ARRAY, THE '91

22    SPEC WHICH IS IN OUR CONSTRUCTION, CAME OUT AFTER

23    SVGA OR XGA.  IT'S NOT ANTIQUATED TECHNOLOGY,

24    YOUR HONOR, IT WAS STILL IN USE AT THE TIME.

25              AND, YOUR HONOR, I THINK YOU MAY BE

1    FAMILIAR WITH THE CHEF AMERICA CASE WHERE THE

2    FEDERAL CIRCUIT RULED THAT EVEN THOUGH THE

3    CONSTRUCTION WOULD RENDER THE COOKING DEVICE

4    UN-USEABLE SUCH THAT EVERYTHING WOULD BE BURNT TO A

5    CRISP, THE PLAIN AND ORDINARY MEANING APPLIES.

6             THEIR ARE REGRETS AND THEIR ARE BUYER

7    REMORSE ABOUT THE COMMERCIAL VIABILITY OF VGA GOING

8    FORWARD, DOES NOT TRANSFORM THE TERM "VIDEO

9    GRAPHICS ARRAY" INTO ANYTHING MEANING ANYTHING

10   OTHER THAN IT ALWAYS MEANT, WHICH IS THE TECHNOLOGY

11   DEFINED IN THE IBM SPEC.

12             IBM, WHO WROTE VGA, DID NOT INCLUDE XGA

13   OR SVGA IN THEIR '91 SPEC.  THEY COULD HAVE

14   MENTIONED THAT IN THEIR SPECIFICATION; THEY COULD

15   HAVE SAID VGA IS A GENERIC TERM; BUT NO, THEY TYPED

16   VGA TO MEAN VIDEO GRAPHICS ARRAY.

17             THANK YOU.

18             THE COURT:  WHAT --

19             MR. YOON:  YES, YOUR HONOR.

20             THE COURT:  IN VGA BLANK, WHETHER IT'S A

21   CONTROLLER OR SIGNAL OR WHATEVER --

22             MR. YOON:  YES.

23             THE COURT:  -- WERE DEFINED AS:

24   CONTROLLER DESIGNED AND BUILT IN ACCORDANCE WITH

25   THE IBM STANDARDS OR SIGNAL GENERATED IN ACCORDANCE

1      WITH THE IBM STANDARD; WHAT WOULD YOUR REACTION BE?

2              MR. YOON:  I BELIEVE, YOUR HONOR, THAT

3      WOULD BE CONSISTENT WITH OUR UNDERSTANDING OF VGA

4      WHICH IS TECHNOLOGY DEFINED BY THE IBM

5      SPECIFICATION.

6              THE COURT:  AS OPPOSED TO A DEFINITION

7      THAT SAID, "COMPATIBLE WITH"?

8              MR. YOON:  YES, YOUR HONOR.

9              AND THE KEY HERE IS WHAT COUNSEL SAID

10     ABOUT, YOU DON'T EVEN HAVE TO USE THE PLUG.  THE

11     PROBLEM, YOUR HONOR, IS THAT REMEMBER, FOR EXAMPLE,

12     EVERYONE HERE HAS FLAT PANEL SCREENS --

13             THE COURT:  COMPATIBLE WITH THE STANDARD.

14     IT WOULDN'T NECESSARILY REQUIRE A PLUG.

15             MR. YOON:  THAT'S RIGHT, YOUR HONOR.

16             THE ONLY QUESTION IS WITH REGARD TO

17     COMPATIBLE, YOU KNOW HOW COMPATIBLE IT IS.  YOU'VE

18     DEALT WITH PLENTY OF PATENT CASES, YOUR HONOR.

19     PARTIES COULD ARGUE WHAT COMPATIBLE MEANS.

20             SO I FIND THERE'S POTENTIAL CONFUSION

21     WHAT THAT MEANS.  "COMPLIES WITH," THE

22     SPECIFICATION OF THE STANDARD OF THE TERM THAT I

23     WOULD FIND MORE DEFINITE AND LESS ROOM FOR THE

24     PARTIES TO FIGHT ABOUT.

25             THE COURT:  WHAT WOULD BE WRONG WITH

1    "COMPLIES WITH?"

2            MR. CAULEY:  I SUPPOSE IT WOULD DEPEND ON

3    WHAT IT COMPLIED WITH.

4            THE COURT:  COMPLIES WITH THE STANDARD

5    GENERATED BY IBM.

6            MR. CAULEY:  WELL, IF IT'S IT IS 1988

7    STANDARD OR THE 1991 STANDARD, THEN WE DON'T THINK

8    THAT'S SUPPORTED BY THE PATENT.

9            THE COURT:  WHAT OTHER STANDARD IS THERE?

10            MR. CAULEY:  ANY VIDEO STANDARD THAT CAN

11    BE USED WITH THAT PLUG AND PORT.  THAT WOULD

12    RESTRICT THE PATENT TO ONE STANDARD THAT CAME OUT

13    14 YEARS BEFORE THE PATENT WAS APPLIED FOR.

14            THE COURT:  WELL, I'M JUST TRYING TO

15    DEFINE YOUR STANDARD.

16            MR. CAULEY:  OUR STANDARD IS:  ANY VIDEO

17    STANDARD THAT CAN BE USED WITH WHAT IS COMMONLY

18    KNOWN AS A VGA SOCKET, PLUG, CABLE.  THOSE ARE

19    CURRENT TERMS IN COMMON USE IN 2002 AND 2008.

20            AND IF YOU COULD PUT VIDEO SIGNALS

21    THROUGH THERE, AND IT WILL DISPLAY ON A SCREEN,

22    THEN WE WOULD SAY THAT'S WHAT THE INVENTOR MEANT BY

23    VGA, USED GENERICALLY TO REFER TO ANY VIDEO

24    STANDARDS.  AND THAT'S THE WAY DISPLAYLINK, ITSELF,

25    USES THE TERM, THAT IT'S NOT RESTRICTED.

1         I MEAN, DISPLAYLINK, IN ITS PROMOTIONAL

2    LITERATURE, DOESN'T SAY, WE HAVE A USB TO VGA AND

3    IT WILL ONLY DISPLAY ON A VGA MONITOR.  THEY USE

4    THAT IN THEIR OWN LITERATURE TO DESCRIBE XVGA,

5    SVGA, EVERY KIND HERE.

6         THE COURT:  I GUESS THE PROBLEM I'M

7    HAVING IS TRYING FIGURE OUT HOW YOU DEFINE WHAT YOU

8    SAY THIS STANDARD IS OTHER THAN BY SAYING, WELL,

9    IT'S WHAT PEOPLE THOUGHT AT THE TIME WAS THE

10   STANDARD.

11        MR. CAULEY:  VGA, IT'S A GENERIC TERM IN

12   COMMON USE BY ONE OF ORDINARY SKILL IN 2002, TO

13   REFER TO ALL THESE VIDEO STANDARDS.  AND VIDEO

14   STANDARD -- THE VIDEO TECHNOLOGY WAS TRANSMITTED

15   FROM A COMPUTER THROUGH THE VGA SOCKET THROUGH THE

16   VGA PLUG -- THIS IS WHAT WE SAW ON THE SCREEN,

17   THROUGH THIS CABLE UP TO THE MONITOR.

18        AND IN 2002, THEY WERE USING DIFFERENT

19   STANDARDS THAT WERE CALLED DIFFERENT THINGS.  AND

20   IF IBM HAD THE SAME NAMING CONVENTIONS AS INTEL

21   THEN MAYBE WE WOULDN'T HAVE THIS PROBLEM.  BUT THEY

22   DIDN'T CALL IT VGA 1.0, 2.0, 3.0.  THEY COULD HAVE,

23   BUT THEY GAVE THEM DIFFERENT NAMES FOR WHATEVER

24   MARKETING REASONS THEY WANTED TO.

25        BUT STILL, EVERYBODY KNOWS THAT THAT'S

1    WHAT DISPLAYLINK CALLS IT.  YOU CALL IT A VGA PLUG;

2    YOU CALL IT A VGA CABLE; YOU CALL IT A VGA SOCKET.

3    AND THEY, THEMSELVES --

4           THE COURT:  OKAY.  I GO HOME AND I SAY TO

5    MY WIFE, I HEARD SOME TESTIMONY TODAY AND ARGUMENT

6    ABOUT WHAT VGA SOCKET IS OR VGA CONTROLLER IS OR

7    VGA DISPLAY IS, AND SHE SAYS TO ME, I UNDERSTAND

8    WHAT A CONTROLLER IS, I UNDERSTAND WHAT A SOCKET

9    IS, I UNDERSTAND WHAT A PLUG IS; WHAT DOES VGA

10   MEAN?

11          HOW DO YOU ANSWER THAT?

12          MR. CAULEY:  VGA, AS USED IN THE PATENT,

13   REFERS GENERICALLY TO ALL THE VIDEO STANDARDS THAT

14   YOU CAN DISPLAY ON A MONITOR THAT THE SIGNALS COME

15   OUT OF A COMPUTER THROUGH THAT SOCKET, THROUGH THAT

16   PLUG, THROUGH THAT CABLE, WHATEVER THEY ARE CALLED,

17   WHATEVER THEIR NAMES ARE.

18          THE COURT:  OKAY.  WHAT YOU JUST TOLD ME

19   IS MEANT BY ALL STANDARDS?

20          MR. CAULEY:  ALL OF THE STANDARDS THAT

21   ARE COMPATIBLE WITH THAT SOCKET, PLUG, CABLE.

22          THE COURT:  WHERE DO I FIND THAT

23   STANDARD?

24          MR. CAULEY:  THIS IS ANOTHER ONE WHERE AS

25   LONG AS THERE IS A STANDARD -- I MEAN, THERE ARE

1    LISTS OF STANDARDS, THERE IS -- I MEAN I THINK

2    WE'VE IDENTIFIED YOU KNOW, PERHAPS, 6 OR 7

3    DIFFERENT NAMES FOR THOSE STANDARDS.

4              AND WHAT WE ARE SAYING IS THAT THE TERM

5    VGA, AS USED IN THE PATENT, REFERS GENERICALLY TO

6    ALL THE VIDEO STANDARDS.  IT'S A GENERIC TERM YOUR

7    VIDEO STANDARDS.

8              THE COURT:  WHAT'S A VIDEO STANDARD?

9              MR. CAULEY:  IT'S A STANDARD FOR THE DATA

10   THAT COMES OUT OF A COMPUTER THAT'S TRANSMITTED

11   THROUGH THE SOCKET, THROUGH THE PLUG, TO THE CABLE,

12   TO THE MONITOR, IN A WAY THAT CAN BE DISPLAYED ON

13   THE SCREEN AND COULD BE SEEN AT WHATEVER RESOLUTION

14   THESE SPECIFICATION WILL SUPPORT.

15             THE COURT:  SO IN OTHER WORDS, VGA MEANS

16   BASICALLY THE PHYSICAL COMMUNICATION ROUTE BETWEEN

17   THE COMPUTER AND THE DISPLAY?

18             MR. CAULEY:  VGA WOULD REFER TO ANY OF

19   THE STANDARDS THAT SUPPORT THE TRANSMISSION OF THAT

20   DATA.

21             THE COURT:  OKAY.  BUT WHEN YOU SAY

22   "STANDARDS," THAT IMPLIES THERE IS SOME STANDARD I

23   CAN LOOK AT OR KNOW WHAT IT IS.

24             MR. CAULEY:  YES.  THERE'S A SERIES OF

25   STANDARDS THAT ALL HAVE DIFFERENT NAMES.  AS

1        COUNSEL NOTED THERE IS SVGA AND XVGA AND QVGA.

2              THE COURT:  WHAT'S A STANDARD THAT'S NOT

3        A VGA STANDARD?

4              MR. CAULEY:  I'M NOT AWARE OF ONE,

5        YOUR HONOR.  THERE MAY BE SOME, BUT THE STANDARDS

6        THAT ARE COMPLIANT WITH THIS TECHNOLOGY, THIS

7        SOCKET, PLUG, CABLE, ALL WE WOULD SAY -- THAT'S

8        WHAT THE INVENTOR MEANT WHEN HE USED THE TERM VGA.

9              AND IF HE HAD MEANT TO MAKE THIS A VERY

10       NARROW PATENT AND IF HE HAD MEANT TO RESTRICT THIS

11       USB TO VGA CONVERTER TO THE ORIGINAL VGA STANDARD

12       IN 1988, WHICH WOULD BE PRETTY UNUSUAL AS DR. JONES

13       NOTES, IT WAS BARELY IN USE IN 2002, HE COULD HAVE

14       SAID THAT.

15             AND I THINK THAT IF WE ARE GOING SAY THAT

16       VGA HAS THAT VERY CONSTRICTED MEANING THAT, IT'S

17       GOT TO BE PRETTY CLEAR FROM THE PATENT THAT THAT'S

18       WHAT THE INVENTOR MEANT.

19             THE COURT:  I LOOK AT THE VGA STANDARD IN

20       '88 AND IT'S REFINED IN '91.  WHAT'S IT GOING TO BE

21       TITLED AND WHAT'S IT GOING TO DESCRIBE, IN GENERAL?

22             MR. CAULEY:  IT'S GOING TO DESCRIBE A

23       STANDARD THAT WILL SUPPORT A 640 BY 480 RESOLUTION.

24             THE COURT:  SO IT'S SUFFICIENT TO

25       COMMUNICATE FROM THE COMPUTER --

1           MR. CAULEY:  TO A MONITOR --

2           THE COURT:  -- ELECTRICAL SIGNALS THAT

3    WILL END UP WITH PIXELS OF THAT PARTICULAR SIZE.

4           MR. CAULEY:  OF THAT PARTICULAR

5    RESOLUTION, BUT NOT ANYTHING MORE THAN THAT.

6           THE COURT:  AND YOU ARE SAYING THAT

7    BASICALLY ANY COMMUNICATION FROM THE COMPUTER TO

8    THE DISPLAY THAT WOULD RESULT IN A DISPLAY OF

9    PIXELS IS--

10          MR. CAULEY:  AND, YOUR HONOR, I WILL JUST

11   NOTE BACK, AND I KNOW I'VE MENTIONED THIS NUMEROUS

12   TIMES, BUT IN COLUMN 3, LINES 64, TO COLUMN 4 LINE

13   2, IT SAYS THE USB TO VGA CONVERTER CAN WORK WITH

14   ANY COMPUTER SYSTEM RUNNING UNDER ANY OPERATION

15   SYSTEMS.

16          IF HE HAD MEANT THAT THIS ONLY WORKED

17   WITH A MONITOR THAT WAS GOOD TEN YEARS AGO, THEY

18   WOULD HAVE SAID THAT.  AND THIS IS -- THE INVENTOR

19   IS DESCRIBING HIS INVENTION BROADLY THAT IT WILL

20   WORK WITH ANY COMPUTER ANY OPERATING SYSTEM.  AND

21   THAT'S NOT -- AND I THINK WE ARE SUPPOSED TO BE

22   FIGURING OUT WHAT THE INVENTOR'S INTENT WAS IN

23   USING HIS TERM.

24          THE COURT:  AND I APOLOGIZE FOR BEING

25   DENSE, BUT BASICALLY IT SEEMS TO ME YOU ARE SAYING

1    THAT YOUR PATENT COVERS ANY CONVERTER THAT USES A

2    USB BUS FOR THE PURPOSE OF -- OR THAT INVOLVES

3    GETTING THE SIGNAL OR THE DATA FROM THE COMPUTER TO

4    THE MONITOR, SUCH THAT A PICTURE WILL BE DISPLAYED.

5         MR. CAULEY:  THAT'S CORRECT, YOUR HONOR.

6         AND TO GIVE REFERENCE TO THE TERM VGA,

7    THAT IT IF IT WERE -- IF THERE WERE STANDARDS THAT

8    COULD NOT BE DISPLAYED WITHOUT USING THIS

9    TECHNOLOGY, WITHOUT USING THE VGA SOCKET, PLUG,

10   CABLE, THEN I WOULD SAY THAT WOULDN'T BE COMPLIANT

11   WITH THIS.  IT WOULD HAVE TO BE ABLE TO BE

12   TRANSMITTED FROM THE COMPUTER TO THE MONITOR BY USE

13   OF VGA SOCKET, PLUG, CABLE.  WHETHER OR NOT THAT'S

14   BEING USED, IT'S -- THE VIDEO STANDARDS THAT ARE

15   COMPLIANT WITH THAT TECHNOLOGY, WHATEVER

16   RESOLUTION, WHATEVER IT'S CALLED.

17        THE COURT:  OKAY.  THEN I ASK:  WHAT KIND

18   OF PLUG OR SOCKET IS NEEDED TO GET THAT DATA FROM

19   THE COMPUTER TO THE DISPLAY?

20        MR. CAULEY:  WELL, IF YOU ARE USING THIS

21   INVENTION, EXCEPT IN THE EMBODIMENT THAT COUNSEL

22   NOTES IN FIGURE 6, THERE'S A VGA PLUG ON THE OTHER

23   END.  THERE'S A VGA SOCKET ON THE MONITOR AND IT

24   PLUGS IN.  THERE'S USB AT ONE END AND, VGA ON THE

25   OTHER END, AND IT HAS THE 15-PIN PLUG THAT PLUGS

1    INTO THE MONITOR.

2              AND SO, THAT'S IN FACT, WHAT IT'S USING.

3    IN THE EMBODIMENT IN FIGURE 6 YOU'VE GOT A USB AT

4    BOTH ENDS BECAUSE THE INVERTER IS PHYSICALLY INSIDE

5    THE MONITOR.  BUT IT'S STILL THE SAME KIND OF

6    SIGNALS, THEY COULD GO THROUGH USING THE 15-PIN.

7              THE COURT:  THE ONE THAT'S INSIDE, DOES

8    THAT USE PINS?

9              MR. CAULEY:  IT DOESN'T USE PINS.  IT

10   DOESN'T KNOW WHETHER IT'S USING PINS OR NOT.  IT'S

11   COMPATIBLE WITH THE PLUG, SOCKET, CABLE THAT'S

12   USING PINS.  THE SIGNALS DON'T KNOW WHAT THEY ARE

13   GOING THROUGH PINS OR NOT.

14             MR. YOON:  JUST BRIEFLY, YOUR HONOR.

15             I THINK COUNSEL HAS ESTABLISHED WHY THEIR

16   CONSTRUCTION IS INDEFINITE.  IT COVERS ALL VIDEO

17   STANDARDS THAT, THEORETICALLY, ARE COMPATIBLE WITH

18   AN ALLEGED VGA PIN OR PLUG EVEN IF YOU DON'T USE

19   IT.

20             SO IF YOU HAVE A STANDARD THAT SOMEONE

21   COULD MAKE WORK WITH THE VGA PLUG, BECAUSE YOU

22   DON'T HAVE TO USE IT FOR THE CLAIMS, THEY CLAIM

23   IT'S COVERED.

24             THE REALTY IS, YOUR HONOR, IS THAT THEY

25   DRAFTED THE PATENT.  THEY SAID "VIDEO GRAPHICS

1      ARRAY."  IT IS UNDISPUTED -- THIS PART IS

2      COMPLETELY UNDISPUTED, AT LEAST ONE MEANING OF

3      VIDEO GRAPHICS ARRAY IS THE IBM SPECIFICATION THAT

4      SETS IT FORTH.  THAT IS THE ORIGIN OF IT.

5              OTHER THAN THE TESTIMONY OF DR. MIN,

6      WHICH COUNSEL SAID AT THE BEGINNING OF HIS OPENING

7      REMARKS YOU SHOULDN'T GIVE WEIGHT TO EXPERT

8      TESTIMONY -- OTHER THAN THE TESTIMONY OF DR. MIN,

9      THEY DON'T HAVE ANY EVIDENCE, YOUR HONOR, THAT THE

10     TERM, YOU KNOW, AT THE FILING DATE OF THE PATENT,

11     THAT THE TERM "VIDEO GRAPHICS ARRAY" WOULD BE

12     UNDERSTOOD BY A PERSON OF ORDINARY SKILL IN THE

13     ART, TO MEAN EXTENDED GRAPHICS ARRAY.

14              IN FACT, YOUR HONOR, IT'S VERY CLEAR WHAT

15     THEY ARE DOING.  THEY ONLY TRY TO SAY THAT VGA

16     MEANS SOMETHING.  VGA SOMEHOW BECOMES A GENERIC

17     TERM.  BUT THE PATENT DIDN'T JUST SAY VGA, IT SAID

18     VIDEO GRAPHICS ARRAY.  AND THE ONLY EVIDENCE THEY

19     ARE OFFERING IS THE RESULTS-ORIENTED EVIDENCE OF

20     THEIR EXPERT.

21              AND THE OTHER THING I WOULD POINT OUT,

22     YOUR HONOR, IT'S INTERESTING THE ONLY OTHER

23     EVIDENCE THEY CAN FIND IS A 2008 WEBSITE SHOT

24     WRITTEN BY SOMEONE FROM MARKETING WHO NEVER READ

25     THE PATENT AND IS NOT A PERSON OF ORDINARY SKILL IN

1    THE ART.

2              THE REALTY IS THAT THE ONLY DOCUMENTED

3    EVIDENCE AND THE UNDISPUTED TESTIMONY SHOWS THAT

4    VIDEO GRAPHICS ARRAY WAS THE TECHNOLOGY CREATED BY

5    IBM IT'S IN A SPECIFICATION OF 1991.  THAT

6    SPECIFICATION IS DATED AFTER SVGA AND XGA, AND THAT

7    THE PURPOSE OF A PATENT IS TO PUT THE PUBLIC ON

8    NOTICE AS TO THE BOUNDARIES OF THE CLAIMS.

9              AND I BELIEVE COUNSEL CLEARLY

10   DEMONSTRATED THERE ARE NO BOUNDARIES TO WHAT THEY

11   ARE TRYING TO CLAIM.

12             THE COURT:  SO I TAKE IT YOU USE SVGA OR

13   ONE OF THOSE IN YOUR PRODUCT, AND THEREFORE YOU

14   DON'T FEEL YOU INFRINGE?

15             MR. YOON:  WELL, YOUR HONOR, THERE ARE

16   TWO ISSUES.  MAYBE YOU HAVE A FLAT SCREEN TV AT

17   HOME.  THEY HAVE WHAT THEY CALL HDMI CONNECTORS.

18   THE VGA CONNECTOR WAS AN ANALOG ONE.

19             SO THERE ARE TWO ISSUES HERE, YOUR HONOR.

20   THE WAY THEIR CONSTRUCTION WORKS IS YOU DON'T HAVE

21   TO USE THE VGA PLUG.

22             SECOND, YOUR HONOR, WE DO HAVE SOME

23   PRODUCTS BUT NOT ALL PRODUCTS, THAT DO USE THE

24   15-PIN PLUG THAT THE PATENT HOLDER SAYS IS

25   INFRINGING.  BUT YOU CAN SEE WHAT THEY ARE TRYING

1    TO DO, THEY ARE TRYING REMOVE THE REQUIREMENT THAT

2    YOU ACTUALLY USE THE 15-PIN PLUG.  WE UNDISPUTEDLY

3    USE PLUGS THAT ARE NOT VGA PLUGS; THEY ARE NOT THE

4    15-PIN PLUG

5            THE COURT:  I TAKE IT YOU DON'T USE THE

6    VGA STANDARD AS DEFINED BY IBM IN 1998 AND -- 1988

7    AND 1991.

8            MR. YOON:  YOUR HONOR, TO BE VERY FAIR

9    BECAUSE I AM MAKING A REPRESENTATION TO THE COURT,

10   IT'S MY UNDERSTANDING THAT WE DO HAVE PRODUCTS THAT

11   WILL SUPPORT THE ORIGINAL IBM SPEC DEPENDING ON

12   WHICH TYPE OF DEVICE THEY'RE CONNECTING TO.

13           BUT, YOUR HONOR, I WOULD REALLY LIKE TO

14   CHECK THAT WITH MY CLIENT.  I DON'T WANT TO MISLEAD

15   THE COURT.  THAT'S BASED ON MY UNDERSTANDING, BUT I

16   WOULD LIKE TO DOUBLE CHECK IF YOU WOULD LIKE.

17           THE COURT:  NO, THAT'S ALL RIGHT.  OKAY.

18   LET'S MOVE ON.

19           MR. CAULEY:  I DON'T THINK DISPLAY DEVICE

20   IS GOING TO --

21           I THINK I ACTUALLY WANTED TO MENTION ONE

22   THING ABOUT, WHICH IS PRETTY MUCH THE SAME POINT I

23   WANTED TO MAKE WITH REGARD TO DISPLAY DEVICE, THAT

24   COUNSEL MENTIONED VGA SIGNALS.  AND WE, I THINK

25   WITH REGARD TO DISPLAY DEVICE, I THINK WE ARE OKAY

1    WITH THEIR DEFINITION THAT VGA IS DEFINED THE WAY

2    WE BELIEVE IT SHOULD BE DEFINED WHICH IS

3    GENERICALLY.

4         SO I DON'T THINK THERE IS -- OTHER THAN

5    THE DEFINITION OF VGA -- THERE'S REALLY THAT MUCH

6    OF A DIFFERENCE BETWEEN THE TWO DEFINITIONS.

7         SO I THINK IN TERMS OF THE VGA SIGNALS,

8    CERTAINLY OUR AGREEMENT TO THAT WAS DEPENDENT UPON

9    OUR DEFINITION OF VGA BEING ACCEPTED.

10        SO THE WAY WE DEFINE VGA SIGNALS WAS VGA

11   SIGNALS THAT WOULD COMPLY WITH THE GENERIC VIDEO

12   STANDARDS.  SO DISPLAY DEVICE, WE WOULD BE OKAY

13   WITH ELECTRONIC DEVICE FOR VISUALLY REPRESENTING

14   VGA SIGNALS IF VGA IS DEFINED THE WAY WE THINK IT

15   SHOULD BE, WHICH IS GENERICALLY.

16        SO I THINK DISPLAY DEVICES DISPLAYING

17   THOSE KINDS OF SIGNALS.  I'M NOT SURE HOW MUCH OF A

18   DISPUTE THERE IS ABOUT THIS TERM AS OPPOSED TO THIS

19   IS REALLY ANOTHER ROUND OF VGA.

20        MR. YOON:  YEAH I THINK, YOUR HONOR,

21   THAT'S A FAIR ASSESSMENT.

22        THE ONE THING, YOUR HONOR, I KNOW FROM

23   PREVIOUS DISCUSSIONS WITH THE COURT, YOU LIKE TO,

24   IN THE CLAIM CONSTRUCTION, AT SOME POINT, ADDRESS

25   THE ISSUES THAT REALLY MATTER FROM THE STANDPOINTS

1    OF INFRINGEMENT AND VALIDITY.  AND WE ARE OF

2    LIMITED TIME.

3            I BELIEVE FROM MY CLIENT'S STANDPOINT WE

4    WOULD LIKE TO TALK ABOUT USB-BASED DISPLAY SIGNALS.

5    THAT'S THE TERM WE WOULD LIKE TO ADDRESS NEXT

6    BECAUSE WE ONLY HAVE ABOUT 15 MINUTES.

7            THE COURT:  DO YOU AGREE THAT THAT'S ONE

8    OF THE CRITICAL TERMS OR NOT?  OR IS THERE ONE YOU

9    ARE PARTICULARLY CONCERNED ABOUT?

10           MR. CAULEY:  I THINK IF WE COULD GO

11   THROUGH THEM, JUST TO NOTE, I THINK I CAN COVER THE

12   NEXT TERMS PRETTY QUICKLY.

13           THE COURT:  OKAY.  GO FOR IT.

14           MR. CAULEY:  I JUST WANTED TO FOR USB

15   CONTROLLER, I THINK I STATE THIS PRETTY CLEARLY,

16   THAT THE TERMS STORAGE, ROUTING, ENCODED, DON'T

17   APPEAR ANYWHERE IN THE PATENT.  THEY ARE TERMS THAT

18   WERE MADE UP BY DR. JONES THAT THEY DON'T -- WE

19   DON'T KNOW WHAT THEY MEAN.  THEY ARE NOT ANYWHERE

20   IN THE PATENT.  WE WOULD HAVE TO, ESSENTIALLY,

21   RE-MARKMAN THEM IF THEY WERE INCLUDED IN THE

22   DEFINITION.

23           ENCODED IS NOT IN THE PATENT.  THE TERM

24   CONTROL IS PULLED OUT OF THE TERM CONTROLLER.  IT

25   DOESN'T DESCRIBE -- IT DOESN'T DESCRIBE WHAT THEY

1    DO.  BASICALLY, THE ONLY THING THE USB CONTROLLER

2    DOES IS IT CONNECTS TO USB PORT, ISSUES A BUS

3    CONTROL COMMAND, SENDS A USB-BASED DISPLAY SIGNAL

4    TO THE BRIDGE.

5           YOU KNOW, THAT'S ALL IT DOES.  IT DOESN'T

6    DO ANY OF THESE OTHER THINGS.  IT ISN'T LIMED TO A

7    DEVICE THAT -- CONTROL, RECEIPT, STORAGE ROUTING,

8    ENCODED.  THOSE TERMS AREN'T IN THE PATENT; WE

9    DON'T THINK THEY BELONG IN THE DEFINITION.

10          MR. YOON:  YOUR HONOR, COULD I HAVE SLIDE

11   37 ON THE SCREEN.  A COUPLE OF THINGS YOUR HONOR.

12          FIRST OF ALL, COUNSEL SEEMS TO MAKE A BIG

13   DEAL ABOUT CERTAIN TERMS NOT APPEARING IN THE

14   PATENT.  THEIR CONSTRUCTION COMMUNICATES THAT WORD

15   DOESN'T APPEAR IN THE PATENT EITHER.

16          THE ISSUE YOUR HONOR, IS WHAT'S

17   CONSISTENT WITH THE LANGUAGE OF THE CLAIMS AND THE

18   SPECIFICATIONS.  AND IT IS VERY CLEAR THAT THE

19   TERMS ROUTING, STORAGE AND RECEIPT, ARE BASED ON

20   THE CLAIMS AND SPECIFICATIONS OF THE '788 PATENT

21   THEY PROVIDE CLARITY AS TO WHAT FUNCTION HAPPENS IN

22   A USB CONTROLLER.

23          MR. YOON:  BILL, COULD I HAVE THE

24   LANGUAGE OF CLAIM 1 ON THE SCREEN, WHICH IS SLIDE

25   39.

1          YOUR HONOR, CLAIM 1 CITES A USB

2     CONTROLLER.  THAT CONTROLLER'S FIRST FUNCTION IS TO

3     RECEIVE EXCLUSIVELY THERE THROUGH USB-BASED DISPLAY

4     SIGNALS.  SO THE FIRST FUNCTION IS THAT IT RECEIVES

5     THE USB-BASED DISPLAY SIGNALS.  THEN THE USB

6     CONTROLLER ISSUES A BUS CONTROL COMMAND.  THE BUS

7     CONTROL COMMAND IS WHAT YOU USE TO PASS INFORMATION

8     ON.  AND THEN AFTER IT ISSUES THE BUS CONTROL

9     COMMAND, THE USB CONTROLLER PROVIDES THE DATA,

10    USB-BASED DISPLAY SIGNALS, TO THE BRIDGE.

11         SO THE FIRST FUNCTION OF THE USB

12    CONTROLLER THAT IT ENGAGES IN ROUTING.  THAT'S IN

13    THE PLAIN LANGUAGE OF THE CLAIM.  IT GETS IT FROM

14    THE HOST COMPUTER.  IT THEN CONTROLS THE ROUTING BY

15    ISSUING THE BUS CONTROL COMMAND, AND THEN IT

16    FORWARDS IT TO THE BRIDGE.

17         IN RESPONSE TO A SIGNAL FROM THE BRIDGE,

18    WHICH IS A FIRST IN FIRST OUT SIGNAL.  AS YOUR

19    HONOR KNOWS AND IT'S UNDISPUTED THAT FIRST-IN

20    FIRST-OUT IS SOMETIMES REFERRED TO AS FIFO.  FIFO

21    IS A STORAGE CONCEPT.  SO WHAT HAPPENS IN THE PLAIN

22    LANGUAGE OF THE CLAIM IS THAT THE USB CONTROLLER

23    RECEIVES THE DISPLAY SIGNAL.  IT HOLDS IT, STORES

24    IT, UNTIL IT GETS THE FIFO CONTROL SIGNAL FROM THE

25    BRIDGE, AT WHICH TIME IT THEN FORWARDS THE SIGNAL

1    TO THE BRIDGE.  SO WE'VE SEEN ROUTING AND WE'VE

2    SEEN STORAGE, AND NOW LET'S TAKE A LOOK AT

3    ENCODING.

4         NOW, MCT SEEMS TO MAKE A BIG DEAL -- IF I

5    COULD HAVE MCT SLIDE 16, WHICH WAS THE SLIDE THAT

6    COUNSEL JUST SHOWED WHERE HE KEPT SAYING ENCODING

7    IS NOT IN THE '788 PATENT.  BUT YOUR HONOR HEARD ON

8    THE STAND -- IF I COULD HAVE DR. MIN'S DEPOSITION

9    TESTIMONY AT 162 -- THIS IS VOLUME 1, YOUR HONOR,

10   LINES 2 TO 14.

11        "QUESTION:  DO YOU HAVE AN UNDERSTANDING

12   OF WHAT USB BASED DISPLAY SIGNALS MEANS?

13        "ANSWER:  OH, SURE.  YEAH.  I MEAN, YOU

14   KNOW, USB-BASED IN THIS CASE IS LIKE WHAT

15   DR. JONES, OUR EXPERT, SAID.  IT WOULD BE THE DATA

16   THAT CAN BE COMMUNICATED OVER THE USB INTERFACE.

17   SO THE SIGNAL HAS TO BE ENCODED ACCORDING TO THE

18   USB STANDARD."

19        AND DR. MIN CONFIRMED THAT A USB-BASED

20   DISPLAY SIGNAL, WHICH THE CLAIM TALKS ABOUT, IS A

21   USB ENCODED SIGNAL.

22        MR. YOON:  IF I COULD HAVE SLIDE 57 ON

23   THE SCREEN.

24        YOUR HONOR, THIS IS PARAGRAPH 46 OF

25   DR. JONES' DECLARATION.

1         "ANY SIGNAL PASSED THROUGH A USB PORT OF

2    A COMPUTER THAT IS NOT USB ENCODED, WOULD BE MORE

3    THAN LIKELY BE UN-USEABLE BY THE RECEIVING

4    PROCESSES."

5         IT'S UN DISPUTED BY THE EXPERTS IN THIS

6    CASE, YOUR HONOR, THAT A USB BASED DISPLAY SIGNAL

7    IS, IN FACT, A USB ENCODED SIGNAL.

8         SO BILL, IF I COULD HAVE SLIDE 39 ON THE

9    SCREEN.

10        SO WITHOUT EVEN LEAVING CLAIM 1,

11   YOUR HONOR, WE SEE HOW THE USB CONTROLLER ROUTES

12   THE USB-BASED DISPLAY SIGNAL, WHICH IS A USB

13   ENCODED SIGNAL, FROM THE HOST COMPUTER TO THE

14   BRIDGE, AND IT DOES SO IN RESPONSE TO THE FIFO

15   COMMAND WHICH INDICATES THAT THE USB CONTROLLER IS

16   STORING IT.  IT'S FOUND RIGHT IN THE LANGUAGE OF

17   THE CLAIMS AND THAT THE TERM HAS BEEN CONFIRMED BY

18   MCT'S OWN EXPERT.

19        IF I COULD HAVE SLIDE 42 ON THE SCREEN.

20   OH, ACTUALLY, WHY DON'T WE SKIP THAT ONE WE DON'T

21   HAVE MUCH TIME.  GO TO SLIDE 43.

22        YOUR HONOR, THE OTHER ISSUE IS IF YOU

23   LOOK AT THE CONSTRUCTION THAT MCT HAS, IT'S ANOTHER

24   ATTEMPT TO COVER ANYTHING AND BROADEN THE CLAIM.

25        MCT SAYS THE USB CONTROLLER IS ANYTHING

1        THAT COMMUNICATES WITH THE HOST AND COMMUNICATES

2        WITH THE BRIDGE.  IT BASICALLY TAKES THE WORD

3        "CONTROLLER" OUT OF "USB CONTROLLER."  A CONTROLLER

4        IS AN ACTIVE DEVICE THAT CONTROLS.  THAT'S WHY IT'S

5        CALLED THE CONTROLLER.  AND IT CONTROLS THE

6        ROUTING, STORAGE OF THE INFORMATION.  AND THIS WAS

7        CONFIRMED BY DR. MIN AT HIS DEPOSITION AT VOLUME 2,

8        PAGE 235, LINES 6 TO 11.

9                DR. MIN AGREED THAT SOMEONE IN THE

10       ORDINARY SKILL IN THE ART WOULD TYPICALLY CONSIDER

11       A CONTROLLER TO BE ACTIVE DEVICE, SOMETHING THAT

12       CONTROLS SOMETHING, AS OPPOSED TO A PASSIVE ONE

13               MR. YOON:  THANK YOU, YOUR HONOR.

14               THE COURT:  IF I UNDERSTAND IT CORRECTLY,

15       WHY WOULDN'T A USB CONTROLLER BE A CONTROLLER THAT

16       RECEIVES A USB DISPLAY SIGNAL, HOLD IT UNTIL IT

17       RECEIVES A COMMAND AND THEN ISSUES -- UNTIL IT

18       RECEIVES A COMMAND, A BUS CONTROL COMMAND, AND THEN

19       FORWARD ITS OUT ON A FIFO BASIS?

20               MR. YOON:  I THINK, YOUR HONOR, THAT'S

21       WHAT THE CLAIM REQUIRES.  WE DON'T HAVE A DISPUTE

22       WITH THAT, PROVIDED IT'S ACTUALLY A CONTROLLER.

23       IT'S DOING THE CONTROL FUNCTION.

24               WHAT THE PLAINTIFF WANTS TO DO IS REMOVE

25       THE WORD "CONTROL" FROM "CONTROLLER" AND SAY,

1    ANYTHING THAT I CAN SAY RECEIVES SOMETHING OR

2    SOMEHOW PASSES IT ON CONSTITUTES A CONTROLLER.  SO

3    I THINK THAT'S THE KEY DIFFERENCE, BUT FROM A

4    FUNCTION STANDPOINT, YOUR HONOR, I AGREE WITH YOU.

5    BUT THE KEY POINT IS A USB CONTROLLER IS ACTIVE

6    DEVICE.  IT IS A CONTROLLER, AS OPPOSED TO

7    SOMETHING THAT MERELY COMMUNICATES.

8         THANK YOU, YOUR HONOR.

9         THE COURT:  ANYTHING FURTHER YOU WANT TO

10   SAY ON THAT?

11        MR. CAULEY:  YOUR HONOR, I THINK WE ARE

12   PRETTY MUCH OKAY WITH WHAT YOU SAID.

13        I THINK A USB CONTROLLER IS ADEQUATELY

14   DESCRIBED IN THE CLAIM AS TO WHAT IT DOES.  SO,

15   AGAIN, PRETTY MUCH FOLLOW THE LANGUAGE OF THE

16   CLAIM.

17        THE COURT:  YOU ARE MORE CONCERNED WITH

18   HIS USE OF TERMS LIKE "ENCODED"?

19        MR. CAULEY:  YES, YOUR HONOR.

20        THE COURT:  NOT KNOWING WHAT THOSE MEAN

21   FOR SURE.

22        MR. CAULEY:  YES.

23        THE COURT:  OKAY.

24        MR. CAULEY:  YOUR HONOR, I AM WILLING TO

25   SKIP OVER VGA CONTROLLER AND USB DISPLAY SIGNAL.

1   THE ONE I'M CONCERNED ABOUT IS THE ONE AFTER THE

2   ONE THAT MR. YOON WANTS WHICH IS THE "FOR RECEIVING

3   EXCLUSIVELY THERETHROUGH USB BASED DISPLAY

4   SIGNALS."  SO I THINK IF WE COULD DO THOSE TWO.

5            THE COURT:  MR. YOON, YOU COULD GO FIRST

6   THEN AND WE WILL GO WITH YOURS.

7            MR. YOON:  WE'VE HAD THE ORDER, COUNSEL

8   GOES FIRST.  WE CAN END IT AFTER THESE TWO TERMS,

9   YOUR HONOR, IT WOULD BE FINE WITH US.

10           MR. CAULEY:  IT WOULD BE FINE WITH US.

11           SO WE WILL JUST DO -- DO YOUR NEXT ONE

12           MR. CAULEY:  SO, SLIDE 22.  AND I THINK

13   IF YOU COULD JUST GO BACK TO SLIDE 20, BECAUSE

14   BASICALLY WHAT WE HAD WAS USB-BASED DISPLAY

15   SIGNALS.  AND SO WE HAVE USB SIGNALS HANDLING

16   DISPLAY INFORMATION AND THEN ALL WE DID WAS -- GO

17   TO 22 -- WAS ADD "FROM THE COMPUTER" TO THAT.

18           WHAT DISPLAYLINK DID WAS, AGAIN, IMPORT

19   TERMS THAT I DON'T QUITE KNOW WHAT THEY MEAN.

20   REPRESENTING THE IMAGE RENDERED BY THE COMPUTER.

21   THERE IS NO TERM "RENDERED BY THE COMPUTER" IN THE

22   PATENT THAT -- I DON'T KNOW WHAT IT MEANS.  I THINK

23   IF THE COURT WERE TO USE THAT WE WOULDN'T KNOW WHAT

24   IT MEANT LATER.

25           I THINK IN THEIR PRESENTATION, IN THEIR

1    SLIDES, THEY REVISED THAT TO USE THE TERM "MAY HAVE

2    BEEN GENERATED," MEANING THAT IT WAS RENDERED,

3    MEANING IT WAS GENERATED FROM THE COMPUTER.

4             AND I DON'T HAVE ACCESS TO THEIR

5    SLIDES -- I WOULD LIKE SLIDE 60.

6             MR. YOON:  COULD YOU PUT SLIDE 60 ON THE

7    SCREEN, BILL.

8             MR. CAULEY:  I THINK THAT'S THE DISPUTE

9    HERE, WHETHER THE IMAGE TO BE DISPLAYED MUST BE

10   RENDERED BY THE COMPUTER OR WHETHER THE IMAGE COULD

11   BE GENERATED SOMEWHERE ELSE.

12            AND MY UNDERSTANDING OF WHERE THEY ARE

13   GETTING THAT FROM IS -- I THINK THIS IS SOMETHING

14   WE SAW BEFORE WHICH IS FIGURE 4.  FIGURE 4, IN

15   FACT, DOES DESCRIBE A GRAPHICS ENGINE INSIDE THE

16   COMPUTER GENERATING AN IMAGE, AND WE DON'T DISPUTE

17   THAT.  THAT THAT'S ONE OF THE EMBODIMENTS OF THE

18   INVENTION.  BUT THAT'S NOT THE ONLY EMBODIMENT OF

19   THE INVENTION.  THIS IS A CLASSIC READING OF THE

20   SPECIFICATION INTO THE CLAIMS.

21            WHAT THE CLAIM SAYS IS THAT IN THE

22   SUMMARY OF THE INVENTION, WHICH TALKS ABOUT THE

23   IMAGE, COLUMN 1, LINE 35 TO 36, TALKS ABOUT DISPLAY

24   DEVICE WHERE THE IMAGE TO BE DISPLAYED CAN BE

25   TRANSMITTED FROM THE HOST COMPUTER IN USB FORM.  IT

1    DOESN'T TALK ABOUT WHERE THE IMAGE COMES FROM.  AND

2    I'M NOT SURE WHERE COUNSEL IS GOING WITH THIS ON AN

3    INFRINGEMENT BASIS, BUT THERE IS NOTHING IN THE

4    CLAIMS -- THERE IS NOTHING IN THE SPEC THAT TALKS

5    ABOUT WHERE THE IMAGE COMES FROM.  THIS TALKS ABOUT

6    THE IMAGE COMING FROM THE COMPUTER, BUT IT DOESN'T

7    SAY WHERE THE IMAGE STARTED OUT.

8            YOU COULD, THEORETICALLY, HAVE AN IMAGE.

9    YOU COULD HAVE A VIDEO CAMERA THAT WAS ATTACHED TO

10   THE COMPUTER THAT WAS ATTACHED TO THE MONITOR

11   THROUGH THIS INVENTION.  AND I GUESS FROM

12   DISPLAYLINK'S PERSPECTIVE THAT WOULDN'T INFRINGE.

13           THERE'S NOTHING IN THE PATENT, OTHER THAN

14   ONE OF THE SPECIFIED EMBODIMENTS IN FIGURE 4, THAT

15   TALK TALKS ABOUT WHERE THE IMAGE IS GENERATED.  YOU

16   KNOW, CERTAINLY, IF IT WAS GENERATED INSIDE THE

17   COMPUTER, I WOULD SAY THAT WOULD INFRINGE, THAT'S

18   ONE OF THE EMBODIMENTS, BUT THERE'S NOTHING IN THE

19   PATENT THAT LIMITS IT TO THAT.

20           I THINK THAT'S THE REAL PROBLEM WITH

21   THEIR DEFINITION.  AND I THINK IF I UNDERSTAND THE

22   TERM "RENDERING" AS GENERATING, I THINK THERE'S

23   NOTHING IN THE PATENT THAT RESTRICTS THAT CLAIM TO

24   BEING A SITUATION WHERE THE IMAGE HAS TO HAVE BEEN

25   GENERATED BY THE COMPUTER.  AND I THINK THAT'S

1    REALLY MY UNDERSTANDING OF WHAT THE DISPUTE IS.

2            THE COURT:  SO INSTEAD OF RENDERED, IT

3    SAID, COMING FROM, YOU WOULD BE FINE.

4            MR. CAULEY:  COMING FROM, IF IT DIDN'T

5    RESTRICT IT TO WHERE IT STARTED OUT.  THAT'S

6    ESSENTIALLY WHAT THEY ARE SAYING IS THAT THE IMAGE

7    HAS TO START OUT IN THE COMPUTER.  AND I'M NOT EVEN

8    SURE WHAT THAT MEANS BECAUSE LIKE I SAID, IF I'VE

9    GOT ON I VIDEO CLIP FROM CNN RUNNING FROM A WEB

10   PAGE, WHERE IS THAT IMAGE GENERATED?  IS IT

11   GENERATED IN A CAMERA IN BAGHDAD COMING THROUGH

12   ATLANTA COMING THROUGH MY COMPUTER OR WHAT?

13           I THINK IT'S REALLY UNCLEAR, IT'S HARD TO

14   FIGURE OUT WHAT THEY ARE TALKING ABOUT, WHERE THIS

15   IMAGE WOULD BE GENERATED.  BUT THERE'S NOTHING IN

16   THE CLAIM, THERE'S NOTHING IN THE SPEC THAT

17   REQUIRES IT.  IT SIMPLY HAS TO COME FROM THE

18   COMPUTER.  WHERE IT STARTED OUT, THE CLAIM DOESN'T

19   TALK ABOUT IT OF.

20           AND IF I UNDERSTAND THEIR ARGUMENT

21   CORRECTLY, I THINK THAT'S WHAT OUR POSITION IS.

22           MR. YOON:  YOUR HONOR, COUNSEL MISSTATES

23   OUR ARGUMENT.

24           A COUPLE OF THINGS, YOUR HONOR, BEFORE WE

25   GET TO THE ISSUE.

1          BILL, IF I COULD HAVE JUST DR. MIN'S

2    DEPOSITION TESTIMONY AT VOLUME 1, 162, LINES 2 TO

3    14.

4          AND THAT WAS THE TESTIMONY, YOUR HONOR.

5    IT'S UNDISPUTED BY BOTH EXPERTS IN THIS CASE, FIRST

6    ALL, BECAUSE WE ARE GETTING TO THE "FROM THE

7    COMPUTER" PART, BUT SETTING UP THE BACKGROUND.

8    IT'S UNDISPUTED THAT THE A USB-BASED DISPLAY SIGNAL

9    IS A USB ENCODED SIGNAL.

10          AND BILL, IF YOU COULD PUT ALSO SLIDE 57

11    UP WHICH IS WHAT WE LOOKED AT BEFORE IN PARAGRAPH

12    46 WHERE DR. JONES EXPLAINED WHY IT NEEDED TO BE A

13    USB ENCODED SIGNAL SO THAT IT COULD BE USED.

14          NOW, GOING TO SLIDE 60, PLEASE.

15          YOUR HONOR, THE KEY HERE IS, YOUR HONOR,

16    WHEN COUNSEL TALKS HE SAYS NOTHING IS IN THE CLAIMS

17    AND NOTHING IS IN THE SPECS, BUT HE NEVER SHOWED

18    YOU THE CLAIMS OR THE SPECS.

19          DISPLAYLINK'S CONSTRUCTION IS FULLY

20    SUPPORTED BY THE PATENT.  WE SAY USB ENCODED

21    SIGNALS REPRESENTING THE IMAGE RENDERED BY THE

22    COMPUTER.  IN OUR BRIEFING TO YOU, YOUR HONOR, YOU

23    SAID "RENDERED BY THE COMPUTER" MEANS THAT THE

24    COMPUTER DISPLAYS THE IMAGE THAT IT WANTS DISPLAYED

25    ON THE SCREEN AND THEN IT SENDS IT OVER THE

1    CONNECTION TO BE DISPLAYED TO THE SCREEN.  THAT'S

2    WHAT "FROM THE COMPUTER" MEANS, THAT THE IMAGE THAT

3    WAS GENERATED THAT SENT AS A USB-BASED DISPLAY

4    SIGNAL COMES FROM THE COMPUTER.  THE COMPUTER SAYS,

5    THIS IS WHAT I WANT TO SHOW ON THE SCREEN.

6              AND HERE'S A KEY ISSUE, YOUR HONOR.  IN

7    THE PARTIES PAPERS -- MCT MADE A BIG DEAL.  WELL,

8    FOR EXAMPLE, A JPEG FILE, FOR EXAMPLE, WOULD NOT BE

9    CONSIDERED AN IMAGE BY DR. JONES, AND I THINK

10   THAT'S A KEY POINT.

11             A JPEG FILE OR AN MPEG FILE THAT I JUST

12   TRANSMIT TO STORE ON MY DISK DRIVE AND I DON'T TURN

13   INTO AN IMAGE, NO, THAT'S NOT AN IMAGE AND THAT'S

14   NOT A DISPLAY SIGNAL.  AND THAT'S WHAT'S WRONG WITH

15   THEIR DEFINITION.

16             THEY SAY DISPLAY INFORMATION, AS OPPOSED

17   TO THE ACTUAL IMAGE BEING GENERATED, AND THAT IS

18   WHAT'S CLEAR FROM THE CLAIMS AND THE SPECIFICATION.

19             BILL, IF I COULD HAVE SLIDE 62 WHICH IS

20   THE LANGUAGE OF THE CLAIM.

21             YOUR HONOR, THE CLAIM BEGINS THAT THIS IS

22   A USB TO VGA CONVERTER, INTERCONNECTING THROUGH A

23   USB PORT OF A COMPUTER, A DISPLAY DEVICE CONTROLLED

24   BY THE COMPUTER.  SO THE PURPOSE OF THIS DEVICE IS

25   TO TAKE A USB-BASED DISPLAY SIGNAL, CONVERT IT INTO

1    A VGA DISPLAY SIGNAL THAT WILL THEN BE SHOWN ON THE

2    DISPLAY DEVICE CONNECTED BY THE COMPUTER.  SO THE

3    COMPUTER CREATES AN IMAGE AND SAYS, I WANT IT ON

4    THE SCREEN.

5              AND THAT'S WHAT THE CLAIM TALKS ABOUT

6    HERE.  BASICALLY, YOU HAVE A USB CONTROLLER

7    DISPOSED EXTERNAL TO THE COMPUTER AND ADAPTED TO

8    DETACHABLY CONNECT TO A USB PORT OF THE COMPUTER

9    FOR RECEIVING EXCLUSIVELY THERETHROUGH USB-BASED

10   DISPLAY SIGNALS FROM THE COMPUTER.

11             SO WHAT DOES THE CLAIM SAY THAT'S SET BY

12   THE COMPUTER?  USB-BASED DISPLAY SIGNALS.  AND WHAT

13   HAPPENS TO THOSE SIGNALS, YOUR HONOR?  WHAT HAPPENS

14   IS THOSE SIGNALS ARE CONVERTING THE USB-BASED

15   DISPLAY SIGNALS INTO THE CORRESPONDING VGA SIGNALS

16   AND FORWARDING THE VGA SIGNALS TO THE VGA

17   CONTROLLER WHICH APPLIES THOSE SIGNALS TO THE

18   DISPLAY DEVICE.

19             SO THERE'S A DIRECT CONVERSION FROM THE

20   SIGNAL RECEIVED FROM THE COMPUTER INTO THE SIGNAL

21   UNDERSTOOD BY THE DISPLAY DEVICE.  THAT'S WHAT THE

22   CLAIM IS TALKING ABOUT.

23             AND IF YOU GO TO THE NEXT SLIDE WHICH IS

24   SLIDE 64.

25             THE COURT:  LET ME STOP YOU FOR A MOMENT.

119

1          I TAKE MY DIGITAL CAMERA AND LOAD THE

2    PICTURES ONTO MY COMPUTER

3          MR. YOON:  YES, YOUR HONOR.

4          THE COURT:  AND I LOOK AT THEM ON THE

5    COMPUTER.

6          MR. YOON:  OKAY.

7          THE COURT:  HAVE I DONE WHAT YOU ARE

8    TALKING ABOUT, OR NOT?

9          MR. YOON:  YES, YOUR HONOR, BUT LET'S BE

10   CLEAR.  WHEN YOU DID IT, BECAUSE I THINK THAT'S THE

11   NUB OF THE DISPUTE, YOU HAVE ON YOUR COMPUTER YOUR

12   "MY PICTURES."  YOU GO TO WINDOWS, YOU CLICK "MY

13   PICTURES," AND THEN IT OPENS UP.

14         THE COURT:  RIGHT.

15         MR. YOON:  AND IT CREATES THE IMAGE.

16   THAT IMAGE IS CREATED BY THE COMPUTER AND THEN SENT

17   OVER THE CABLE AND SHOWN ON YOUR MONITOR.

18         THE COURT:  RIGHT.

19         MR. YOON:  WE WOULD SAY THAT THAT'S WHAT

20   WE MEAN BY RENDERED BY THE COMPUTER, SAYING, HERE'S

21   THE INSTRUCTIONS FOR SHOWING IT ON THE SCREEN;

22   THAT'S WHAT WE SAY.  THEY SAY IT'S SOME DISPLAY

23   INFORMATION.  THAT'S WHAT THE FUNDAMENTAL RUB IS.

24         AND IF YOU GO BACK, BILL, TO SLIDE 60.

25         THE TERM "FROM THE COMPUTER" HAS TO HAVE

1    SOME MEANING.  INSTEAD OF ACTUALLY TELLING YOU WHAT

2    IT MEANS, YOUR HONOR, THEY JUST ADD IT TO THE END.

3    THEY JUST GO FROM THE COMPUTER THERE.

4         THEY IGNORE THE CLAIM AND THEY IGNORE THE

5    SPECIFICATION.  THE CLAIMS AND THE SPECIFICATION

6    MAKE VERY CLEAR, YOUR HONOR, WHAT THAT IS, IS THAT

7    THE COMPUTER GENERATES THE IMAGE TO BE DISPLAYED BY

8    THE MONITOR THAT'S SENT OVER THE USB.

9         THE COURT:  WITH MY PICTURE EXAMPLE, TELL

10   ME WHAT WOULD NOT BE -- WHAT WOULD NOT MEET THIS

11   LANGUAGE.

12        MR. YOON:  THE JPEG FILE ITSELF, IN

13   UNOPENED FORM, WOULD NOT MEET THAT LANGUAGE BECAUSE

14   IT'S NOT AN IMAGE TO BE DISPLAYED, YOUR HONOR.

15        THE COURT:  IT'S NOT AN IMAGE BECAUSE?

16        MR. YOON:  IT'S NOT OPENED UP.  IT HASN'T

17   BEEN CREATED BY THE COMPUTER.  YOU STORE A FILES --

18   FOR EXAMPLE, I STORE A JPEG FILE AND IT'S STORED IN

19   JPEG FORMAT.  AND THEN MY COMPUTER'S OPERATING

20   SYSTEM OR DRIVER HAS A PROGRAM FOR CONSTRUCTING

21   FROM THAT FILE, AN ACTUAL IMAGE.

22        THE IMAGE WHICH THEN IS -- BILL IF YOU

23   COULD SHOW FIGURE 4.

24        THE COURT:  SO IF I JUST GOT A LIST OF MY

25   JPEG FILES --

1          MR. YOON:  RIGHT.

2          THE COURT:  -- AND THAT SHOWED UP ON THE

3    SCREEN, THAT WOULD OR WOULD NOT BE.

4          MR. YOON:  WELL, WHAT'S ON YOUR SCREEN IS

5    OBVIOUSLY AN IMAGE, YOUR HONOR, BUT THE REFERENCE

6    TO THE FILES ITSELF, THE FILES THAT ARE STILL

7    RESIDING ON YOUR HARD DRIVE OR SOMETHING, THAT

8    WOULD NOT BE DISPLAY INFORMATION.  THAT WOULD NOT

9    BE A USB ENCODED DISPLAY SIGNAL IN LIGHT OF THE

10   PATENT.  IT WOULD HAVE TO BE WHAT'S ACTUALLY

11   DISPLAYED BY THE MONITOR.  THE COMPUTER GENERATES

12   AN IMAGE, A PICTURE OF WHAT WOULD BE DISPLAYED, AND

13   THEN IT'S TRANSMITTED BY THE USB.

14          SO THAT IS WHAT WE SAY CLEARLY IS "FROM

15   THE COMPUTER" MEANS, THAT THE IMAGE TO BE SHOWN ON

16   THE MONITOR WAS GENERATED OR RENDERED BY THE

17   COMPUTER.

18          AND THEN BILL, IF YOU COULD PUT FIGURE 4

19   ON THE SCREEN, PLEASE.

20          JUST TO GIVE YOU AN EXAMPLE, YOUR HONOR,

21          SO YOUR HONOR, YOU SEE THAT THE PATENT --

22   THIS IS THE ONLY DISCLOSURE IN THE PATENT -- IS

23   THAT THE APPLICATION, THIS IS YOUR JPEG FILE,

24   YOUR HONOR, SAYS, I WANT TO REQUEST A DISPLAY; I

25   WANT TO SHOW A PICTURE OF ONE OF MY THREE

1    DAUGHTERS, FOR EXAMPLE, YOUR HONOR.  THEN THE HOST

2    COMPUTER NEGOTIATES THE DISPLAY CONTROL FUNCTION

3    THEN THE GRAPHIC ENGINE GETS STARTED.  THE GRAPHIC

4    DRIVER THEN GETS STARTED SO THAT, VIRTUALLY, IN THE

5    MEMORY OF THE COMPUTER YOUR HONOR, IS THE PICTURE

6    THAT WILL BE DISPLAYED ON THE SCREEN.  THAT PICTURE

7    IS TRANSMITTED VIA THE USB INTERFACE.  THIS IS THE

8    ONLY DISCLOSURE IN THE PATENT.

9         THE COURT:  OKAY.  SORRY TO BE DENSE

10   AGAIN, BUT LET'S ASSUME THAT I DON'T WANT TO LOOK

11   AT THE PICTURE OF MY DAUGHTER, BUT I JUST WANT TO

12   FIND OUT IF -- I CAN'T REMEMBER WHETHER I LOADED IT

13   INTO MY COMPUTER OR NOT, SO ALL I WANT TO DO IS

14   LIST WHAT I GOT.

15        MR. YOON:  RIGHT.  WE WOULD SAY THAT THAT

16   WOULD CERTAINLY NOT BE A USB-BASED DISPLAY SIGNAL

17   BECAUSE ALL THAT IS, IS INDEXING INFORMATION THAT

18   SOME OTHER SOFTWARE APPLICATION OF THE COMPUTER

19   GENERATES INTO AN IMAGE.

20        BUT YOUR HONOR, I THINK WE CAN CRYSTALIZE

21   WHAT THE DISPUTE ULTIMATELY IS BETWEEN THE PARTIES.

22        THE ISSUE HERE IS:  DOES THE CLAIM "FROM

23   THE COMPUTER" REQUIRE THE ACTUAL IMAGE TO BE

24   GENERATED BY THE COMPUTER OF WHICH, AS YOU SAW WITH

25   DR. MIN, THAT MEANS IT CAN'T BE XGA OR SVGA BECAUSE

1    YOU NEED SOME TYPE OF COMPRESSION OR SOME TYPE OF

2    OTHER PROGRAM.  IT'S JUST NOT ENOUGH BANDWIDTH IN

3    THE USB PLUG.

4           OR IF SOMEWHERE DOWN THE ROAD, THE USB

5    CABLE TRANSMITS SOME INFORMATION -- LET'S SAY PART

6    OF THE FILE, THE FILE YOU TALKED ABOUT YOUR HONOR,

7    WAS TRANSMITTED TO AN INTERMEDIATE DEVICE, AND THAT

8    INTERMEDIATE DEVICE GENERATED THE IMAGE, AND THEN

9    THAT WAS THEN FORWARDED TO A VGA MONITOR, RIGHT?

10   LET'S SAY THEY HAVE SOME INTERMEDIATE COMPUTER OR

11   PROCESSOR.  THEY WOULD SAY THAT FALLS WITHIN THE

12   SCOPE OF THE CLAIM.  WE SAY IT WOULD NOT,

13   YOUR HONOR

14           THE COURT:  OKAY.  I WILL LET YOU GO.

15           I THINK 22 MINUTES BEYOND WHEN I SAID I

16   WOULD SHUT OFF, BUT YOU HAVE ONE MORE YOU WANTED TO

17   COVER?

18           MR. CAULEY:  I JUST WANTED TO COVER IT

19   ORALLY.  I DON'T THINK IT WILL TAKE MORE THAN A

20   COUPLE OF MINUTES, IT'S MORE OF A GRAMMATICAL

21   ISSUE.

22           MR. CAULEY:  WE WILL FINISH THIS IN THREE

23   MINUTES.

24           SLIDE 23.  THIS IS REALLY A GRAMMATICAL

25   ISSUE.  THIS IS THE ISSUE OF WHETHER THE -- THIS IS

1    DESCRIBING THE USB CONTROLLER -- IT'S WHETHER THE

2    ONLY SIGNALS THAT COULD GO THROUGH A USB CONTROLLER

3    ARE USB-BASED DISPLAY SIGNALS, OR WHETHER THE USB

4    DISPLAY SIGNALS CAN'T GO ANY PLACE ELSE OTHER THAN

5    THROUGH A USB CONTROLLER.

6            SO BASICALLY, I THINK THE WAY THAT WE

7    READ IT I THINK IS, YOU KNOW, CERTAINLY

8    GRAMMATICALLY THE WAY THE SENTENCE IS SET UP, IS

9    THAT A USB CONTROLLER -- DISPOSED EXTERNAL TO THE

10   COMPUTER AND ADAPTED DETACHABLY CONNECTED TO THE

11   USB PORT OF THE COMPUTER FOR RECEIVING EXCLUSIVELY

12   THERETHROUGH USB-BASED DISPLAY SIGNALS.

13           AND I THINK WHAT THEY WANT IS THEY WANT

14   TO SWITCH AROUND EXCLUSIVELY AND THERETHROUGH.

15   THEY REALLY WANT TO MAKE IT FOR RECEIVING

16   THERETHROUGH EXCLUSIVELY USB-BASED DISPLAY SIGNALS.

17   AND IF IT READ THAT WAY, I WOULD AGREE WITH THEM.

18   THEY WANT TO MAKE IT THAT THE ONLY THING THAT COULD

19   GO THROUGH THE USB CONTROLLER IS EXCLUSIVELY

20   USB-BASED DISPLAY SIGNALS, NOTHING ELSE

21           THE COURT:  THIS MAY BE PRETTY WELL

22   COVERED IN THE BRIEFS.

23           MR. CAULEY:  AND THAT'S PRETTY WELL

24   COVERED IN THE BRIEF, BUT THIS IS ONE WAS IMPORTANT

25   TO US AND SO I JUST WANTED TO -- I DON'T THINK MY

1    SWITCHING OF THE TERMS WAS QUITE COVERED IN THE

2    BRIEFS; I WANTED TO MAKE THAT DISTINCTION.

3            MR. YOON:  LITERALLY, I WILL TRY TO KEEP

4    IT TO A MINUTE.  I JUST WANTED TO PUT ON THE

5    SCREEN, SLIDE 73.

6            AND BILL, WOULD YOU BLOW UP THE BIG PART.

7            THE KEY ISSUE HERE, YOUR HONOR, IS THAT

8    THIS LANGUAGE EXCLUSIVELY THERETHROUGH WAS ADDED

9    DURING THE PROSECUTION OF THE PATENT IN THE

10   MAY 2006 AMENDMENT.  AND THE KEY ASPECT HERE,

11   YOUR HONOR, IS THAT THEY ADDED THE PHRASE "THROUGH

12   A USB PORT," AND THEN THEY ADDED ALSO THE PHRASE

13   "EXCLUSIVELY THERETHROUGH."

14           YOU COULD SHUT IT OFF, BILL.  WE ARE ON

15   LIMITED TIME.

16           THIS CLAIM, YOUR HONOR, IS DIRECTED TO

17   USB TO VGA CONVERTER.  IT'S DESIGNED TO CONNECT TO

18   A DISPLAY DEVICE.  AS YOU WILL SEE IN THE PAPERS

19   YOUR HONOR, AND WHAT DR. MIN ADMITTED, IS THAT ALL

20   THE SIGNALS ALREADY GO THROUGH THE USB CONNECTOR.

21   THE MEANING "EXCLUSIVELY THERETHROUGH" WAS DIRECTED

22   TO THE FUNCTION AND PURPOSE OF THE DEVICE WHICH WAS

23   TO PROVIDE USB DISPLAY SIGNALS TO A DISPLAY DEVICE.

24   AND EXCLUSIVELY THERETHROUGH WAS ADDED TO INDICATE

25   THAT THE CONVERTER EXCLUSIVELY RECEIVED DISPLAY

1    SIGNALS.  AND SO THAT WAS THEN PROVIDED TO THE

2    DISPLAY DEVICE.

3            THE COURT:  WHY WOULD THAT BE IMPORTANT?

4            MR. YOON:  YOUR HONOR, I DON'T KNOW

5    PLAINTIFF'S THEORY ON THAT, BUT I BELIEVE THAT HE

6    IDENTIFIED IT AS IMPORTANT.  I IDENTIFIED THE OTHER

7    ONE AS IMPORTANT.

8            THE COURT:  WHY IS IT IMPORTANT THAT IT

9    BE EXCLUSIVELY?

10            MR. YOON:  TWO THINGS, YOUR HONOR.

11            ONE IS THAT THIS INVENTION IS DIRECTED

12    TO -- AND I THINK WHAT ACTUALLY SUMS IT UP IS THAT

13    WHEN MY PARTNER, MS. SHANBERG, PUT UP THE TUTORIAL

14    WHERE SHE SHOWED THE HUB, AND THE HUB CONNECTED TO

15    A LOT OF DIFFERENT PERIPHERALS, YOU SAW THAT IN THE

16    PICTURE, AS OPPOSED TO WHAT THIS PATENT IS DIRECTED

17    TO WHICH IS A USB TO VGA, A 1 TO 1 CONVERSION WHERE

18    YOU SEND ONLY DISPLAY SIGNALS THROUGH.  I THINK

19    THAT MUST BE THE LEVEL OF CONCERN ON THE PART OF

20    THE PLAINTIFF.  THEY WANT TO COVER THESE BIGGER

21    HUBS AS OPPOSED TO AN ACTUAL USB TO VGA CONVERTER.

22            THE COURT:  OKAY.  THANK YOU.

23            MR. YOON:  THANK YOU, YOUR HONOR.

24            MR. CAULEY:  THANK YOU, YOUR HONOR.

25            THE COURT:  YOU ARE FREE.

1          MR. YOON:  THANK YOU.

2          THE COURT:  I AM REFERRING TO THE

3    REPORTER.

4          YOU'RE FREE TOO.

5          MR. CAULEY:  THANK YOU, YOUR HONOR.

6          THE COURT:  YOU ARE FREE TOO.  THANK YOU.

7          (WHEREUPON, THE PROCEEDINGS IN THIS

8    MATTER WERE CONCLUDED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25